**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BIOSCRIP, INC. SECURITIES LITIGATION | Civil Action No. 13-cv-6922-AJN |
| | CONSOLIDATED CLASS ACTION COMPLAINT |
| | **JURY TRIAL DEMANDED** |
| | ECF CASE |

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ......................................................................................2

        A.      BioScrip's Exjade Kickback Scheme ............................................3

        B.      BioScrip's PBM Services Scheme ................................................7

II.     THE CLAIMS ASSERTED IN THE COMPLAINT ................................9

III.    JURISDICTION AND VENUE ..............................................................10

THE EXCHANGE ACT CLAIMS .....................................................................11

IV.     THE EXCHANGE ACT PARTIES .........................................................11

        A.      Lead Plaintiff .............................................................................11

        B.      Additional Named Plaintiff .........................................................11

        C.      The Exchange Act Defendants ....................................................12

                1.      BioScrip .........................................................................12

                2.      The Officer Defendants ...................................................12

                3.      Kohlberg ........................................................................13

V.      FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS .........13

        A.      BioScrip's Exjade Kickback Scheme ...........................................14

                1.      Background on Exjade and the Drug's Distribution Network...................16

                2.      The Unlawful Scheme to Increase Exjade Sales Despite the Drug's Severe Side Effects .................................17

                3.      BioScrip Misleadingly Pushed Exjade Refills to Reap Significant Financial Rewards.................................19

                        a.      BioScrip Falsely Promoted Its Exjade Program as Patient-Focused and Clinically Beneficial .................................20

                4.      Novartis Increased Its Kickbacks to BioScrip to Continue Pushing Exjade .................................23

                5.      BioScrip Reaped Significant Financial Benefits from the Exjade Kickback Scheme and Submitted Thousands of False Claims for Medicare and Medicaid Reimbursement .................................26

i

6.       BioScrip Covered Up Its Illegal Exjade Kickback Scheme........................28

7.       Post-Class Period Developments: BioScrip Was Forced to Abandon Its Cover-Up and Finally Admit the Exjade Kickback Scheme .............................................................................................34

B.   BioScrip Also Covers Up Its Dying PBM Services Business .............................34

1.       BioScrip's PBM Services Business Segment and Its Critical Role for the Company ......................................................................................35

2.       BioScrip Concealed Problems That Were Battering the PBM Services Business................................................................................38

3.       BioScrip Began to Partially Disclose the Problems Affecting Its PBM Segment While Downplaying the Extent of Those Problems .........42

4.       The Company Further Partially Disclosed the Problems Affecting Its PBM Business While Continuing to Downplay the Extent of the Problems ......................................................................................44

5.       The Company Finally Disclosed the Truth About the PBM Business ........................................................................................45

C.   BioScrip Conducted Two Public Offerings While Perpetrating Its Exjade Kickback and PBM Schemes.................................................................................46

D.   Defendants Bogusz and Kohlberg Engaged in Extensive Insider Selling Just Before the Truth Was Revealed.................................................................47

VI.    DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS ..................................................................49

A.   The Quarter Ended September 30, 2012................................................................49

B.   The Year Ended December 31, 2012......................................................................51

C.   The Quarter Ended March 31, 2013 .....................................................................55

VII.   PARTIAL DISCLOSURES, MORE FALSE STATEMENTS, AND THE GRADUAL EMERGENCE OF THE FULL IMPACT OF DEFENDANTS' SCHEMES ................................................................................................57

A.   August 7, 2013: BioScrip Acknowledged Problems in Its PBM Services Segment.................................................................................................58

B.   September 23-24, 2013: BioScrip Disclosed the Government Investigation and Admitted to Continued Deterioration in PBM Services ................................60

C.   November 6, 2013: BioScrip Disclosed a $15 Million Estimated Liability With Regard to the Government Investigation and Finally Revealed the Full Truth About Its PBM Services Segment .......................................................63

VIII.  ALLEGATIONS CONFIRMING DEFENDANTS' SCIENTER ......................................66

IX.     DEFENDANT KOHLBERG CONTROLLED BIOSCRIP AND
        PARTICIPATED IN BIOSCRIP'S FRAUD ........................................................71

X.      LOSS CAUSATION ...........................................................................................74

XI.     PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET AND
        *AFFILIATED UTE* ..............................................................................................75

XII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS-
        CAUTION DOCTRINE ......................................................................................77

XIII.   CLASS ACTION ALLEGATIONS ....................................................................78

XIV.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT................................81

THE SECURITIES ACT CLAIMS ......................................................................................87

XV.     CLAIMS BROUGHT UNDER THE SECURITIES ACT ..................................87

        A.      The Securities Act Defendants .................................................................88

                1.      The Company .................................................................................88

                2.      Kohlberg ........................................................................................88

                3.      The Officer and Director Defendants ...........................................88

                4.      Underwriter Defendants .................................................................89

        B.      Background of the Securities Act Claims ................................................90

                1.      The April 2013 Offering ................................................................90

                2.      The August 2013 Offering .............................................................92

                3.      BioScrip's Participation in the Exjade Kickback Scheme.............93

                4.      The Collapse of BioScrip's PBM Business over the Course of 2013........95

        C.      The Offering Materials Contained Untrue Statements of Fact and Omitted
                Material Facts Necessary to Make the Offering Materials Not Misleading .........97

                1.      The April 2013 Offering Materials Contained Untrue Statements of
                        Fact About BioScrip's Participation in the Exjade Kickback
                        Scheme ...........................................................................................97

                2.      The April 2013 Offering Materials Omitted Material Facts
                        Regarding BioScrip's PBM Business ..........................................101

                3.      The August 2013 Offering Materials Contained Untrue Statements
                        of Fact About BioScrip's Participation in the Exjade Kickback
                        Scheme .........................................................................................102

| | | | |
|---|---|---|---|
| | 4. | The August 2013 Offering Materials Contained Untrue Statements of Fact About BioScrip's PBM Business | 104 |
| D. | | Class Action Allegations Relevant to the Securities Act Claims | 104 |
| E. | | Claims for Relief Under the Securities Act | 104 |
| XVI. | | PRAYER FOR RELIEF | 109 |
| XVII. | | JURY DEMAND | 110 |

The Fresno County Employees' Retirement Association ("Lead Plaintiff" or "Fresno") and additional named plaintiff the West Palm Beach Police Pension Fund (together with Lead Plaintiff, "Plaintiffs") bring this federal securities class action on behalf of themselves and all other persons and entities, other than defendants and their affiliates as specified below, who purchased or acquired the publicly traded common stock of BioScrip, Inc. ("BioScrip" or the "Company") between November 9, 2012 and November 6, 2013, inclusive (the "Class Period"), and persons and entities who purchased or otherwise acquired BioScrip's common stock pursuant or traceable to two registered public offerings conducted on or about April 19, 2013 (the "April 2013 Offering"), and August 13, 2013 (the "August 2013 Offering," and together with the April 2013 Offering, the "Offerings"), and who based on the conduct of defendants asserted herein, were injured thereby.

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, *inter alia*, the independent investigation of their counsel, Bernstein Litowitz Berger & Grossmann LLP. This investigation included, but was not limited to, a review and analysis of: (i) BioScrip's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of BioScrip's earnings conference calls and industry conferences; (iv) BioScrip's press releases and media reports; (v) economic analyses of BioScrip's common stock movement and pricing data; (vi) consultations with relevant experts; (vii) information obtained from former BioScrip employees throughout the course of counsel's investigation; (viii) the amended complaint filed by the United States Attorney's Office for the Southern District of New York against BioScrip on January 8, 2014 captioned *United States of America v. Novartis Pharmaceuticals Corporation and BioScrip, Inc.*,

1

1:11-cv-08196, ECF No. 62, and pending before the Honorable Colleen McMahon (the "Government Complaint"); (ix) the Stipulation and Order of Settlement and Dismissal as to BioScrip filed on January 8, 2014, in which BioScrip agreed to settle the action brought by the United States Attorney's Office for the Southern District of New York and admitted to many of the allegations set forth in the Government Complaint (the "Settlement Stipulation"), 1:11-cv-08196, ECF No. 41; and (x) other publicly available material and data identified herein. Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

I.      **INTRODUCTION**

1.      During the Class Period, BioScrip, a home-healthcare and pharmaceuticals company, violated the securities laws by simultaneously perpetrating two significant deceptive schemes on its investors. In the first scheme—the "Exjade Kickback Scheme"—as the Company has now admitted, BioScrip pushed a life-threatening drug on its patients in exchange for kickbacks from the drug's manufacturer in violation of myriad federal and state healthcare laws. This scheme resulted in an extensive government investigation that jeopardized the Company's ability to participate in Medicare and Medicaid, one of the Company's main sources of revenue. Moreover, BioScrip concealed the existence of this investigation for nearly a year. In the second scheme—the "PBM Scheme"—the Company concealed the fact that one of its most significant business segments, which accounted for nearly 20% of its revenue, was collapsing throughout 2013. Both the government investigation and the dying business segment put the Company at risk, but the Company refused to disclose the existence of either issue to investors until it was

absolutely forced to. As a result, investors were harmed when the truth was eventually revealed and the price of the Company's common stock declined precipitously as a result.

A.   **BioScrip's Exjade Kickback Scheme**

2.     As BioScrip admitted in the Settlement Stipulation with the United States Attorney's Office for the Southern District of New York, the Company colluded with Novartis Pharmaceuticals Corp. for five years to push Exjade, a drug with known, life-threatening side effects, on patients in exchange for tens of millions of dollars in kickbacks. The Company also engaged in a deliberate cover-up to prevent its patients and investors from learning the truth about this kickback scheme.

3.     The scheme started in 2007, when Novartis's sales of Exjade began to plummet. By that time, the drug's serious side effects, which included kidney and liver failure, were well known, causing physicians to stop prescribing Exjade and patients to stop taking it. Thus, as detailed in the Government Complaint, to meet its sales goals, Novartis made increasing Exjade prescription refills a "top strategic priority." To achieve this objective, Novartis threatened to cut off BioScrip's ability to dispense Exjade or, at a minimum, to send fewer Exjade prescriptions to BioScrip to fill unless BioScrip quickly increased its Exjade refill rates.

4.     BioScrip could not afford to lose its access to Exjade, which was one of the most profitable drugs it sold. Accordingly, in response to Novartis's threat, BioScrip immediately launched an intensive effort to push Exjade on its patients by creating a special "Exjade Team" to convince the drug's patients to refill their prescriptions and to encourage patients who had stopped taking Exjade to restart treatment. BioScrip issued this team a script that deliberately downplayed the drug's potentially fatal side effects, telling patients that Exjade could "cause some discomfort initially," but that such discomfort "usually resolves over time," and advising patients that they needed to merely "manage" their side effects.

3

5.      The Company's misrepresentations to its patients were successful, and Exjade sales skyrocketed. Novartis rewarded BioScrip by offering additional incentives to increase Exjade sales, including lucrative "rebates"—essentially bonuses for meeting sales goals. Novartis also gave BioScrip access to significantly more patient referrals than other pharmacy companies. As BioScrip admitted in the Settlement Stipulation, this preferential treatment was valuable because "more Exjade patients resulted in higher sales revenue, additional dispensing fees, and additional rebates." As a former member of BioScrip's Exjade Team explained it to the government, "keep[ing] Novartis happy" was BioScrip's "top priority." Indeed, according to a former BioScrip supervisor's testimony quoted in the Government Complaint, Novartis's system of "tying rebates and patient referrals to the number of refill shipments caused [BioScrip] to be focused exclusively on the number of order and refill rates, rather than on patient care."

6.      BioScrip admittedly participated in this lucrative kickback scheme for over five years. During that time, according to the Government Complaint and the Settlement Stipulation, the Company submitted more than 40,000 kickback-tainted reimbursement claims to Medicare and Medicaid, reaping tens of millions of dollars from the government in violation of anti-kickback laws and the False Claims Act.

7.      While this scheme was enormously profitable for the Company, it also put BioScrip in a precarious position. A violation of anti-kickback laws or the False Claims Act could cripple the Company, subjecting it to serious civil liability or criminal sanctions. The scheme could also result in BioScrip being expelled or suspended from the Medicare and Medicaid programs, which accounted for approximately 25% of the Company's annual revenue. In order to conceal the truth, BioScrip and its most senior officers—Defendants Richard M. Smith (its CEO), Hai Tran (its CFO), and Patricia Bogusz (its Vice-President of Finance)

(collectively, the "Officer Defendants")—repeatedly and falsely assured patients and investors that the Company complied with all state and federal healthcare laws. For example, these Defendants stated during the Class Period that "[o]ur management carefully considers the importance of . . . anti-kickback laws when structuring each company's operations and believes that each of our respective companies is in compliance therewith."

8.      BioScrip intensified its cover-up once it learned that the government was investigating its unlawful relationship with Novartis. Specifically, in 2011, a sealed *qui tam* complaint accused Novartis and BioScrip of violating anti-kickback laws and the False Claims Act. This spurred a non-public joint state-federal investigation by the U.S. Attorney's Office for the Southern District of New York, the U.S. Department of Justice, the Federal Bureau of Investigation, and other federal and state agencies. Then, in October 2012, the federal government served BioScrip with a civil investigative demand (the "Civil Investigative Demand"), which identified the factual grounds for the investigation and the laws that the Company was suspected of violating.

9.      Despite the significant risk that the government investigation posed to the Company, BioScrip deliberately concealed the investigation's existence from investors for nearly one year. During this time, the Defendants touted the fact that the government was investigating its *competitors* for violations of anti-kickback regulations, but failed to disclose that it had also already become the subject of a government investigation. Indeed, notwithstanding the fact that the government's Civil Investigative Demand had already been served on BioScrip, the Defendants only stated that, in the future, "[t]here can be no assurance that we will not receive subpoenas or be requested to produce documents in pending investigations."

10.     While hiding the existence of the government's investigation from its investors, BioScrip and its controlling shareholder, Defendant Kohlberg & Co. ("Kholberg")—which also had two seats on BioScrip's board—completed two public common-stock offerings in April and August 2013 for a total of over $250 million. Kohlberg alone realized over $130 million through these two offerings. These Defendants did not disclose the investigation in the offering materials that they filed with the SEC in connection with either offering.

11.     The truth about the Exjade Kickback Scheme began to be revealed on September 23, 2013, when the Company finally disclosed that the government was investigating its distribution of Exjade and its relationship with Novartis. This news immediately caused the Company's stock to drop almost 6% on enormous trading volume. But the Company downplayed both the investigation's extent—it had been going on for *almost a year* by that point—and its potential consequences. Instead, BioScrip portrayed the government's investigation as a preliminary inquiry that would have little or no impact on the Company. This was a lie.

12.     Indeed, on November 6, 2013, BioScrip shocked investors when it disclosed a significant $15 million estimate of its liability as a result of the government's investigation. This $15 million estimate was material to BioScrip, as the Company had no cash on hand, and any liability could threaten the Company's solvency. Ultimately, this was the exact amount the Company agreed to pay to settle the government action. The Settlement Stipulation (to which BioScrip agreed after the end of the Class Period) makes clear that this settlement amount was the absolute maximum penalty BioScrip could afford to pay given its financial position, stating: "BioScrip lacks the financial wherewithal to pay certain damages and penalties sought by the United States in connection with its claims against BioScrip." BioScrip's stock price fell by $1.54, or over 20%, in response to BioScrip's November 6, 2013 disclosures.

### B.    BioScrip's PBM Services Scheme

13.    BioScrip's Pharmacy Benefit Management ("PBM") Services segment, which distributed cards that allowed patients to purchase medications from pharmacies at discounted rates, was critically important to the Company. It accounted for nearly 20% of the Company's annual revenue and 40% of the Company's EBITDA—a critical metric relied upon by analysts because it focuses on the profitability of the Company's operations. It also provided "strong cash flows" that the Company reinvested in its Infusion Services segment, which provides services for administering drugs outside hospitals (typically in patients' homes). As BioScrip's CEO, Defendant Richard Smith, described the Company's PBM business in August 2012, PBM Services is "a good business with good margins."

14.    In early 2013, however, PBM Services experienced a significant contraction in its business. By no later than March 31, 2013, the Company lost a major PBM Services client that accounted for roughly 33% of the segment's quarterly revenue. Similarly, by no later than the second quarter of 2013, the segment was suffering from significant cash-flow problems, which resulted from a material reduction in marketing efforts by third-party brokers the Company used to market its discount cards. These problems materially affected the segment's earnings.

15.    Instead of disclosing these problems, BioScrip kept them secret. In fact, BioScrip capitalized on its inflated stock price to launch the Company's April 2013 Offering and assured investors that the PBM Services segment was healthy and operating at a "flat" rate.

16.    Only after BioScrip and Kohlberg had already benefited from the Company's inflated stock price by raising nearly $170 million in the April 2013 Offering did the Company begin to disclose the truth about the problems plaguing its PBM Services segment. The truth began to be revealed in August 2013, when BioScrip reported what the market called "ugly" second-quarter earnings, including a shocking $10.4 million revenue decline for the PBM

segment. The Company and the Officer Defendants—who were all involved in managing this segment—emphatically denied any long-term downturn in the business, stating that "the market for these cards [is] *not* going away."[1]  Even though the Company attempted to reassure investors, the Company's stock price plummeted over $3.00 per share, or 18%, on August 8, 2013 on extraordinary volume.

17.    Shortly thereafter, Kohlberg sold approximately 6.9 million shares of the Company's common stock in the August 2013 Offering for proceeds of almost $90 million. Again, in connection with this Offering, Defendants did not disclose the true problems facing BioScrip. Rather, BioScrip incorporated its previously issued false statements in the offering materials.

18.    Notwithstanding BioScrip's reassurances, five weeks later, on September 24, 2013, BioScrip disclosed even more bad news concerning the PBM Services segment, announcing that "PBM continues to show signs of risk" and that the Company was taking "lumps and . . . body blows from the PBM business." Even so, Defendant Tran falsely reassured investors that PBM volumes "were steady" for the third quarter, which had only four business days remaining. Tran also emphasized the fact that the Company had just received some "very high volume new clients." In reality, and unbeknownst to investors, PBM Services' volume was continuing to decrease throughout the third quarter.

19.    As a result of the Company's September 23 and 24 disclosures of both the problems affecting its PBM Services business and the government investigation into its Exjade kickback scheme, the Company's share price declined another 23%, or $2.60 per share, over a two-day trading period, wiping out over $175 million in shareholder value.

---

[1] All emphasis is added unless otherwise indicated.

20.     The truth about BioScrip's PBM Services business was finally revealed on November 6, 2013, when the Company released its third-quarter results. At that time, the Company disclosed that it had suffered its third straight quarterly decline in PBM Services revenue. The next day, Tran admitted on an investor conference call that, contrary to his statements a little over a month earlier, "[o]ur PBM services segment volume continues to weaken."

21.     Investors were shocked at the simultaneous revelation of this further decline in BioScrip's PBM business and the $15 million estimated liability for BioScrip's Exjade Kickback Scheme. As set forth above, the Company's stock price dropped more than 20% on this news. In total, as a direct result of the Exjade Kickback and PBM Schemes, BioScrip's stock price declined from a Class Period high of $17.23 to close at $5.65 on November 7, 2013, a drop of $11.58, or more than *67%*.

22.     By this action, Plaintiffs (on behalf of themselves and the Class) seek to recover damages for the substantial losses they have suffered as the truth about Defendants' false and misleading statements and omissions came to light.

## II.     THE CLAIMS ASSERTED IN THE COMPLAINT

23.     Plaintiffs assert two sets of claims on behalf of the Class. First, Plaintiffs allege securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") against BioScrip and its executive officers Smith, Tran, and Bogusz. These claims are based on Defendants' knowing or reckless violation of the Exchange Act during the Class Period. Plaintiffs also assert control-person claims under Section 20(a) of the Exchange Act.

24.     The second set of claims arises under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") against those Defendants who are statutorily liable for strict

liability or negligence for materially untrue statements and misleading omissions made in the Shelf Registration Statement and Offering Materials (defined in ¶¶ 30, 277, and 283) filed in connection with the Offerings. Plaintiffs also assert control-person claims under Section 15 of the Securities Act. Plaintiffs expressly disclaim any allegations of scienter in these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made.

## III.   JURISDICTION AND VENUE

25.     The claims asserted herein arise under: (i) Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) ("Rule 10b-5"); and (ii) Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77*l*, and 77*o*).

26.     This Court has jurisdiction over the subject matter of this action under Section 27(a) of the Exchange Act (15 U.S.C. § 78aa(a)), Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), and 28 U.S.C. §§ 1331 and 1337.

27.     Venue is proper in this Judicial District under § 27(a) of the Exchange Act (15 U.S.C. § 78aa(a)), § 22(a) of the Securities Act (15 U.S.C. § 77v(a)), and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, many of the Underwriter Defendants (defined below in ¶275 maintain their executive offices or other offices within this Judicial District.

28.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

**THE EXCHANGE ACT CLAIMS**

**IV.     THE EXCHANGE ACT PARTIES**

     **A.     Lead Plaintiff**

     29.     Lead Plaintiff the Fresno County Employees' Retirement Association ("Fresno") provides retirement benefits for the employees of the County of Fresno, Superior Courts of California in Fresno, and other participating agencies. Fresno manages billions of dollars in assets on behalf of its members. During the Class Period, and as set forth in the schedule attached hereto as Exhibit A, Fresno purchased stock in BioScrip and suffered substantial damages as a result of the violations of the securities laws alleged herein. On December 19, 2013, this Court appointed Fresno to serve as Lead Plaintiff in this consolidated securities class action.

