**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE BIOSCRIP, INC. SECURITIES LITIGATION | Civil Action No. 13-cv-6922 (AJN) (FM)<br><br>ECF CASE |

---

**MEMORANDUM OF LAW IN SUPPORT**
**THE BIOSCRIP DEFENDANTS' MOTION TO DISMISS THE**
**CONSOLIDATED AMENDED COMPLAINT**

---

Jay P. Lefkowitz, P.C.
Joseph Serino Jr., P.C.
Shireen A. Barday
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-6460

*Counsel for Defendants BioScrip, Inc.,*
*Richard M. Smith, Hai V. Tran, Patricia*
*Bogusz, Myron Z. Holubiak, Charlotte W.*
*Collins, Samuel P. Frieder, David R.*
*Hubers, Richard L. Robbins, Stuart A.*
*Samuels, Gordon H. Woodward, Kimberlee*
*Seah, and Kohlberg & Co., LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................ii

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ......................................................................................................................2

ARGUMENT ...........................................................................................................................5

I.      THE SPECIALTY PHARMACY AND PBM DISCLOSURES WERE NOT
        MISLEADING..............................................................................................................5

        A.      The Legal Compliance Statement Was Not False or Disbelieved..........................6

        B.      There Was No Duty to Disclose the Specialty Pharmacy Omissions.....................7

        C.      The PBM Forward-Looking Statements Are Not Actionable. ..............................10

        D.      There Was No Duty to Disclose the PBM Omissions. .........................................11

        E.      The PBM Historical Statement Was Literally True...............................................13

II.     THE SPECIALTY PHARMACY AND PBM DISCLOSURES WERE
        IMMATERIAL.............................................................................................................14

        A.      Any Impact of the Specialty Pharmacy and PBM Disclosures Was
                Negligible.............................................................................................................14

        B.      The Public Had Access to, and Knew, All Information Relating to the
                Specialty Pharmacy and PBM Disclosures...........................................................16

III.    THE CAC FAILS TO ADEQUATELY ALLEGE SCIENTER. .....................................18

IV.     THE CAC FAILS TO ADEQUATELY ALLEGE LOSS CAUSATION........................21

V.      THE CONTROL PERSON CLAIMS FAIL AS A MATTER OF LAW.........................23

        A.      There is No Primary Violation or Culpable Participation by Any
                Defendant..............................................................................................................24

        B.      Kohlberg Does not Control BioScrip.....................................................................24

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)........................................................................... 5, 18, 19

*Ballan v. Wilfred Am. Educ. Corp.*,
720 F. Supp. 241 (E.D.N.Y. 1989) ...................................................................... 9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................... 5

*Bldg. Trades United Pens. Trust Fund v. Kenexa Corp.*,
2010 WL 3749459 (E.D. Pa. Sept. 27, 2010) .................................................... 11

*Cent. States, Se. & Sw. Areas Pens. Fund v. Fed. Home Loan Mortg. Corp.*,
543 F. App'x 72 (2d Cir. 2013) ........................................................................ 21

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
388 F. Supp. 2d 932 (S.D. Ind. 2005) ................................................................ 6

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)..................................................................................... 21, 23

*ECA, Local 134 IBEW Joint Pens. Trust of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)......................................................................... 6, 14

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011).................................................................... 6, 7, 10

*Garber v. Legg Mason, Inc.*,
537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009)..................... 14

*Glassman v. Computervision Corp.*,
90 F.3d 617 (1st Cir. 1996)............................................................................. 15

*Gusinsky v. Barclays PLC*,
944 F. Supp. 2d 279 (S.D.N.Y. 2013), *aff'd in part, vacated in part*, 2014 WL
1645611 (2d Cir. Apr. 25, 2014) ...................................................................... 7

*Hutchison v. Deutsche Bank Sec. Inc.*,
647 F.3d 479 (2d Cir. 2011)............................................................................ 14

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)......................................................... 24, 25

# TABLE OF AUTHORITIES (CONT'D)

Page(s)

*In re AOLTW Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007)...............................................................22, 23

*In re BofA AIG Discl. Sec. Litig.*,
    2013 WL 5878814 (S.D.N.Y. Nov. 1, 2013)...........................................8, 16, 18

*In re China Valves Tech. Sec. Litig.*,
    2013 WL 5708570 (S.D.N.Y. Oct. 21, 2013) ..............................................25

*In re Citigrp., Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004)..........................................................8, 9

*In re Convergent Techs. Secs. Litig.*,
    948 F.2d 507 (9th Cir. 1991) .........................................................................15

*In re Flag Telecom Hldgs., Ltd. Sec. Litig.*,
    352 F. Supp. 2d 429 (S.D.N.Y. 2003).............................................................25

*In re Flag Telecom Hldgs., Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009).............................................................................23

*In re Flag Telecom Holdings*,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004).............................................................25

*In re Global Crossing, Ltd. Sec. Litig.*,
    2005 WL 1875445 (S.D.N.Y. Aug. 5, 2005)..................................................24

*In re GMR Sec. Litig.*,
    2013 WL 3781509 (S.D.N.Y. July 19, 2013) ...........................................16, 18

*In re Intelligroup Sec. Litig.*,
    468 F. Supp. 2d 670 (D.N.J. 2006) .................................................................22

*In re IPO Sec. Litig.*,
    544 F. Supp. 2d 277 (S.D.N.Y. 2008)...............................................................3

*In re Lehman Bros. MBS Litig.*,
    650 F.3d 167 (2d Cir. 2011).............................................................................24

*In re Lululemon Sec. Litig.*,
    2014 WL 1569500 (S.D.N.Y. Apr. 18, 2014) ...........................................19, 21

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
    643 F. Supp. 2d 366 (S.D.N.Y. 2009), *aff'd*, 592 F.3d 347 (2d Cir. 2010). ..................7, 8, 11

**TABLE OF AUTHORITIES (CONT'D)**

Page(s)

*In re NBTY, Inc. Sec. Litig.*,
224 F. Supp. 2d 482 (E.D.N.Y. 2002) ....................................................... 12

*In re Noah Educ. Hldgs.*,
2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) .......................................... 12

*In re Satyam Computer Servs. Sec. Litig.*,
915 F. Supp. 2d 450 (S.D.N.Y. 2013)...................................................... 24

*In re Sec. Capital Assur. Ltd. Sec. Litig.*,
2011 WL 4444206 (S.D.N.Y. Sept. 23, 2011)......................................... 23

*In re UBS AG Sec. Litig.*,
2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)................................... 7, 9

*In re UBS ARS Litig.*,
2009 WL 860812 (S.D.N.Y. Mar. 30, 2009) ........................................... 24

*Joffee v. Lehman Bros.*,
410 F. Supp. 2d 187 (S.D.N.Y.), *aff'd*, 209 F. App'x 80 (2d Cir. 2006)................... 21, 22, 23

*Jones v. Perez*,
2013 WL 6800604 (2d Cir. Dec. 26, 2013) .............................................. 19

*Kushner v. Beverly Enters., Inc.*,
317 F.3d 820 (8th Cir. 2003) ..................................................................... 6

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)..................................................................... 22

*Local No. 38 IBEW v. Am. Exp. Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011)...................... 19

*Oughtred v. E\*Trade Fin. Corp.*,
2011 WL 1210198 (S.D.N.Y. Mar. 31, 2011) ........................................ 20

*Plumbers & Pipefitters Local Union No. 630 Pens.-Annuity Trust Fund v. Arbitron Inc.*,
741 F. Supp. 2d 474 (S.D.N.Y. 2010)...................................................... 21

*Raab v. Gen. Physics Corp.*,
4 F.3d 286 (4th Cir. 1993) ....................................................................... 16

*Richman v. Goldman Sachs Grp, Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012).................................................. 8, 9

