# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

IN RE BIOSCRIP, INC. SECURITIES
LITIGATION

No. 13-cv-06922 (AJN)

# MEMORANDUM OF LAW IN SUPPORT OF
# THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS

Dated:  April 28, 2014

Bradley J. Butwin
Jonathan Rosenberg
William J. Sushon
Ross Galin
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
(212) 326-2000

*Attorneys for Defendants Morgan
Stanley & Co. LLC, Jefferies LLC,
SunTrust Robinson Humphrey, Inc.,
Dougherty & Company, and Noble
International Investments, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... 1

FACTUAL BACKGROUND ...................................................................... 5

    A.    The Defendants ....................................................................... 5

    B.    Plaintiffs ................................................................................. 5

    C.    The April 2013 Offering ......................................................... 6

        1.    The PBM Statements ................................................... 6

        2.    The Exjade Statements ................................................ 6

    D.    The August 2013 Offering ...................................................... 8

ARGUMENT ............................................................................................. 9

    I.    THE COMPLAINT PLEADS NO ACTIONABLE MISSTATEMENTS OR OMISSIONS IN THE OFFERING MATERIALS. ........................... 9

    A.    Plaintiffs Fail to Plead Actionable Misstatements or Omissions Concerning the PBM Business. ................................................ 9

        1.    The April 2013 Offering ............................................. 10

        2.    The August 2013 Offering .......................................... 13

    B.    Plaintiffs Fail to Plead Actionable Misstatements or Omissions Concerning the Alleged Exjade Kickback Scheme. .................. 15

        1.    BioScrip's Statements Were Objectively True. ............ 16

            a.    The Complaint Fails to Plead Objective Misrepresentations. ........................................... 16

            b.    The Complaint Fails to Plead Any Objective Omissions. .......................................................... 16

        2.    Plaintiffs Have Failed to Allege That BioScrip's Statements Were Subjectively False. ........................... 19

        3.    The Complaint Does Not Plead that Any Non-Opinion Statements Were False. ............................................. 20

## TABLE OF CONTENTS
### (continued)

Page

II.   PLAINTIFFS LACK STANDING TO BRING ANY SECTION 12(a)(2) CLAIMS AND ANY SECTION 11 CLAIMS BASED ON THE AUGUST 2013 OFFERING..................................................................... 21

   A.   The Complaint Fails to Allege Plaintiffs' Standing Under Section 12(a)(2). ..................................................................... 21

      1.   The April 2013 Offering ................................................. 21

      2.   The August 2013 Offering ............................................. 22

   B.   Plaintiffs Lack Standing to Bring a Section 11 Claim Arising from the August Offering. ..................................................... 22

CONCLUSION............................................................................................ 23

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abbey v. Computer Memories, Inc.*,
  634 F. Supp. 870 (N.D. Cal. 1986) ................................................................. 22, 23

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  No. 11 Civ. 6678, 2013 WL 5878814 (S.D.N.Y. Nov. 1, 2013) ........................... 18

*Barnes v. Osofsky*,
  373 F.2d 269 (2d Cir. 1967) ................................................................................. 23

*Ciresi v. Citicorp*,
  782 F. Supp. 819 (S.D.N.Y. 1991) ......................................................................... 17

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
  388 F. Supp. 2d 932 (S.D. Ind. 2005) ................................................................... 19

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*,
  679 F.3d 64 (2d Cir. 2012) ................................................................................... 15

*In re Cosi, Inc. Sec. Litig.*,
  379 F. Supp. 2d 580 (S.D.N.Y. 2005) .............................................................. 21, 22

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011) ............................................................... 10, 15, 16, 23

*Fait v. Regions Fin. Corp.*,
  712 F. Supp. 2d 117 (S.D.N.Y. 2010) ...................................................................... 9

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008) ................................................................... 16

*Gart v. Electroscope, Inc.*,
  24 F. Supp. 2d 969 (D. Minn. 1998) ..................................................................... 17

*Glassman v. Computervision Corp.*,
  90 F.3d 617 (1st Cir. 1996) .................................................................................. 13

*Goldstein v. Quantum Health Res., Inc.*,
  No. 95 Civ. 713, 1996 WL 813245 (C.D. Cal. Dec. 23, 1996) ............................. 14

*Griffin v. PaineWebber, Inc.*,
  No. 99 Civ. 2292, 2001 WL 740764 (S.D.N.Y. June 29, 2001) ....................... 21, 22

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995) ............................................................................................. 21

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Init. Public Offering Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006)................................................................. 22, 23

*Krim v. BancTexas Grp. Inc.*,
    989 F.2d 1435 (5th Cir. 1993) ......................................................... 13

*Krim v. pcOrder.com, Inc.*,
    402 F.3d 489 (5th Cir. 2005) ........................................................... 23

*Kushner v. Beverly Enters., Inc.*,
    317 F.3d 820 (8th Cir. 2003) ........................................................... 19

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
    902 F. Supp. 2d 329 (S.D.N.Y. 2012)............................................... 12, 16

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    910 F. Supp. 2d 561 (S.D.N.Y. 2012)............................................... 20

*Lyondell Petrochemical Co. Sec. Litig.*,
    984 F.2d 1050 (9th Cir. 1993) ......................................................... 13

*Medis Investor Grp. v. Medis Techs., Ltd.*,
    586 F. Supp. 2d 136 (S.D.N.Y. 2008)............................................... 5

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)........................................................... 9, 10, 12, 14

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
    643 F. Supp. 2d 366 (S.D.N.Y. 2009)............................................... 11

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
    No. 08 Civ. 5653, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ......... 23

*NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*,
    No. 10 Civ. 440, 2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012) ............. 15

*Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010)............................................... 21

*Rapoport v. Asia Elecs. Holding Co.*,
    88 F. Supp. 2d 179 (S.D.N.Y. 2000)................................................. 17

*Resnik v. Swartz*,
    303 F.3d 147 (2d Cir. 2002)............................................................ 10

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012)............................................... 18

## TABLE OF AUTHORITIES
### (continued)

Page

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000)................................................................................. 5, 8

*Scibelli v. Roth*,
  No. 98 Civ. 7228, 2000 WL 122193 (S.D.N.Y. Jan. 31, 2000)............................. 17

*Steinberg v. PRT Grp., Inc.*,
  88 F. Supp. 2d 294 (S.D.N.Y. 2000)................................................................ 11, 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................... 5

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) .................................................................................... 11

*In re UBS AG Sec. Litig.*,
  No. 07 Civ. 11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012).......................... 11, 21, 22

*In re Ultimate Corp. Sec. Litig.*,
  No. 86 Civ. 5944, 1989 WL 79372 (S.D.N.Y. July 11, 1989) ............................... 17