     **B.     Additional Named Plaintiff**

     30.     Plaintiff West Palm Beach Police Pension Fund ("West Palm Beach") provides retirement benefits for the employees of the City of West Palm Beach Police Department. West Palm Beach manages approximately $238 million in assets on behalf of its members. During the Class Period, and as set forth in the schedule attached hereto as Exhibit B, West Palm Beach purchased stock in BioScrip, both throughout the Class Period and pursuant or traceable to the Company's April 19, 2013 public offering pursuant to a shelf registration statement no. 333-187336 that BioScrip filed with the SEC on Form S-3 on March 18, 2013, as amended on Form S-3/A on April 2, 2013 (the "Shelf Registration Statement"), under which both the April 2013 and August 2013 Offerings were made, and has been damaged thereby.

11

### C.     The Exchange Act Defendants

#### 1.     BioScrip

31.     Defendant BioScrip is a company incorporated under the laws of Delaware, with its principal executive offices located at 100 Clearbrook Road, Elmsford, New York 10523. The Company's common stock is traded on the NASDAQ under the ticker symbol "BIOS." BioScrip is a healthcare company that now specializes in home-based medical treatments. The Company also offers prescription discount cards, which allow cardholders to purchase prescription medications at discounted prices, through its PBM Services operating segment. Of relevance to the claims asserted herein, the Company also operated specialty pharmacies that dispensed medications meant to treat a variety of serious and chronic medical ailments, such as cancer, HIV/AIDS, and multiple sclerosis.

#### 2.     The Officer Defendants

32.     Defendant Richard M. Smith became the Company's President and Chief Operating Officer in January 2009, and was appointed a director of the Company in September 2009. In January 2011, Smith became the Company's CEO. Smith signed each of BioScrip's Form 10-Ks and the Sarbanes-Oxley certifications contained in each of BioScrip's Form 10-Ks and 10-Qs that are discussed below.

33.     Defendant Hai V. Tran has been the Company's Senior Vice President, CFO, and Treasurer since May 2012. Defendant Tran signed each of BioScrip's Form 10-Ks and the Sarbanes-Oxley certifications contained in each of BioScrip's Form 10-Ks and 10-Qs that are discussed below.

34.     Defendant Patricia Bogusz was at all relevant times the Company's Vice President of Finance. Bogusz signed each of BioScrip's Form 10-Qs that are discussed below.

35.     Defendants Smith, Tran, and Bogusz are collectively referred to herein as the "Officer Defendants."

### 3.     Kohlberg

36.     Defendant Kohlberg & Co., LLC. ("Kohlberg") is a private-equity firm that advises or manages funds including Kohlberg Management V, L.L.C., Kohlberg Investors V, L.P., Kohlberg Partners V, L.P., Kohlberg TE Investors V, L.P., and KOCO Investors V, L.P. (collectively, the "Kohlberg Funds"), which beneficially owned approximately 26% of BioScrip's outstanding stock at the time of the April 2013 Offering. Kohlberg's offices are located at 111 Radio Circle, Mount Kisco, NY 10549. Under a 2010 stockholders' agreement, Kohlberg was entitled to and did elect two members of BioScrip's Board of Directors during the Class Period. Specifically, throughout the Class Period, Samuel P. Frieder, Kohlberg's Managing Partner, and Gordon H. Woodward, Kohlberg's Chief Investment Officer, served as Kohlberg's two representatives on BioScrip's eight-member Board. Kohlberg thus controlled BioScrip, as more fully alleged below.

37.     Collectively, BioScrip, Kohlberg, and the Officer Defendants are referred to as the "Exchange Act Defendants."

## V.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

38.     BioScrip is presently a national provider of home-healthcare services. Until May 2012, the Company also operated a specialty-pharmacy division that dispensed medications to its patients for serious, chronic ailments such as cancer, HIV/AIDS, and multiple sclerosis. As set forth below, BioScrip distributed the Exjade drug through its specialty-pharmacy division and continued to do so for more than five years until May 2012, when BioScrip sold this division. Significantly, BioScrip retained its liabilities for that division as part of this sale. As the Company acknowledged in its 2012 Form 10-K, after the sale, BioScrip remained "subject to

13

claims by, and liabilities to, various stakeholders or other parties, including . . . regulatory authorities . . . , resulting from the conduct" of the specialty-pharmacy division that occurred before the sale.

39.     Following the sale, BioScrip restructured itself into three operating segments: "Infusion Services," "Home Health Services" and "PBM Services." BioScrip's Infusion Services segment offers services, medications, and equipment related to dispensing and administering infusion-based drugs outside hospitals (typically in patients' homes). The Company's Home Health Services segment primarily provides private-duty nursing and hospice services. The Company's PBM Services segment primarily distributes discount prescription cash cards that allow uninsured or underinsured cardholders to purchase medications from pharmacies at discounted prices.

40.     As explained in detail below, during the Class Period, BioScrip engaged in two cover-ups related to its specialty pharmacy division's distribution of Exjade and its PBM Services segment's collapsing business.

**A.      BioScrip's Exjade Kickback Scheme**

41.     Both before and during the Class Period, BioScrip repeatedly emphasized its strict compliance with federal and state laws. This was significant because the healthcare industry is heavily regulated, and the consequences of not complying with the numerous applicable federal and state laws are potentially devastating. For example, as BioScrip itself repeatedly acknowledged in its SEC filings, a company that violates federal or state healthcare laws could be subject to civil or criminal liability and could lose access to Medicare and Medicaid reimbursements. As set forth below, Medicaid and Medicare reimbursements accounted for approximately 25% of BioScrip's annual revenues, and thus any violation of the healthcare laws seriously jeopardized the Company's business.

42.     BioScrip therefore made clear to its investors, patients, and customers that it was devoted to compliance. As Defendant Smith stated on the Company's August 8, 2011 investor call, "[e]nsuring that a compliance culture, training, practices and procedures are effective, is of the highest priority every day at BioScrip." The Company also repeatedly stated in its SEC filings both before and during the Class Period that BioScrip's "[m]anagement strives to maintain the Company in substantial compliance with all existing laws and regulations material to the operation of its business" and that the Company was in compliance with anti-kickback laws and the False Claims Act.

43.     In reality, a recent government investigation into BioScrip's relationship with pharmaceutical giant Novartis has uncovered that the Company's purported compliance with the laws was a lie. As BioScrip admitted on January 8, 2014, BioScrip pushed patients to use Novartis's specialty drug Exjade in order to increase its own profitability to the direct detriment of its patients and in violation of the healthcare laws.

44.     Specifically, a complaint filed by the United States Attorney for the Southern District of New York on January 8, 2014 (defined above as the "Government Complaint")— many of whose factual allegations BioScrip has now admitted—provides detailed information regarding a longstanding unlawful kickback scheme perpetrated by BioScrip and Novartis before and during the Class Period. The Government Complaint relies on testimony and statements from numerous employees and executives at both BioScrip and Novartis, including nurses, account management executives, and medical assistants who were members of BioScrip's Exjade Team. The Government Complaint also cites numerous documents, including internal files, presentations, emails, and marketing materials regarding Exjade from both Novartis and BioScrip.

15

45.     The government's investigation revealed that for over five years, from 2007 until 2012, BioScrip called patients who had been prescribed Exjade, a drug with severe and sometimes even fatal side effects, and—under the guise of offering "education" or "counseling"—pushed those patients to order refills of the drug while downplaying the drug's side effects. BioScrip engaged in this practice in exchange for significant kickbacks from Novartis, including rebates and increased patient referrals, which increased its revenues by tens of millions of dollars. BioScrip's scheme operated in direct violation of federal and state anti-kickback laws and the False Claims Act. As the Government Complaint makes clear, even though BioScrip knew that the anti-kickback laws prohibited it from receiving kickbacks to promote Exjade refills, the Company disregarded that prohibition, choosing profits over its duty to comply with the law.

### 1.     Background on Exjade and the Drug's Distribution Network

46.     Exjade is an iron-chelation drug that helps remove iron from a patient's body. It was approved by the Food and Drug Administration ("FDA") in November 2005 for use in treating "chronic iron overload due to blood transfusions . . . in patients 2 years of age and older." Repeated blood transfusions can lead to a build-up of iron in the body, which may cause damage to organs such as the liver or pancreas, and Exjade was designed to treat that problem.

47.     When Novartis launched the drug in 2005, it established an exclusive distribution system to process and fill almost all Exjade prescriptions. This system, which Novartis called the EPASS ("Exjade Patient Assistance and Support Services") network, included three pharmacy companies that would be responsible for dispensing the drug.

48.     BioScrip was accepted by Novartis into the EPASS network in November 2005 along with two other pharmacy companies (Accredo Health Group, Inc. and US Bioservices). These three EPASS pharmacy companies were responsible for sending Exjade to patients,

contacting the patients to solicit refill orders, and confirming that Exjade shipments were received. In addition, these pharmacy companies submitted claims for reimbursement on behalf of the patients to their insurers, including Medicare and Medicaid.

49.     Novartis had ultimate control over how Exjade patients and prescriptions were distributed among the three pharmacy companies in the EPASS network. Generally, to prescribe Exjade, physicians submitted enrollment forms to EPASS. While some insurance companies or physicians required EPASS to refer patient prescriptions to a specific EPASS pharmacy, approximately half of the patient prescriptions received by EPASS were not designated for a particular pharmacy. Novartis distributed these undesignated patients (the "undesignated patient referrals") among the three pharmacy companies at its sole discretion.

### 2.     The Unlawful Scheme to Increase Exjade Sales Despite the Drug's Severe Side Effects

50.     The crux of the Exjade kickback scheme, as detailed in the Government Complaint and admitted by BioScrip in the Settlement Stipulation, involved BioScrip pushing Exjade on patients in exchange for financial rewards from Novartis. The scheme was designed to achieve Novartis's sales goals for the drug and increase both Novartis's and BioScrip's earnings to the detriment of innocent patients and, ultimately, unsuspecting investors.

51.     For Novartis and, in turn, for BioScrip, maximizing the number of refills for each patient was essential to meeting sales targets and profit objectives for Exjade. This was because the population of potential Exjade patients was "very small," comprising only "about 15 out of [every] 100,000 people" due to the very specific nature of the drug and the limited pool of individuals who needed it. Thus, even before the drug was launched, one of Novartis's imperatives was to "maximiz[e] the life time value of each patient" by maximizing the number of refills each patient ordered.

52.     Approximately one year after the drug's launch, however, Novartis was unable to generate the desired number of refills per patient. As BioScrip knew, one of the primary reasons why refill orders were decreasing was the drug's severe, even life-threatening side effects, which were much more serious than initially thought.

53.     According to pre-approval clinical studies, Exjade's most frequent side effects included vomiting, nausea, and abdominal pain. But after patients began to use Exjade outside clinical studies, doctors reported that Exjade caused more serious side effects, including kidney failures, liver failures, gastrointestinal ulceration and bleeding, and toxicity at higher doses for patients with lower blood iron levels. A September 2007 *Bloomberg* article stated that the FDA found that Exjade "was linked to at least 17 deaths in almost eight months" and that "[o]verall, 108 cases of serious side-effects were reported."[2]

54.     BioScrip has admitted in the Settlement Stipulation that it knew by 2007, based on patient data it was collecting for Novartis, that a significant percentage of physicians and patients were discontinuing Exjade therapy because the drug's side effects were so severe and difficult to manage. As a result, a significant percentage of prescribers and patients decided against ordering refills.

55.     At the same time, the new Exjade patient population was shifting away from patients who received regular blood transfusions towards patients who received only intermittent blood transfusions. This shift negatively affected sales because intermittent-transfusion patients did not need to use Exjade for prolonged periods. As the head of Novartis's Exjade marketing

---

[2] These safety concerns ultimately grew so dire that, in January 2010, Exjade was required to feature a "Black Box warning"—the strongest warning for a prescription drug the FDA can require. The Black Box warning stated that "Exjade may cause" kidney failure, liver failure, and gastrointestinal hemorrhage, and that "[i]n some reported cases these reactions were fatal."

team acknowledged in a February 2007 e-mail detailed in the Government Complaint, the intermittent-transfusion patients were more likely to stop getting Exjade refills "after several months" because they would "have almost normalized iron values."

56.      For Novartis, the prospect of fewer refills per patient represented a "key issue" affecting its ability to achieve its Exjade sales target for 2007, and by March 2007 the Exjade marketing team identified "improv[ing] refill rates" and "generat[ing] re-starts" (*i.e.*, getting patients who discontinued Exjade therapy to resume ordering refills) as one of its top three priorities. Improving refill rates was the "top strategic priority" for the Exjade marketing team throughout the rest of 2007 and 2008, and Novartis records show that getting Exjade patients to order more refills continued to be a key marketing objective from 2009 to 2012.

57.      To increase the refill rate and maximize Exjade sales, Novartis used threats and substantial financial kickbacks to induce BioScrip to initiate and continue an unlawful program designed to get Exjade patients to order more refills and resume using the drug if they had stopped taking it.

### 3.      BioScrip Misleadingly Pushed Exjade Refills to Reap Significant Financial Rewards

58.      In February 2007, Novartis told BioScrip that the level of refill orders among BioScrip's Exjade patients was below the refill levels achieved by the other two EPASS pharmacy companies. Novartis put BioScrip on a 45-day probationary period from February to April 2007, during which BioScrip had to increase the refill level among its Exjade patients and convince Exjade patients who had stopped ordering refills to resume ordering. As BioScrip admitted in the Settlement Stipulation, Novartis made clear that if BioScrip did not increase its refill levels, Novartis would "cut off the flow of undesignated patient referrals to BioScrip and, potentially, remove BioScrip from EPASS."

59.     Given how profitable Exjade was to BioScrip, the Company could not risk losing its EPASS access or the patient referrals. Indeed, according to Confidential Witness ("CW") 1, who was an Exjade Patient Care Consultant at BioScrip from July 2011 until June 2012, Exjade was one of the most profitable drugs for BioScrip. Similarly, as detailed in the Government Complaint and admitted to in the Settlement Stipulation, the Exjade patient referrals were "very valuable to BioScrip: getting more Exjade patients translated to higher sales, larger Medicare and Medicaid reimbursements, higher dispensing fees, and more rebates from Novartis."

60.     Accordingly, BioScrip needed to make sure it improved its Exjade numbers in order to protect its revenue. BioScrip has admitted in the Settlement Stipulation that, in response to Novartis's threat, it launched an intensive effort to increase its Exjade refills and restart patients who had stopped ordering Exjade. BioScrip created an Exjade Team—including a licensed practical nurse, medical assistants, and several customer-service representatives—to work exclusively on this effort.

61.     BioScrip developed a specific protocol requiring its Exjade Team to make: (i) "assessment calls" or "survey calls," during which patients were told that they were receiving clinical counseling and education about Exjade; (ii) calls to patients who were taking Exjade to encourage them to order refills; and (iii) "recovery" calls to encourage patients who had stopped ordering Exjade to "restart." BioScrip named this protocol "ScripCare."

        **a.     BioScrip Falsely Promoted Its Exjade Program as
               Patient-Focused and Clinically Beneficial**

62.     As BioScrip made its calls to solicit patient usage of Exjade—a practice that BioScrip continued throughout the scheme—it consistently framed its activities as "clinical education" and "counseling" for its Exjade patients.

63.     As the Government Complaint revealed, members of the Exjade Team calling new patients were directed to tell the patients that BioScrip was assigning a nurse to call them to share information "about your new [Exjade] therapy, your disease and how to best manage taking your Exjade." The patients were also told that the purpose of the calls was "to provide you with the best possible care while taking . . . Exjade." The Exjade Team members encouraged the patients to call BioScrip "to discuss symptoms you are experiencing or if you are concerned about a side effect."

64.     BioScrip characterized its Exjade marketing activities as emblematic of its commitment to patient care. For example, a 2009 marketing brochure stated that BioScrip's program for Exjade (referred to as the "Iron Overload Care" program in the brochure) "is patient centric, disease focused and therapy conscious." The brochure further claimed that this program "provides consistent assessment, education, and intervention resulting in improved patient healthcare delivery."

65.     Contrary to how BioScrip promoted its Exjade program, the program was not focused on benefiting patients. Instead, BioScrip was pressuring patients to order refills by giving the patients biased information that emphasized the drug's benefits while understating the severity of its side effects. Significantly, as admitted in the Settlement Stipulation, the activities and approach of the BioScrip Exjade Team were discussed frequently in both monthly calls and quarterly meet-ups between and among BioScrip and Novartis from 2007 to 2010.

66.     While reports of Exjade's severe side effects increased, BioScrip's Exjade Team was directed by the Company to downplay the side effects when speaking with patients. Specifically, BioScrip promoted Exjade refills by focusing on the less-serious side effects and ignoring the more-serious ones. As BioScrip admitted in the Settlement Stipulation, from mid-

2007 until November 2010, members of the Exjade Team were given prepared scripts for making calls to new patients to discuss Exjade therapy (the "Call Scripts"). With regard to side effects, the Call Scripts directed BioScrip's Exjade Team members to falsely tell patients that Exjade could "cause some discomfort initially," but that the discomfort "usually resolves over time."

67.     Significantly, the talking points in the Call Scripts did not disclose that, as the FDA-approved package insert indicated, Exjade treatment had been linked to a lengthy list of severe side effects, including "acute renal failure [that was] fatal in some patients and requir[ed] dialysis in others," "fatal GI [gastrointestinal] hemorrhages," and "non-fatal upper GI irritation, ulceration and hemorrhage." In fact, as former BioScrip employees told the government, they were directed to tell Exjade patients who were experiencing side effects to continue ordering refills and to just "manage" the side effects. As BioScrip admitted in the Settlement Stipulation, neither BioScrip nor Novartis changed these Call Scripts from at least January 2008 until November 2010. In other words, at no time during this nearly three year period did BioScrip update the Call Scripts to address Exjade's severe side effects.

68.     Further, the team that was calling patients to purportedly "counsel" them on Exjade and help "manage" the drug's side effects did not have proper training or knowledge about the drug. For example, the government investigation revealed that the licensed practical nurse on the Exjade Team was assigned to call Exjade patients "immediately upon starting work at BioScrip," was not "given training on Exjade or its side effects," and "did not know [which] side effects were typical or unusual." Nonetheless, BioScrip directed her to "emphasize to patients the importance of staying on Exjade" and "counsel patients to manage any side effects they had." Similarly, a former medical assistant on the Exjade Team explained to the government that if patients reported "side effects . . . such as diarrhea or vomiting," they were told "that they

should continue taking Exjade and wait for the side effects to pass." CW 2, who was a Patient Care Coordinator at BioScrip from 2007 until October 2012 and a member of the Company's Exjade Team, stated that the BioScrip Exjade Team members were directed by both BioScrip and Novartis management on how to "explain" the drug and "discuss" its side effects with patients. Accordingly, CW 2 stated that when discussing the drug with patients, CW2 did not proactively bring up Exjade's severe side effects. Rather, CW2 would simply ask if the patients were experiencing anything out of the ordinary or ask if things were going okay. Indeed, CW 2 said that his primary responsibility and goal as a member of the BioScrip Exjade Team was to fill prescriptions of the drug.

69.     Former BioScrip employees have made clear that, contrary to BioScrip's public statements regarding the Exjade program's focus on providing optimal patient care, the Company was exclusively focused on pushing the drug to make money. As a former BioScrip supervisor explained under oath to the government, BioScrip was "focused exclusively on the number of order and refill rates, rather than on patient care." Similarly, CW 2 stated that the Exjade Team "often felt that we were pushing the drug for profitability as much as patient care." Indeed, as detailed in the Government Complaint, a former BioScrip Exjade Team member explained that "keep[ing] Novartis happy" was BioScrip's "top priority." In other words, the Company was focused on financial rewards from Novartis and not on patient care.

### 4.     Novartis Increased Its Kickbacks to BioScrip to Continue Pushing Exjade

70.     The Exjade Team's efforts were massively successful. By April 2007, BioScrip's intensive efforts to recommend refills had resulted in a significant increase in the refill level among its Exjade patients, and, in just 45 days, BioScrip employees had convinced 139 unsuspecting patients to resume ordering Exjade. BioScrip committed to continue its ScripCare

program "to keep[] these patients on drug therapy," and by September 2007 the refill levels at BioScrip were higher than at the other two EPASS pharmacy companies.

71.     Novartis was happy with BioScrip's success in pushing the drug. Indeed, as compared to the other EPASS pharmacy companies, BioScrip generated a $2,000 net benefit per patient for Novartis, and Novartis therefore worked to ensure that the arrangement continued. Novartis offered the Company three types of kickbacks to cement the Company's commitment to continuing its vigorous promotion of Exjade refills.

72.     First, as BioScrip admitted in the Settlement Stipulation, as of January 2008, Novartis increased the standard rebates that BioScrip earned for each Exjade shipment from $13 to $20—an increase of more than 50%—in recognition of BioScrip's performance and, as BioScrip understood, to encourage BioScrip to continue its Exjade Team's efforts. Months later, Novartis further increased BioScrip's per-shipment rebate another $10 to $30 per shipment. Thus, in less than a year, BioScrip's Exjade rebate increased by $17, or *130%*, as a reward for pushing the drug on the most patients.