# TABLE OF AUTHORITIES (CONT'D)

Page(s)

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).................................................................. 10

*Roth v. AON Corp.*,
    2008 WL 656069 (N.D. Ill. Mar. 7, 2008)............................................. 20

*Schoenhaut v. Am. Sensors, Inc.*,
    986 F. Supp. 785 (S.D.N.Y. 1997)......................................................... 12

*SEC v. Rorech*,
    720 F. Supp. 2d 367 (S.D.N.Y. 2010)................................................... 20

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010).................................................................. 10

*Steinberg v. PRT Grp., Inc.*,
    88 F. Supp. 2d 294 (S.D.N.Y. 2000)............................................. 11, 13

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999).................................................................... 12

*Tabak v. Canadian Solar Inc.*,
    2013 WL 6697923 (2d Cir. Dec. 20, 2013) ...................................... 14, 15

*Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)............................................. 20, 21

**Statutes**

15 U.S.C. § 78u-5 ....................................................................................... 10

**Other Authorities**

Rachel Slajda, *DOJ Probes Novartis Ties With Specialty Pharmacies*,
    Law 360 (Nov. 6, 2012, 6:18 PM) ................................................... 17, 18

**Rules**

17 C.F.R. § 229.303 .................................................................................... 12

Fed. R. Civ. P. 9(b) ................................................................................... 1, 5

Fed. R. Civ. P. 12(b)(6)............................................................................. 1, 5

# <u>PRELIMINARY STATEMENT</u>[1]

This is primarily a stock drop case in which Plaintiffs[2] assert claims under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"), based on purported misrepresentations and omissions concerning two business lines of BioScrip, Inc. ("BioScrip" or the "Company"): the old specialty pharmacy business, which was sold long ago, and the Pharmacy Benefits Management ("PBM") segment.  Yet all of Plaintiffs' claims fail, and the entire action should be dismissed, for the simple reason that Plaintiffs cannot point to a single actionable misrepresentation under the securities laws, either because (1) Plaintiffs have not alleged an actual misstatement or omission of fact or, alternatively, (2) any supposed misrepresentation or omission was immaterial as a matter of law.

As for the specialty pharmacy business, the CAC alleges that BioScrip misrepresented its compliance with various laws, but fails to allege, as required, either that (1) BioScrip was not compliant when the statement was made, or (2) the speaker of these statements disbelieved them. Similarly, the CAC alleges that BioScrip failed to disclose in 2012 that BioScrip was the target of a government anti-kickback investigation regarding Exjade, a drug manufactured by Novartis Pharmaceuticals Corp. ("Novartis"); however, the very documents that Plaintiffs rely upon state that the government did not inform BioScrip that it was a target of the investigation until

---

[1]   Pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), this motion and supporting memorandum are submitted on behalf of BioScrip, Inc.; Richard M. Smith, Hai V. Tran, and Patricia Bogusz (the "Officer Defendants"); Myron Z. Holubiak, Charlotte W. Collins, Samuel P. Frieder, David R. Hubers, Richard L. Robbins, Stuart A. Samuels, Gordon H. Woodward (the "Director Defendants"); Kimberlee Seah; and Kohlberg & Co., LLC ("Kohlberg" and, together with the Officer and Director Defendants, Ms. Seah, and BioScrip, the "BioScrip Defendants").  The Consolidated Amended Complaint (the "CAC") also names Jefferies LLC, Morgan Stanley & Co. LLC, SunTrust Robinson Humphrey, Inc., Dougherty & Company, and Noble International Investments, Inc. (the "Underwriter Defendants").  The BioScrip Defendants join the Underwriter Defendants' Motion to Dismiss and Memorandum in Support in its entirety.

[2]   Plaintiffs are Fresno County Employees' Retirement Association and the West Palm Beach Police Pension Fund.  ¶¶29-30.  "¶__" refers to paragraphs of the CAC.  *See* Dkt. No. 22.  Unless otherwise noted, all emphasis has been added and all internal quotations have been omitted.

September 2013, only a few days before BioScrip publicly announced that status.  As for BioScrip's PBM business, the CAC attacks forward-looking statements that were accompanied by meaningful risk disclosures and thus non-actionable.  The CAC alleges that BioScrip failed to disclose quickly enough issues in the PBM segment, but points to no duty to make such preemptive disclosures.  And the CAC alleges that a historical statement regarding PBM business volumes was false, but the documents Plaintiffs rely on show that this statement was true.  Finally, all of these alleged misstatements and omissions were legally immaterial.

The CAC's Exchange Act claims should also be dismissed because Plaintiffs fail to plead scienter.  As to all but one Officer Defendant, the CAC offers only generic statements from anonymous sources to the effect that "management knew everything," coupled with speculation that the Officer Defendants "must have known" about the Exjade investigation and PBM problems because of their purported significance.  It is well-settled that such generalized allegations are insufficient to plead scienter.  The only additional scienter allegation concerns a single stock sale by one Officer Defendant, Patricia Bogusz, but this allegation fails because it raises no plausible suspicions regarding the timing or amount of such sale.

The Exchange Act claims fail for the additional reason that the CAC does not adequately allege that the supposed misrepresentations caused Plaintiffs' losses.  The CAC contains no allegations showing that the purported "truth" eventually disclosed to the market contradicted the allegedly misleading statements or revealed the allegedly omitted facts, as required.

Finally, the "control person" claims fail because Plaintiffs have not adequately alleged a primary violation, culpable participation by any defendant, or "control" on the part of Kohlberg, a minority shareholder in BioScrip.

## **BACKGROUND**

BioScrip is a national provider of home infusion and other home healthcare services.

¶38.   Its specialty pharmacy division distributed specialty drugs like Exjade, a drug manufactured by Novartis that removes unsafe excess iron from a patient's body.  ¶¶38, 46, 76. BioScrip sold its specialty pharmacy business in May 2012.  ¶76.  BioScrip's PBM division primarily administers discount card programs, including selling prescription cash cards to underinsured and uninsured individuals.  Ex. A, 2012 10-K at 8, 61.[3]  PBM customers purchase cards through third-party brokers, and present them to participating pharmacies to receive discounted prescription medications.  *Id*. at 8.

**The Alleged Specialty Pharmacy Misstatements**.   The federal government started investigating Novartis for alleged kickbacks to specialty pharmacies, including BioScrip, in 2011.  ¶8.  Those kickbacks allegedly involved rebates and patient referrals given to specialty pharmacies in return for distributing Exjade.  *Id.*  In October 2012, BioScrip received a civil investigative demand ("CID")—the equivalent of a third-party subpoena—in that investigation. ¶87.  BioScrip fully cooperated with the government by producing documents and testimony for nearly a year.  ¶88.  It was only in September 2013 that the Department of Justice ("DOJ") first notified BioScrip that it was contemplating bringing anti-kickback claims against BioScrip itself, in addition to Novartis.  ¶91.  The Company promptly disclosed that development and—without admitting any wrongdoing—settled all claims with the DOJ in January 2014.  ¶¶91, 99.

The CAC alleges that, beginning in March 2013, BioScrip misled the public by stating its "belief" that it was in compliance with relevant laws when, according to Plaintiffs, BioScrip knew it had previously violated anti-kickback laws through the activities of its divested specialty pharmacy business (the "Legal Compliance Statement").[4]  The CAC further alleges that BioScrip

---

[3]   "Ex. __" refers to the exhibits to the Declaration of Shireen A. Barday, which includes documents subject to judicial notice because they were cited in the CAC, filed with the SEC, or are publicly available.  *In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 284 (S.D.N.Y. 2008).

[4]   *See* ¶¶154-57, 161-62, 177, 296-97, 311-15.