*In re Verifone Sec. Litig.*,
  784 F. Supp. 1471 (N.D. Cal. 1992) ................................................................ 11, 13

*In re Vonage IPO Sec. Litig.*,
  No. 07 Civ. 177, 2009 WL 936872 (D.N.J. Apr. 6, 2009) ............................... 13, 14

## STATUTES

15 U.S.C. § 77k(a) ................................................................................................... 22

The Underwriter Defendants[1] hereby join in the BioScrip Defendants' Memorandum of Law in Support of Their Motion to Dismiss, Parts I.A., I.B., I.D, and II.  The Underwriter Defendants respectfully submit this separate brief to amplify certain arguments that relate solely to the claims against them, those under the Securities Act of 1933 (Counts III and IV).[2]

## PRELIMINARY STATEMENT

Plaintiffs have failed to plead material misstatements or omissions in the Offering Materials for BioScrip's April and August 2013 secondary public offerings, the sole basis for their claims against the Underwriter Defendants.  The Complaint alleges that the Offering Materials should have disclosed that (i) BioScrip's PBM Services segment was experiencing slowing broker marketing expenditures and the loss of one customer; (ii) BioScrip had become a focus of a civil government investigation into the marketing of Exjade (a Novartis drug) by a business unit that BioScrip had sold in May 2012; and (iii) BioScrip was wrong in believing that it was legally compliant.  But Plaintiffs have failed to identify any omitted material fact regarding either PBM or Exjade that BioScrip was legally obligated to disclose.  For these and other reasons—including that Plaintiffs lack standing for most of their Securities Act claims— the claims against the Underwriter Defendants should be dismissed.

---

[1] This Memorandum refers to: (1) Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), Jefferies LLC ("Jefferies"), SunTrust Robinson Humphrey, Inc. ("SunTrust"), Dougherty & Company ("Doherty"), and Noble International Investments, Inc. ("Noble") collectively as the "Underwriter Defendants"; (2) all other Defendants as the "BioScrip Defendants"; (3) Lead Plaintiff The Fresno County Employees' Retirement Association as "Fresno"; (4) additional named plaintiff West Palm Beach Police Pension Fund as "West Palm" (together with Lead Plaintiff, "Plaintiffs"); (5) BioScrip, Inc. as "BioScrip" or the "Company"; (6) BioScrip's April and August 2013 secondary public offerings as the "April Offering" and "August Offering" (together, the "Offerings"); (7) the Prospectus and Registration Statement and all incorporated documents collectively as the "Offering Materials"; and (8) the Consolidated Amended Class Action Complaint as the "Complaint."  References to exhibits are to exhibits to the Declaration of William J. Sushon, Esq., in Support of the Underwriter Defendants' Motion to Dismiss (the "Sushon Declaration").  Unless otherwise specified, all emphasis is added, and all citations and quotations are omitted.

[2] The Underwriter Defendants are not named in the Securities Act Section 15 control person claims (Count V) and the Exchange Act Section 10(b) and 20(a) claims (Counts I and II).

-1-

*The PBM Allegations*

The Offering Materials contained no false or misleading statements regarding BioScrip's PBM business.  Plaintiffs try to manufacture a claim based on the absence in the Offering Materials of (i) a discussion that BioScrip had lost a large PBM client and was witnessing its brokers reduce their marketing efforts and (ii) a prediction that these issues would end up adversely affecting BioScrip's earnings.  Those alleged omissions can only be actionable if BioScrip had a duty to disclose that information.  But the only conceivable basis for imposing such a duty—to render other BioScrip statements not misleading—does not exist.

There can be no dispute that BioScrip had accurately reported its PBM segment's financial results and said nothing about its client relationships (other than disclosing in its second quarter 10-Q the loss of a client that decreased quarterly revenue by $8.8 million) or broker expenditures.  Thus, there was no statement BioScrip needed to correct or clarify.  Plaintiffs point to a statement in the April 2013 Offering Materials that BioScrip was not aware of any intention of a broker to terminate or not renew an agreement with BioScrip.  But that disclosure concerned *brokers* (small marketing businesses that aided BioScrip in selling discount prescription cards), not *clients* (employers and other third party plan sponsors).  Because the disclosures made no assurance that BioScrip would continue to enjoy future business from the PBM client, there was nothing misleading in failing to disclose that BioScrip had lost that client.

Similarly, the disclosure did not indicate that broker marketing expenditures would remain steady; it merely indicated that BioScrip was unaware that any broker intended to reduce its expenditures to zero by terminating or not renewing an agreement.  Thus, the failure to disclose alleged slackening broker marketing was not misleading, either.

Nor was BioScrip under any duty to make the allegedly omitted prediction.  Courts consistently reject the notion that companies have a duty to predict the future.  All that the

securities laws require market participants to disclose is objective, verifiable facts.  Speculation about future revenues is neither objective nor verifiable.

### The Exjade Allegations

The Complaint's Exjade-related allegations likewise fail to state a Securities Act claim. The bulk of the challenged statements consist of management's "belief" that BioScrip complied with applicable laws, rules and regulations.  As the Second Circuit made clear in *Fait v. Regions Financial Corporation*, statements of belief are actionable only if they are *both* objectively *and* subjectively false—*i.e.*, that the speaker did not actually believe the statements when made.  But the Complaint pleads neither objective nor subjective falsity.

The challenged statements were objectively true:

- Even if BioScrip's Exjade program ended up running afoul of applicable (and highly technical) laws and regulations, the challenged compliance statements would nevertheless have been true when made in April and August 2013, because BioScrip had sold the division responsible for the Exjade program and ceased marketing Exjade in May 2012, nearly a year before the first securities offering; and

- BioScrip did not know that the government was contemplating civil claims against the Company; the government has stipulated that it did not communicate that view until September 2013, after the Offerings.

For these same reasons, the Complaint fails to plead subjective falsity.  There is no plausible basis to infer that BioScrip's officers disbelieved the statements because (i) BioScrip had sold the allegedly offending division before the Offerings; (ii) the government did not tell BioScrip management that the Company was a potential defendant until after the Offerings; and (iii) it was permissible for management to believe that BioScrip had done nothing wrong— indeed, BioScrip admitted no violations in settling the government's claims.

The remaining Exjade-related non-opinion statements were also accurate.  All but one were warnings that the Company could be under investigation for regulatory violations or could become subject to scrutiny for regulatory violations in the future.  Plaintiffs fault these

3

disclosures for not adding what BioScrip did not know (and therefore could not disclose)—that the government was contemplating civil claims.  Moreover, courts have repeatedly held that a broad risk disclosure is not misleading for failing to warn of a specific risk the disclosure subsumes.  And the sole definitive disclosure (that BioScrip was not the target of a criminal investigation) was indisputably true.  The government's Exjade-related inquiry was civil, not criminal.