73.     Second, as BioScrip admitted in the Settlement Stipulation, by November 2008, BioScrip agreed to a new patient-allocation plan proposed by Novartis, which linked the percentage of undesignated patient referrals for BioScrip to its refill rates as measured by a Novartis-created "Exjade Scorecard." As it sounds, the Exjade Scorecard kept "score" of the amount of Exjade BioScrip (and the other two EPASS pharmacies) dispensed to patients. Under that plan, Novartis allocated 60% of all undesignated patients to BioScrip for the first half of 2009 (with the other two EPASS pharmacy companies splitting the remaining 40%) because, according to the September 2008 Exjade Scorecard, BioScrip had generated the highest refill

rates among the three EPASS pharmacy companies. For the second half of 2009, BioScrip also received the majority of undesignated patient referrals based on its high refill rates in early 2009.

74.     Third, Novartis began to offer BioScrip kickbacks under the guise of further "performance rebates" based on the number of Exjade orders that BioScrip shipped to patients each quarter. These rebates were separate and additive to the standard rebates and other financial incentives that BioScrip was receiving from Novartis. BioScrip admitted in the Settlement Stipulation that from 2008 to 2010, these "performance rebates" were conditioned on BioScrip meeting or exceeding quarterly shipment goals set by Novartis. According to CW 2, there was always a push at BioScrip to meet these quarterly numbers. Thus, the Company was constantly striving to get these rebates from Novartis.

75.     Because of these significant unlawful financial benefits, BioScrip continued to promote Exjade refills in support of Novartis's marketing goals. For example, the Government Complaint detailed that, in a February 2009 strategy presentation, a BioScrip account-management executive summarized what Novartis had conveyed regarding its marketing goals and tactics for pushing Exjade, and then declared that the "BioScrip Strategic Plan [for Exjade] is to mirror and support Novartis priorities." As a result, BioScrip's Exjade Team continued to call patients and—under the guise of offering education, reminders, and clinical counseling—to encourage the patients to order Exjade refills or to "restart" on Exjade. As a former Exjade Team member told the government, meeting Exjade shipment goals in order to "make Novartis happy"—and not patient care—was BioScrip's top priority.

76.     This unlawful conduct continued for the next 40 months, with Novartis continuing to exercise its control over undesignated patient referrals to influence BioScrip's performance in pushing the drug, and with BioScrip striving to maximize the kickbacks that it was receiving

from Novartis. Indeed, in March 2011, Novartis placed the Company under "corrective action" due to its lower refill rates, and BioScrip immediately responded by increasing its efforts to sell the drug. By late 2011, BioScrip's refill rates had increased significantly, and Novartis again allocated 60% of its undesignated patient referrals to BioScrip as a reward. The scheme only ended when BioScrip sold its specialty-pharmacy division in May 2012.

5. **BioScrip Reaped Significant Financial Benefits from the Exjade Kickback Scheme and Submitted Thousands of False Claims for Medicare and Medicaid Reimbursement**

77.     BioScrip realized higher Exjade sales, greater Medicare and Medicaid reimbursements, larger dispensing fees, and more kickbacks from Novartis as a result of its participation in the Exjade Kickback Scheme. According to the Government Complaint, BioScrip realized hundreds of thousands of dollars on a quarterly basis as a result of this fraudulent scheme. Thus, BioScrip realized tens of millions of dollars from this scheme that spanned more than 21 fiscal quarters.

78.     As BioScrip profited, Medicare and Medicaid were made to bear the scheme's cost. The government investigation revealed that Medicare Part D plans (which provide prescription-drug benefits) reimbursed BioScrip for more than 37,900 Exjade claims submitted during the course of the Exjade Kickback Scheme. In total, Medicare Part D plans reimbursed tens of millions of dollars for BioScrip's fraudulent Exjade claims.

79.     Medicaid state agencies similarly reimbursed BioScrip for tens of thousands of Exjade claims submitted during the Exjade Kickback Scheme. For example, between February 2007 and May 2012, New York Medicaid alone reimbursed BioScrip for over 4,800 Exjade claims. BioScrip also submitted tainted Exjade claims to Medicaid state agencies in numerous other states, including Maryland, Ohio, Washington, and Kentucky. In total, the Medicaid state

agencies reimbursed tens of millions of dollars for claims submitted in connection with the Exjade kickback scheme.

80.     These reimbursements were material for BioScrip. On average, the Company receives approximately 25% of its annual revenue from Medicare and Medicaid reimbursements. The following chart details the percentage of BioScrip's revenue that was derived from Medicare, Medicaid, or other government-sponsored healthcare programs from 2007 through 2012:

| Fiscal Year | Total Company Revenue | Amount of Revenue Derived from Medicare, Medicaid or Other Government-Sponsored Healthcare Programs | Percentage of Company Revenue Derived from Medicare, Medicaid or Other Government-Sponsored Healthcare Programs |
|---|---|---|---|
| 2007 | $1.198 billion | $287 million | 24% |
| 2008 | $1.402 billion | $350 million | 25% |
| 2009 | $1.33 billion | $332 million | 25% |
| 2010 | $1.639 billion | $262 million | 16% |
| 2011 | $1.818 billion | $400 million | 22% |
| 2012 | $663 million | $219 million | 33% |

81.     BioScrip's Exjade-related Medicare and Medicaid claims were false and ineligible for reimbursement because each claim was tainted by the kickbacks BioScrip received from Novartis. By submitting these kickback-tainted claims for Medicare and Medicaid reimbursement, BioScrip violated a number of state and federal laws. Indeed, the federal Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a-7b, and similar state anti-kickback laws and regulations expressly prohibit payments by a pharmaceutical company to pharmacies to induce them to recommend or purchase the company's drugs when (as here) the drugs are reimbursed by

a federal health-care program like Medicare or Medicaid. Similarly, the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729—3733, imposes treble-damages liability to the United States on an individual or entity that knowingly presents a false or fraudulent claim for payment or approval to the government (including where a company, as here, falsely certifies compliance with the AKS in connection with a claim submitted to a federally funded insurance program). Violating these laws can result in substantial criminal penalties, as well as suspension or exclusion from the Medicare and Medicaid programs.

82.     These laws are meant to protect a vulnerable patient population by prohibiting companies that can influence health care decisions from accepting remuneration in exchange for pushing goods and services that may be medically unnecessary, of poor quality or even harmful on patients. Indeed, the government made it clear as early as 1994 that the AKS prohibited pharmaceutical manufacturers (like Novartis) from offering financial incentives to pharmacy companies (like BioScrip) to induce the increased use of prescription drugs (like Exjade) covered by federal healthcare programs.

83.     Significantly, the Government Complaint makes clear that, despite the Company's violations of the FCA and the anti-kickback laws, Defendants *affirmatively certified* the Company's compliance with those laws to both the government and its business partners.

### 6.     BioScrip Covered Up Its Illegal Exjade Kickback Scheme

84.     During the five years it was actively engaged in the Exjade Kickback Scheme, BioScrip never disclosed the true nature of its relationship with Novartis or its true drug-dispensing practices. Instead, the Company repeatedly falsely represented to investors and others that it complied with healthcare regulations, including the AKS and the FCA, even though it was secretly pushing the drug on unsuspecting patients in exchange for kickbacks and submitting thousands of false claims for Medicare and Medicaid reimbursement.

85.     BioScrip continued to conceal its involvement in this illegal scheme even after the government initiated its investigation. In fact, once the government investigation began, BioScrip actively concealed both its involvement in the illegal scheme *and* the government investigation from its investors.

86.     Specifically, the government's investigation into the Exjade Kickback Scheme began in November 2011, when former Novartis sales-and-marketing executive David Kester brought a sealed *qui tam* action against Novartis and BioScrip, alleging that they violated the FCA and the AKS in connection with their distribution of Exjade. Kester's sealed *qui tam* action spurred a non-public joint state-federal investigation of the matter by the National Association of Medicaid Fraud Control Units, the U.S. Attorney's Office for the Southern District of New York, the U.S. Department of Justice, the Federal Bureau of Investigation, and other state and federal agencies.

87.     By no later than October 2012, one month before the start of the Class Period, the government informed BioScrip of the investigation. In October 2012, the United States served the Civil Investigative Demand on BioScrip related to its arrangements with Novartis and its marketing of Exjade. A civil investigative demand is an investigative device defined by statute (31 U.S.C. § 3733) which may be served upon an entity when the government "has reason to believe that [the entity] may be in possession, custody, or control of any documentary material or information relevant to a false claims law investigation." The statute also provides that "[e]ach civil investigative demand issued . . . shall state the nature of the conduct constituting the alleged violation of a false claims law which is under investigation, and the applicable provision of law alleged to be violated." Thus, the Company and its senior management knew by no later than

October 2012 not only that they were being investigated, but the *specific factual grounds for that investigation and the specific laws that the Company was suspected of having violated.*

88.     After the Company received the Civil Investigative Demand, it started responding to the government's document requests. Company employees were also interviewed by the government during this time. As set forth below, numerous former BioScrip employees described how they and others were interviewed by government investigators. Nevertheless, for nearly a year—from the time BioScrip was served with the Civil Investigative Demand in October 2012 until September 23, 2013—the Company covered up even the existence of the government's ongoing investigation into the Exjade Kickback Scheme.

89.     Indeed, despite the Company's recent admission that it had engaged in the scheme and despite being under an intense government investigation regarding that scheme by no later than October 2012, the Company continued falsely assuring the market that it complied with the anti-kickback laws and failed to disclose that it was already the subject of a government investigation focusing on its violations of the false claims laws.[3] For example, in its Quarterly Report on Form 10-Q for the third quarter of 2012 filed with the SEC on November 9, 2012, the Company failed to disclose the existence of the government investigation and misleadingly stated that "[t]here can be no assurance that the Company will not be subject to scrutiny or challenge under one or more existing laws and regulations. . . ." Further, the Company's Annual

---

[3]     BioScrip's decision to cover up the government investigation is especially troubling in light of the fact that one of the other EPASS pharmacy companies—Accredo Health Group—promptly disclosed when it received a similar investigative demand. On November 6, 2012, Accredo's parent company, Express Scripts Holding Company, disclosed in its Quarterly Report on Form 10-Q for the third quarter of 2012 that "[o]n October 1, 2012, Accredo Health Group Inc. . . . received a subpoena *duces tecum* from the United States Department of Justice, Southern District of New York, requesting information from Accredo concerning its arrangements with Novartis Pharmaceuticals Corporation pertaining to the drug Exjade. [Accredo] is cooperating with the inquiry and is not able to predict with certainty the timing or outcome of this matter."

Report on Form 10-K for 2012 acknowledged that the government was investigating kickback arrangements between other pharmacy companies and drug manufacturers, but did not disclose that BioScrip was itself already subject to such an investigation:

> Governmental entities have . . . commenced investigations against specialty pharmaceutical distribution companies having dealings with pharmaceutical manufacturers concerning retail distribution and sales and marketing practices of certain products and therapies. *There can be no assurance that we will not receive subpoenas or be requested to produce documents in pending investigations or litigation from time to time. In addition, we may be the target or subject of one or more such investigations or named parties in corresponding actions.*

90.     The government's investigation continued throughout 2013. Indeed, during the summer of 2013, BioScrip's employees were being interviewed by the government. For example, CW 1, a core member of BioScrip's Exjade Team, stated that he was approached in June or July 2013 by investigators from Washington State about BioScrip's Medicare and Medicaid reimbursements. CW 1 stated that BioScrip's Exjade Team leader was also interviewed by those investigators around the same time. CW 2, a former Patient Care Coordinator at BioScrip and a member of the Company's Exjade Team, likewise confirmed that the government had been speaking with numerous former BioScrip employees since that summer.  On information and belief, the government was also interviewing current BioScrip employees at that time. Thus, it was known within the Company by the summer of 2013, at the latest, that the government's investigation involved both federal and state agencies and was directly related to potentially false Medicare and Medicaid claims.

91.     Yet the Company continued to conceal even the existence of the government's investigation for months, until the government made clear that it was going to take legal—and ultimately public—action against the Company. Specifically, on September 23, 2013, BioScrip disclosed for the first time in a Form 8-K that it was the subject of a government investigation and had received the Civil Investigative Demand and a subpoena from the New York State

Attorney General's Medicaid Fraud Control Unit, and that the government was going to "engage in discussions" with the Company regarding that investigation:

> On September 11, 2013, the Company was advised by the government that it plans to engage in discussions with the Company regarding its investigation. The investigation is civil in nature. To the Company's knowledge, no proceedings have been initiated against it at this time. The Company cannot predict or determine the timing or outcome of this investigation or the impact it may have, if any, on the Company's financial condition, results of operations or cash flows.

92.     Defendants made it appear as if this was the first time BioScrip could have disclosed the investigation. Indeed, when Defendant Smith discussed the investigation during an investor presentation the following day, he reassured BioScrip's investors and analysts that the Company had promptly disclosed the fact that it was being investigated. Smith stated during that presentation that "we thought carefully about making this voluntary disclosure and ultimately concluded that based on all of the circumstances, it would be in the best interest of both the company and its investors to provide transparency regarding this matter." Smith's statement about "transparency" was patently false considering that the Company had been served with the Civil Investigative Demand almost one year before this disclosure and had been responding to the government's demands for documents and testimony since that time.

93.     The Company also attempted to frame its longstanding scheme as a discrete issue tied to a divested segment of the Company. The Form 8-K stated that "[t]he Company sold its traditional and specialty pharmacy mail operations and community retail pharmacy stores on May 4, 2012" and that the investigation was focused entirely on the distribution of Exjade "by the Company's legacy specialty pharmacy division that was divested." Analysts were persuaded by the Company's false reassurances about the investigation. For example, Dougherty & Company LLC ("Dougherty") wrote in a September 23, 2013 report that the "Novartis Situation Seems Benign" and "it does not appear [to be] a significant threat to BIOS or investors."

94.     The Company continued to emphasize that the investigation concerned a "sold" division during the September 24, 2013 investor presentation. There, Defendant Smith emphasized that "[a]s most of you know, the company sold its legacy specialty pharmacy division in May 2012."

95.     In reality, BioScrip's ongoing operations *were* put at serious risk. In particular, the government investigation presented an enormous risk for the Company and its ongoing operations because BioScrip derived approximately a quarter of its annual revenue from Medicaid and Medicare reimbursements. But the Company's disclosures of September 23 and 24, 2013 were completely silent about the threat that the investigation posed to the Company's future.

96.     BioScrip was forced to reveal more details about the government's ongoing investigation in the coming months. In a press release announcing its third-quarter 2013 earnings on November 6, 2013, the Company disclosed that it had accrued a liability reserve of $15 million related to the investigation. On an investor conference call the next day, Defendant Smith repeated the $15 million estimate and noted that "[t]he actual outcome is uncertain and the actual loss could be higher."

97.     This $15 million estimated liability was a serious blow to BioScrip, since the Company was in a precarious financial state. By this time, BioScrip had approximately $415.6 million in debt and little cash. As Jefferies noted in a November 14, 2013 report, "investors have grown weary of BIOS's tight liquidity positions." Thus, a further $15 million liability posed severe solvency issues for BioScrip. As set forth below, approximately two months later, BioScrip settled the government's claims for $15 million, which was less than the government's estimate of BioScrip's liability but was limited based on BioScrip's inability to pay more.

### 7. Post-Class-Period Developments: BioScrip Was Forced to Abandon Its Cover-Up and Finally Admit the Exjade Kickback Scheme

98.     On January 8, 2014, the U.S. government publicized the details of BioScrip's unlawful kickback scheme and the government's investigation of the scheme in its Complaint and Settlement Stipulation with BioScrip. Both documents contain detailed descriptions of the Exjade Kickback Scheme, and the Settlement Stipulation contains extensive factual admissions by BioScrip about the scheme.

99.     On that day, the Company filed a Form 8-K that disclosed that it had entered into the Settlement Stipulation with the U.S. Department of Justice and *qui tam* relator David Kester, settling all civil claims under the FCA and related statutes and all common-law claims that could be brought by the Department of Justice and Kester arising out of the Company's distribution of Exjade.

100.    In addition, the Company agreed in principle with various State Attorneys General to settle civil claims under the False Claims Act and related statutes that could be brought by the states with regard to the Company's distribution of Exjade.

101.    BioScrip agreed to pay a total of $15 million under these settlement agreements, with $11,685,705.43 going to the federal government and the rest to the states. The government explicitly noted, however, that the settlement amount was limited to $15 million because the Company "lack[ed] the financial wherewithal to pay certain damages and penalties sought by the United States."

### B. BioScrip Also Covers Up Its Dying PBM Services Business

102.    At the same time that BioScrip was covering up its Exjade Kickback Scheme, risk, and liability, it was also concealing the fact that one of its significant business segments was collapsing. Unbeknownst to investors, the Company's pharmacy benefit management operating

segment (identified by BioScrip as "PBM Services")—which accounted for nearly 20% of the Company's annual revenue and provided the Company with vital cash flow—was materially declining throughout 2013.

1.    **BioScrip's PBM Services Business Segment and Its Critical Role for the Company**

103.    BioScrip's PBM Services business primarily consists of discount cash-card programs aimed at individuals who are uninsured or underinsured or whose insurance does not cover certain medications. These discount programs enable individuals to purchase their prescription medications at a discount from the retail price (generally, in a range of up to 70%) at the Company's network pharmacies or through one of the Company's mail-service pharmacies. According to one BioScrip discount card marketed through www.DiscountMeds4You.com, these cards are accepted by over 57,000 pharmacies nationwide, including "all of the major chains" and "thousands of independent pharmacies," and can realize a discount of up to 70% of the retail price.

104.    BioScrip's discount-card business relies on participating network pharmacies to fill drug prescriptions and pay the Company an agreed-upon amount for the utilization of the card. By way of example, according to CW 3, a former Corporate Accounting Manager at BioScrip from February 2013 to October 2013, if a customer receives 10% savings on medications by using a discount card, an agreed-upon percentage of the discount (e.g., 5% of the 10%) would in turn be paid as a fee to BioScrip by the pharmacy. The Company's fee rates are negotiated with the pharmacies. CW 3 explained that the rationale underlying this fee system is that these pharmacies only get discount cardholders' business because of BioScrip's marketing of the discount card and the discount BioScrip provides the cardholders. Further, pharmacies do a significant amount of add-on business. That is, most customers purchase other products (e.g.,

toothpaste, gum, or magazines) once they are in the pharmacy. Thus, pharmacies are willing to pay BioScrip a percentage of the discount-card savings for the opportunity to make these profitable add-on sales from the cardholders.

105.    BioScrip markets its cash cards using brokers who receive fees based on sales generated. CW 4, an employee in BioScrip's PBM Services segment from June 2010 until May 2012, explained that these brokers would purchase mailing lists and do mass mailings of thousands of the discount cash cards. Cards were also given to doctors' offices to distribute to patients who did not have prescription coverage and were made available free online for patients to download or print from websites such as www.DiscountMeds4You.com.

106.    The PBM Services segment was very important to BioScrip. First, it generated substantial revenue for the Company. For example, in 2012 and 2011, PBM Services revenue constituted 17% and 20%, respectively, of the Company's total revenue. The PBM Services segment also represented roughly 40% of the Company's adjusted EBIDTA—earnings before interest, taxes, depreciation, and amortization. Indeed, for 2012, PBM Services' adjusted EBITDA was $25.6 million, constituting 37.8% of the Company's total segment adjusted EBITDA of $67.8 million. For 2011, PBM Services' adjusted EBITDA was $30.1 million, or 42.3% of the Company's total segment adjusted EBITDA of $71.2 million. EBITDA is a critical metric for the Company. EBITDA represents a measure of a company's operating profit, and since it does not include costs such as interest, taxes, and financing, which can mask a company's true operating condition, it represents a good method for comparing companies within and across industries. Indeed, analysts regularly evaluated BioScrip based on its EBITDA. As Dougherty stated in a March 12, 2012 report, EBITDA was the "prefer[red]" method for valuing BioScrip for this exact reason.

107.     Second, the PBM Services segment was critical to the Company because its revenue helped fund the Company's expansion of its home-infusion business by acquiring other home-infusion companies and establishing its own home-infusion pharmacies. The Company repeatedly represented that the PBM segment was a high-margin business that provided consistent and steady cash that the Company then invested in the aggressive growth of its infusion business. For example, during a May 2012 healthcare conference, Defendant Smith stated that the "PBM services and Cash Card . . . gives us some good cash flow" and "we essentially look to use the cash flow from this business to redeploy into our infusion expansion, as well as helping us to fund the transition of the corporate infrastructure." Similarly, on August 9, 2012, Defendant Smith stated on an investor conference call that PBM Services "generates strong cash flows, which the Company will continue to use to reinvest in the growth of the Infusion division."

108.     The Company also held out the PBM business as an attractive divestment target, with the proceeds of a sale to be used to further expand BioScrip's infusion business. For example, Defendant Tran stated during an August 2012 investor conference call that "we are clearly looking at [the PBM] business in terms of harvesting it," which "can mean a range of things. It can mean keeping that business [and] continu[ing] to make the appropriate investments to grow that business," but "it could also mean that if somebody put a big price tag on it, we would consider divesting that business as well."