(1) failed to disclose that it received the October 2012 CID, (2) knew, but failed to disclose, that it was a "target" of that investigation as of October 2012, and (3) understated the risks associated with the investigation in September 2013 when BioScrip disclosed that it was a target of the Exjade investigation (the "Specialty Pharmacy Omissions"[5] and, together with the Legal Compliance Statement, the "Specialty Pharmacy Disclosures").

**The Alleged PBM Misstatements**.  Plaintiffs do not dispute the accuracy of the financial information reported in BioScrip's 2013 10-Qs regarding BioScrip's PBM segment.  Rather, the CAC alleges that BioScrip overstated PBM's profitability in earnings calls on May 9 and August 8, 2013, in two forward-looking statements: (1) that BioScrip expected business "will be relatively flat," and (2) that "the market for these cards are [sic] not going away" (the "PBM Forward-Looking Statements").[6]   The CAC further alleges that the Company stated in a September 24, 2013, earnings call that PBM "[v]olumes were steady" in Q3 2013, when, according to Plaintiffs, they were not (the "PBM Historical Statement").[7]   Finally, the CAC alleges that BioScrip did not disclose quickly enough (1) the loss of one low-margin PBM customer, and (2) reduced spending by certain brokers who design and market BioScrip's cards (the "PBM Omissions"[8] and, together with the PBM Forward-Looking Statements and the PBM Historical Statement, the "PBM Disclosures").  This information was disclosed in August 2013,

---

[5]   *See* ¶¶146-47, 150-53, 158-62, 166, 177, 179, 181-84, 298-306, 311-15.

[6]   *See* ¶¶15, 118-19, 123-25, 163-66, 172-75.

[7]   *See* ¶¶15, 18, 129, 185-87.

[8]   *See* ¶¶15, 117-19, 163-65, 292, 307-10, 316-17.  Plaintiffs allege that the PBM Omissions were omitted from the Mar. 18, 2013 Shelf Registration Statement (as amended on Apr. 2, 2013), the Apr. 4, 2013 Prospectus, and the Apr. 16 and 19, 2013 Prospectus Supps., ¶¶136, 292, 307-10, as well as the May 2013 10-Q, Form 8-K press release filed on May 8, 2013, and the earnings call on May 9, 2013, ¶¶163-66 (the "April and May Filings").  Additionally, Plaintiffs allege in purely conclusory terms that BioScrip omitted the "the full extent of the problems affecting the PBM segment" in the August 2013 Prospectus Supp., ¶178; but this filing incorporated by reference public filings stating that PBM Services revenues had declined due to the loss of a low margin funded PBM Services client and the reduction of broker marketing efforts, *see*  Ex. F, Aug. 2013 Prospectus Supp. at S-23.

when it first affected financial results.  ¶121.

**Plaintiffs' Claims for Relief**.  Based on the Specialty Pharmacy and PBM Disclosures, Plaintiffs assert a claim against BioScrip and the Officer Defendants under Exchange Act Section 10(b), and against all defendants under Sections 11 or 12(a)(2) of the Securities Act. ¶¶234-46, 319-34.  Plaintiffs also assert control person claims against the Officer Defendants and Kohlberg under Exchange Act Section 20(a), ¶¶247-55, and against the Officer Defendants, the Director Defendants, Ms. Seah, and Kohlberg under Securities Act Section 15,  ¶¶335-39.

## ARGUMENT

To survive a 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Claims under Section 10(b) must also satisfy the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), which require, at a minimum, that Plaintiffs specify each misleading statement; set forth the facts on which a belief that a statement is misleading was formed; and "state with particularity" facts giving rise to a strong inference of scienter.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  As set forth below, all of Plaintiffs' claims fail because the Specialty Pharmacy and PBM Disclosures were not misleading or material.  The Exchange Act claims fail for the additional reasons that Plaintiffs do not adequately allege scienter or loss causation.  Finally, the "control person" claims fail because there is no underlying violation or adequate allegations of culpable participation; and, as to Kohlberg, Plaintiffs do not and cannot allege actual control.

## I.    THE SPECIALTY PHARMACY AND PBM DISCLOSURES WERE NOT MISLEADING.

Plaintiffs cannot state a claim for relief under either the Exchange Act or the Securities Act for the basic reason that none of the challenged statements was false or misleading.  *See*

*ECA, Local 134 IBEW Joint Pens. Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206-07 (2d Cir. 2009) (plaintiffs must plead actionable misstatement or omission under Securities and Exchange Acts).  The Legal Compliance Statement was a statement of belief that was neither false nor subjectively disbelieved when made, and there was no duty to disclose the alleged Specialty Pharmacy Omissions.   Similarly, the PBM Forward-Looking Statements were accompanied by meaningful risk disclosures and are thus non-actionable, there was no duty to disclose the alleged PBM Omissions, and the PBM Historical Statement was literally true.

A.      **The Legal Compliance Statement Was Not False or Disbelieved.**

Because the Legal Compliance Statement was a statement of belief, under the Second Circuit's decision in *Fait v. Regions Fin. Corp.*, Plaintiffs must plead plausible facts showing that it was "both objectively false and disbelieved . . . at the time it was expressed."  655 F.3d 105, 110 (2d Cir. 2011).  Plaintiffs have not done so for at least three reasons.  <u>First</u>, Plaintiffs do not allege that the Legal Compliance Statement was subjectively "disbelieved . . . at the time it was expressed."   *Id.*   Courts have long held that "[a] company can . . . believe in . . . its compliance with federal law and be the object of a state investigation, even one targeted at the very metrics of that compliance."  *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 946 (S.D. Ind. 2005) (disclosure that company had been under investigation for 2 years did not render false past statement of belief of compliance with law); *see also Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (company's failure to opine on legality of its billing practices was non-actionable, even though those practices were the subject of a criminal investigation).   Because the CAC alleges no facts showing that BioScrip's Exjade-related practices were, in fact, illegal, much less that anyone at BioScrip believed as much when the Legal Compliance Statement was made, the CAC fails to state a claim.

<u>Second</u>, the CAC does not adequately allege that the Legal Compliance Statement was

6

false when made.  The earliest Legal Compliance Statement the CAC identifies dates to March 2013, ¶156, nearly one year *after* BioScrip had sold the specialty pharmacy division and ceased distributing Exjade.  Even if BioScrip's Exjade conduct had violated the law—and BioScrip knew so when the violations occurred—that conduct ceased long before the first alleged misstatement.  ¶76.  The statement therefore is non-actionable.  *See Fait*, 655 F.3d at 107.[9]

Third, the Legal Compliance Statement did not relate to Exjade.  Instead, it concerned BioScrip's existing business lines, none of which is alleged to have violated any law.  *See, e.g.*, ¶¶156 ("We believe we are in compliance with the legal requirements imposed by the anti-kickback laws"), 296 ("[M]anagement believes the Company is in substantial compliance with all existing laws and regulations material to the operation of its business").  Statements about legal compliance are non-actionable where, as here, they are not "directly related to the subject of the [alleged] fraud."  *Gusinsky v. Barclays PLC*, 944 F. Supp. 2d 279, 289-90 (S.D.N.Y. 2013), *aff'd in part*, *vacated in part on other grounds*, 2014 WL 1645611 (2d Cir. Apr. 25, 2014) (complaint dismissed where legal compliance statements did not relate to alleged fraud in LIBOR practices).