***Plaintiffs Lack Standing for Most of their Securities Act Claims***

In addition to the merits-based pleading deficiencies, the Complaint is also deficient in pleading Plaintiffs' standing to bring Securities Act claims.  In fact, the Court should dismiss for lack of standing all claims except the Section 11 claims concerning the April 2013 Offering.

*First*, the Complaint fails to allege adequately that either Plaintiff has standing to sue under Section 12(a)(2).  Standing under that section requires plaintiffs to plead and prove both that they purchased their securities (i) in the actual offering at issue and (ii) directly from a defendant or as a result of a solicitation from a specific defendant (the "privity" requirement). While Plaintiff West Palm maintains that it purchased some BioScrip stock in the April 2013 Offering, the Complaint does not allege from whom West Palm bought those shares or any defendant' solicitation.  And Courts routinely reject the form allegation on which Plaintiff Fresno relies, *i.e.*, that it bought BioScrip shares "during the Class Period."

*Second*, the Complaint fails to allege adequately that any plaintiff has standing to sue under Section 11 for the August 2013 Offering.  To ensure that the Securities Act reaches only public securities offerings, Congress included in Section 11 a strict standing requirement:  the plaintiff must plead and prove that it acquired securities issued under the allegedly defective Registration Statement.  Here, neither Plaintiff can shoulder that burden for the August 2013

Offering, because they admit in the Complaint that the last securities purchase by either Plaintiff was in July 2013.

**FACTUAL BACKGROUND**[3]

### A.    The Defendants

BioScrip is a life-sciences company that offers, among other things, home-based medical treatments and prescription discount cards.  (Compl. ¶ 31.)  This action concerns two BioScrip businesses.  The first is its integrated pharmacy benefit management, or PBM, segment, which offers discount prescription cards, design programs, and claims processing services.  (Ex. A at 4.)  The second is a specialty pharmacy business that dispensed medication manufactured by others, such as Novartis, to treat serious, chronic diseases.  (Compl. ¶ 31.)  BioScrip sold the specialty pharmacy business in May 2012.  (*Id.* ¶ 38.)

Two BioScrip secondary public offerings are at issue—one in April 2013 and another in August 2013.  (*Id.* ¶ 257.)  The Underwriter Defendants were underwriters for BioScrip's April 2013 Offering, and Morgan Stanley was the sole underwriter for BioScrip's August 2013 Offering.

### B.    Plaintiffs

Lead Plaintiff Fresno alleges that it purchased BioScrip stock "[d]uring the Class Period." (*Id.* ¶ 29.)  It does not allege that it purchased securities in either the April or August 2013

---

[3] The Court may consider on this motion "'any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff[s] and upon which [they] relied in bringing the suit.'"  *Medis Investor Grp. v. Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 138 (S.D.N.Y. 2008), *aff'd*, 328 F. App'x 754 (2d Cir. July 21, 2009); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider . . . sources courts ordinarily examine when ruling on Rule 12(b)(6) motions . . . , in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.").

5

Offerings, nor does it specify from whom it acquired BioScrip stock.  (*Id.* and Compl. Ex. A.)
Its last alleged BioScrip stock purchase was on July 24, 2013.  (*Id.*, Ex. A.)

Plaintiff West Palm alleges that it purchased BioScrip stock both "throughout the Class
Period" and "pursuant or traceable to" the April 2013 Offering.  (*Id.* ¶ 30.)  It does not allege that
it bought in the August 2013 Offering, and its last alleged BioScrip stock purchase was on
July 9, 2013.  (*Id.*, Ex. B.)  It does not specify from whom it acquired BioScrip stock.

C.    **The April 2013 Offering**

The Complaint alleges that the April 2013 Offering Materials made misleading
statements concerning (i) BioScrip's PBM Services business; and (ii) a federal government
investigation concerning the distribution of Exjade, a Novartis medication.

1.    *The PBM Statements*

The Complaint alleges that the April Offering Materials misled investors concerning the
state of BioScrip's PBM business.  The sole statement from the April Offering Materials that the
Complaint cites disclosed that BioScrip was "unaware of any intention by a significant discount
card broker to terminate or not renew an agreement" with the Company.  (Compl. ¶ 308.)  The
Complaint alleges that this statement was false because it did not disclose that (i) BioScrip lost
an unidentified "major PBM client" as of March 31, 2013, (ii) BioScrip's PBM brokers were
"reducing or delaying" their marketing for the PBM program, and (iii) these issues "*would* have
a material negative impact" on BioScrip.  (*Id.* ¶¶ 307, 309.)

2.    *The Exjade Statements*

The April 2013 Offering Materials incorporated by reference BioScrip's Annual Report
on Form 10-K for the year ended December 31, 2012.  That 2012 Form 10-K included several
statements of management's belief concerning the Company's regulatory compliance:

6

- "Our management carefully considers the importance of . . . anti-kickback laws when structuring each company's operations and *believes* that each of our respective companies is in compliance therewith."  (Ex. A at 15; Compl. ¶ 296.)

- "[M]anagement *believes* the Company is in substantial compliance with all existing laws and regulations material to the operation of its business."  (Ex. A at 81; Compl. ¶ 296.)

- "[W]e *believe* we are in compliance with Medicaid and Medicare billing rules and requirements."  (Ex. A at 16; Compl. ¶ 296.)

As the Complaint acknowledges, the 2012 Form 10-K also contained several cautionary statements concerning BioScrip's regulatory compliance and potential effects of government investigations:

- "Governmental entities have also commenced investigations against specialty pharmaceutical distribution companies . . . concerning retail distribution and sales and marketing practices of certain products and therapies.  There can be no assurance that we will not receive subpoenas or be requested to produce documents in pending investigations or litigation from time to time.  In addition we may be the target or subject of one or more such investigations or named parties in corresponding actions."  (Ex. A at 15; Compl. ¶ 298.)

- "From time to time, the Company responds to subpoenas and requests for information from governmental agencies. . . . While the Company believes it is in substantial compliance with all laws, rules and regulations that affect its business and operations, there can be no assurance that the Company will not be subject to scrutiny or challenge under one or more existing laws or that any such challenge would not be successful."  (Ex. A at 81; Compl. ¶ 299.)

- "We periodically respond to subpoenas and requests for information from governmental agencies.  We confirm that we are not a target or a potential subject of a criminal investigation.  We cannot predict with certainty what the outcome of any of the foregoing might be or whether we may in the future become a target or potential target of an investigation or the subject of further inquiries or ultimately settlements with respect to the subject matter of these subpoenas."  (Ex. A at 21; Compl. ¶ 299.)