109.     Analysts credited the Company's representations regarding the importance of its PBM Services segment. For example, in a January 24, 2013 report, SunTrust called the segment a "Steady" and "Attractive Cash Flow Generator" and noted that "the business is relatively predictable, is a solid cash flow generator, and carries attractive margins."

110.   In short, the success of BioScrip's plans for growth relied on the continued success of its PBM Services segment, either by providing a consistent stream of cash that the Company could utilize to realize its expansion goals or by serving as an attractive target for outside acquirers, with the proceeds of a sale further funding the Company's infusion-based growth.

### 2.   BioScrip Concealed Problems That Were Battering the PBM Services Business

111.   On March 11, 2013, the Company reported that its PBM Services segment had generated $111.9 million in revenue during 2012 and had experienced growth during that year due to an increase in discount card sales. The market responded positively to this news. BioScrip stock increased by $2.00, or nearly 20%, from $10.90 per share on March 11, 2013 to $12.90 on March 13, 2013. SunTrust raised BioScrip's price target from $13.50 to $14.00 on March 12, 2013 due to "higher conviction in core business trends and our thought that 2013 and 2014 estimates EBITDA could prove overly conservative." Feltl and Company initiated coverage of BioScrip on April 9, 2013 with a "STRONG BUY" rating and a $15 price target, specifically noting that "[g]oing forward we expect fairly stable margin performance within the PBM."

112.   Within weeks, however, the PBM Services segment began to suffer from a number of serious undisclosed problems that severely impaired its business. First, on March 31, 2013, the Company lost a major PBM client that accounted for approximately $8 to $10 million—or nearly 33%—of PBM Services revenue per quarter. Second, by the second quarter of 2013, some of BioScrip's existing discount-card brokers were reducing or delaying their marketing of the discount cards, which reduced the number of card sales.

113.   Former employees and business partners confirm that the PBM Services segment was experiencing serious problems by no later than the first quarter of 2013. For example, CW 3,

a Corporate Accounting Manager at BioScrip's offices in Eden Prairie, Minnesota from February 2013 to October 2013, who reported to the Company's Controller, who was also located in Eden Prairie (as was Defendant Bogusz), described the cash-flow problems that permeated the segment throughout 2013. Contrary to the Company's representations that the PBM segment was a significant source of cash, CW 3 stated that BioScrip would cut checks for vendors who distributed its cards but not mail the checks for approximately 30 days in order to manage its cash, particularly at the end of a quarter, because the Company was short of cash. CW 3 stated that the Company also delayed paying non-PBM vendors for the same cash-shortage reason, particularly at the end of a quarter, sometimes holding over as much as $10 million in payables until after quarter-end. CW 3 further explained that the cash-flow problem was the result of significant decreases in the cash-card business. As an example, CW 3 stated that in the beginning of 2013, the Company received a check for $1-$2 million every other week from a PBM vendor that aggregated BioScrip's payments from all the various pharmacies accepting BioScrip's discount cards, but that the PBM revenue stream drastically decreased during the first and second quarters of 2013 to only $1 million every three weeks. CW 3 stated that Bogusz—who former employees explained was highly involved and in charge of the PBM Services segment throughout the Class Period—told CW 3 around September 2013 that the Company could not continue to manage its cash flows by delaying vendors' payments with the expectation that the PBM business would bring in the same revenue it had in the past.

114.    Similarly, former business partners described the problems they encountered with BioScrip's PBM Services segment. For example, Watertree Health was a broker for BioScrip PBM discount cards. CW 5, who worked at Watertree Health as a Director of Research & Analysis in New York from June 2012 to November 2013 and reported to Watertree Health's

chief operating officer, stated that BioScrip became very unreliable and difficult to work with in 2013. CW 5 explained the problems as: (i) BioScrip had inconsistent service such as the cards' discounted price (i.e., the percent discount off the price) changing for the same medication from month to month; (ii) medications available for the cards' discount changed frequently; and (iii) BioScrip did not offer as much of a discount as competing PBM companies. CW 5 stated that BioScrip's pricing became worse—i.e., the discount was not as much, leading to more expensive medications than its competitors' cards provided—starting around April or May 2013. As a result of these issues, which created problems with patients and brokers alike, Watertree started to significantly reduce its business with BioScrip. CW 5 explained that BioScrip's discount-card business deteriorated even more over the ensuing months until by August or September 2013, Watertree Health stopped doing any new business with BioScrip. Indeed, because BioScrip's discount card brokers received fees based on the amount of sales generated by the discount cards, the fact that BioScrip's increasingly noncompetitive practices were driving down card usage would materially affect the brokers' own returns. CW 5 also stated that one of the major pharmacy chains stopped accepting BioScrip cards around August or September 2013 for these same reasons.

115.   The Officer Defendants were well aware of these problems as they were occurring. According to former employees, Defendants Smith, Tran, and Bogusz were all involved in the Company's PBM business. CW 6, who was a senior accountant at BioScrip in Eden Prairie, Minnesota from 2008 until the end of 2012, stated that corporate management was "pretty involved" in the PBM segment's business. CW 7, an Executive Assistant/Office Manager at BioScrip from April 2005 until November 2012, also stated that BioScrip Vice President Daniel Colucci—who managed the Company's PBM business—would express any concerns or

information regarding the PBM segment directly to Defendant Smith and that BioScrip's senior executives, including Defendants Smith, Tran and Bogusz, would often receive reports on the PBM segment. Indeed, CW 6 stated that, with respect to the PBM Services segment, management "were aware of everything that was going on."

116.    Former employees provided even further detail regarding Defendant Bogusz's involvement. CW 8, who was a senior accountant at BioScrip in Eden Prairie from 2008 to 2012, said that the three directors of the PBM segment all reported to Defendant Bogusz, who worked in Eden Prairie and reported directly to Tran. Indeed, CW 3 stated that Defendant Bogusz was one of only a limited number of individuals who attended Company meetings regarding the PBM business, and CW 9, a finance director at BioScrip from December 2007 until July or August 2012, stated that Defendant Bogusz held monthly reviews with the Company's PBM finance team.

117.    Nevertheless, the Company and Defendants Smith, Tran, and Bogusz concealed the PBM segment's problems when it released its earnings for the first quarter of 2013 in May 2013. Specifically, even though BioScrip had known for months that it had lost a major PBM client that accounted for nearly a third of the segment's revenue and that its brokers' decreased marketing had resulted in lost sales, both of which greatly affected the Company's cash flows, the Company did not disclose this highly material information. Instead, when announcing its quarterly results, which included a $3.1 million quarterly decline in the PBM Services segment's revenue from the same quarter in 2012, the Company stated without further explanation or detail that this decline was primarily due to "a reduction in discount card volume."

118.    Furthermore, the Company's senior executives actively attempted to downplay the significance of this decrease in PBM Services revenue. During the Company's earnings

conference call, Defendant Tran represented that the segment's revenue would not further decline. Specifically, when an analyst asked Defendant Tran to provide his outlook for the PBM business, Tran stated that "*[i]t will be relatively flat.*"

119.    The Company did not disclose the numerous problems that were then affecting its PBM Services segment. Indeed, the undisclosed lost client and the undisclosed slowdown in PBM marketers' efforts were rendering the PBM Services segment's performance anything but "flat." Rather than representing a stable source of revenue—as the Company was holding out to investors—the segment was collapsing.

### 3.    BioScrip Began to Partially Disclose the Problems Affecting Its PBM Segment While Downplaying the Extent of Those Problems

120.    The Company finally began to partially disclose the problems affecting its PBM business on August 7, 2013, three months after completing the April 2013 Offering, as discussed in greater detail below. Specifically, on this date BioScrip reported second-quarter results that missed revenue estimates by *$15 million* and missed adjusted EBITDA estimates by *$2 million*— results Stephens Inc. ("Stephens") described as "ugly" in an August 8 report.

121.    The prime contributor to the miss was the unusually large, $10.4 million decline in the Company's PBM revenue resulting from the previously undisclosed problems that were affecting the PBM segment. For the first time, the Company disclosed some of the problems plaguing that segment, attributing the segment's decline primarily to "the loss of one low-margin client" as well as a "decline in discount card volume . . . due to a decrease in marketing from certain distribution partners."

122.    During the Company's earnings call the next day, Defendant Smith further explained that $9.1 million of the $10.4 million decrease—or *88%*—was attributable to the lost client and the remaining $1.3 million was related to lower cash-card utilization. Smith

additionally, and for the first time, disclosed that the PBM business was negatively affected because "certain of our existing brokers reduced or delayed their marketing spend, which resulted in reduced sales and profit contribution impacting this segment's [performance]."

123.    Yet the Company and Defendants Smith and Tran downplayed the PBM Services segment's negative performance and emphasized its stability, including the volume of new business it would realize from new business partners, and the important contributions this segment made, and would continue to make, to the Company's overall performance. For instance, on the earnings call to discuss these results, Tran declared that "the market for these cards [is] *not* going away" and that "there is a large and growing number of underinsured, relative to their prescriptions needs, and that I think is where the opportunity is." Tran further stated that "these [discount-card] programs are still ways to address a growing underinsured population." Smith echoed these sentiments, stating that the Company "continued to see utilization of discount cards, as well as interest from patients and new distribution partners."

124.    Defendants also minimized the extent of the problems affecting the PBM segment by focusing on the segment's cash flow and the projects it helped fund. For example, Smith touted that "the cash flow from this segment has helped us fund investments in our de novo location, a stronger IT infrastructure to support the growth of our infusion network, the creation of a transitional care software solution we now offer in the marketplace, and establishing the corporate development resources needed [to] execute on the acquisition pipeline that is building our national footprint." Smith further praised the PBM segment's contribution in response to an analyst's question about the PBM business, stating that "we have used that [PBM] cash flow to really strengthen the infrastructure and invest in the transition, bridge the transition to the Infusion platform, and the growth of the establishment."

125.    In short, the Company was falsely assuring the market that, though the PBM Services segment had experienced the partially disclosed problems, its business was "*not* going away" and would remain ultimately "flat" from then on. That was not the case. The lost major client would cause a significant decline in the segment's revenue for the following quarter. Further, the PBM Services segment was continuing to suffer from an overall decline in volume that would materially reduce the segment's earnings for the rest of 2013.

126.    BioScrip's misleading representations comforted analysts. Feltl and Company reported on August 8, 2013 that BioScrip "noted [PBM] volume should benefit going forward with new distribution partners," that "the PBM results were disappointing, but this business has effectively reset and should not experience further pressure," and that BioScrip "expect[s] continued flat growth" in the segment. Dougherty similarly noted in an August 12, 2013 report that "we remain convinced management can effectively utilize the cash flows [BioScrip's PBM] business generates," and Noble Financial Capital Markets wrote on August 9 that "[t]he company expects discount card volume to increase as a result of new distribution partners' implementation of prescription discount cards through their pre-existing network."

### 4.    The Company Further Partially Disclosed the Problems Affecting Its PBM Business While Continuing to Downplay the Extent of the Problems

127.    On the morning of September 24, 2013, the Company disclosed even more problems that were plaguing its PBM business. During the Company's investors day presentation, BioScrip's management reduced its guidance for 2013 adjusted EBITDA from a range of $67 to $73 million to just $56 million (or by 16% to 23%, respectively), attributing a large portion of this reduction to further setbacks in its PBM business. Specifically, the Company said that it now expected the PBM business to contribute $17 million in 2013 EBITDA, compared to its earlier estimate of $21 million, a decline of nearly 20%.

128.    During the presentation, Defendant Tran spoke about the continued deterioration of BioScrip's PBM Services segment, stating that "PBM continues to show signs of risk." Specifically, Tran stated that "we have . . . some rumblings with regards to one of our pharmacy network providers who have indicated to us a desire to look at pricing again" and "[o]n the PBM business . . . it's really Q4 that's causing us some real—some heartache here potentially." Tran further stated that the Company was taking "lumps and . . . body blows from the PBM business."

129.    But the Company again downplayed the problems affecting its PBM Services business. Tran assured investors that, for the *third quarter*, the segment's sales volume would remain at current levels, stating that "*[v]olumes were steady for Q3*" and that "[w]ith regards to the discount card business . . . the good news on it is we got some very high volume new clients by just ramping up." Tran's statements were false, made only *four business days* before the end of a third quarter in which PBM volume would be shown to have declined again.

130.    In spite of the Company's downplaying its reduced guidance and its PBM Services segment's continuing deterioration, analysts reacted negatively to the news. Feltl and Company reported on September 25 that "[t]he step down in the PBM business is disappointing," and Stephens noted in a September 25 report that the PBM business had suffered "another setback."

### 5.    The Company Finally Disclosed the Truth About the PBM Business

131.    On November 6, 2013, the Company released its third-quarter results and finally revealed the full truth of the problems besetting its PBM business. In its press release, BioScrip disclosed that, contrary to its September 24 assurance that volumes were "steady" for the third quarter, it had suffered its third straight quarterly decrease in PBM Services revenue due to "decreases in the funded PBM and prescription discount card businesses, primarily from the

termination of a contract with a large, low-margin, funded PBM client, as well as a decrease in volume in the prescription discount card business."

132.    Further, during BioScrip's earnings conference call the following day, Defendant Smith stated that "the third quarter was heavily impacted by headwinds associated with our non-core businesses" and that "[w]ith regard to our PBM services segment, revenues [were] down this quarter due to a reduction in volume from discount card distributors." Indeed, in contrast to both Tran's and Smith's statements on September 24 that PBM Services volume would remain "steady," Tran finally admitted that "[o]ur PBM services segment volume continues to weaken" and that the Company's PBM Services business "is still challenged."

133.    Several days later, on November 12, 2013, the Company filed its third-quarter Quarterly Report on Form 10-Q, which blamed the decrease in PBM Services revenue on "a decline in volume."

### C.    BioScrip Conducted Two Public Offerings While Perpetrating Its Exjade Kickback and PBM Schemes

134.    While concealing the Company's Exjade Kickback Scheme and the existence of the government investigation into that scheme, as well as the true extent of the problems facing the Company's PBM Services segment, BioScrip and Defendant Kohlberg—the Company's largest shareholder with two seats on BioScrip's Board of Directors—capitalized on the Company's inflated stock price through two public offerings of BioScrip's common stock.

135.    In April 2013—six months after the Company had been served with the Civil Investigative Demand and shortly after the Company lost its major PBM Services client—the Company launched a public offering of its common stock. On or around April 19, 2013, the Company conducted this Offering of approximately 10.4 million shares of its common stock at the artificially inflated price of $12.00 per share. The April 2013 Offering was also extremely

beneficial to Kohlberg, which sold approximately 4 million shares of BioScrip common stock at the artificially inflated price of $12.00 per share, realizing net proceeds of over $45 million. In total, BioScrip and Kohlberg together sold approximately 14.375 million shares of the Company's common stock in the April 2013 Offering for almost $170 million.

136.    In marketing this Offering to the investing public, BioScrip never disclosed the Exjade Kickback Scheme, the government's investigation of that scheme, or the severe problems plaguing the PBM Services segment.

137.    The Company announced another public offering on August 13, 2013, before it disclosed the government's then ten-month-old investigation into its Exjade Kickback Scheme and the true scope of the deterioration in PBM Services. Significantly, none of the shares at issue in the August 2013 Offering were sold by BioScrip itself. Instead, Kohlberg sold approximately 6.9 million shares of BioScrip's common stock. These shares were offered at the inflated price of $13.65 per share, and Kohlberg recouped almost $90 million from the offering. In total, Kohlberg realized over $130 million through the two Offerings.

138.    In the August 2013 Offering, BioScrip again failed to disclose its Exjade Kickback Scheme, the government's investigation of that scheme, or the severe problems plaguing the PBM Services segment.

**D.    Defendants Bogusz and Kohlberg Engaged in Extensive Insider Selling Just Before the Truth Was Revealed**

139.    While concealing the Company's Exjade Kickback Scheme and the government investigation into that scheme, as well as the true extent of the problems facing the PBM business, BioScrip insiders sold large amounts of Company stock in the weeks before disclosing the government's then month-old investigation.

140.    As discussed above, Defendant Kohlberg sold approximately 4 million shares of BioScrip common stock in the April 2013 Offering at an artificially inflated price of $12.00 per share, realizing net proceeds of over $45 million.

141.    Kohlberg then moved extremely quickly following the partial disclosures of August 7 and 8, 2013 to unload a further substantial portion of its holdings in BioScrip and profit from the inflation in the BioScrip stock price before the full truth was disclosed. As discussed above, in the August 2013 Offering, Kohlberg sold approximately 6.9 million shares of the Company's common stock to realize almost $90 million. Through this offering, Kohlberg sold almost 60% of its remaining holdings in BioScrip.

142.    Analysts expressed concern over this sale, with Dougherty reporting on August 14, 2013 that "having an investor with two Board seats selling now, at this price, just after a disappointing quarter, with a weaker outlook ahead, is really surprising." Of course, at this time, analysts did not know about the full problems facing the Company.

143.    The August 2013 Offering was followed by even more insider trading by Defendant Bogusz, who was the Vice President of Finance at BioScrip and was actively involved in the PBM Services segment. Bogusz sold 39,687 shares of the Company's common stock on August 28, 2013, reaping a profit of approximately $290,904.

144.    These trades were suspiciously timed. They occurred only a few weeks after the Company's partial disclosure of the problems besetting its PBM business and just three weeks before the Company announced both the government's investigation into its Exjade Kickback Scheme and further problems affecting its PBM segment on September 23-24, 2013. These transactions are especially notable because they were Defendant Bogusz's *only* trades of Company stock during the Class Period.

145.    These insider sales did not go unnoticed. On September 3, 2013, Dougherty reported that "[q]uestions abound with regard to BIOS and a raft of insider selling suggests a number of key players would rather take a bird in the hand than two in the bush. Frankly, this concerns us as these insiders are experienced investors who are clearly electing to vote with their feet."

## VI.   DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

### A.    The Quarter Ended September 30, 2012

146.    On November 9, 2012, shortly after BioScrip was served with the Civil Investigative Demand from the United States Attorney for the Southern District of New York in October 2012, the Company filed its Form 10-Q for the third quarter of 2012 (the "2012 Third Quarter 10-Q"). Defendant Bogusz signed the 10-Q, and Defendants Smith and Tran certified that its contents were accurate pursuant to their obligations under the Sarbanes-Oxley Act.

147.    The 2012 Third Quarter 10-Q omitted to disclose the government's investigative demand into BioScrip's Exjade Kickback Scheme that caused Medicare and Medicaid to reimburse the Company for tens of millions of dollars in false claims and endangered countless patients for more than five years—or over 21 consecutive quarters. Further, in the section titled "Government Regulation," BioScrip made false and misleading statements regarding its purported compliance with federal and state laws, including anti-kickback laws, and omitted to disclose that the Company was already "subject to scrutiny or challenge under one or more existing laws . . . ." In particular, the 2012 Third Quarter 10-Q stated:

> Various Federal and state laws and regulations affecting the healthcare industry do or may impact the Company's current and planned operations, including, without limitation, Federal and state laws prohibiting kickbacks in Government health programs, Federal and state antitrust and drug distribution laws, and a wide variety of consumer protection, insurance and other state laws and regulations. *Management strives to maintain the Company in substantial compliance with all*

*existing laws and regulations material to the operation of its business.* However, such laws and regulations are subject to rapid change and often are uncertain in their application.

***

From time to time, the Company responds to subpoenas and requests for information from Governmental agencies. The Company cannot predict with certainty what the outcome of any of the foregoing might be. *There can be no assurance that the Company will not be subject to scrutiny or challenge under one or more existing laws or that any such challenge would not be successful.*

148.    The statement quoted above regarding the Company's "substantial compliance with all existing laws and regulations material to the operation of its business" was materially false and misleading because the Company omitted to disclose that, in reality, it had been engaged in a kickback scheme with Novartis in direct violation of federal and state laws prohibiting kickbacks in government health programs.

149.    This statement was also materially false and misleading because it gave the misleading impression that any noncompliance by the Company was because such laws "are subject to rapid change and often are uncertain in their application" when, in reality, the laws that the Company violated were well established. In particular, the government made it clear as early as 1994 that the federal AKS prohibited manufacturers (like Novartis) from offering financial incentives to pharmacy companies (like BioScrip) to induce the increased use of prescription drugs (like Exjade) covered by federal healthcare programs.

150.    In addition, the statement quoted above that "[t]here can be no assurance that the Company will not be subject to scrutiny . . . under one or more existing laws" was false and misleading as the Company was then currently under "scrutiny" for its role in dispensing Exjade. The Company misleadingly disclosed that it was at general risk of a potential investigation without disclosing that this risk had already come to pass. Indeed, by the time it made this statement, the Company had already received the government's Civil Investigative Demand that

50

set forth "the nature of the conduct constituting the alleged violation of a false claims law" and "the applicable provision of law alleged to be violated." 31 U.S.C. § 3733.

151.    The   Company's   Form   10-Q   also   contained   Sarbanes-Oxley-required certifications, signed by Defendants Smith and Tran. These certifications stated, in relevant part: (i) "I have reviewed this Quarterly Report on Form 10-Q of BioScrip, Inc."; and (ii) "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." These statements were materially false and misleading because, as set forth above, the report omitted to disclose the Civil Investigative Demand into BioScrip's Exjade Kickback Scheme.