## B.  There Was No Duty to Disclose the Specialty Pharmacy Omissions.

The CAC fares no better in its effort to recast the Legal Compliance Statement as an actionable omission, because omissions are non-actionable absent a duty to disclose the information—even if the information would be material.  *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009), *aff'd*, 592 F.3d 347 (2d Cir. 2010).  And a disclosure duty arises only where (1) "imposed by statute or regulation" or (2) "additional

---

[9]   Plaintiffs also allege BioScrip falsely stated that "Management *strives* to maintain . . . substantial compliance with all existing laws."  ¶¶ 146-47.  But that statement—which also post-dates divestment of the subject division—is puffery, and thus, non-actionable.  *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *34-36 (S.D.N.Y. Sept. 28, 2012) ("[UBS] *strives* to maintain . . . compliance with relevant regulations" held to be non-actionable puffery.).

information is needed to make another statement . . . not misleading." *Id.*  Plaintiffs do not adequately allege that BioScrip had any duty to disclose the Specialty Pharmacy Omissions. While the CAC faults BioScrip for failing to earlier disclose its receipt of the CID, ¶147, the CAC does not cite any statute or regulation requiring immediate disclosure.  To the contrary, there is no requirement to disclose receipt of every governmental investigatory notice or demand for information.  *See Richman v. Goldman Sachs Grp*, *Inc.*, 868 F. Supp. 2d 261, 272-75 (S.D.N.Y. 2012) (no requirement to disclose receipt of SEC Wells Notices).  Nor are companies required to predict exposure to possible future litigation, even where related to ongoing governmental investigations, unless such exposure is "substantially certain to occur."  *In re Citigrp., Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (involvement in transactions alleged to be "unduly risky or noncompliant with regulatory requirements" insufficient to trigger disclosure requirement despite pendency of class action lawsuits against the issuer arising from same); *In re BofA AIG Discl. Sec. Litig.*, 2013 WL 5878814, at *11 (S.D.N.Y. Nov. 1, 2013) (no duty to disclose multi-billion dollar suit where company "could not determine that the lawsuit would in fact be filed").  Here, Plaintiffs plead no contemporaneous facts suggesting any degree of certainty, much less "substantial certainty," that the mere receipt of the CID would ultimately result in the government contemplating claims against the Company one year later.

Moreover, BioScrip repeatedly disclosed to investors that it constantly faced requests for information from governmental entities: "[f]rom time to time, the Company responds to subpoenas and requests for information from Governmental agencies."  ¶147.  The CAC insinuates that such statements were misleading or incomplete because a truthful disclosure of a general category of risk somehow implies the absence of a specific instance of that risk.  *E.g.*, ¶¶154-55.  But courts have repeatedly rejected that assertion.  *See, e.g.*, *AIG*, 2013 WL 5878814,

at *10-13 (general disclosures warning of possible litigation not misleading despite lack of disclosure of potential suit); *Richman*, 868 F. Supp. 2d at 273-74 (nondisclosure of Wells Notices did not make general disclosures about ongoing government investigations misleading).

Next, the CAC's allegation that BioScrip was required to disclose in October 2012 that it was the "target" of the DOJ's investigation into Novartis and Exjade is belied by the very documents on which the CAC relies. The settlement agreement between the DOJ and BioScrip expressly states that the DOJ "first notified BioScrip that [it] was contemplating civil claims against BioScrip" on "September 11, 2013." Ex. B, Jan. 8, 2014 8-K, Ex. 10.1 at 1. There is no dispute that BioScrip disclosed that item a few days later, on September 23, 2013. ¶91.

The allegation that BioScrip improperly "framed" the disclosure of the investigation in September 2013 by purportedly failing to disclose the "extraordinary threat that the investigation posed to the Company's future," ¶¶181-83, also fails. The CAC concedes that BioScrip disclosed the salient facts, including: (1) the identity of the investigating authorities, (2) the subject matter of the investigation, (3) BioScrip's cooperation with the authorities, (4) that the government advised BioScrip on September 11, 2013, that it planned to engage in discussions with BioScrip, and (5) "[t]he Company cannot predict or determine the timing or outcome of this investigation or the impact it may have, if any, on the Company's financial condition, results of operations or cash flows." ¶91. That is enough. There is no duty to speculate as to the consequences of an investigation.[10] *See UBS*, 2012 WL 4471265, at *29 (rejecting claim that alleged "innocuous description" of government investigation "downplayed [its] scope" and "failed to disclose the magnitude of" the alleged misconduct); *Ballan v. Wilfred Am. Educ.*

---

[10] Nor was BioScrip obligated to accuse itself of uncharged misconduct. *See, e.g.*, *Citigrp.*, 330 F. Supp. 2d at 377 (S.D.N.Y. 2004) ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing.").

*Corp.*, 720 F. Supp. 241, 248 (E.D.N.Y. 1989) (defendants not bound "to predict as the 'imminent' or 'likely' outcome of the investigations that indictments . . . would follow, with financial disaster in their train").

### C.   The PBM Forward-Looking Statements Are Not Actionable.

Forward-looking statements are actionable only where made "with actual knowledge" of falsity.  15 U.S.C. § 78u-5(c)(1)(B)(i)-(ii).  Because the CAC contains no such allegations, as set forth *infra* in Section III, Plaintiffs' claims relating to the PBM Forward-Looking Statements— that business will be "flat" and the market for discount cards "[is] not going away"—fail for this reason alone.  *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773-77 (2d Cir. 2010) (complaint dismissed for failure to plead actual knowledge of falsity).[11]

Moreover, even if subsequent performance disappoints, forward-looking statements are not actionable where they are accompanied by "meaningful cautionary statements."  *Id.* at 765. Here, during the earnings calls in which the PBM Forward-Looking Statements were made and the filings referenced therein, BioScrip made the following cautionary statements:

- BioScrip's forward-looking statements are "based upon current expectations and there can be *no assurance* that the results contemplated in these statements will be realized.  Actual results may differ *materially* from such statements due to a number of factors and risks, some of which are identified in our press release and our annual and quarterly reports . . . ."  Ex. D, May 9, 2013 Earnings Tr. at 1; Ex. E, Aug. 8, 2013 Earnings Tr. at 1.

- PBM clients have short-term contracts that could be terminated on "relatively short notice." Ex. A, 2012 10-K at 21.

---

[11]   Plaintiffs recite a number of other statements from BioScrip's earnings and investor day calls that they allege generally to be false and misleading.  ¶¶123-25, 129, 165, 172-75.  Such statements have either not been demonstrated to be false, *e.g.*, "the good news on [the discount card business] is we got some very high volume new clients by just ramping up," ¶129, and the decline in Q1 PBM revenues was primarily due "to "a reduction in discount card volume," ¶165, or are non-actionable puffery.  *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (expressions of puffery and corporate optimism are non-actionable; companies need not "take a gloomy, fearful or *defeatist* view of the future").  And although BioScrip stated that it "believed" its 2013 guidance would remain in the range originally projected, Ex. E, Aug. 8 2013 Earnings Tr. at 5, Plaintiffs do not allege that this statement "was both objectively false *and* disbelieved by the defendant."  *Fait*, 655 F.3d at 110.

- If those clients "elect not to extend their relationship" with BioScrip, its "future business and operating results *could be materially and adversely affected*." *Id.*

- The termination of one or more brokers "could have a *material and adverse effect* on [BioScrip's] Consolidated Financial Statements." *Id.* at 24-25.

These risk disclosures bring the PBM Forward-Looking Statements within the safe harbor and adequately bespoke caution such that the "total mix" of information was not misleading. *See Bldg. Trades United Pens. Trust Fund v. Kenexa Corp.*, 2010 WL 3749459, at *14-15 (E.D. Pa. Sept. 27, 2010) (meaningful cautionary language where defendant warned investors about negative impact on business if clients terminated contracts).[12]

### D.     There Was No Duty to Disclose the PBM Omissions.

The CAC alleges that BioScrip failed to make a timely disclosure about the loss of one low-margin PBM client and a decline in spending among certain external brokers involved in that business.  According to the CAC, these items, which were disclosed in BioScrip's 2013 second-quarter 10-Q press release, ¶¶120-21, should have been disclosed earlier because they allegedly had a material impact on BioScrip's future prospects before the 2013 second-quarter 10-Q.  In fact, there was no duty to disclose the PBM Omissions before BioScrip's second-quarter 10-Q.  *See Morgan Stanley Tech. Fund*, 643 F. Supp. 2d at 375 (omission non-actionable absent duty to disclose).