The April 2013 Registration Statement and Prospectus also included several warnings concerning the effects of (i) regulatory changes, (ii) failure to comply with Medicare

requirements, and (iii) liabilities arising from BioScrip's sale of its pharmacy services segment. (Ex. B at S-6, S-7, S-16; Compl. ¶¶ 301–04.)[4]

The Complaint alleges that all these statements were materially false and misleading because the federal government had been investigating BioScrip's former Exjade distribution activities in its pharmacy services segment, which BioScrip had sold in May 2012. (Compl. ¶¶ 38, 297, 300, 305.) While BioScrip first received a civil investigative demand concerning Exjade in October 2012, the government acknowledged in its settlement with BioScrip that the Company did not learn until September 11, 2013, that the government was considering False Claims Act civil claims against BioScrip: "[O]n September 11, 2013, the United States *first notified* BioScrip that the United States was contemplating civil claims against BioScrip under the FCA relating to BioScrip's distribution of Exjade." (Ex. C at 1.)[5] Even then, the government did not "reveal the existence" of a sealed *qui tam* complaint or "that BioScrip was named as a defendant therein." (*Id.* at 1–2.)

### D.   The August 2013 Offering

In August 2013, BioScrip made another secondary offering. The August 2013 Offering Materials also incorporated by reference the 2012 Form 10-K, and so the Complaint challenges those same statements. (Compl. ¶ 311.) The August 2013 Offering Materials also incorporated

---

[4] *See, e.g.*, Ex. B at S-6 ("Our business is subject to numerous federal, state and local laws and regulations. . . . Changes in these regulations may require extensive changes to our systems and operations that may be difficult to implement. . . .The regulations to which we are subject include, but are not limited to, Anti-Kickback laws"); Ex. B at S-7 ("Any termination of one or more of our agencies or pharmacies from the Medicare program for failure to satisfy the Medicare conditions of participation or supplier standards, as applicable, could adversely affect our consolidated financial statements"); Ex. B at S-16 ("We may also be subject to claims by . . . regulatory authorities and employees, resulting from the conduct of the operations subject to the Pharmacy Services Asset Sale prior to the consummation of the Pharmacy Services Asset Sale.").

[5] The Court may take judicial notice of the Settlement Stipulation because it is publicly available and integral to the Complaint. *Rothman*, 220 F.3d at 88–89 .

by reference the Company's quarterly filings on Form 10-Q for the first and second quarters of 2013.  (Ex. D at S-23.)

As for the PBM business, the Complaint alleges that only one incorporated statement in the 2013 first-quarter 10-Q was false—that a $3.1 million decline in PBM revenues from the same quarter in 2012 was attributable "primarily . . . to a decrease in discount card volume." (Compl. ¶ 316.)  According to the Complaint, the Company should also have disclosed "the true extent of the problems facing the PBM segment."  (*Id.* ¶ 317.)  The Complaint ignores BioScrip's disclosure in the second-quarter 10-Q that it had lost a client, resulting in a $8.8 million drop in discount card revenue.  (Ex. E at 26.)

The Complaint also alleges that one statement concerning BioScrip's regulatory compliance, appearing in both the 2013 first and second-quarter 10-Qs, was misleading.  Much like the challenged statements from the 2012 Form 10-K, that statement warned that "[w]hile the Company *believes* it is in substantial compliance" with applicable laws and regulations, there could be no assurance that it would not be scrutinized or challenged for failing to comply or that such a challenge would not succeed.  (Compl. ¶¶ 312, 314.)

## ARGUMENT

### I.   THE COMPLAINT PLEADS NO ACTIONABLE MISSTATEMENTS OR OMISSIONS IN THE OFFERING MATERIALS.

#### A.   Plaintiffs Fail to Plead Actionable Misstatements or Omissions Concerning the PBM Business.

The lynchpin of a Securities Act claim is a false or misleading statement in the challenged offering materials.[6]  Yet the Complaint fails to meet even this basic requirement as to

---

[6] *See Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117, 121 (S.D.N.Y. 2010) ("[T]o state a claim under the Securities Act, [a plaintiff] must allege a misstatement or omission of fact."), *aff'd*, 655 F.3d 105 (2d Cir. 2011); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (noting that Sections 11 and 12(a)(2) "impose

the PBM statements, merely quoting the Offering Materials without alleging in what way their statements were false.[7]

### 1.   The April 2013 Offering

The Complaint highlights only one April 2013 statement concerning the Company's PBM business:

> ***The loss of a relationship with one or more of our discount card brokers could negatively impact our business***. . . .   The brokers we use are typically small, privately held marketing companies.  The two largest brokers generate a significant percentage of the discount card business.  We are unaware of any intention by a significant discount card broker to terminate or not renew an agreement with us.

(Compl. ¶ 308 (quoting Ex. B at S-14) (emphasis in original).)  Plaintiffs do not allege that this cautionary statement was itself misleading.  Rather, they complain that it was rendered misleading because the April Offering Materials did not also disclose that (i) BioScrip had lost a major PBM client on March 31, 2013; and (ii) discount brokers were reducing or delaying their marketing efforts.  (*Id.* ¶ 309.)  And Plaintiffs also fault the April Offering Materials for failing to predict that the loss of a PBM client and reduction in broker marketing efforts "would have a material negative impact on the Company's future earnings."  (*Id.*)

A duty to disclose is the foundation of a Securities Act claim.  To plead an actionable material omission, a complaint must allege that the issuer had a duty to disclose the allegedly omitted information.[8]  But a disclosure duty arises only where (i) "imposed by statute or

---

liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions").

[7] Sections 11 and 12(a)(2) of the Securities Act have parallel elements.  Section 11 governs registration statements while Section 12 governs prospectuses and oral communications.  *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (affirming dismissal of claims under both Sections 11 and 12 based on the same allegations and same legal standard).

[8] *In re Morgan Stanley Info. Fund*, 592 F.3d at 360 ("The question is whether . . . the Offering Documents omitted information that defendants were required to disclose."); *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information.").

regulation" or (ii) "additional information is needed to make another statement, whether required or voluntarily made, not misleading."[9]  As the Second Circuit has held, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."[10]

There was no duty to disclose the alleged loss of an unidentified "major client" on March 31, 2013.  This is because the April 2013 Offering Materials made no representation concerning any future business from that client that would trigger such a duty.[11]  Indeed, BioScrip's April Offering Materials made no representations about sales to any particular PBM client, much less the unidentified "major client" that allegedly defected on March 31, 2013.

The decision in *Steinberg v. PRT Group, Inc.* illustrates the point.  There, plaintiffs alleged that the prospectus omitted that the company had failed to secure bids for new business from certain established clients.  The court held that the issuer had no duty to disclose that information because the offering materials "made no representations about any past, present, or expected . . . projects with any of the five clients named by plaintiffs."[12]  Absent a specific representation that the company "had received or was expecting to receive any . . . business" from the named clients, there was nothing misleading in failing to disclose that the company

---

[9] *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009), *aff'd*, 592 F.3d 347 (2d Cir. 2010).