**B.    The Year Ended December 31, 2012**

152.    On March 15, 2013, BioScrip filed its Form 10-K for the year ended December 31, 2012 (the "2012 10-K"). Defendants Smith and Tran signed the 2012 10-K and also certified that its contents were accurate pursuant to their obligations under the Sarbanes-Oxley Act. In its Form 10-K, the Company continued to conceal the government's Civil Investigative Demand into BioScrip's Exjade Kickback Scheme. Indeed, BioScrip not only failed to disclose the existence of the government's investigation, but also misled the investing public by disclosing that other companies were being investigated for potentially unlawful sales practices and then implying that BioScrip was not then subject to such an investigation. In a section specifically discussing "Anti-Kickback Laws," the Form 10-K stated:

> Governmental entities have . . . commenced investigations against specialty pharmaceutical distribution companies having dealings with pharmaceutical manufacturers concerning retail distribution and sales and marketing practices of certain products and therapies. *There can be no assurance that we will not receive subpoenas or be requested to produce documents in pending investigations or*

*litigation from time to time. In addition, we may be the target or subject of one or more such investigations or named parties in corresponding actions.*

153.   The above quoted statement was materially false and misleading because Defendants concealed the fact that, at the time this statement was made, BioScrip was already the subject of a government investigation regarding its dealings with Novartis concerning "retail distribution and sales and marketing practices" for Exjade. Contrary to the Company's suggestion that "there can be no assurance that we will not receive subpoenas or be requested to produce documents in pending investigations," the Company had already received the Civil Investigative Demand five months earlier in October 2012 and was in the process of responding to it. Moreover, this statement was materially false and misleading because, based on the content of the Civil Investigative Demand, the Company already knew that it was the "target or subject of one or more such investigations" into its role in dispensing Exjade and the propriety of its relationship with Novartis.

154.   In the section of its 10-K discussing "Government Regulation," the Company stated:

> From time to time, the Company responds to subpoenas and requests for information from Governmental agencies. The Company cannot predict with certainty what the outcome of any of the foregoing might be. *While the Company believes it is in substantial compliance with all laws, rules and regulations that affects its business and operations, there can be no assurance that the Company will not be subject to scrutiny or challenge under one or more existing laws or that any such challenge would not be successful.*

Similarly, in the section discussing pending and future litigation, the Form 10-K stated:

> We periodically respond to subpoenas and requests for information from Governmental agencies. We confirm that we are not a target or a potential subject of a criminal investigation. We cannot predict with certainty what the outcome of any of the foregoing might be or *whether we may in the future become a target or potential target of an investigation or the subject of further inquiries or ultimately settlements with respect to the subject matter of these subpoenas.*

155. The above quoted statements were false and misleading because, as set forth above, at the time the Company made these statements, it was already the subject of the government's Civil Investigative Demand and was in the process of responding to the government's investigation. These statements misleadingly failed to disclose that the Company was, and had been for at least five months, the subject of a government civil investigation and, due to the nature of its kickback scheme, could be a potential subject of a criminal investigation. The Company again misleadingly disclosed that it was at a general risk of a potential investigation without disclosing that this risk had already come to pass.

156. In its 2012 Form 10-K, the Company also falsely represented that it was in compliance with federal and state healthcare regulations. For example, with respect to federal and state anti-kickback laws, the Company stated that "[o]ur management carefully considers the importance of such anti-kickback laws when structuring each company's operations and believes that each of our respective companies is in compliance therewith" and that "[w]e believe we are in compliance with the legal requirements imposed by the anti-kickback laws and regulations." Similarly, with respect to the FCA, the Company stated that "[w]e believe we have procedures in place to ensure the accuracy of our claims" and that "we believe we are in compliance with Medicaid and Medicare billing rules and requirements."

157. The statements above regarding the Company's compliance with the anti-kickback laws and the Medicaid and Medicare billing rules were materially false and misleading because, in reality, the Company had been engaged in a kickback scheme with Novartis that was in direct violation of federal and state laws prohibiting kickbacks in government health programs. As set forth above, far from being in compliance with these regulations, BioScrip engaged in a kickback scheme that violated anti-kickback laws and the FCA for more than 5

years, including for a substantial portion of 2012, which was covered by this filing. Indeed, until at least May 2012, BioScrip was actively engaged in the Exjade Kickback Scheme, which Defendants knew or were reckless in not knowing by this time (months after receiving the government's Civil Investigative Demand) violated the anti-kickback laws and regulations and resulted in more than 40,000 false claims being submitted to Medicare and Medicaid. Moreover, these statements gave investors the misleading impression that the Company was not exposed to any known government liability when, in reality, from its response to the Civil Investigative Demand, Defendants knew that it faced serious exposure to liability.

158. The 2012 Form 10-K included Sarbanes-Oxley certifications, signed by Defendants Smith and Tran, containing substantially identical statements as set forth in ¶ 151. These statements were materially false and misleading because, as set forth above, the 2012 Form 10-K omitted to disclose the Civil Investigative Demand into BioScrip's Exjade Kickback Scheme and falsely represented that BioScrip was in compliance with federal and state healthcare regulations when, in fact, BioScrip had engaged in a kickback scheme that violated anti-kickback laws and the False Claims Act for more than 5 years, including for a substantial portion of 2012, which was covered by this filing.

159. Shortly after BioScrip released its 2012 10-K and following the close of the first fiscal quarter, the Company commenced the April 2013 Offering. The offering materials (including both the prospectus and prospectus supplement) filed by BioScrip in connection with the Offering were silent with respect to the government's investigation and the problems negatively affecting the Company's PBM segment. Instead, the offering materials incorporated by reference Defendants' false and misleading statements in the 2012 Form 10-K described

above in ¶¶ 152 to 158 and included the false and misleading statements described below in ¶¶ 301 to 306 and 308 to 310.

### C.   The Quarter Ended March 31, 2013

160.   The Company continued to conceal the government's investigation in its Form 10-Q for the quarter ended March 31, 2013 (the "2013 First Quarter 10-Q") filed on May 9, 2013. Defendant Bogusz signed the 10-Q, and Defendants Smith and Tran certified that its contents were accurate pursuant to their obligations under the Sarbanes-Oxley Act.

161.   In the 2013 First Quarter 10-Q, the Company again represented that it was in substantial compliance with healthcare regulations, including the anti-kickback laws. The Company also continued to conceal the existence of the Civil Investigative Demand, even though, by the time of this filing, it had been responding to the government's demand for six months. Specifically, the 10-Q stated:

> From time to time, the Company responds to subpoenas and requests for information from Governmental agencies. The Company cannot predict with certainty what the outcome of any of the foregoing might be. *While the Company believes it is in substantial compliance will [sic] all laws, rules and regulations that affect its business and operations, there can be no assurance that the Company will not be subject to scrutiny or challenge under one or more existing laws or that any such challenge would not be successful.*

162.   The above statement was materially false and misleading because Defendants concealed the fact that, at the time this statement was made, BioScrip was already the subject of a government investigative demand regarding its dealings with Novartis concerning the distribution and marketing practices for Exjade. Contrary to the Company's statement that "there can be no assurance that the Company will not be subject to scrutiny or challenge under one or more existing laws," the Company had received the investigative demand in October 2012, six months before making this statement, and was in the process of responding to it. This statement gave investors the misleading impression that the Company was not exposed to any known

government liability when, in reality, from its response to the Civil Investigative Demand, Defendants knew that it faced serious exposure to liability. The Company again misleadingly disclosed that it was at a general risk of a potential investigation without disclosing that this risk had already come to pass.

163.    The Company also made false and misleading statements related to its collapsing PBM business segment during the release of its financial results for the first quarter of 2013. In its press release issued on May 8, 2013, the Company disclosed a $3.1 million, or 10.4%, quarterly decline in the PBM Services segment's revenue from the same quarter in 2012. The Company attributed this decline primarily to "a reduction in discount card volume." BioScrip repeated this disclosure in the 2013 First Quarter 10-Q. Despite reporting this decrease, the May 8, 2013 press release "reaffirm[ed] [the Company's] initial 2013 revenue target of $830.0 million to $865.0 million and 2013 Adjusted EBITDA target of $67.0 million to $73.0 million."

164.    The Company downplayed the decrease in PBM revenue during an investor conference call the following day. For example, Defendant Tran reassured investors and analysts that the Company's PBM business would not experience further declines in the coming quarters, but would remain "flat." Specifically, in response to an analyst's question regarding his outlook for the PBM business, Tran stated that "*[i]t will be relatively flat*." Defendant Smith also participated in this call and did not correct Tran's statement.

165.    These statements were materially false and misleading because the Company and Defendants Smith, Tran, and Bogusz failed to disclose that BioScrip had lost a major PBM client on March 31, 2013, which would have a material negative impact on the Company's earnings. These Defendants also omitted to disclose that BioScrip's discount-card brokers were reducing and delaying their marketing efforts because, as CW 5 noted, BioScrip's pricing of the discounts

offered by its cash cards was becoming progressively worse, to the extent that at least one such broker, Watertree Health, would shortly stop doing new business with the Company. This slowdown in marketing would also have a material negative impact on the Company's earnings. Specifically, the Company's attribution of the decline in PBM Services revenue primarily to "a reduction in discount card volume" was misleading because it omitted to disclose these problems that were negatively affecting the PBM segment and served to minimize the extent and severity of the problems. Similarly, Tran's statement that the PBM business "will be relatively flat" was false because Tran and the other senior executives at BioScrip knew that these problems would have a materially negative impact on the segment's earnings. Accordingly, the outlook for the PBM Services was not "flat" as the Company represented to investors.

166.    The 2013 First Quarter 10-Q included Sarbanes-Oxley certifications, signed by Defendants Smith and Tran, containing the same statements as set forth in ¶ 151. The statements set forth above were materially false and misleading because, as set forth above, the 10-Q omitted to disclose the Civil Investigative Demand into BioScrip's Exjade Kickback Scheme and the problems affecting its PBM Services segment.

167.    Analysts were encouraged by BioScrip's representations. Stephens raised its price target from $15.00 to $17.00 on May 10, 2013. Jefferies initiated coverage on BioScrip on May 21 with a "BUY" rating and a $17 price target, noting that "[o]ur positive view on BIOS is driven primarily by our expectation for sustained, robust top line and EBITDA growth over the next five years."

## VII.  PARTIAL DISCLOSURES, MORE FALSE STATEMENTS, AND THE GRADUAL EMERGENCE OF THE FULL IMPACT OF DEFENDANTS' SCHEMES

168.    BioScrip's cover-up of both its Exjade Kickback Scheme and its collapsing PBM Services business began to unravel starting in August 2013.

A.   **August 7, 2013: BioScrip Acknowledged Problems in Its PBM Services Segment**

169.   On August 7, 2013, BioScrip issued its second-quarter 2013 earnings press release, in which it disclosed an unusually large decline in the Company's PBM revenue, which declined from first quarter to second quarter by $10.4 million, or approximately 39%. For the first time, the Company disclosed some of the problems plaguing the PBM Services segment, attributing the segment's decline primarily to "the loss of one low-margin client" as well as a "decline in discount card volume . . . due to a decrease in marketing from certain distribution partners."

170.   The next day, on BioScrip's investors call, Defendant Smith stated that $9.1 million of the $10.4 million decrease in PBM Services revenue was attributable to the lost client. Smith additionally explained that the PBM business was negatively affected because "certain of our existing brokers reduced or delayed their marketing spend, which resulted in reduced sales and profit contribution."

171.   On this news, the price of BioScrip stock dropped over $3.00 per share from $16.63 to $13.56, or 18%, on heavy volume by the close of market on August 8.

172.   The Company downplayed PBM Services' negative performance, however, by focusing on the PBM segment's stability and the volume of new business that it was purportedly generating. Specifically, the Company assured investors that "overall discount card volume should benefit from the implementation by new distribution partners of prescription discount cards through their pre-existing network." Defendant Smith also assured analysts and investors that "the cash flow from [PBM Services] has helped us fund investments" in the Company and that "[w]e also continued to see utilization of discount cards, as well as interest from patients and new distribution partners."

58

173.   Defendant Tran further noted that "the market for these cards [is] *not* going away" and that "there is a large and growing number of underinsured, relative to their prescriptions needs, and that I think is where the opportunity is." Tran concluded that "these [discount card] programs are still ways to address a growing underinsured population."

174.   BioScrip further assured the market that the PBM business did not affect its outlook for the Company's financial results. Indeed, BioScrip specifically reiterated its 2013 guidance, and Tran assured analysts and investors that this continued guidance reflected the Company's "current assessment for the PBM segment."

175.   These statements were materially false and misleading because the Company, though forced to admit some of the problems affecting its PBM Services segment, continued to conceal the extent of the problems that were then hurting the segment. For example, despite the Company's continued statements that discount-card volume would remain "flat" and that there were opportunities to increase volume, the Company's discount-card volume was actually continuing to experience steady deterioration throughout the year.

176.   Analysts were comforted by the Company's statements. For example, Feltl and Company reported on August 9, 2013 that the Company's PBM Services business "has effectively reset and should not experience further pressure," that Feltl and Company "expect[ed] continued flat growth" in the segment, and that "after resetting [PBM's] base we do not expect a further step down." Dougherty noted on August 12, 2013 that "we remain convinced management can effectively utilize the cash flows [BioScrip's PBM] business generates."

177.   The Company's Form 10-Q for the quarter ended June 30, 2013 filed on August 8, 2013 (the "2013 Second-Quarter 10-Q") also repeated the Company's false and misleading statements regarding its compliance with healthcare laws and continued to conceal the existence

of the government investigation as set forth above at ¶¶ 161 to 162. These statements were false and misleading because, at the time these statement were made, BioScrip had been subject to the Civil Investigative Demand for *nine months*.

178.    Importantly, the Company's false assurances, as well as its continued concealment of the Civil Investigative Demand, prevented an even steeper decline in the price of BioScrip stock. Indeed, shortly after Defendants made the August 7 and 8 partial disclosures and further false statements, the Company commenced the August 2013 Offering in which Kohlberg, as selling stockholder, sold approximately 6.9 million shares of BioScrip common stock to realize almost $90 million. In connection with this Offering, BioScrip filed the prospectus dated April 4, 2013 and a prospectus supplement dated August 13, 2013. Neither of these filings disclosed the government investigation into BioScrip's Exjade Kickback Scheme or the full extent of the problems affecting the PBM segment. Instead, both the prospectus and prospectus supplement incorporate by reference the Company's false and misleading statements contained in its 2012 Form 10-K (as described above at ¶¶ 152 to 157), 2013 First Quarter 10-Q and 2013 Second Quarter 10-Q (as described above at ¶¶ 161, 162, 163, 165 and 177).

**B.     September 23 and 24, 2013: BioScrip Disclosed the Government
Investigation and Admitted to Continued Deterioration in PBM Services**

179.    A little over a month later, but only after Defendants sold additional stock, BioScrip's cover-up of both the Exjade Kickback Scheme itself and the government's investigation into the scheme began to unravel. On September 23, 2013, the Company finally acknowledged in a Form 8-K that "[p]ursuant to a civil investigative demand issued by the United States Attorney's Office for the Southern District of New York and a subpoena from the New York State Attorney General's Medicaid Fraud Control Unit" the Company had "produc[ed] documents and information regarding the distribution of" Exjade. Further, the Company

disclosed that "[o]n September 11, 2013, the Company was advised by the government that it plans to engage in discussions with the Company regarding its investigation. The investigation is civil in nature. To the Company's knowledge, no proceedings have been initiated against it at this time."

180.    As a result of this disclosure, the price of BioScrip common stock dropped by $0.62, or almost 6%, on September 23 on heavy trading volume.

181.    The next day, Defendant Smith presented the Company's disclosure as a purported effort on its part to proactively inform the investing public about the investigation at the first opportunity. Indeed, the Company framed the investigation as a recently commenced, preliminary inquiry by the government, failing to disclose that the investigation had already been proceeding for almost a year. For example, during the presentation to investors, Defendant Smith remained silent about the length and depth of the government's investigation—including that BioScrip had already produced documents to the government and that the government had already begun interviewing Company employees—portraying it as a preliminary inquiry and stating that the Company's "voluntary disclosure" was simply "in the best interest of both the company and its investors to provide transparency regarding this matter." BioScrip was still concealing all details of the actual Exjade Kickback Scheme along with the advanced stage of the government investigation.

182.    The Company also framed the Company's longstanding kickback scheme as a discrete issue tied to a divested segment of the Company. For example, the 8-K disclosing the investigation stated that the investigation was focused entirely on the distribution of Exjade "by the Company's legacy specialty pharmacy division that was divested," and Defendant Smith similarly emphasized this point during the Company's presentation to investors, noting that "the

company sold its legacy specialty pharmacy division in May 2012." These statements were misleading and served to minimize the impact the investigation would have on the Company.

183.    BioScrip and its CEO were concealing from investors the serious consequences that the Company was facing as a result of the investigation. By September 23 and 24, 2013, BioScrip's senior management well knew that the government was investigating the kickback-tainted claims that the Company had submitted for Medicare and Medicaid reimbursement in violation of anti-kickback laws and the FCA. In addition, as it had repeatedly represented to investors in its SEC filings, the Company knew that violating those laws could result in substantial civil liability and criminal penalties, as well as the Company's suspension or exclusion from the Medicare and Medicaid programs. These were enormous risks for the Company, especially considering the fact that it derived almost a quarter of its annual revenue from Medicaid and Medicare reimbursements. But the Company's disclosures of September 23 and 24 were completely silent about the extraordinary threat that the investigation posed to the Company's future.

184.    Analysts accepted the Company's misleading representations. Stephens for example, stated on September 23 that the investigation "actually relates to the specialty pharmacy business which BIOS sold to Walgreen's . . . in May 2012 so this should not impact current operations." In addition, Dougherty stated in a September 23 report that "[w]e sense this is a preliminary request and it does not appear [to be] a significant threat to BIOS or investors."

185.    The Company also made further partial disclosures and further false statements regarding its PBM Services business during the September 24 investor presentation. During that presentation, the Company adjusted its expectations for the segment, with management now saying that they expected the PBM business to contribute $17 million in 2013 EBITDA

compared to their earlier estimate of $21 million, a decline of nearly 20%. Defendant Tran also discussed the continued deterioration of the segment, stating that "PBM continues to show signs of risk" and that the Company was taking "lumps and . . . body blows from the PBM business."

186.    But BioScrip again downplayed the problems affecting its PBM business. Defendant Tran assured investors that the PBM business's sales volume would remain level, stating that "[v]olumes were *steady* for Q3."

187.    This statement was false. Defendant Tran made this statement *only four business days* before the end of the third quarter of 2013, and as BioScrip would later reveal in November 2013 when disclosing its results for that quarter, PBM volumes for that quarter were not "steady." Instead, the PBM segment had continued to suffer a decrease in volume throughout the quarter. BioScrip either knew or recklessly failed to discover the reality of the quarter's declining PBM Services volume. Instead of accurately disclosing to investors the state of the segment, the Company falsely assured them that it was "steady" at a time when it was not.

188.    Even though full disclosure was not yet made, investors reacted negatively to the Company's partial disclosures about both the government investigation and the PBM Services segment. BioScrip's share price plummeted over 18% ($1.94 per share) on September 24 alone. Ultimately, over a two-day trading period, BioScrip's share price dropped from $11.07 per share on Friday, September 20, 2013, to $8.47 per share on Tuesday, September 24, 2013—an overall drop of 23% (or $2.60 per share). This massive stock-price decline eliminated over $175 million in shareholder value on unusually heavy trading volume.

**C.     November 6, 2013: BioScrip Disclosed a $15 Million Estimated Liability With Regard to the Government Investigation and Finally Revealed the Full Truth About Its PBM Services Segment**

189.    The Company was ultimately required to disclose further developments regarding the government investigation in connection with its earnings for the third quarter of 2013. On

November 6, 2013, the Company disclosed in a press release that it had accrued a $15 million litigation reserve in connection with the government's investigation. On an investors conference call the next day, Defendant Smith repeated the $15 million estimate and noted that "[t]he actual outcome is uncertain and the actual loss could be higher."

190.    This $15 million estimated liability was a significant blow to BioScrip since, as Noble Financial Capital Markets stated on November 8, the Company "ended the third quarter with no cash and approximately $415.6 million in total debt." As Jefferies noted on November 14, "investors have grown weary of BIOS's tight liquidity positions." Indeed, as was later revealed when BioScrip settled the government's charges, $15 million was the government's view of the *most* BioScrip could afford to pay.

191.    BioScrip was also forced to finally disclose the full truth about the collapse of its PBM Services segment. In the November 6 press release, the Company disclosed that it had suffered its third straight quarterly decrease in PBM Services revenue due to "decreases in the funded PBM and prescription discount card businesses, primarily from the termination of a contract with a large, low-margin, funded PBM client, as well as a decrease in volume in the prescription discount card business." On the following day's investors call, Defendant Smith stated that "the third quarter was heavily impacted by headwinds associated with our non-core businesses" and that "[w]ith regard to our PBM services segment, revenues [were] down this quarter due to a reduction in volume from discount card distributors."[4] Indeed, in stark contrast to the Company's statements four business days before quarter-end on September 24 that PBM

---

[4]    Defendants also admitted that the Company had experienced a significant decrease in PBM Services volume during the third quarter of 2013 in its Quarterly Report filed with the SEC on Form 10-Q on November 12, 2013. The Quarterly Report admitted that the overall decrease in PBM Services revenue for the quarter "is primarily the result of a decline in volume."