First, as to the alleged omission regarding spending by external brokers, the CAC contains no allegations that BioScrip knew of this reduction in broker marketing before its second-quarter 10-Q filings in August 2013.  It merely notes that BioScrip's "pricing became worse . . . starting around April or May 2013," causing one broker "to significantly reduce its business with BioScrip," to the point at which it stopped doing new business with BioScrip in

---

[12]     In addition, the PBM Forward-Looking Statements are non-actionable because they are vague and therefore puffery. *See Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 301 (S.D.N.Y. 2000).

"August or September 2013"—*after* BioScrip's disclosure of the alleged PBM Omissions.  ¶114. The CAC does not allege when this broker started to reduce its business with BioScrip, much less that it was before BioScrip's second-quarter filing.  *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) ("fraud by hindsight" allegations non-actionable even though later disclosure revealed lowered earnings).  Of course, BioScrip could not have a duty to disclose absent plausible allegations that it actually knew of a reduction in broker marketing.

Second, SEC rules require intra-quarter disclosures only in a narrow set of exceptional circumstances, none of which is present here.  The only arguably relevant SEC rule, Item 303, relates to disclosure of "known trends or uncertainties" that a company "reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income."  17 C.F.R. § 229.303(a)(3)(ii) ("Item 303").  Item 303, however, "does not require companies to disclose isolated occurrences that affect their financial performance," like the loss of a single broker or the termination of a single client.  *In re Noah Educ. Hldgs.*, 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010) (increase in raw material cost over two month period not a "trend").  And courts routinely reject securities claims, like Plaintiffs', based on an issuer's purported failure to disclose mid-quarter a decline in its competitive position, even where the allegations involve a loss of consumers or market share.  *See In re NBTY, Inc. Sec. Litig.*, 224 F. Supp. 2d 482, 491-94 (E.D.N.Y. 2002) (dismissal because allegations of 50% decline in customers did not plead a "trend"); *Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 793 (S.D.N.Y. 1997) (non-disclosure of sales reduction by largest customer did not make prospectus materially misleading).

Moreover, it was not necessary to disclose the PBM Omissions in order to make the April and May Filings not misleading because those filings did not address the subject of the PBM Omissions, i.e., future business from the lost PBM client or the level of broker marketing.  *See*

*Steinberg*, 88 F. Supp. 2d at 308–09 (no duty to disclose unsuccessful project bids, where offering materials "made no representations about any past, present or expected . . . projects"). Nor can Plaintiffs find a disclosure duty by pointing to BioScrip's statement, in the April 16 and 19, 2013 Prospectus Supplements, that it was unaware of an intention of any broker to terminate or not renew its agreement with BioScrip.  ¶¶308-10.  That statement says nothing about client loss or reduced broker spend, and the only broker Plaintiffs discuss is not alleged to have stopped doing new business with BioScrip until *after* those filings.  ¶114.

      **E.**    **The PBM Historical Statement Was Literally True.**

      The PBM Historical Statement that "[v]olumes were steady for Q3," ¶186, is literally true and thus not actionable.  The CAC alleges that Mr. Tran, BioScrip's CFO, falsely told investors during an investor presentation on September 24, 2013, that PBM business volumes were "steady" between the second and third quarters of 2013.  ¶¶186-87.  In fact, BioScrip's publicly filed financial statements show that statement was true.  While PBM revenues declined from $26.8 million in the first quarter to $16.3 million in the second quarter, Ex. G, May 2013 10-Q at 26; Ex. C, Aug. 2013 10-Q at 26, they stabilized at $16 million in the third quarter.  Ex. H, Nov. 2013 10-Q at 27.  In other words, there was nothing misleading about telling investors that volumes between the second and third quarters were "steady" when second-quarter revenues were $16.3 million and third-quarter revenues were $16 million; this is especially so given that the first quarter revenues were $26.8 million, meaning that the slight (less than 2%) decline in revenue from second to third quarter was insignificant compared with the revenue decline from first to second quarter.  Moreover, during the very same presentation, Mr. Tran stated that "[i]n the third quarter, after [the] first two months of [the] third quarter, the volume in the PBM business has stabilized *to slightly less* [than] in the second quarter."  Ex. I, Sept. 24, 2013 Inv. Day Tr. at 34.  Thus, the notion that Mr. Tran somehow falsely represented that PBM revenues

had not declined in the third quarter is belied by the very transcript on which Plaintiffs rely.

## II.   THE SPECIALTY PHARMACY AND PBM DISCLOSURES WERE IMMATERIAL.

The alleged misstatements and omissions fail and are not actionable for the independent reason that they were not material.  *ECA*, 553 F.3d at 197, 206 (2d Cir. 2009) (only "material" misrepresentations are actionable).   A statement or omission is material only if there is a "substantial likelihood" disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information." *Id.* at 197.  The alleged Specialty Pharmacy and PBM Disclosures did not alter the total mix of information available to the public and, accordingly, were not material.

### A.   Any Impact of the Specialty Pharmacy and PBM Disclosures Was Negligible.

Because the portion of BioScrip's business impacted by the alleged Specialty Pharmacy and PBM Disclosures was, at best, insignificant, there is no "substantial likelihood" that these disclosures "would have been viewed by the reasonable investor as having significantly altered the total mix of information." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 489 n.5 (2d Cir. 2011) (omission of $30.4 million immaterial in context of defendant's overall investment portfolio).  As such, the alleged misstatements were not material.

While the CAC refers generally to the alleged "magnitude" and "profitability" of the specialty pharmacy division's sale of Exjade, *e.g.*, ¶198, it acknowledges elsewhere that BioScrip realized only "hundreds of *thousands* of dollars" out of hundreds of *millions* of dollars in total quarterly revenues as a result of its distribution of Exjade, ¶¶77, 80.  By definition, revenues comprising a fraction of one percent are not material.  *Tabak v. Canadian Solar Inc.*, 2013 WL 6697923, at *1-2 (2d Cir. Dec. 20, 2013) (overstatement of revenue by 2.7% immaterial); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008), *aff'd*, 347

F. App'x 665 (2d Cir. 2009) (omission amounting to 0.4% of revenue immaterial).

Similarly, the PBM Disclosures, which refer to the termination of one PBM client and the marketing reduction of certain PBM-brokers, did not have a material impact on BioScrip's overall business.  For example, for the second quarter of 2013, BioScrip reported a loss of $9.1 million due to the termination of the one PBM client and a loss of $1.3 million due to the brokers' reduced marketing efforts.  Ex. E, Aug. 8, 2013 Earnings Tr. at 3.  By contrast, BioScrip's total revenues for that quarter were $191 million.  Ex. C, Aug. 2013 10-Q at 17.  In other words, the loss of the PBM client accounted for only 4.5% of total revenue for the second quarter, while the losses caused by the reduced broker marketing accounted for just 0.67%.[13] The SEC uses a 5 percent threshold for a preliminary assessment of materiality—a rule of thumb numerous courts have relied on in dismissing securities claims.  *See, e.g.*, *Tabak* 2013 WL 6697923 at *1-2 (citing 5% SEC guidance to support finding that 2.7% revenue overstatement was immaterial).  Even if the losses caused by the PBM client and reduced broker marketing were aggregated, the combined loss would account for only 5.17% of total revenues for the quarter, which is still quantitatively immaterial.  *See Glassman v. Computervision Corp.*, 90 F.3d 617, 633 n.26 (1st Cir. 1996) (failure to disclose 9% of quarterly revenue not material); *In re Convergent Techs. Secs. Litig.*, 948 F.2d 507, 514 (9th Cir. 1991) (finding immaterial a revenue estimate missed by approximately 10%).