[10] *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993); *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225, 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012).

[11] *See Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 308–09 (S.D.N.Y. 2000) (finding no duty to disclose unsuccessful bids for business from existing clients at the time of the IPO); *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1484 (N.D. Cal. 1992) (no duty to disclose fact that defendant did not have current orders from customers listed in the prospectus because "the prospectus neither expressly states or implies this fact"), *aff'd*, 11 F.3d 865 (9th Cir. 1993).

[12] *Steinberg*, 88 F. Supp. 2d at 308–09.

"had not proceeded beyond the bidding stage" with those clients.[13]  The same reasoning applies

here.

Nor can Plaintiffs find a disclosure duty by pointing to the statement in the April 2013

Offering Materials that BioScrip was not aware of an intention of any broker to terminate or not

renew its agreement with BioScrip.  That statement concerned BioScrip's *brokers*, not its clients

(*i.e.*, employers and other third party plan sponsors (*see* Ex. A at 8)).[14]  The Complaint fails to

allege why the loss of a client renders BioScrip's statements regarding its discount card brokers

false or misleading.

Similarly, nothing in the challenged April 2013 PBM warning gave rise to a duty to

disclose alleged reductions and delays in broker marketing efforts.  The challenged statement

says nothing about the pace or intensity of broker marketing—it spoke only to the potential

adverse impact if the Company were to *lose* its discount card broker *relationships*.  That

statement gave rise to no duty to discuss alleged reductions or delays.[15]

To the extent that the Complaint could be read to suggest that Defendants were under a

duty to predict (i) that broker Watertree Health would later stop doing new business with

BioScrip in August or September 2013 (Compl. ¶¶ 114, 309) and (ii) the effect of various events

on the Company's future earnings, such a claim would also fail.  That is because the federal

---

[13] *Id.* at 309.

[14] *See, e.g.*, *In re Morgan Stanley Info. Fund*, 592 F.3d at 365–66 (declining to hold that risk disclosures in offering documents gave rise to duty to disclose "the entire corpus of [defendants'] knowledge" on "related subjects"); *see also Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 344 (S.D.N.Y. 2012) (rejecting an alleged misstatement regarding defendant's due diligence where "[a] close reading of these statements does not indicate that [defendant] continued to conduct due diligence, but only that meeting participants discussed due diligence matters").

[15] *See, e.g.*, *Steinberg*, 88 F. Supp. 2d at 303–04 (where prospectus did not guarantee future business, company had no duty to disclose that it was "losing ground to competitors in bidding for IT contracts").

securities laws impose no duty to predict the future.[16]  Instead, all that must be disclosed are objective, verifiable, historic facts.[17]  The alleged forward-looking omissions are none of these things and are therefore not actionable.

### 2.    The August 2013 Offering

Similarly flawed are the Complaint's conclusory allegations that the August 2013 Offering Materials made false PBM-related statements.  The sole statement that the Complaint references in this regard is a May 2013 announcement (both in a May 8, 2013 press release attached to a BioScrip Form 8-K and BioScrip's May 9, 2013 10-Q for the quarter ending March 31, 2013, each incorporated by reference in the August 2013 Offering) of a $3.1 million decline in PBM revenues, year-over-year.  (Compl. ¶ 316.)  The Complaint does not allege that these financial results themselves were false, nor does it allege that BioScrip misled the market in attributing the decline to a decrease in discount card volume.  (*Id.* ¶¶ 316–17.)  Instead, the Complaint alleges that the statement was misleading because it "failed to disclose the true extent of the problems facing the PBM business," which are the same facts allegedly omitted from the April 2013 Offering Materials.  (*Id.* ¶ 317.)

That allegation fails to state a claim.  As the court in *In re Vonage IPO Securities Litigation* held, "[a]ccurate disclosure of historical performance is simply not a basis for liability based on the risk that future performance may deteriorate."[18]  The Complaint's allegation in

---

[16] *See Glassman v. Computervision Corp.*, 90 F.3d 617, 631 (1st Cir. 1996) ("The federal securities laws impose no obligation upon an issuer to disclose forward-looking information such as internal projections, estimates of future performance, forecasts, budgets, and similar data."); *Krim v. BancTexas Grp. Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993) (no duty to make economic forecasts); *Lyondell Petrochemical Co. Sec. Litig.*, 984 F.2d 1050, 1053 (9th Cir. 1993) (no duty to disclose income projections in prospectus); *In re Verifone Sec. Litig.*, 784 F. Supp. at 1484 (allegations that company failed to warn that it "faced a brick wall" fail because they "amount to nothing more than a failure of VeriFone to predict the future").

[17] *See Glassman*, 90 F.3d at 631 (affirming dismissal of Section 12 claims, noting "the federal securities laws focus on the mandatory disclosure of backward-looking hard information, not forecasts").

[18] No. 07 Civ. 177, 2009 WL 936872, at *8 (D.N.J. Apr. 6, 2009) (dismissing Section 11 and 12 claims).

paragraph 317 does not challenge the accuracy of BioScrip's first-quarter 2013 reported results; that is, it does not allege that BioScrip's alleged PBM "problems" affected first quarter results. Rather, it alleges only that in reporting first-quarter results, BioScrip did not also state that PBM "problems" might cause BioScrip's second-quarter performance to deteriorate. The Complaint itself alleges that reduced broker marketing efforts affected only second quarter results. (Compl. ¶ 294(b).) And the loss of a client on March 31, 2013—the very last day of the first quarter— could not have adversely affected the first quarter results. Because paragraph 317 thus amounts only to an allegation that BioScrip failed to disclose "the risk that future performance may deteriorate," it fails to state a claim.[19]

And nothing else in the May 2013 earnings announcements for the PBM business triggered a duty to disclose the allegedly omitted information. The announcements made no disclosures concerning client or broker relationships or future anticipated earnings.[20]

To the extent Plaintiffs again point to BioScrip's alleged failure to disclose the loss of a single PBM client or decreased broker marketing in the August Offering Materials, that allegation is simply false. BioScrip disclosed the loss of the client in its 2013 Second Quarter 10-Q and disclosed a "decrease in marketing from certain distribution partners" in its August 7, 2013 8-K,[21] both incorporated by reference in the August 2013 Prospectus Supplement:

> This decrease in service revenue for the quarter was primarily due to the contract termination of a low margin funded PBM Services client effective on March 31,

---

[19] *See id.*

[20] *See In re Morgan Stanley Info. Fund*, 592 F.3d at 365–66 (affirmative disclosures do not impose duty to make disclosures on "related matters"); *see also Goldstein v. Quantum Health Res., Inc.*, No. 95 Civ. 713, 1996 WL 813245, at *6 (C.D. Cal. Dec. 23, 1996) ("Absent attack on the accuracy of [the financial data], it is difficult to conclude the omission of pricing pressures was misleading.").