Services volumes were "steady" for the quarter, Defendant Tran finally admitted that "[o]ur PBM services segment volume continues to weaken" and that the PBM Services business "is still challenged."

192.     Upon disclosure of the $15 million litigation reserve and the continuing collapse of the Company's PBM Services segment, the price of BioScrip stock dropped another $1.54, or over 20%, and a further $104.9 million in shareholder value was wiped out.

193.     The truth about the Company's Exjade Kickback Scheme was finally revealed only when the Company had no other choice given that its settlement with the government would be made public on the *same* day. On January 8, 2014, the Company disclosed in a Form 8-K that it had entered into the Settlement Stipulation with the U.S. government effective as of that day. As part of the settlement, BioScrip agreed to pay the government $15 million. But the $15 million settlement did not reflect BioScrip's full liability for its unlawful Exjade Kickback Scheme. Indeed, the Settlement Stipulation explicitly stated that "in connection with its discussions with the United States, BioScrip has submitted records and information regarding its financial circumstances, and has demonstrated to the United States that BioScrip lacks the financial wherewithal to pay certain damages and penalties sought by the United States in connection with its claims against BioScrip."

194.     On that same day, the government publicly filed and released both the Government Complaint, which described the mechanics of the kickback scheme in meticulous detail, and the Settlement Stipulation, in which BioScrip admitted many of the facts in the Government Complaint. For the first time, BioScrip's investors were able to learn the true extent of the Company's wrongdoing in the Exjade scheme.

## VIII.   ALLEGATIONS CONFIRMING DEFENDANTS' SCIENTER

195.   Numerous facts give rise to a strong inference that, throughout the Class Period, Defendants BioScrip, Smith, Tran, and Bogusz knew or recklessly disregarded that their statements and omissions set forth herein were materially false and misleading when made. Specifically, as a result of the following, Defendants knew, or recklessly disregarded, that: (i) BioScrip was being investigated by the government for false claims submitted for Medicare and Medicaid reimbursement through its kickback scheme with Novartis; (ii) BioScrip violated anti-kickback laws and the FCA through its Exjade Kickback Scheme; and (iii) the Company's PBM Services segment was suffering myriad problems throughout 2013 that were materially harming that segment's business:

196.   *First*, the government's Civil Investigative Demand and following investigation are compelling evidence of scienter. As explained above, in October 2012, the government served the Company with its Civil Investigative Demand, which made clear that the government was investigating BioScrip's relationship with Novartis and its distribution of Exjade for violations of the anti-kickback laws and the FCA. Given the seriousness of such an investigation, including that it: (i) involved a scheme whereby BioScrip focused exclusively on profitability to the detriment of patient care and, in some cases, patients' lives; (ii) could have jeopardized the Company's participation in and reimbursements from Medicare and Medicaid, which accounted for approximately 25% of the Company's revenues annually; and (iii) could have—and in fact did—subject the Company to significant civil liability, it is not plausible that the Officer Defendants were not aware of the October 2012 Civil Investigative Demand and the Company's response.

197.   This is especially true given that the Company was responding to the Civil Investigative Demand, including by producing documents and providing government

investigators with access to employees, for nearly one year before the Company disclosed the existence of the investigation. Indeed, by no later than the summer of 2013, Company employees were being interviewed by the government and discussing amongst each other the subject of that investigation. For example, both CW 1 and CW 2 confirmed that numerous former Company employees, including key members of BioScrip's Exjade Team, were being interviewed by government investigators from both state and federal agencies. On information and belief, the government was also interviewing current BioScrip employees at that time. Thus, it was known within BioScrip—before the Company disclosed the investigation—that the government's investigation into BioScrip's Exjade scheme involved both federal and state agencies and was directly related to potentially false Medicare and Medicaid claims.

198.    *Second*, the facts and circumstances of the Government Complaint and BioScrip's factual admissions establish the scienter of each of the Officer Defendants and BioScrip. For example, the kickback scheme involved one of the most profitable drugs for BioScrip and caused the Company to reap tens of millions of dollars in unlawful rebates, fees, and reimbursements. Moreover, the kickback scheme involved BioScrip submitting more than 40,000 false claims to Medicare and Medicaid. Exjade's importance to the Company's profitability and the sheer volume of false claims submitted are evidence of scienter. Similarly, the duration and magnitude of the kickback scheme are evidence of scienter. The scheme spanned more than five years, encompassing twenty-one consecutive quarters, during which the Company: (i) developed an intensive protocol involving a dedicated Exjade Team and scripted talking points meant to convince patients to refill their Exjade prescriptions or restart Exjade treatment; (ii) actively marketed its Exjade program and met with Novartis executives on numerous occasions for this purpose; (iii) received three different types of kickbacks from Novartis in exchange for pushing

the drug; and (iv) was twice placed on probation by Novartis and engaged in intense efforts to increase its numbers of Exjade refills and restarts. These facts demonstrate the duration, severity, and extent of the Company's unlawful scheme and are further evidence of scienter.

199.  *Third*, the Government Complaint describes how the details of the Exjade Kickback Scheme were known throughout the Company. In fact, the scheme was the subject of high-level meetings and reports. For example, the government's investigation uncovered that in a February 2009 strategy presentation, a BioScrip account-management executive summarized what Novartis had conveyed regarding its marketing goals and the tactics for pushing Exjade, and then declared that the "BioScrip Strategic Plan [for Exjade] is to mirror and support Novartis priorities." Furthermore, the nature of the scheme was known and discussed openly at the Company. For example, the Government Complaint discusses how a former BioScrip Exjade Team member explained that "keep[ing] Novartis happy" was BioScrip's "top priority." In addition, a former BioScrip supervisor explained under oath to the government that BioScrip was "focused exclusively on the number of orders and refill rates, rather than on patient care." Similarly, CW 2, a former member of BioScrip's Exjade Team, stated that the Exjade Team "often felt that we were pushing the drug for profitability as much as patient care" and that BioScrip was focused on meeting its quarterly numbers. The fact that Defendants were on notice of the specifics regarding the Company's Exjade distribution practices supports a strong inference of Defendants' scienter.

200.  *Fourth*, Defendants' scienter is further demonstrated by the fact that compliance with all healthcare laws and regulations was central to its reputation and success. Indeed, the Company's reputation for strict compliance with federal and state healthcare laws was of critical importance to BioScrip's investors and customers because the healthcare industry is heavily

regulated and the consequences of not complying with federal and state regulations can be devastating to a company. BioScrip therefore made clear to its investors, physicians, and patients that it was devoted to compliance. As Defendant Smith stated on the Company's August 8, 2011 investor call, "[e]nsuring that a compliance culture, training, practices and procedures are effective, is of the highest priority every day at BioScrip." The Company similarly boasted throughout the Class Period in numerous filings with the SEC that BioScrip's "[m]anagement strives to maintain the Company in substantial compliance with all existing laws and regulations material to the operation of its business." As set forth in the Government Complaint, Defendants were also required to—and did—*affirmatively certify* that the Company strictly complied with healthcare regulations, including anti-kickback laws and the FCA, in order to submit claims for Medicare and Medicaid reimbursement. The fact that the misstatements and omissions at issue here went directly to this core reputational factor further supports a strong inference of Defendants' scienter. This is particularly true given that Defendants held themselves out as knowledgeable regarding the Company's compliance practices in the Company's SEC filings and on its conference calls.

201.    *Fifth*, the fact that the PBM Services segment was such a significant part of the Company's business is strong evidence of Defendants' scienter. Specifically, BioScrip's PBM Services segment was critical to the Company's success, constituting nearly 20% of the Company's annual revenue and 40% of EBITDA, and providing vital cash flow to fund the Company's aggressive growth. In addition, Defendant Bogusz oversaw the PBM segment in Eden Prairie; Bogusz held monthly reviews with the Company's PBM finance team; the PBM segment's three directors reported to Bogusz; Defendants Smith and Tran were involved in managing the PBM segment; Bogusz reported to Tran; Daniel Colucci—who managed

BioScrip's PBM business—would express any concerns or information regarding the PBM segment directly to Smith; and BioScrip's senior executives would often receive reports on the PBM segment. The fact that the misstatements and omissions at issue here related to one of BioScrip's critical business segments supports a strong inference of Defendants' scienter.

202.    *Sixth*, Defendants' scienter is further demonstrated by the size and importance of the PBM Services client that it lost on March 31, 2013. Indeed, that large client comprised approximately 33% of the segment's quarterly revenue. Thus, PBM Services' earnings for the second quarter of 2013 suffered a $9.1 million dollar decline from that one lost client alone. Because this one client was so important to the segment's performance, BioScrip and Defendants Smith, Tran, and Bogusz—the most senior executives at the Company—knew or should have known about this lost client as of March 31, 2013. Indeed, given the significant ramifications of the loss of this client to the Company, it is not plausible that these Officers were not aware of the loss as soon as it happened, especially since according to former employees they were involved in this business and it was such a small business that everyone knew everything about what was going on.

203.    *Finally*, Defendants Bogusz and Kohlberg engaged in suspicious insider trading during the Class Period to collectively reap over $90 million. As discussed in detail above, in late August 2013—shortly after the Company's first partial disclosures regarding the state of its PBM Services segment and only a few weeks before it first disclosed the government's investigation into its Exjade scheme—Defendant Kohlberg sold approximately 6.9 million shares of BioScrip common stock at an artificially inflated price, and Defendant Bogusz also sold shares at an artificially inflated price. The suspicious timing and amounts of these sales further support a strong inference of Defendants Kohlberg's and Bogusz's scienter, as well as the Company's.

## IX.   DEFENDANT KOHLBERG CONTROLLED BIOSCRIP AND PARTICIPATED IN BIOSCRIP'S FRAUD

204.   Kohlberg, which is BioScrip's largest shareholder and also holds two seats on the Company's eight-person Board of Directors, exercises significant control over the Company.

205.   Kohlberg's relationship with BioScrip began in 2010, when Kohlberg sold Critical Homecare Solutions Holdings, Inc. ("CHS") to the Company and obtained a significant stake in BioScrip as a result of the BioScrip-stock consideration paid. Kohlberg beneficially owned approximately 15.7 million shares, or approximately 26%, of BioScrip's common stock at the time of the April 2013 Offering. Even after selling approximately 4 million shares in that Offering, Kohlberg retained beneficial ownership of approximately 11.7 million shares, or approximately 17%, of BioScrip's common stock at the time of the August 2013 Offering.

206.   In connection with Kohlberg's sale of CHS to BioScrip, the Company and Kohlberg entered into a stockholders' agreement that granted Kohlberg the right to designate up to two directors to be nominated for election to the Company's board of directors. Kohlberg designated Samuel P. Frieder—Kohlberg's Managing Partner—and Gordon H. Woodward—a Partner and Chief Investment Officer at Kohlberg—as its representatives for nomination to the Board. Both Frieder and Woodward were appointed to BioScrip's board upon the closing of the CHS acquisition and have remained on the board ever since.

207.   As a result of Kohlberg's position as BioScrip's largest shareholder and its two board seats, Kohlberg was able to and did exercise significant control over the Company, including the oversight of BioScrip's business management and direction of its economic interests throughout the Class Period.

208.   Indeed, analysts covering BioScrip specifically noted Kohlberg's control over the Company. For example, BB&T Capital Markets stated in a September 28, 2011 report that

Kohlberg "has substantial influence" over BioScrip. Dougherty also stated in a November 9, 2012 report that the influence of Kohlberg's two board designees "brought experience and stability" to the BioScrip Board.

209. Kohlberg participated in the schemes at issue in this action through its control over both Frieder and Woodward. As directors of BioScrip and members of certain Board committees, Frieder and Woodward were privy to non-public information and were responsible for, and participated in, the preparation and dissemination of BioScrip's SEC filings and other public statements that contained materially false information. For example, through Kohlberg's active representation on BioScrip's board, it knew by October 2012 at the latest of the government's investigation into the Company's illegal Exjade scheme when the Company was served with the Civil Investigative Demand, and was complicit in the ensuing cover-up of both the Demand and the scheme itself. Indeed, as directors, and while in the possession of adverse non-public information about the Company, both Frieder and Woodward signed the Company's false and misleading annual report on Form 10-K for the fiscal year 2012.

210. Further, Frieder and Woodward, as members of BioScrip's Governance and Nominating Committee and its Audit Committee, respectively, knew or recklessly failed to discover that BioScrip: (i) had been violating anti-kickback laws and the FCA through the Exjade Kickback Scheme; (ii) was the subject of an intensive government investigation in connection with that scheme; and (iii) was concealing both the Exjade scheme and the collapse of its PBM Services segment from investors.

211. Specifically, Frieder is a member of BioScrip's Governance and Nominating Committee. That committee's charter states that "[t]he Committee will monitor on an ongoing basis regulatory and legal compliance issues and activities affecting or involving the Company,

[and] conduct an annual review of the Company's compliance program, policies and practices. *The Committee will also meet periodically with the Company's chief compliance officer to review the Company's compliance with applicable law.*" Accordingly, throughout the Class Period, Frieder actively reviewed and was (or should have been) aware of any compliance issues— including the Civil Investigative Demand—that the Company was facing as well as whether or not the Company's operations were in compliance with the anti-kickback laws and the FCA.

212.   In addition, Woodward sits on BioScrip's Audit Committee. According to that committee's charter, the Audit Committee "review[s] the Company's policies and practices with respect to risk assessment and risk management" and also "review[s] with the chief executive officer and the chief financial officer the Company's disclosure controls and procedures" and "review[s] periodically, but no less frequently than quarterly, management's conclusions about the efficacy of such disclosure controls and procedures, including any significant deficiencies in, or material non-compliance with, such controls and procedures." As such, throughout the Class Period, Woodward was charged with reviewing the Company's disclosure controls and procedure, and whether Defendants had not complied with those procedures when they made the numerous false and misleading statements described above.

213.   Thus, both of Kohlberg's board representatives were intimately involved in reviewing the Company's compliance with applicable laws and its disclosures pertaining to both compliance and the operating performance of its PBM Services segment.

214.   Ultimately, Kohlberg exploited its control over BioScrip and cashed in on the Company's artificially inflated stock price by selling almost 11 million shares of the Company's common stock during the Class Period. As discussed above, Kohlberg sold approximately 4 million shares of BioScrip's common stock in the April 2013 Offering and approximately 6.9

million shares of the Company's common stock in the August 2013 Offering to realize a total of over *$130 million* through the Offerings.

215.    Kohlberg's control over BioScrip is further demonstrated by the fact that following the August 2013 Offering, Kohlberg was obligated to cause the removal or the resignation of both of its Board designees under the stockholders agreement because it then owned less than 50% (which allowed Kohlberg to nominate two representatives to the Board) and less than 15% (which allowed Kohlberg to nominate one representative to the Board) of the BioScrip shares that Kohlberg had acquired from selling CHS to BioScrip in 2010. But as the Company disclosed in an August 19, 2013 Form 8-K, the Company and Kohlberg amended the stockholders' agreement to waive Kohlberg's obligation to remove its directors. The fact that Kohlberg negotiated an agreement to maintain its Board positions even while divesting itself of most of its holdings in the Company further demonstrates its control over BioScrip.

## X.    LOSS CAUSATION

216.    The Exchange Act Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial losses. As set forth above in Section V, Section VI and Section VII, the price of BioScrip's common stock significantly declined (causing investors to suffer losses) when the Exchange Act Defendants' misrepresentations and omissions and the effects thereof were revealed, or the risks that had been fraudulently concealed by Defendants materialized. Specifically, the Exchange Act Defendants' false and misleading statements and omissions misrepresented the Company's participation in the unlawful Exjade Kickback Scheme and the existence of a government investigation into that scheme, as well as the strength and stability of BioScrip's PBM Services business. Investors suffered losses as the price of BioScrip stock declined when those statements and omissions were corrected and the risks concealed by them materialized, including when the Company's

participation in the Exjade Kickback Scheme, the existence of an intensive government investigation into the Exjade Kickback Scheme, specific problems affecting the Company's PBM Services segment, and the significant losses being incurred by the PBM Services segment were disclosed to the market. As set forth herein, when the true facts became known or the materialization of the risks that had been fraudulently concealed by the Exchange Act Defendants occurred, the price of BioScrip common stock declined precipitously as the artificial inflation was removed from the market price, causing substantial damage to Plaintiffs and the members of the Class.

217.   Accordingly, as a result of their purchases of BioScrip's common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss and damages.

## XI.   PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET AND *AFFILIATED UTE*

218.   Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine in that, among other things:

   a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   b.   The misrepresentations and omissions were material;

   c.   The Company's stock traded in an efficient market;

   d.   The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

   e.   Plaintiffs and other members of the Class purchased BioScrip common stock between the time defendants misrepresented or failed to disclose material facts

and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

219.    At all relevant times, the market for BioScrip's common stock was an efficient market for the following reasons, among others:

       a.  The Company's common stock was actively traded on the NASDAQ, a highly efficient market;

       b.  The average daily trading volume for BioScrip common stock during the Class Period was 759,747 shares. The average weekly turnover as a percentage of shares outstanding was 5.80% (median of 4.20%);

       c.  As a regulated issuer, the Company filed periodic public reports with the SEC;

       d.  BioScrip was followed by numerous securities analysts, who issued a significant number of reports on BioScrip during the Class Period;

       e.  BioScrip was eligible to and did register securities using Form S-3; and

       f.  BioScrip communicated with public investors via established market communication mechanisms, including the regular issuance of press releases through the Business Wire news service and conference calls with analysts and investors.

220.    As a result, the market for BioScrip's common stock promptly digested current information with respect to BioScrip from all publicly available sources and reflected such

information in the price of the Company's common stock. Under these circumstances, purchasers of the Company's publicly traded common stock during the Class Period suffered similar injury through their purchase of BioScrip's publicly traded common stock at artificially inflated prices, and a presumption of reliance applies.

221.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because, as set forth above, Plaintiffs' fraud claims are grounded in Defendants' material omissions. As this action involves Defendants' failure to disclose material adverse information, including the Company's unlawful kickback scheme, the government's investigation of that scheme, and the severe problems in the PBM Services segment—information that Defendants were obligated to disclose in light of their statements on these topics—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

## XII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS-CAUTION DOCTRINE

222.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.

223.    None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements of reported financial results and business practices. Given the then-existing facts contradicting the Defendants' statements, the generalized risk disclosures made by BioScrip, including those regarding the Company's

financial condition and legal risks, were not sufficient to insulate the Defendants from liability for the statements they made because those statements were materially misstated when made.

224.    To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted the Defendants' alleged false or materially misleading statements.

225.    To the extent that the statutory safe harbor may apply to any of the false statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker actually knew the statement was false or the statement was authorized or approved by an executive officer of BioScrip who actually knew that the statement was false when made.

226.    In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and the Defendants failed to update those statements that later became inaccurate.

## XIII.   CLASS ACTION ALLEGATIONS

227.    Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons or entities that acquired BioScrip common stock during the Class Period and who suffered damages as a result (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate families of the Defendants who are natural persons; (iii) the subsidiaries and affiliates of Defendants; (iv) any person or entity who is a partner, executive officer, director, or controlling person of BioScrip or of any other Defendant; (v) any entity in which any Defendant has a

controlling interest; (vi) Defendants' liability insurance carriers; and (vii) the legal representatives, heirs, successors, and assigns of any such excluded party.

228.   The members of the Class are so numerous that joinder of all members is impracticable. As of November 7, 2013, BioScrip had 68,109,366 shares of common stock outstanding. Throughout the Class Period, BioScrip's common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believes that Class members number at least in the thousands.

229.   Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and other members of the Class acquired BioScrip common stock in the open market during the Class Period. Plaintiffs and members of the Class also acquired BioScrip common stock pursuant to the Shelf Registration Statement, under which both the April 2013 and August 2013 Offerings were made, and sustained damages as a result of Defendants' conduct.

230.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Class.

231.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

232.   Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.  whether the federal securities laws were violated by Defendants' conduct as alleged herein;

b.  whether the SEC filings, press releases, and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

c.  whether the Shelf Registration Statement and the prospectuses for the April 2013 Offering contained material misstatements or omitted to state material information;

d.  whether the Shelf Registration Statement and the prospectuses for the August 2013 Offering contained material misstatements or omitted to state material information;

e.  whether and to what extent the market price of BioScrip's common stock was artificially inflated during the Class Period due to the omissions and misstatements complained of herein;

f.  whether, with respect to Plaintiffs' claims under the Exchange Act, defendants named in those claims acted with scienter;

g.  whether, with respect to Plaintiffs' claims under the Exchange Act, reliance may be presumed pursuant to the fraud-on-the-market doctrine or *Affiliated Ute*;

h.  whether, with respect to Plaintiffs' claims under the Securities Act, defendants named in those claims can sustain their burden of

establishing an affirmative defense under the applicable statute;
and

i.  whether the members of the Class have sustained damages as a
result of the conduct complained of herein, and if so, the proper
measure of damages.

233.  The names and addresses of those persons and entities who purchased or sold
BioScrip common stock during the Class Period are available from the Company's transfer
agent(s) or from the Underwriter Defendants. Notice may be provided to Class members via
first-class mail using techniques and a form of notice similar to those customarily used in
securities class actions.