Nor did the PBM Disclosures impact a segment that was qualitatively material to BioScrip's overall business.  As the publicly filed financial statements that Plaintiffs rely upon show, contrary to Plaintiffs' contentions, PBM was not BioScrip's core business.  Of BioScrip's

---

[13]   Moreover, because the one PBM client was a low-margin client, the impact on BioScrip's profit was even smaller; in fact, EBITDA margins in the PBM segment—calculated by dividing EBITDA by revenue—actually increased 30% over the first quarter after the client was terminated.  *Compare* Ex. G, May 2013 10-Q at 27, 16-17 *with* Ex. C, Aug. 2013 10-Q at 29, 17.

total revenues for 2012, only 16.9% was attributable to PBM, Ex. A, 2012 10-K at 84, and in the first quarter of 2013, PBM accounted for only 13% of total Company revenues. Ex. G, May 2013 10-Q at 16-17. By contrast, BioScrip's Infusion Services segment represented *77.5%*. *Id*. Further, BioScrip disclosed in its 2012 10-K that, several years earlier, it had decided to "focus[] [its] growth on investments in the Infusion Services and Home Health Services segments" rather than its PBM Services segment, Ex. A, 2012 10-K at 39, and even considered selling the entire division at one point. *See* Ex. J, Aug. 9, 2012 Earnings Tr. at 7.

### B. The Public Had Access to, and Knew, All Information Relating to the Specialty Pharmacy and PBM Disclosures.

The Specialty Pharmacy Disclosures concern the DOJ's investigation of Novartis's distribution of Exjade, while the PBM Disclosures involve BioScrip's PBM business. Yet, at all relevant times, such information and any associated risks were disclosed to the public not only by BioScrip but by numerous other sources as well. And those other disclosure sources must be taken into consideration because, "unfortunately for [Plaintiffs], the presumption that the market price has internalized all publicly available information cuts both ways." *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993). This principle applies with special force here given Plaintiffs' allegation that "the market for BioScrip's common stock promptly digested current information . . . from all publicly available sources." ¶220. As discussed below, a review of the information disclosed by both BioScrip and the market regarding the Exjade investigation and BioScrip's PBM business compels the conclusion that the "total mix" of information here was not materially misleading. *See In re GMR Sec. Litig.*, 2013 WL 3781509, at *3-7 (S.D.N.Y. July 19, 2013) (no material omission where various disclosures addressed the risk that ultimately materialized); *AIG*, 2013 WL 5878814, at *8 (where information about potential lawsuit was public, its omission "could not have altered the 'total mix of information available'").

With respect to the Specialty Pharmacy Disclosures and the Exjade investigation, BioScrip repeatedly disclosed the extensive risks concerning government regulation, including:

- "Federal and state laws prohibiting kickbacks in Government health programs . . . are subject to *rapid change* and often are uncertain in their application." ¶147.

- "[F]ederal and state regulation and enforcement priorities in this area can be expected to increase . . . ." Ex. A, 2012 10-K at 81.

- "Anti-kickback laws have been cited as a partial basis . . . for investigations and multi-state settlements relating to financial incentives provided by drug manufacturers to retail pharmacies." *Id.* at 15.

- "[A] violation of the statute may occur even if only one purpose of a payment arrangement is to induce patient referrals or purchases." *Id.*

- "Governmental entities have . . . commenced investigations against specialty pharmaceutical distribution companies having dealings with pharmaceutical manufacturers concerning retail distribution and sales and marketing practices of certain products and therapies.  There can be *no assurance* that we will not receive subpoenas or be requested to produce documents in pending investigations or litigation from time to time.  In addition, *we may be the target* or subject of one or more such investigations or named parties in corresponding actions." ¶152.

- BioScrip "periodically respond[s] to subpoenas and requests for information from Governmental agencies . . . [and] [w]e *cannot predict* . . . whether we may in the future *become a target* or potential target of an investigation or the subject of further inquiries or ultimately settlements with respect to the subject matter of these subpoenas." ¶154.

The market also knew that BioScrip distributed Exjade through its specialty pharmacy division, that Exjade was a Novartis product, and that Novartis was the subject of a pending investigation regarding Exjade.  The Company repeatedly disclosed that it sold Exjade, Ex. M, 2010 10-K at 7; Ex. N, 2011 10-K at 8, and, as the CAC acknowledges, both Novartis and Accredo publicly disclosed that, throughout 2012 and 2013, the DOJ was conducting an investigation regarding Novartis' interactions with specialty pharmacies concerning Exjade. Compl. ¶89 n.3 (describing Accredo disclosure of Exjade investigation in November 2012); Ex. O, Novartis 2012 Form 20-F at F-60 (Novartis disclosure regarding investigation into its interactions with specialty pharmacies); Ex. P, Novartis Report at 39 (same).  The media also reported on this investigation as far back as November 6, 2012. *See* Rachel Slajda, *DOJ Probes*

*Novartis Ties With Specialty Pharmacies*, Law 360 (Nov. 6, 2012, 6:18 PM).[14]  This publicly

available information, coupled with BioScrip's extensive cautionary language, shows that even

before BioScrip's September 2013 specific disclosure of the CID, the "total mix of information"

in the market already contained the very information Plaintiffs now allege was omitted.

    With respect to the PBM Disclosures, BioScrip plainly disclosed ongoing risks facing its

PBM business, including risks associated with client relationships and brokers:

- BioScrip "has over 100 relationships" with PBM clients, but contracts generally last only three years and "may be terminated by the client on relatively short notice."  Ex. A, 2012 10-K at 9, 21.  If PBM clients "elect not to extend their relationship" with BioScrip, its "future business and operating results could be *materially and adversely affected*."  *Id.* at 21.

- The Company's PBM clients may demand increased services in response to increases in prescription drug costs; however, BioScrip "may not be able to increase [its] fees to compensate for these increased services, which could put pressure on [its] margins."  *Id.*

- "[T]he managed care industry is undergoing substantial consolidation, and another party that is not [BioScrip's] client could acquire some of [its] managed care clients.  In such case, there is a risk of contract loss and a loss of the associated revenues and profit."  *Id.*

- In late 2012, BioScrip was having trouble collecting a $7.8 million debt from a "*large* PBM Services customer."  *Id.* at 32.

- Termination of one or more brokers "could have a *material and adverse effect* on [BioScrip's] Consolidated Financial Statements."  *Id.* at 24-25.

These risk disclosures rendered non-misleading the "total mix of information" pertaining to the

PBM Disclosures.  *See GMR*, 2013 WL 3781509, at *3-7 (no material omission where various

disclosures addressed the risk that ultimately materialized).[15]

## III.    THE CAC FAILS TO ADEQUATELY ALLEGE SCIENTER.

    To state a claim under Section 10(b) of the Exchange Act, a party must plead "with

particularity facts giving rise to a strong inference" that each defendant acted with scienter with

respect to each alleged misstatement or omission.  *ATSI*, 493 F.3d at 99.  To meet that burden, a

---

[14]  http://www.law360.com/articles/392310/doj-probes-novartis-ties-with-specialty-pharmacies.

[15]  Because the CAC fails to allege a single actionable misstatement or omission, Plaintiffs' allegations challenging Sarbanes-Oxley certifications for the 2012 Q3 10-Q, ¶151, 2012 10-K, ¶158, 2013 Q1 10-Q, ¶166, and 2013 Q2 10-Q, ¶¶314-15, must similarly fail.  *AIG*, 2013 WL 5878814, at *13 n.4.

party must allege particularized facts that "(1) show[] that the defendants had both motive and opportunity to commit the fraud or (2) constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* And the inference of scienter must be "cogent and *at least as compelling* as any opposing inference." *Id.* (emphasis in original). The CAC fails to plead scienter with respect to either the Specialty Pharmacy or PBM Disclosures, and the Exchange Act claims should be dismissed, for at least three reasons.