[21] Ex. F at Ex. 99.1.

2013 which reduced revenues by $8.8 million and due to a decrease in discount card revenue of $3.9 million.[22]

*       *       *

Because Plaintiffs have failed to plead any material misrepresentation or omission in the Offering Materials concerning BioScrip's PBM business, any claims pertaining to the PBM business should be dismissed.

### B.   Plaintiffs Fail to Plead Actionable Misstatements or Omissions Concerning the Alleged Exjade Kickback Scheme.

The Complaint also fails to state a claim based on alleged omissions relating to the government's civil investigation of BioScrip's Exjade arrangements with Novartis.  Virtually all the challenged statements expressed management's belief that the Company complied with applicable laws, regulations and rules.[23]  In *Fait v. Regions Financial Corporation*, the Second Circuit held that a plaintiff challenging a statement of belief or opinion must plead not only that the statement was actually false when made (objective falsity), but also that the speaker did not believe the statement to be true (subjective falsity):

> [W]hen a plaintiff asserts a claim under section 11 or 12 based upon a belief or opinion alleged to have been communicated by a defendant, liability lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed.[24]

---

[22] Ex. E at 26.

[23] (*See* Compl. ¶¶ 296 ("[M]anagement *believes* the Company is in substantial compliance with all existing laws and regulations material to the operation of its business"), ("We *believe* we have procedures in place to ensure the accuracy of our claims"), ("[W]e *believe* we are in compliance with Medicaid and Medicare billing rules and requirements"), 298 ("[T]he Company *believes* that it is in substantial compliance with all laws, rules and regulations that affect its business and operations . . . ), 312 ("[T]he Company *believes* it is in substantial compliance with all laws, rules and regulations that affect its business and operations"), 314 (same).)

[24] *Fait*, 655 F.3d at 110; *see also City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67–68 (2d Cir. 2012); *NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, No. 10 Civ. 440, 2012 WL 3191860, at *9 (S.D.N.Y. Feb. 9, 2012).  The Supreme Court recently granted *certiorari* to review the Sixth Circuit's 2013 decision rejecting *Fait*'s (and two other Circuits') two-pronged pleading requirement for statements of opinion and belief. *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 719 F.3d 498 (6th Cir. 2013), *cert. granted*, 134 S. Ct. 1490 (U.S. Mar. 3, 2014) (No. 13-435).

The Complaint's allegations concerning the Offering Materials' Exjade statements of belief fail this standard.

### 1.    BioScrip's Statements Were Objectively True.

#### a.    The Complaint Fails to Plead Objective Misrepresentations.

For a statement to be actionable, it must have been "false at the time" it was made.[25]  As BioScrip has explained (*see* BioScrip Defs.' Mem. at 6–7), the statements in the Offering Materials that BioScrip complied with applicable laws and regulations were true when made. The Complaint itself acknowledges that in May 2012 (almost a year before the April 2013 Offering), BioScrip sold the specialty pharmacy services unit that distributed Exjade for Novartis.  BioScrip filed its 2012 10-K on March 15, 2013.  (*See* Compl. ¶ 152.)  Thus, regardless of the state of affairs before May 2012, BioScrip's statements of compliance in its 2012 Form 10-K and its 2013 First and Second Quarter 10-Qs were true both when they appeared in those filings and when the Underwriter Defendants signed onto the Offering Materials in April and August 2013.  For that reason alone, the Complaint cannot state a claim as to those statements.[26]

#### b.    The Complaint Fails to Plead Any Objective Omissions.

The Complaint fares no better with its allegations that the Offering Materials did not disclose that BioScrip was the subject of a government civil investigation.  Any such assertion falls flat at the outset because the Complaint fails to plead facts showing that the defendants were even aware the government was considering False Claims Act civil claims against BioScrip.  In fact, the Court need look no further than BioScrip's Settlement Stipulation with the Department

---

[25] *Lighthouse Fin. Grp.*, 902 F. Supp. 2d at 344–45.

[26] *See Fait*, 655 F.3d at 107; *see also In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360–62 (S.D.N.Y. 2008) (2003–04 disclosures not actionable even though company did not disclose regulatory non-compliance that ceased in 2001).

of Justice to see *the government's own acknowledgement* that BioScrip did not know it was a

potential civil defendant until a month after the August 2013 Offering:

> [O]n September 11, 2013, the United States *first* notified BioScrip that the United States was contemplating civil claims against BioScrip under the FCA relating to BioScrip's distribution of Exjade (*but did not at that time reveal the existence of the Action under seal or the fact that BioScrip was named as a defendant therein by the Relator*)."

(Ex. C, at 1–2.)  In the face of this acknowledgement by the very body conducting the Exjade

investigation, the Complaint's conclusory allegations to the contrary must fail.[27]  Even Plaintiffs

would agree that Defendants could not disclose what they did not know.[28]

Plaintiffs' reliance on BioScrip's response to the civil investigative demand— collecting

and producing documents and making employees available for interviews (Compl. ¶¶ 90, 289)—

does not alter this conclusion.  These activities were entirely consistent with what BioScrip

believed—that it was cooperating as a witness in the investigation.  The Complaint does not

allege anything about those interviews or document productions suggesting that BioScrip knew

the government was contemplating civil claims.  Indeed, there would have been no disclosure

duty even if BioScrip had known that fact.  Where a company is merely under investigation, and

no conclusion has been reached concerning its alleged conduct, that company is under no

obligation to speculate that it may have broken the law.[29]  And courts routinely reject contentions

---

[27] *See Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) (dismissing Section 11 and 12 claims where documents amenable to judicial notice directly contradicted plaintiffs' allegations).

[28] *See Scibelli v. Roth*, No. 98 Civ. 7228, 2000 WL 122193, at *3 (S.D.N.Y. Jan. 31, 2000) (dismissing Section 11 claim because "it cannot be reasonably inferred that the defendants had the allegedly omitted data at the time the prospectus was issued"); *Gart v. Electroscope, Inc.*, 24 F. Supp. 2d 969, 975 (D. Minn. 1998) (dismissing Section 11 omission claim because plaintiffs "do not allege that Defendants were aware at the time of the IPO" of the allegedly omitted information); *In re Ultimate Corp. Sec. Litig.*, No. 86 Civ. 5944, 1989 WL 79372, at *3–4 (S.D.N.Y. July 11, 1989) ("The issue is what the moving defendants knew and thus could have disclosed in the June prospectus.").