## XIV.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**Against Defendants BioScrip, Smith, Tran and Bogusz**

234.  Plaintiffs repeat and reallege all paragraphs set forth above as if fully set forth
herein.

235.  During the Class Period, the Exchange Act Defendants named in this Count (a)
deceived the investing public, including Plaintiffs and other Class members, as alleged herein;
(b) artificially inflated and maintained the market price of BioScrip's common stock; and (c)
caused Plaintiffs and other members of the Class to purchase BioScrip's common stock at
artificially inflated prices.

236.  As a result of their making affirmative statements and reports to the investing
public, the Exchange Act Defendants had a duty to promptly disseminate truthful information
that would be material to investors in compliance with the integrated disclosure provisions of the

SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, performance and compliance with the law, so that the market prices of BioScrip's publicly traded common stock would be based on truthful, complete, and accurate information.

237.   The Exchange Act Defendants made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading, which operated as a fraud and deceit upon the purchasers of BioScrip's common stock, in an effort to maintain artificially high market prices for the BioScrip common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

238.   The Exchange Act Defendants directly and indirectly, by the use of means and instrumentalities of interstate commerce and the mails, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made about the Company, in light of the circumstances under which they were made, not misleading, as set forth herein.

239.   The Exchange Act Defendants named in this Count had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The facts alleged herein set forth a strong inference that each of the Exchange Act Defendants named in this Count acted with scienter.

240.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of BioScrip's common stock was artificially inflated throughout the Class Period. In ignorance of the fact that the market price of BioScrip's common stock was artificially inflated, and relying directly or

indirectly on the false and misleading statements and omissions made by the Exchange Act Defendants, or upon the integrity of the market in which such shares trade, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which such statements were made, and on the absence of material adverse information that was known or recklessly disregarded by the Exchange Act Defendants but not disclosed in public statements by these Defendants, Plaintiffs and the other members of the Class purchased BioScrip's common stock at artificially high prices, and were damaged when truthful information was disclosed or concealed risks materialized and the inflation of BioScrip's common stock's value was corrected.

241.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were unaware of their falsity, and believed the false statements to be true. Had Plaintiffs, the other members of the Class, and the marketplace known of the true nature of the operations of BioScrip and its noncompliance with federal and state laws, which were not disclosed by the Exchange Act Defendants, Plaintiffs and the other members of the Class would not have purchased BioScrip's common stock, or, if they had purchased such common stock, they would not have done so at the artificially inflated prices they paid.

242.    The Exchange Act Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of BioScrip were materially false and misleading, knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public, in violation of the federal securities laws.

243.    As alleged herein, the Exchange Act Defendants participated in the fraudulent scheme, by virtue of their receipt of information reflecting the true facts regarding BioScrip, their

control over and receipt or modification of BioScrip's allegedly materially misleading misstatements and omissions, and their associations with BioScrip, which made them privy to confidential proprietary information concerning BioScrip.

244.    The Exchange Act Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent conduct alleged herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge or recklessness and complicity of the personnel at the highest level of the Company.

245.    The Exchange Act Defendants had the opportunity to perpetrate the fraudulent scheme and course of business described herein because they were the most senior executive officers (and in Smith's case, a director) of BioScrip, and they issued statements and press releases on behalf of BioScrip. As illustrated by the Exchange Act Defendants' respective positions with the Company, they had and used their influence and control to further the scheme alleged herein.

246.    By reason of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiffs and the other members of the Class for damages which they suffered in connection with their purchases of BioScrip common stock during the Class Period.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against Smith, Tran, Bogusz, and Kohlberg**

247.    Plaintiffs repeat and reallege all paragraphs set forth above as if fully set forth herein.

248.    BioScrip committed a primary violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, by making the false and misleading statements and omissions of material facts, identified above, in connection with the purchase or sale of common stock, which constituted a fraud on the market and were, therefore, presumed to have been relied upon by Plaintiffs and the Class. At the time that it made these false and misleading statements and omissions, the Company either knew of, or recklessly disregarded, their falsity.

249.    During their employment by BioScrip, as BioScrip's most senior officers, Defendants Smith, Tran, and Bogusz exercised control over the general operations of BioScrip. Moreover, these defendants had direct control and supervisory involvement in BioScrip's operations during the Class Period, and therefore had the power to control or influence the particular conduct giving rise to the violations of the Exchange Act by the Company as alleged herein, and exercised the same.

250.    By reason of their status as officers of BioScrip during the Class Period, Defendants Smith, Tran, and Bogusz are "controlling persons" of BioScrip within the meaning of Section 20(a) of the Exchange Act because they had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, these Defendants were able to, and did, directly and indirectly, control the conduct of BioScrip's business, the information contained in its filings with the SEC, and public statements about its business.

251.    As senior executive officers (and in Smith's case, a director) of BioScrip, the Defendants named in this count had a duty to disseminate accurate and truthful information regarding BioScrip's performance and compliance with the law and to correct any previously

issued statements that had become untrue so that the market price of BioScrip's common stock would be based upon truthful and accurate information.

252. Defendant Kohlberg was at all relevant times also a controlling person within the meaning of Section 20(a) of the Exchange Act, as alleged herein. Defendant Kohlberg was a controlling person of BioScrip through its position as the largest shareholder of BioScrip's common stock and its representation on the Board. For instance, Kohlberg beneficially owned approximately 15.7 million shares, or approximately 26%, of BioScrip's common stock from the start of the Class Period until the April 2013 Offering. After the April 2013 Offering, Kohlberg retained beneficial ownership of approximately 11.7 million shares, or almost 17%, of BioScrip's common stock until the August 2013 Offering. Defendant Kohlberg was also a controlling person of BioScrip through its designation of and representation by two Kohlberg partners as its representatives on the BioScrip Board during the Class Period. As a result, Kohlberg at all relevant times had access to all reports, agendas, and other information available to the BioScrip Board, and, through its agents on the Board, participated in the preparation and dissemination of BioScrip's SEC filings and other public statements that contained materially false information.

253. Each of the Defendants named in this Count participated in writing or reviewing the Company's corporate reports, press releases, and SEC filings alleged by Plaintiffs to be misleading before or shortly after these statements were issued, thus had the ability and opportunity to prevent their issuance or cause them to be corrected, and thereby culpably participated in the fraud alleged herein.

254. Defendants Smith and Tran served as the Company's primary spokespeople and representatives in communicating with the investing public about the matters complained of

herein, and did in fact speak and write on the Company's behalf concerning the factual bases of Plaintiffs' fraud allegations.

255.    As set forth above, each of the Defendants named in this Count controlled BioScrip, which violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, these Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate cause of the wrongful conduct set forth in this Count, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## THE SECURITIES ACT CLAIMS

## XV.    CLAIMS BROUGHT UNDER THE SECURITIES ACT

256.    In this part of the Complaint, Plaintiffs assert strict-liability and negligence claims based on Sections 11, 12, and 15 of the Securities Act on behalf of the Class (as defined above). Plaintiffs expressly disclaim any allegations of scienter in these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made.

257.    These Securities Act claims concern a $150 million registered public offering of 14,375,000 shares of BioScrip common stock in April 2013 (defined above as the "April 2013 Offering") and a $94 million registered public offering of 6,895,873 shares of BioScrip common stock in August 2013 (defined above as the "August 2013 Offering" and together with the April 2013 Offering, the "Offerings"). As more fully described below, the two Offerings were both conducted pursuant to the same Shelf Registration Statement and base prospectus, and they both incorporated by reference BioScrip's 2012 Form 10-K.

A.      **The Securities Act Defendants**

     1.      **The Company**

258.    Defendant BioScrip (described above at ¶ 31) was the issuer of the common stock sold in the Offerings.

     2.      **Kohlberg**

259.    Defendant Kohlberg (described above at ¶ 36) sold BioScrip common stock in the Offerings.

     3.      **The Officer and Director Defendants**

260.    Defendants Smith, Tran, and Bogusz (defined above at ¶¶ 32 to 34) were officers of BioScrip and signed the Shelf Registration Statement, as well as certain of the documents incorporated therein.

261.    Defendant Myron Z. Holubiak has been a director of the Company since March 2005, and was appointed Chairman of the Board on April 18, 2012. Holubiak signed the Shelf Registration Statement and the 2012 Form 10-K incorporated therein.

262.    Defendant Charlotte W. Collins, Esq. has been a director of the Company since April 2003. Collins signed the Shelf Registration Statement and the 2012 Form 10-K incorporated therein.

263.    Defendant Samuel P. Frieder, the Managing Partner of Kohlberg, has been a director of the Company since March 2010 and serves as one of Kohlberg's representatives on the Board. Frieder signed the Shelf Registration Statement and the 2012 Form 10-K incorporated therein.

264.    Defendant David R. Hubers has been a director of the Company since March 2005. Hubers signed the Shelf Registration Statement and the 2012 Form 10-K incorporated therein.

265.    Defendant Richard L. Robbins has been a director of the Company since March 2005. Robbins signed the Shelf Registration Statement and the 2012 Form 10-K incorporated therein.

266.    Defendant Stuart A. Samuels has been a director of the Company since March 2005. Samuels signed the Shelf Registration Statement and the 2012 Form 10-K incorporated therein.

267.    Defendant Gordon H. Woodward, a Partner and Chief Investment Officer of Kohlberg, has been a director of the Company since March 2010 and serves as one of Kohlberg's representatives on the Board. Woodward signed the Shelf Registration Statement and the 2012 Form 10-K incorporated therein.

268.    Defendant Kimberlee Seah was at all relevant times the Company's Senior Vice President, Secretary, and General Counsel. Seah signed the Shelf Registration Statement.

269.    Defendants Smith, Tran, Bogusz, Holubiak, Collins, Frieder, Hubers, Robbins, Samuels, Woodward, and Seah are collectively referred to herein as the "Officer and Director Defendants." The Officer and Director Defendants are liable under the Securities Act for signing the Company's false and misleading Registration Statement.

### 4.    Underwriter Defendants

270.    Defendant Jefferies LLC ("Jeffries") acted as an underwriter and Joint Book-Running Manager in BioScrip's April 2013 Offering. Jefferies is headquartered at 520 Madison Avenue, 10th Floor, New York, NY 10022.

271.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") acted as an underwriter and Joint Book-Running Manager in BioScrip's April 2013 Offering. Morgan Stanley also acted as the sole underwriter in BioScrip's August 2013 Offering. Morgan Stanley is headquartered at 1585 Broadway, New York, NY 10036.

272.    Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") acted as an underwriter and Joint Book-Running Manager in BioScrip's April 2013 Offering. SunTrust is headquartered at 3333 Peachtree Road NE, Atlanta, GA 30326.

273.    Defendant Dougherty & Company ("Dougherty") acted as an underwriter and Co-Manager in BioScrip's April 2013 Offering. Dougherty is headquartered at 90 South Seventh Street, Suite 4300, Minneapolis, MN 55402.

274.    Defendant Noble International Investments, Inc. ("Noble") acted as an underwriter and Co-Manager in the April 2013 Offering. Noble is headquartered at 6501 Congress Avenue, Suite 100, Boca Raton, FL 33487.

275.    Defendants Jefferies, Morgan Stanley, SunTrust, Dougherty, and Noble are collectively referred to as the "Underwriter Defendants." The Company, the Officer and Director Defendants, and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

**B.    Background of the Securities Act Claims**

276.    Both the April 2013 Offering and the August 2013 Offering were conducted pursuant to the Shelf Registration Statement.

**1.    The April 2013 Offering**

277.    Specifically, with regard to the April 2013 Offering, a prospectus dated April 4, 2013 was issued pursuant to the Shelf Registration Statement, as was a prospectus supplement dated April 19, 2013, both of which became part of the Shelf Registration Statement pursuant to which the April 2013 Offering was conducted. The Shelf Registration Statement and the relevant prospectus and prospectus supplement are referred to collectively as the "April 2013 Offering Materials."

278.   The April 2013 Offering Materials also include, through their incorporation by reference, numerous other BioScrip public filings, including, as relevant to this action, BioScrip's 2012 Form 10-K.

279.   Jefferies, Morgan Stanley, and SunTrust acted as Joint Book-Running Managers for the April 2013 Offering. Dougherty and Noble acted as Co-Managers for the April 2013 Offering. These Underwriter Defendants, which sold and distributed 14.375 million shares of BioScrip common stock to the investing public in the April 2013 Offering, were obligated to ensure the truthfulness and accuracy of the various statements contained in or incorporated by reference into the April 2013 Offering Materials.

280.   The April 2013 Offering was conducted at a critical time for BioScrip, allowing the Company to pursue acquisitions that would expand the infusion side of its business. The Company was consistently holding out to investors that it had adopted a strategic plan to aggressively expand its infusion business through a combination of acquisitions and the creation of de novo infusion pharmacies. As the Company stated in its prospectus supplement, "[w]e intend to use the net proceeds from the sale of common stock by us in this offering for general corporate purposes, which may include, among other things, financing our growth, both organically and through acquisitions," and "[w]e have a number of acquisitions, both small and large, that are in various stages of development, consideration and discussion."

281.   Indeed, the Offering netted BioScrip proceeds of approximately $118.6 million, and less than two months later, the Company announced that it had entered into an Asset Purchase Agreement with CarePoint Partners Holdings LLC ("CarePoint") to purchase CarePoint's home-infusion business for $223.0 million in cash. As BioScrip disclosed in its Form 10-Q filed on November 12, 2013, over a quarter of the total consideration ultimately paid to

CarePoint was paid by cash on hand. CW 3, a Corporate Accounting Manager at BioScrip from February 2013 to October 2013, confirmed that some of this cash was paid from the proceeds of the April 2013 Offering.

282.     As described below, the April 2013 Offering Materials contained untrue statements of material fact and material omissions, regarding, among other things, BioScrip's participation in a kickback scheme with Novartis regarding the Company's distribution of Exjade, the government's investigation into that scheme, and the problems that were negatively affecting BioScrip's PBM Services segment.

## 2.     The August 2013 Offering

283.     In August 2013, the Company commenced another public offering. Significantly, none of the shares sold in the August 2013 Offering were sold by BioScrip. Instead, Kohlberg sold 6,895,873 shares of BioScrip's common stock. The prospectus dated April 4, 2013 was issued pursuant to the Shelf Registration Statement, as was a prospectus supplement dated August 13, 2013, both of which became part of the Shelf Registration Statement pursuant to which the August 2013 Offering was conducted. The Shelf Registration Statement and the relevant prospectus and prospectus supplement are referred to collectively as the "August 2013 Offering Materials" (and together with the April 2013 Offering Materials, the "Offering Materials").

284.     The August 2013 Offering Materials include, through incorporation by reference, numerous BioScrip public filings, including, as relevant to this action, BioScrip's 2012 Form 10-K, 2013 First and Second Quarter Form 10-Qs, and the Form 8-K filed on May 8, 2013.

285.     Morgan Stanley acted as the sole underwriter of the August 2013 Offering, and therefore sold and distributed approximately 6.9 million shares in the Offering to the investing

public and was obligated to ensure the truthfulness and accuracy of the various statements contained in or incorporated by reference into the August 2013 Offering Materials.

286.    As described below, the August 2013 Offering Materials contained untrue statements of material fact and material omissions regarding, among other things, BioScrip's participation in a kickback scheme with Novartis regarding the Company's distribution of Exjade, the government investigation into that scheme, and the problems that were seriously affecting BioScrip's PBM Services segment.

### 3.    BioScrip's Participation in the Exjade Kickback Scheme

287.    As BioScrip recently admitted in a stipulation of settlement with the United States Attorney's Office for the Southern District of New York (defined above as the "Settlement Stipulation"), for over five years beginning in February 2007 and ending in May 2012, BioScrip engaged in a scheme to push Exjade—a drug with potentially fatal side effects—on patients in exchange for kickbacks from the drug's manufacturer, Novartis. These kickbacks included: (i) standard rebates that BioScrip earned on each of its Exjade shipments; (ii) additional "performance rebates" based on the number of Exjade orders that BioScrip shipped to patients each quarter; and (iii) a higher allocation of Exjade patient referrals from Novartis. BioScrip realized tens of millions of dollars through this scheme.

288.    Throughout the Exjade Kickback Scheme, BioScrip submitted claims to Medicare Part D and Medicaid state agencies seeking reimbursement for the Exjade shipments it dispensed. These Medicare and Medicaid claims were ineligible for reimbursement because each claim had been tainted by the kickbacks that BioScrip was receiving from Novartis. By submitting these claims, BioScrip violated both anti-kickback laws—which expressly prohibit payments by pharmaceutical companies to pharmacies to induce them to recommend or purchase the company's drugs when (as here) the drugs are reimbursed by a federal health-care program

like Medicare or Medicaid—and the False Claims Act—which imposes treble-damages liability

to the United States on entities that knowingly present false or fraudulent claims for payment to

the government. Over the course of the scheme, Medicare Part D plans and Medicaid state

agencies reimbursed BioScrip for *tens of millions* of dollars with respect to these kickback-

tainted false claims.

289.    The government began investigating the scheme in November 2011, when a

former Novartis executive filed a sealed *qui tam* action in the United States District Court for the

Southern District of New York alleging that Novartis and BioScrip violated the False Claims Act

and the Anti-Kickback Statute in connection with their distribution of Exjade. This spurred a

non-public, joint state-federal investigation of the matter by the National Association of

Medicaid Fraud Control Units, the U.S. Attorney's Office for the Southern District of New York,

the U.S. Department of Justice, the Federal Bureau of Investigation, and other federal and state

agencies.  In October 2012, the United States Attorney for the Southern District of New York

served the Civil Investigative Demand on BioScrip. Thereafter, BioScrip produced documents to

the government, and numerous BioScrip employees were interviewed in connection with the

government's investigation. Indeed, CW 2, a former Patient Care Coordinator at BioScrip,

confirmed that the government had been speaking with numerous former BioScrip employees

since the summer of 2013 at the latest. On information and belief, the government was also

interviewing current BioScrip employees at that time.

290.    BioScrip did not disclose either its participation in the Exjade Kickback Scheme

or the government's ongoing investigation into the Company for over a year, or until September

23, 2013—after both the April and August 2013 Offerings—when the Company disclosed in a

Form 8-K that it had received the Civil Investigative Demand and was responding to the

government's investigation. The true extent of the Exjade Kickback Scheme finally came to light on January 8, 2014, when the U.S. government publicized the details of BioScrip's unlawful kickback scheme in the Government Complaint and the Settlement Stipulation, both of which were released publicly. Both documents contain detailed descriptions of the Exjade Kickback Scheme, and the Settlement Stipulation contains extensive factual admissions by BioScrip about the scheme.

291.   As set forth below, as a result of the Company's failure to disclose its participation in the Exjade Kickback Scheme and the government's investigation into the Company, the Company's Offering Materials and the publicly filed documents incorporated into the Offering Materials by reference contained materially untrue and misleading statements and omissions of fact.

### 4.   The Collapse of BioScrip's PBM Business over the Course of 2013

292.   BioScrip also failed to disclose the Company's deteriorating PBM Services operations and earnings in the Offering Materials and the documents specifically incorporated therein.

293.   The PBM Services segment accounted for almost 20% of the Company's 2012 revenue and 40% of its critical EBITDA metric, and the Company continuously represented that the segment was a high-margin business that provided consistent and steady cash that the Company was using to fund the growth of its infusion business. For example, during a May 2012 healthcare conference, Smith stated that the "PBM services and Cash Card . . . gives us some good cash flow, does not require [a] lot of human capital mostly technology and other services, and so we essentially look to use the cash flow from this business to redeploy into our infusion expansion, as well as helping us to fund the transition of the corporate infrastructure."

294.     Before BioScrip launched the April 2013 Offering, the PBM Services segment began experiencing a series of problems that had a material negative impact on both the PBM Services segment and the Company. Indeed, former BioScrip employees and business partners confirm that the PBM Services segment was experiencing serious problems by no later than the first quarter of 2013. For example, CW 3, a Corporate Accounting Manager at BioScrip, described the cash-flow problems that existed in the PBM segment throughout 2013 and explained that the segment's revenue stream drastically decreased during the first and second quarters of 2013. Facts demonstrating that Defendants' statements about the PBM Services segment in the Offering Materials were negligently untrue or misleading by the time of the Offerings include the following:

> a. The Company lost a major PBM Services client effective as of March 31, 2013, which decreased the Company's PBM Services revenue for the second and third quarters of 2013 by almost $10 million, or over 33%.
>
> b. By the second quarter of 2013, the Company's existing discount cash card brokers were reducing or delaying their marketing efforts, which had a material negative impact on the segment's revenue for the second quarter of fiscal year 2013. For example, CW 5, who worked at Watertree Health (a broker for BioScrip's discount cards), stated that Watertree started to significantly reduce its business with BioScrip after the Company's pricing of its discount cards became less competitive around April or May 2013.

     c.  Throughout 2013, the volume of BioScrip's PBM Services business was steadily declining.

295.    These facts and others rendered the Securities Act Defendants' statements regarding the current state of the Company's PBM Services segment that were incorporated in the Offering Materials (as discussed below) untrue and misleading.