First, the CAC relies on the purported statements of nine confidential "witnesses" ("CWs") to allege scienter, but these CWs scarcely mention the specific Officer Defendants to whom Plaintiffs would have this Court impute scienter. Indeed, the limited allegations that touch on the Officer Defendants allege only in general terms that "management [was] aware of everything," and was "'pretty involved' in the PBM segment's business," or that the Officer Defendants "would often receive reports," "concerns or information" and "attend Company meetings," or "reviews" on the PBM segment, without alleging what specific facts were conveyed or reviewed, and when.[16]  ¶¶115-16, 201. These allegations are too general to support an inference of scienter. *See Local No. 38 IBEW v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011) (CW allegations deficient where they failed to establish "what specific contradictory information the [defendants] received or when they received it."); *In re Lululemon Sec. Litig.*, 2014 WL 1569500, at *23 (S.D.N.Y. Apr. 18, 2014) (CW allegations that defendant "had access to information about . . . problems"

---

[16]  The CAC alleges only one instance of direct contact between a CW and an Officer Defendant: Ms. Bogusz allegedly told CW 3 in Sept. 2013 that "the Company could not continue to manage its cash . . . with the expectation that the PBM business would bring in the same revenue it had in the past."  ¶113.  The CAC does not allege how this statement conflicts with publicly disclosed information or supports an inference of scienter. *See Jones v. Perez*, 2013 WL 6800604, at *3 (2d Cir. Dec. 26, 2013) (CW allegation that officers had access to reports saying business was missing forecasts did not plead scienter "absent any pleading indicating a divergence from publicly disclosed information.").

insufficient to support inference "that she did not, or could not, believe in what she said").

Second, the CAC's suggestion that scienter exists whenever a company's business practices attract the government's attention reaches too far and is not the law. *See* ¶¶196-99. Neither the existence of a government investigation nor the subsequent settlement of that inquiry, without admission of wrongdoing, creates an inference of scienter.[17] *See Oughtred v. E*Trade Fin. Corp.*, 2011 WL 1210198, at *11 n.5 (S.D.N.Y. Mar. 31, 2011) (no inference of scienter where "E*Trade . . . acknowledged that its marketing tactics and conduct in the ARS market became the subject of government investigations"); *accord Roth v. AON Corp.*, 2008 WL 656069, at *8 (N.D. Ill. Mar. 7, 2008) (attorney general suit "charging fraud" and "quick settlement of that  lawsuit" "not enough to establish securities fraud after *Tellabs*").

Third, the CAC's allegations regarding the stock trades of one of the Officer Defendants, Ms. Bogusz, are insufficient to establish her scienter, let alone the other Officer Defendants'. The CAC alleges that Ms. Bogusz exercised stock options on August 28, 2013, and then sold shares the same day at an average price of $11.94 per share—70% below the class period high of $17.23.   ¶¶143-44.  But trading by insiders "is suspicious only when it is *dramatically* out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *SEC v. Rorech*, 720 F. Supp. 2d 367, 414 (S.D.N.Y. 2010). The CAC does not allege what percentage of Ms. Bogusz's holdings the sale constituted, or the volume of her sales during the class period as compared to other periods.  If anything, the timing

---

[17]   The CAC's conclusory allegations that BioScrip violated the False Claims Act, *e.g.*, ¶45, do not give rise to an inference that the Officer Defendants *knew* such laws were violated, particularly because, as BioScrip repeatedly disclosed, "[t]he healthcare industry is subject to *extensive* regulation by a number of governmental entities at the federal, state and local level," those laws and regulations are "extremely complex, and, in many instances, the industry does not have the benefit of significant regulatory or judicial interpretation." Ex. A, 2012 10-K, at 10; *see also  Take-Two*, 551 F. Supp. 2d at 272 ("Given the . . . ambiguity in the ESRB's rules, [the] mere allegation that Take-Two violated the ESRB's rules does not give rise to a strong inference that [defendants] *knew*" as much.).

undermines any argument that the trades were designed to maximize personal profit.  Indeed, the disputed trades occurred weeks *before* the DOJ first notified BioScrip that it was a target of the investigation, and nearly ten months *after* the first alleged misstatement.  *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 275-77 (S.D.N.Y. 2008) (insider stock sale insufficient to establish motive absent allegation relating to total holdings and historical trading volumes); *see also id.* at 279 (inference of scienter "inescapably attenuate[d]" where trading occurred three months after false statement and four months before alleged corrective disclosure); *Lululemon*, 2014 WL 1569500, at *23-24 ($224 million of insider sales insufficient to establish scienter).[18]

## IV.   THE CAC FAILS TO ADEQUATELY ALLEGE LOSS CAUSATION.

To state a claim under Section 10(b) of the Exchange Act a party must also plead loss causation.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  Where, as here, a party has failed to allege "that the *subject* of the fraudulent statement or omission was the cause of the actual loss," the claims must be dismissed.  *Cent. States, Se. & Sw. Areas Pens. Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 74 (2d Cir. 2013) (emphasis in original).

Plaintiffs, true to form in a stock drop case, allege that BioScrip's disclosure of the CID in September 2013 and its reserve estimate in November 2013 for the DOJ settlement were corrective disclosures regarding the prior Legal Compliance Statement that, in turn, led to precipitous stock drops.   ¶¶11-12, 216.  But to plead loss causation regarding the Legal Compliance Statement, Plaintiffs must "allege that the . . . *dishonesty of the opinions*[] is revealed to the market." *Joffee v. Lehman Bros.*, 410 F. Supp. 2d 187, 193 (S.D.N.Y.), *aff'd*, 209

---

[18]   Plaintiffs' attempt to establish scienter of the *Company and the Officer Defendants* by pointing to *Kohlberg's* participation in BioScrip's secondary offerings, ¶¶140-41, fails because Kohlberg is not a 10(b) defendant and, regardless, its alleged conduct cannot support an inference of scienter on the part of the Officer Defendants or BioScrip.  *See Plumbers & Pipefitters Local Union No. 630 Pens.-Annuity Trust Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010) (dismissing claim because "the fact that other insiders may have engaged in unusual trading activity is irrelevant.").

F. App'x 80 (2d Cir. 2006); *see also In re AOLTW Sec. Litig.*, 503 F. Supp. 2d 666, 679-80 (S.D.N.Y. 2007) (disclosures regarding accounting problems did not "reveal" falsity of prior audit opinions).  The mere disclosure of the DOJ investigation and a settlement reserve in no way establishes that BioScrip did not previously believe its Legal Compliance Statement. Accordingly, because the "corrective disclosure" reveals no "concealed" facts, the CAC fails to plead loss causation.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (affirming dismissal where allegations did "not reveal to the market the falsity of the prior [analyst] recommendations").[19]

Moreover, according to Plaintiffs' own allegations, the Company not only stopped distributing Exjade no later than May 2012—nearly *seventeen months* before the first alleged corrective disclosures relating thereto in September 2013—the Company sold the entire specialty pharmacy division at that time.  ¶38.  Corporate information "quickly becomes stale," and so the Exjade-related disclosures Plaintiffs point to simply "could not have affected the market's pricing tendencies since th[eir] disclosure[s] addressed . . . [information from] long in the past, and upon which [BioScrip's] future earnings did not depend."  *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 699 (D.N.J. 2006).  Plaintiffs' causation theory—that the purported wrongdoing relating to a division sold in 2012 could have inflated and propped up BioScrip's share price until it dropped in September 2013—is thus implausible, and impermissibly "attenuated" as a matter of law.  *Lentell*, 396 F.3d at 174.