[29] *See Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991) (company has no duty to accuse itself of wrongdoing in registration statement), *aff'd*, 956 F.2d 1161 (2d Cir. 1992).

like Plaintiffs'—that BioScrip's statements that the Company "from time to time . . . responds to subpoenas and requests for information from Government agencies" somehow imposed a duty to disclose every such instance.[30]

*Richman v. Goldman Sachs* is squarely on point.  There, plaintiffs alleged that Goldman should have disclosed an SEC Wells Notice—warning the company that the SEC's Enforcement Division had preliminarily decided to recommend charges[31]—concerning a Goldman synthetic collateralized debt obligation that allegedly favored a single hedge fund client over Goldman's other clients.[32]  The SEC's investigation was not publicly disclosed until it sued Goldman and a Goldman employee several months later.[33]  The court found that Goldman had no duty to disclose the Wells Notice because the notice did not mean that "litigation was substantially certain to occur."[34]  The court also relied on Goldman's general disclosure, similar to that of BioScrip here, that Goldman had

> received requests for information from various governmental agencies and self-regulatory organizations relating to subprime mortgages, and securitizations, collateralized debt obligations and synthetic products relating to subprime mortgages.[35]

Likewise here, BioScrip adequately warned investors that it received government subpoenas and requests for information from time-to-time and that there could be no assurance that such requests would not result in the Company being named as a defendant in a civil

---

[30] *See, e.g.*, *In re Bank of Am. AIG Disclosure Sec. Litig.*, No. 11 Civ. 6678, 2013 WL 5878814, at *10–13 (S.D.N.Y. Nov. 1, 2013) (warnings of MBS litigation not rendered misleading by failure to disclose one sizable potential suit); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273–74 (S.D.N.Y. 2012) (nondisclosure of SEC Wells notices did not render misleading prior disclosures about ongoing governmental investigations).

[31] 868 F. Supp. 2d at 272.

[32] *Id.* at 269–70.

[33] *Id.* at 270.

[34] *Id.* at 274.

[35] *Id.* at 270.

government action.  (*See* Compl. ¶¶ 298–99; Ex. A at 15, 21, 81.).  BioScrip disclosed the

investigation once it became aware in September 2013 that the government was contemplating

civil claims against the Company.[36]

        2.      *Plaintiffs Have Failed to Allege That BioScrip's Statements Were*
                *Subjectively False.*

Even if BioScrip's compliance statements had been objectively misleading, Plaintiffs'

Exjade-related claims would still fail.  This is because the Complaint also fails to plead

subjective falsity, as *Fait* requires.

*First*, before the challenged statements were made, BioScrip had already sold the

specialty pharmacy business that had distributed Exjade.  (*See* p. 16, *supra*.)  It was therefore

perfectly natural for BioScrip to assume that it was complying with applicable laws, rules and

regulations when the Offering Materials were filed.

*Second*, the Complaint fails to allege facts showing that BioScrip management was aware

that the government was contemplating civil action.  (*See* pp. 16–17, *supra*.)

*Third*, the Offering Materials would not have been subjectively false even if BioScrip

management had known that the government's investigation focused on the Company.  The mere

fact of a government investigation does not give rise to an inference that management believed

an actual violation had occurred:  "[a] company can both believe in and internally monitor its

compliance with federal law and be the object of a state investigation, even one targeted at the

very metrics of that compliance."[37]  Indeed, even BioScrip's settlement with the government

does not rebut this conclusion, as the Company admitted no wrongdoing.  (*See* Ex. C.)

---

[36] Ex. G at 1.

[37] *See, e.g., City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 945–46 (S.D. Ind. 2005)
(2004 disclosure that company had been under investigation by state attorney general since 2002 did not render false
belief of legal compliance); *see also Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (failure to

3.    *The Complaint Does Not Plead that Any Non-Opinion Statements Were False.*

The Complaint also alleges that a handful of non-opinion statements in the Offering Materials were misleading because they omitted that the government was considering civil claims against the Company.[38]  But as discussed above, BioScrip was unaware of that fact until September 11, 2013.  (*See* pp. 16–17, *supra*.)  Moreover, there was no duty to disclose the specific Exjade investigation in view of the Company's broader cautionary statements concerning potential government actions—the very statements that Plaintiffs contend were misleading.  (*See* pp. 18–19, *supra*.)

The only other allegedly misleading non-opinion statement was indisputably true. Plaintiffs allege that the Offering Materials misleadingly stated that "we are not a target or a potential subject of a criminal investigation."  (Compl. ¶¶ 298, 303.)  The Exjade investigation was a civil, not criminal, investigation, handled by the civil division of the United States Attorney's Office.  (*See* Ex. C at 1–2; Ex. G at 1.)

---

opine on the legality of Medicare billing practices non-actionable, even though company was under federal criminal investigation involving Medicare billing practices); *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 581 (S.D.N.Y. 2012) (auditor's statement that financials were GAAP-compliant non-actionable even though NYSE later commenced delisting process based on GAAP violations).

[38] *See* Compl. ¶ 298 ("[W]e may be the target or subject of one or more such investigations or named parties in the corresponding actions."), ¶ 299 ("We confirm that we are not a target or a potential subject of a criminal investigation."), ¶ 301 (disclosure concerning potential adverse effects of "existing and new government legislative and regulatory action"), ¶ 302 (disclosure concerning effects of failure to comply with Medicare standards and requirements), ¶ 303 ("We confirm that we are not a target or a potential subject of a criminal investigation."), ¶ 304 (disclosure concerning potential liabilities for pharmacy services segment even after its sale).

## II.  PLAINTIFFS LACK STANDING TO BRING ANY SECTION 12(A)(2) CLAIMS AND ANY SECTION 11 CLAIMS BASED ON THE AUGUST 2013 OFFERING.

### A.  The Complaint Fails to Allege Plaintiffs' Standing Under Section 12(a)(2).

#### 1.  The April 2013 Offering

Section 12(a)(2) standing requires Plaintiffs to plead and prove that they purchased securities (i) directly from, or as a result of being solicited by, the Defendants (the "privity" requirement) and (ii) in the public offering.[39]  Plaintiffs fail to do so here, and thus, the Section 12(a)(2) claim (Count IV) must be dismissed for this reason as well.