**C.    The Offering Materials Contained Untrue Statements of Fact and Omitted Material Facts Necessary to Make the Offering Materials Not Misleading**

    **1.    The April 2013 Offering Materials Contained Untrue Statements of Fact About BioScrip's Participation in the Exjade Kickback Scheme**

296.    On March 15, 2013, BioScrip filed its 2012 Form 10-K with the SEC. The 2012 Form 10-K stated that "[o]ur management carefully considers the importance of . . . anti-kickback laws when structuring each company's operations and believes that each of our respective companies is in compliance therewith" and that "[w]e believe we are in compliance with the legal requirements imposed by the anti-kickback laws and regulations." In a section discussing "Government Regulation," the Form 10-K stated that "[v]arious federal and state laws and regulations affecting the healthcare industry do or may impact the Company's current and planned operations, including, without limitation, federal and state laws prohibiting kickbacks in Government health programs," and that "management believes the Company is in substantial compliance with all existing laws and regulations material to the operation of its business." Similarly, with respect to the False Claims Act, the Company stated that "[w]e believe we have procedures in place to ensure the accuracy of our claims" and that "we believe we are in compliance with Medicaid and Medicare billing rules and requirements."

297.    These statements were materially untrue and misleading. As set forth above, far from being in compliance with anti-kickback laws and the False Claims Act, BioScrip had been engaged in a kickback scheme that violated those laws for more than five years, including for a

substantial portion of 2012, which was covered by this filing. Indeed, until at least May 2012, BioScrip was engaged in the Exjade Kickback Scheme, which violated the anti-kickback laws and regulations and resulted in more than 40,000 false claims being submitted to Medicare and Medicaid.

298.     The 2012 Form 10-K also stated the following with respect to the Company's exposure to government investigations:

> Governmental entities have also commenced investigations against specialty pharmaceutical distribution companies having dealings with pharmaceutical manufacturers concerning retail distribution and sales and marketing practices of certain products and therapies. *There can be no assurance that we will not receive subpoenas or be requested to produce documents in pending investigations or litigation from time to time. In addition, we may be the target or subject of one or more such investigations or named parties in corresponding actions.*

299.     The 2012 Form 10-K also stated in the section discussing "Government Regulation":

> From time to time, the Company responds to subpoenas and requests for information from Governmental agencies. The Company cannot predict with certainty what the outcome of any of the foregoing might be. *While the Company believes it is in substantial compliance with all laws, rules and regulations that affects its business and operations, there can be no assurance that the Company will not be subject to scrutiny or challenge under one or more existing laws or that any such challenge would not be successful.*

Similarly, in the section discussing pending and future litigation, the Form 10-K stated:

> We periodically respond to subpoenas and requests for information from Governmental agencies. We confirm that we are not a target or a potential subject of a criminal investigation. We cannot predict with certainty what the outcome of any of the foregoing might be or *whether we may in the future become a target or potential target of an investigation or the subject of further inquiries or ultimately settlements with respect to the subject matter of these subpoenas.*

300.     These statements were materially untrue and misleading at the time of the April 2013 Offering because, at the time the Company made these statements, it had already been the subject of the government's Civil Investigative Demand for five months—since October 2012—

and was in the process of responding to the government's investigation. Contrary to the Company's statements suggesting that it may, sometime in the future, be the subject of an investigation concerning dealings between specialty pharmaceutical distribution companies and pharmaceutical manufacturers concerning sales and marketing practices of certain products, BioScrip was *at that present moment* the subject of just such an investigation. Further, because violations of anti-kickback laws and the False Claims Act can result in criminal sanctions, BioScrip at that point could have been the potential subject of a criminal investigation.

301.    BioScrip's preliminary prospectus supplement dated April 16, 2013 also contained materially untrue and misleading statements about its compliance with laws, including anti-kickback and false claims laws:

> ***Existing and new government legislative and regulatory action could adversely affect our business and financial results.***
> Our business is subject to numerous federal, state and local laws and regulations. . . . Changes in these regulations may require extensive changes to our systems and operations that may be difficult to implement. Untimely compliance or noncompliance with applicable laws and regulations could adversely affect the continued operation of our business, including, but not limited to: imposition of civil or criminal penalties; suspension of payments from government programs; loss of required government certifications or approvals; suspension of authorizations to participate in or exclusion from government reimbursement programs; or loss of licensure. Reduction in reimbursement by Medicare, Medicaid and other governmental payors could adversely affect our business. The regulations to which we are subject include, but are not limited to, Anti-Kickback laws; . . . and regulations of various state regulatory authorities. (Emphasis in original.)

302.    The April 16 preliminary prospectus supplement further stated:

> ***If any of our home health agencies or pharmacies fail to comply with the conditions of participation in the Medicare program or Medicare supplier standards that home health agency or pharmacy could be suspended or disbarred from Federal healthcare programs, including Medicaid and Medicare, which could adversely affect our consolidated financial statements.***
> . . .
> Our home health agencies and pharmacies must comply with the extensive conditions of participation in the Medicare program. These conditions vary

depending on the type of facility, but, in general, require our facilities to meet specified standards relating to licensure, personnel, patient rights, patient care, patient records, physical site, administrative reporting and legal compliance. If an agency or pharmacy fails to meet any of the Medicare conditions of participation or supplier standards, as applicable, that agency or pharmacy could be terminated from the Medicare program. . . . Any termination of one or more of our agencies or pharmacies from the Medicare program for failure to satisfy the Medicare conditions of participation or supplier standards, as applicable, could adversely affect our consolidated financial statements. (Emphasis in original.)

303.    The April 16 preliminary prospectus supplement further stated:

We periodically respond to subpoenas and requests for information from governmental agencies. We confirm that we are not a target or a potential subject of a criminal investigation. We cannot predict with certainty what the outcome of any of the foregoing might be or whether we may in the future become a target or potential target of an investigation or the subject of further inquiries or ultimately settlements with respect to the subject matter of these subpoenas.

304.    The April 16 preliminary prospectus supplement further stated with respect to the business that engaged in the Exjade Kickback Scheme:

*We may face liabilities and expect to incur significant costs relating to our business and the Pharmacy Services Asset Sale.*
We are still subject to potential liabilities relating to historical business operations that were subject to the Pharmacy Services Asset Sale. Under the terms of the Pharmacy Services Asset Sale, we retained and are responsible for most historical liabilities of the operations subject to the Pharmacy Services Asset Sale. . . . We may also be subject to claims by, and liabilities to, various stakeholders or other parties, including . . . regulatory authorities . . . , resulting from the conduct of the operations subject to the Pharmacy Services Asset Sale prior to the consummation of the Pharmacy Services Asset Sale. (Emphasis in original.)

305.    The representations quoted in ¶¶ 301 to 304 were materially untrue and misleading because Defendants concealed the fact that, at the time this statements were made, BioScrip was already the subject of a government investigation regarding its dealings with Novartis concerning retail distribution and sales and marketing practices for Exjade. Thus, the company misleadingly disclosed that it was at general risk of a potential investigation without disclosing that this risk had already come to pass. The Company had already received the Civil

Investigative Demand five months earlier in October 2012 and was in the process of responding to it. Moreover, these statements was materially false and misleading because, based on the content of the Civil Investigative Demand, the Company already knew that it was the subject of an investigation into its role in dispensing Exjade, the propriety of its relationship with Novartis, and its violations of anti-kickback and false claims laws.

306. The Company's final prospectus supplement for the April 2013 Offering, dated April 19, 2013, repeated verbatim the materially false and misleading statements quoted in    ¶¶ 301 to 305.

### 2. The April 2013 Offering Materials Omitted Material Facts Regarding BioScrip's PBM Business

307. The April 2013 Offering Materials also omitted material facts regarding BioScrip's PBM Services segment. Specifically, the April 2013 Offering Materials did not disclose that: (i) the Company had lost a major PBM client effective as of March 31, 2013; (ii) by the second quarter of 2013 at the latest, the Company's existing PBM brokers were reducing or delaying their marketing efforts for PBM sales; and (iii) these problems would have a material negative impact on BioScrip's financial results and PBM Services segment.

308. The April 16 preliminary prospectus supplement contained materially untrue and misleading statements about the Company's PBM segment:

> ***The loss of a relationship with one or more of our discount card brokers could negatively impact our business.***
> We contract with over 80 marketing companies that provide pharmacy discount cards to the uninsured and underinsured. Depending on the amount of revenue generated by any broker agreement, one or more terminations could have a material and adverse effect on our consolidated financial statements. The brokers we use are typically small, privately held marketing companies. The two largest brokers generate a significant percentage of the discount card business. We are unaware of any intention by a significant discount card broker to terminate or not renew an agreement with us. (Emphasis in original.)

101

309. The statement quoted in ¶ 308 was materially untrue and misleading because the Company failed to disclose that BioScrip had lost a major PBM client on March 31, 2013, which would have a material negative impact on the Company's future earnings. The Company also omitted to disclose that BioScrip's discount-card brokers were reducing and delaying their marketing efforts, because, as CW 5 noted, BioScrip's pricing of the discounts offered by its cash cards was becoming progressively worse, to the extent that at least one such broker, Watertree Health, would shortly stop doing new business with the Company. This slowdown in marketing would also have a material negative impact on the Company's future earnings.

310. The Company's final prospectus supplement for the April 2013 Offering, dated April 19, 2013, repeated verbatim the materially false and misleading statements quoted in ¶ 308.

### 3. The August 2013 Offering Materials Contained Untrue Statements of Fact About BioScrip's Participation in the Exjade Kickback Scheme

311. As set forth above in ¶¶ 296 to 230, BioScrip's 2012 Form 10-K contained statements that were materially untrue and misleading. First, as discussed in ¶¶ 296 to 297, the Form 10-K contained materially untrue and misleading statements affirming that the Company was in compliance with federal and state healthcare regulations, when the Company had in fact been violating the anti-kickback laws and the FCA throughout 2012 via the Company's Exjade Kickback Scheme. Second, as discussed in detail above in ¶¶ 298 to 300, the Form 10-K omitted the material fact that the Company was then under investigation by the government with respect to kickbacks and false claims. Indeed, by the time BioScrip commenced the August 2013 Offering, it had been subject to the government's investigative demand for *nine* months.

312. The Company filed its Quarterly Report on Form 10-Q for the first quarter of 2013 on May 9, 2013. Defendant Bogusz signed the 10-Q, and Defendants Smith and Tran certified the truth of its contents pursuant to their obligations under the Sarbanes-Oxley Act. In

the Form 10-Q, BioScrip again omitted the material fact that the Company was then under investigation by the government with respect to kickbacks and false claims, even though at the time of this filing, it had been responding to the government's Civil Investigative Demand for six months. Specifically, the 10-Q stated:

> From time to time, the Company responds to subpoenas and requests for information from Governmental agencies. The Company cannot predict with certainty what the outcome of any of the foregoing might be. *While the Company believes it is in substantial compliance will all laws, rules and regulations that affect its business and operations, there can be no assurance that the Company will not be subject to scrutiny or challenge under one or more existing laws or that any such challenge would not be successful.*

313.    These statements were materially untrue and misleading at the time of the August 2013 Offering because, by the time BioScrip commenced the Offering, which incorporated this 10-Q, it had been the subject of the government investigation into its dealings with Novartis concerning the distribution and marketing practices for Exjade for *nine* months. Indeed, contrary to the Company's statement that "there can be no assurance that the Company will not be subject to scrutiny or challenge under one or more existing laws," the Company had received the Civil Investigative Demand in October 2012 and was in the process of responding to it.

314.    The Company's Quarterly Report on Form 10-Q for the second quarter of 2013 filed on August 8, 2013 contained identical statements to those outlined in ¶ 312. Defendant Bogusz signed the 10-Q, and Defendants Smith and Tran certified the truth of its contents pursuant to their obligations under the Sarbanes-Oxley Act.

315.    The statements in the second-quarter 2013 10-Q were materially untrue and misleading because, as set forth in greater detail above, BioScrip had been actively violating the anti-kickback laws and the False Claims Act throughout 2012 via the Company's Exjade Kickback Scheme, and because the Company had been the subject of the government's Civil Investigative Demand with respect to that scheme for nine months by the time of this Offering.

4.   **The August 2013 Offering Materials Contained Untrue Statements of Fact About BioScrip's PBM Business**

316.   The August 2013 Offering Materials also contained materially untrue and misleading statements regarding BioScrip's PBM Services segment. Specifically, BioScrip filed a Form 8-K on May 8, 2013, to which it attached a press release reporting its first quarter 2013 financial results. In that press release, the Company disclosed a $3.1 million, or 10.4%, quarterly decline in the PBM Services segment's revenue from the same quarter in 2012. The Company attributed this decline primarily to "a reduction in discount card volume." BioScrip repeated this disclosure in its 2013 First Quarter Form 10-Q, stating that the $3.1 million decline in the PBM Services segment's revenue from the same quarter in 2012 was "primarily due to a decrease in discount card volume."

317.   These statements were materially untrue and misleading because, at the time the Company made this statement, it failed to disclose the true extent of the problems facing the PBM segment as set forth above.

D.   **Class-Action Allegations Relevant to the Securities Act Claims**

318.   Plaintiffs bring these Securities Act claims as a class action and incorporate the allegations of Section XIV, but expressly exclude any allegations of or concerning fraud therein, including, without limitation, allegations (including sub-paragraphs) that specifically refer to the Exchange Act.

E.   **Claims for Relief Under the Securities Act**

**COUNT III**

**For Violations of Section 11 of the Securities Act Against BioScrip, the Officer and Director Defendants, and the Underwriter Defendants**

319.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert strict-liability and negligence

104

claims and expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief made in the Offering Materials are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offerings.

320.    This Count is asserted against BioScrip, the Officer and Director Defendants, and the Underwriter Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired the common stock sold pursuant or traceable to the April 2013 and August 2013 Offerings.

321.    Liability under this Count is predicated on these Defendants' respective participation in the Offerings, which were conducted pursuant to the Shelf Registration Statement. The Shelf Registration Statement contained untrue statements and omissions of material fact. This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct or motive are specifically excluded from this Count. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

322.    The Shelf Registration Statement, which had been updated to incorporate the documents constituting the Offering Materials, contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading.

323.    In connection with offering the registered common stock to the public and the sale of that common stock, the Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and a national securities exchange.

324.    None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

325.    Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Materials contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered common stock.

326.    As a direct and proximate result of the acts and omissions of the Defendants named in this Count in violation of the Securities Act, Plaintiffs and the Class suffered substantial damage in connection with their purchase of BioScrip common stock sold through the Offerings.

327.    By reason of the foregoing, the Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired the common stock sold pursuant or traceable to the Offerings and the Shelf Registration Statement.

## COUNT IV

### For Violations of Section 12(a)(2) of the Securities Act
### Against BioScrip and the Underwriter Defendants

328.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert strict-liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to

have been materially misstated statements of opinion or belief when made and at the time of the Offerings.

329. This Count is asserted against BioScrip and the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), on behalf of all members of the Class who purchased or otherwise acquired BioScrip common stock pursuant to the Offerings.

330. BioScrip and the Underwriter Defendants were sellers, offerors, or solicitors of sales of the common stock issued in the Offerings pursuant to the Offering Materials. The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements therein not misleading, and failed to disclose material facts.

331. By means of the Offering Materials, and by using the means and instrumentalities of transportation and communication in interstate commerce and of the mails, the Defendants named in this Count, through two public offerings, solicited and sold BioScrip common stock to members of the Class.

332. Members of the Class purchased BioScrip common stock by means of the materially misstated Offering Materials. At the time they purchased shares in the Offerings, no member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements in and omissions from the Offering Materials.

333. By reason of the foregoing, BioScrip and the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased common stock sold pursuant to the Offerings pursuant to the Offering Materials.

334.     Accordingly, members of the Class who purchased or otherwise acquired BioScrip common stock pursuant to the Offerings have a right to rescind and recover the consideration paid for their common stock and hereby elect to rescind and tender their stock to BioScrip and the Underwriter Defendants. Members of the Class who have sold their BioScrip common stock issued in the Offerings are entitled to rescissory damages.

## COUNT V

### For Violations of Section 15 of the Securities Act
### Against the Officer and Director Defendants and Kohlberg

335.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert strict-liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offerings.

336.     This Count is asserted against the Officer and Director Defendants and Kohlberg for violations of Section 15 of the Securities Act, 15 U.S.C. § 77*o*, on behalf of Plaintiffs and the other members of the Class who purchased or otherwise acquired BioScrip common stock sold pursuant or traceable to the Offerings.

337.     At all times relevant hereto, the Officer and Director Defendants and Kohlberg were controlling persons of BioScrip within the meaning of Section 15 of the Securities Act. The Officer and Director Defendants served as executive officers and directors of BioScrip before and at the time of the Offerings. Kohlberg had two representatives on BioScrip's board of directors and owned a controlling block of BioScrip stock.

338.    The Officer and Director Defendants and Kohlberg at all times relevant hereto participated in the operation and management of BioScrip, and conducted and participated, directly and indirectly, in the conduct of BioScrip's business affairs. As officers and directors and the controlling stockholder of a publicly owned company, the Officer and Director Defendants and Kohlberg had a duty to disseminate accurate and truthful information with respect to BioScrip's legal compliance and results of operations. Because of their positions of control and authority as officers and directors and the controlling stockholder of BioScrip, the Officer and Director Defendants and Kohlberg were able to, and did, control the contents of the Shelf Registration Statement, which contained materially untrue financial information.

339.    By reason of the foregoing, the Officer and Director Defendants and Kohlberg are liable under Section 15 of the Securities Act, to the same extent that BioScrip is liable under Sections 11 and 12(a)(2) of the Securities Act, to Plaintiffs and the other members of the Class who purchased common stock pursuant or traceable to the Offerings pursuant to the Shelf Registration Statement and the applicable Offering Materials.

## XVI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d.      As to the claims set forth under the Securities Act, awarding rescission or a rescissionary measure of damages as appropriate; and

e.      Such other and further relief as the Court may deem just and proper.

## XVII.  JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: February 19, 2014

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
By: _____
Hannah G. Ross
Jai Chandrasekhar
Evan M. Berkow
1285 Avenue of the Americas
New York, NY 10019
Tel.: (212) 554-1400
Fax: (212) 501-0300
Email: Hannah@blbglaw.com
Email: Jai@blbglaw.com
Email: Evan.Berkow@blbglaw.com

*Counsel for Lead Plaintiff The Fresno County Employees' Retirement Association and Lead Counsel for the Class*

SAXENA WHITE P.A.
Joseph E. White, III
Lester R. Hooker
2424 N. Federal Highway, Suite 257
Boca Raton, FL 33431
Tel: 561 394-3399
Fax: 561 394-3382
Email: jwhite@saxenawhite.com
Email: lhooker@saxenawhite.com

*Counsel for Additional Named Plaintiff the West Palm Beach Police Pension Fund*

110

# EXHIBIT A

**Fresno County Employees' Retirement Association**
Transactions in BioScrip, Inc. (BIOS)
Between November 9, 2012 through November 6, 2013,
inclusive

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 7/17/2013 | 13,480 | 16.3086 |
| Purchase | 7/18/2013 | 13,000 | 16.5251 |
| Purchase | 7/22/2013 | 19,620 | 16.3161 |
| Purchase | 7/24/2013 | 12,495 | 16.3867 |

# EXHIBIT B

**West Palm Beach Police Pension Fund**
Transactions in BioScrip, Inc. (BIOS)
Between November 9, 2012 through November 6, 2013,
inclusive

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 4/19/13 | 3,857 | 12.96 |
| *Purchase* | *4/19/13* | *3,450* | *12.00* |
| Purchase | 5/06/13 | 234 | 14.10 |
| Purchase | 5/14/13 | 156 | 13.78 |
| Purchase | 7/09/13 | 855 | 17.54 |
| Sale | 9/24/13 | (8,552) | 8.67 |

*Italics: Indicates direct participation in secondary offering.*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 13-cv-6922-AJN

IN RE BIOSCRIP, INC. SECURITIES
LITIGATION

## CERTIFICATE OF SERVICE

I, Hannah G. Ross, hereby certify that a true and correct copy of the foregoing

Consolidated Class Action Complaint is being filed with the Clerk of Court and served on this

date on counsel for the parties identified on the attached service list by electronic mail.

Dated: February 19, 2014

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

Hannah G. Ross
Jai Chandrasekhar
Evan Berkow
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiff
Fresno County Employees' Retirement
Association and Lead Counsel for the Class*

## SERVICE LIST

Jay P. Lefkowitz, P.C.
**Kirkland & Ellis LLP**
601 Lexington Ave
New York, NY 10022
Tel: (212) 446-4800
FaxL212) 446-4900
lefkowitz@kirkland.com

*Counsel for BioScrip, Inc., Richard M.
Smith, Hai V. Tran, Patricia Bogusz, Myron
Z. Holubiak, Charlotte W. Collins, Samuel
P. Frieder, David R. Hubers, Richard L.
Robbins, Stuart A. Samuels, Gordon H.
Woodward, and Kimberlee Seah*

Bill Sushon, Esq.
**O'Melveny & Myers LLP**
Times Square Tower
7 Times Square
New York, NY 10036
Tel: (212) 326-2000
Fax: (212) 326-2061
wsushon@omm.com

*Counsel for Jefferies LLC, Morgan Stanley
& Co. LLC, SunTrust Robinson Humphrey,
Inc., Dougherty & Company LLC, and
Noble International Investments, Inc.*