Plaintiffs fare no better in their efforts to plead loss causation based on the PBM Disclosures.  According to the CAC, the "full truth" about the PBM segment—that BioScrip

---

[19]   Indeed, far from "revealing" any previously omitted truth, as explained *supra* in Section II.B, the alleged omissions were already disclosed before the "corrective disclosures."  *See Joffee*, 410 F. Supp. 2d at 191 (dismissing complaint where "each of the matters that Plaintiffs claim Lehman failed to disclose had, in fact, been disclosed to the market" in SEC filings, analyst reports and FDA letters).

"had suffered its third straight quarterly decrease in PBM Services revenue"—was revealed on November 6, 2013.  ¶191.  As a matter of law, however, "the mere failure to meet earnings forecasts is insufficient to establish loss causation." *AOLTW*, 503 F. Supp. 2d at 678-79.[20]

Finally, even if some loss were attributable to the Specialty Pharmacy or PBM Disclosures, Plaintiffs have not alleged loss causation because the CAC fails to disaggregate the impact of the alleged fraud from the "tangle of [other] factors affecting [the stock] price." *Dura*, 544 U.S. at 343.  The CAC does no more than allege that "BioScrip's stock price declined from a class period high of $17.23 to close at $5.65 on November 7, 2013."  ¶21.  Such allegations are not sufficient to establish loss causation in light of other factors that could have adversely affected BioScrip's stock price including that BioScrip (1) missed earnings three quarters in a row, (2) revised downward its revenue guidance twice in a span of 41 days—including on September 24, 2013, which coincides with the allegedly corrective disclosure regarding the DOJ investigation, and (3) conducted two secondary public offerings during the class period.  Ex. K, Nov. 7, 2013 Earnings Tr. at 5; ¶10; *see In re Flag Telecom Hldgs., Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (Plaintiffs must disaggregate "losses caused by changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, from disclosures of the truth behind the alleged misstatements.").

## V.      THE CONTROL PERSON CLAIMS FAIL AS A MATTER OF LAW.

To establish a prima facie case of control person liability under Section 20(a) and Section 15, Plaintiffs must allege "(a) a primary violation by a controlled person, (b) actual control by the defendant, and (c) the controlling person's culpable participation in the primary violation." *In re*

---

[20]   Moreover, the CAC fails to identify any omissions that were concealed prior to this date, particularly as third-quarter losses in the PBM segment were disclosed during the September 24, 2013 investor day presentation, as discussed *supra* in Section I.E.  *See Joffee*, 410 F. Supp. 2d at 191 (finding no loss causation where allegedly omitted matters had been disclosed in earlier filings).

*Sec. Capital Assur. Ltd. Sec. Litig.*, 2011 WL 4444206, at *7 (S.D.N.Y. Sept. 23, 2011).  *See also In re Alstom SA*, 406 F. Supp. 2d 433, 487 n. 49 (S.D.N.Y. 2005) (noting that Sections 20(a) and 15 "are interpreted in the same manner").  None of these elements are met here.

### A.    There is No Primary Violation or Culpable Participation by Any Defendant.

First, for the reasons above, Plaintiffs have failed to allege a primary violation by a controlled person.  Accordingly, Plaintiffs' control person claims must be dismissed.  Second, Plaintiffs have also failed to adequately allege culpable participation by any alleged control person because they have not, as required, alleged "particularized facts of the controlling person's conscious misbehavior or recklessness."[21]  *In re Satyam Computer Servs. Sec. Litig.*, 915 F. Supp. 2d 450, 482-83 (S.D.N.Y. 2013); *In re UBS ARS Litig.*, 2009 WL 860812, at *3 (S.D.N.Y. Mar. 30, 2009) (same); *see supra* Section III.

### B.    Kohlberg Does not Control BioScrip.

Plaintiffs' control person claims against Kohlberg fail for the additional and independent reason that the CAC does not adequately allege "actual control."  "Control" means "the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise."  *In re Lehman Bros. MBS Litig.*, 650 F.3d 167, 185 (2d Cir. 2011).  "To be liable as a control person, the defendant must *actually* possess . . . the ability to direct the actions of the controlled person."  *In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005).  The "exercise of influence," without more "is not sufficient to establish control."  *Alstom*, 406 F. Supp. 2d at 487.

Here, Plaintiffs allege that Kohlberg controlled BioScrip because (1) it owned stock

---

[21]    The CAC's attempt to plead Kohlberg's culpable participation based on its alleged appointment of two BioScrip directors, ¶252, fails for the same reasons that Plaintiffs have failed to adequately allege scienter, *see supra* Section III: the CAC contains no particularized facts showing that these appointed directors—let alone *Kohlberg*—acted "recklessly" or consciously misbehaved.  And Plaintiffs have not even attempted to allege culpable participation by any of the other control person defendants.

(ranging from 17% to 26%) and (2) two of its nominees sat on BioScrip's eight-member Board of Directors.  ¶252.  But "[m]inority stock ownership and the ability to appoint a minority of the board do not create power to direct management and policies, and thus do not constitute sufficient control" for purposes of "control person" liability.  *Alstom*, 406 F. Supp. 2d at 492.  In *In re Flag Telecom Holdings*, for example, Plaintiffs alleged that Verizon controlled the primary violator (Flag Telecom) because it owned almost *30%* of Flag's voting stock and selected *three of the nine* board members.  308 F. Supp. 2d 249, 273 (S.D.N.Y. 2004) ("*FTH*").  The court held that while such allegations "establish that Verizon had considerable influence over the direction of the management and policies of [Flag Telecom], they do not create the inference that Verizon could control Flag."  *Id.* at 273-74.  *See also In re China Valves Tech. Sec. Litig.*, 2013 WL 5708570, at *11 (S.D.N.Y. Oct. 21, 2013) (34% ownership insufficient).

Plaintiffs try to bolster their "control" allegations by alleging that Kohlberg was able to negotiate an agreement to maintain its directorships even after it sold off shares in BioScrip.  ¶215.  But that allegation falls short, because the alleged power to *influence* company policies is not the same as the power to *control* the company.  *FTH*, at 273-74; *see also In re Flag Telecom Hldgs., Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2003) ("Control in this context is not the mere ability to persuade, but almost always means the practical ability to *direct* the actions of people who issue or sell securities." (emphasis in original)).  Here, too, Kohlberg's alleged ability to *influence* BioScrip to agree to retain Kohlberg's ability to nominate board members is not the same as having the ability to *direct* BioScrip to do so.[22]

## CONCLUSION

For these reasons the CAC should be dismissed with prejudice.

---

[22]   Moreover, pursuant to that amended stockholders' agreement, BioScrip's board of directors retains discretion to remove Kohlberg's appointed directors. Ex. L, Aug. 19, 2013 8-K, Ex. 1.2. § 3(ii).

Dated: April 28, 2014                    Respectfully submitted,
New York, New York

                                         */s/ Jay P. Lefkowitz*
                                         Jay P. Lefkowitz, P.C.
                                         Joseph Serino Jr., P.C.
                                         Shireen A. Barday
                                         **KIRKLAND & ELLIS LLP**
                                         601 Lexington Avenue
                                         New York, New York  10022
                                         Telephone: (212) 446-4800
                                         Facsimile: (212) 446-6460

                                         *Counsel for Defendants BioScrip, Inc., Richard M.
                                         Smith, Hai V. Tran, Patricia Bogusz, Myron Z.
                                         Holubiak, Charlotte W. Collins, Samuel P. Frieder,
                                         David R. Hubers, Richard L. Robbins, Stuart A.
                                         Samuels, Gordon H. Woodward, Kimberlee Seah,
                                         and Kohlberg & Co., LLC.*