Fresno alleges only that it purchased BioScrip stock "[d]uring the Class Period." (Compl. ¶ 29 and Ex. A.)  This is plainly insufficient to plead Section 12(a)(2) standing because it shows neither that the securities were purchased from a Defendant (or as a result of any Defendants' solicitation) or in the offering.[40]  As for West Palm, the Complaint alleges that it purchased BioScrip stock "both throughout the Class Period and pursuant or traceable to the Company's April 19, 2013 public offering . . ."  (Compl. ¶ 30.)  This too is inadequate.  Courts routinely hold that conclusory allegations such as these cannot plead Section 12(a)(2) standing "[e]ven under the modest requirements of Rule 8(a)."[41]  And even if the Court were to read West Palm's certification in Complaint Exhibit B as showing that it purchased in the April Offering,

---

[39] *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 578 (1995) (limiting Section 12 claims to those who purchased in offering); *Griffin v. PaineWebber, Inc.*, No. 99 Civ. 2292, 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001) (dismissing Section 12(a)(2) claim for lack of standing where plaintiff failed to allege either purchasing shares from particular defendant or defendant "directly involved in the actual solicitation of his purchase").

[40] *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *25 (because Section 12(a) "imposes liability on only the buyer's immediate seller," Securities Act plaintiffs must demonstrate Section 12(a)(2) standing).

[41] *Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (dismissing for lack of standing Section 12(a)(2) claim that alleged "rather coyly . . . that '[p]laintiffs and other Class members purchased or otherwise acquired Certificates pursuant and/or traceable to the defective Prospectus Supplements"); *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005) (dismissing for lack of standing Section 12(a)(2) claim that included allegation that plaintiffs bought shares "pursuant to or traceable to" prospectus).

West Palm would still lack standing because the Complaint fails to allege privity with any of the Underwriter Defendants (*i.e.*, from which defendant West Palm actually purchased its shares).[42]

### 2.    The August 2013 Offering

The Complaint refutes any contention that Plaintiffs purchased shares in the August 2013 Offering.  Fresno's and West Palm's last purchases were on July 24, 2013, and July 9, 2013, respectively; both before the August 2013 Offering.  (*See* Compl. Ex. A (Fresno), Ex. B (West Palm).)  Thus, neither Plaintiff has standing to bring Section 12(a)(2) claims relating to that offering.[43]

### B.    Plaintiffs Lack Standing to Bring a Section 11 Claim Arising from the August Offering.

Section 11 confers standing on "any person acquiring" a security issued under a registration statement containing a materially false or misleading statement.[44]  Section 11 plaintiffs must therefore satisfy the "tracing" requirement by " 'plead[ing] and prov[ing] that his stock was issued pursuant to the particular registration statement alleged to be defective.' "[45] This tracing requirement is not a mere procedural speed-bump; it is a significant safeguard ensuring that the Securities Act regulates only public offerings.[46]  Unlike Exchange Act Section 10(b) and Rule 10b-5 (which apply to any purchase or sale of a security), a Securities Act

---

[42] *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *26–27 (dismissing Section 12(a)(2) claim where plaintiff failed to allege purchase directly from specific underwriter or that any underwriter "specifically and successfully solicited its purchases"); *Griffin*, 2001 WL 740764, at *2 (dismissing Section 12(a)(2) claim against underwriter where plaintiff did not allege purchase from specific defendant or that a specific defendant was directly involved in soliciting plaintiff's purchase).

[43] *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *27; *Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d at 589 .

[44] 15 U.S.C. § 77k(a).

[45] *Abbey v. Computer Memories, Inc.*, 634 F. Supp. 870, 872 (N.D. Cal. 1986) (quoting *Lorber v. Beebe*, 407 F. Supp. 279, 286 (S.D.N.Y. 1975)); *see also In re IPO Sec. Litig.*, 471 F.3d 24, 31 n.1 (2d Cir. 2006) ("To prevail on a Section 11 claim for a misleading registration statement, a plaintiff must be able to 'trace' his or her shares to the defective registration statement.").

[46] *See Abbey*, 634 F. Supp. at 876 ("The purpose of section 11's tracing requirement is to limit standing to sue to those individuals who actually purchased shares issued pursuant to a defective registration statement.").

Section 11 claim does not require proof of scienter or reliance.[47]  For this reason, it is not enough to allege a "high mathematical probability" that one or more of the plaintiff's securities were offered under the allegedly misleading registration statement.  Rather, Section 11 plaintiffs must be able to plead and prove with certainty that their securities are traceable to those offering materials:  "Congress conferred standing on those who *actually* purchased the tainted stock, not on the whole class of those who *possibly* purchased tainted shares—or, put another way, are at risk of having purchased tainted shares."[48]

The Complaint does not satisfy the stringent tracing requirement as to the August 2013 Offering.  As discussed above, all Plaintiffs' purchases occurred before the August 2013 Offering, and so neither Plaintiff could have purchased shares issued under the August 2013 registration statement.  Thus, the Court should dismiss the Complaint's Section 11 claims arising from the August 2013 offering.[49]

## CONCLUSION

The Complaint brings serious charges of misrepresentations and omissions in the Offering Materials without satisfying the most fundamental prerequisites.  The statements that the Complaint challenges are not misleading because they were accurate.  And there was no duty

---

[47] *Fait*, 655 F.3d at 109.

[48] *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 495–96 (5th Cir. 2005) (rejecting plaintiffs' use of statistics to indicate "high mathematical probability" that some of their shares were issued pursuant to the challenged registration statement) (emphasis in original); *see also In re IPO Sec. Litig.*, 471 F.3d 24 at n.1 (tracing must be established through proof either of "direct chain of title from the original offering" or that plaintiff bought shares "in a market containing only shares issued pursuant to the allegedly defective registration statement").

[49] *See N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653, 2010 WL 1473288, at *3 (S.D.N.Y. Mar. 29, 2010) ("A lead plaintiff asserting Section 11 claims concerning mortgage-backed securities from an issuing trust lacks standing to sue on claims arising from trust offerings which he did not purchase."); *Abbey*, 634 F. Supp. at 872 (dismissing Section 11 claim where shares acquired before challenged offering) (citing *Barnes v. Osofsky*, 373 F.2d 269, 272–73 (2d Cir. 1967)).

to disclose the allegedly omitted information.  In addition, the Complaint fails to plead facts establishing Plaintiffs' standing to sue for any of the claims against the Underwriter Defendants, except for the Section 11 claims arising from the April 2013 Offering.

Dated:  April 28, 2014                            Respectfully submitted,

                                                 /s/ Jonathan Rosenberg
                                                 Bradley J. Butwin
                                                 bbutwin@omm.com
                                                 Jonathan Rosenberg
                                                 jrosenberg@omm.com
                                                 William J. Sushon
                                                 wsushon@omm.com
                                                 Ross Galin
                                                 rgalin@omm.com
                                                 O'MELVENY & MYERS LLP
                                                 7 Times Square
                                                 New York, New York 10036
                                                 (212) 326-2000

                                                 *Attorneys for Defendants Morgan Stanley &
                                                 Co. LLC, Jefferies LLC, SunTrust Robinson
                                                 Humphrey, Inc., Dougherty & Company,
                                                 and Noble International Investments, Inc.*