UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

IN RE BIOSCRIP, INC. SECURITIES
LITIGATION

                             .

_____

: Civil Action No. 13-cv-6922-AJN
:
:
: OBJECTION OF CLASS MEMBER
: ISAACSON/WEAVER FAMILY TRUST TO
: PROPOSED ATTORNEYS' FEE AWARD
:
:
:
:
:
:
x

LAW OFFICE OF ERIC ALAN ISAACSON

6580 Avenida Mirola
La Jolla, CA  92037-6231
Email:  ericalanisaacson@icloud.com
Telephone:  858-263-9581

      (Pro Hac Vice Motion Pending)

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... ii

I.   PRELIMINARY STATEMENT ........................................................................... 1

II.   LEAD COUNSEL'S ATTORNEYS' FEES SHOULD BE LIMITED TO
      LODESTAR.......................................................................................................... 1

    A.   All Claims Asserted are Subject to the Federal Securities Laws' Fee-Shifting
           Regime, Under which a Reasonable Fee Must be Determined on the Basis
           of the Attorneys' Lodestar. ...................................................................... 3

    B.   A Lodestar Award is Mandated Where, As Here, Lead Counsel Benefitted
           from the Uncompensated Work of Other Lawyers.............................. 11

    C.   Lead  Counsel's Lodestar Already Fully Incorporates and Rewards them for
           Factors that they Contend Warrant an Enhanced Award..................... 14

III.   CONCLUSION ................................................................................................... 21

EXHIBIT A (redacted transaction confirmation)....................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Albemarle Paper Co. v. Moody,* 422 U.S. 405 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Blum v. Stenson,* 465 U.S. 886 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18, 21

*In re Bolar Pharm. Co. Sec. Litig.,* 966 F.2d 731 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 1

*Boeing Co. v. Van Gemert,* 444 U.S. 472 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Bowen v. Southtrust Bank of Alabama,* 760 F. Supp. 889 (M.D. Ala. 1991) . . . . . . . . . . . . . . 9

*Brytus v. Spang & Co.,* 203 F.3d 238 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

*Buckhannon Board & Care Home, IN.c v. West Virginia*
     *Dept. of Health & Human Resources,* 532 U.S. 598 (2001) . . . . . . . . . . . . . . . . . . . . . . 21

*Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116 (1885) . . . . . . . . . . . . . . . . . . . . 11-12

*Christiansburg Grament Co. v. EEOC,* 434 U.S. 412 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*City of Burlington v. Dague,* 505 U.S. 557 (1992) . . . . . . . . . . . . . . . . . . . . .3, 10, 15, 17-18, 21

*Dean v. Riser,* 240 F.3d 505 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Eaves v. Penn,* 587 F.2d 453 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Global Crossing Sec. & ERISA Litig.,*
     225 F.R.D. 436 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

*Goldberger v. Integrated Resourdces, Inc.,*
     209 F.3d 43 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11-12, 16-17

*Gordcon v. United States,* 724 F.2d 106 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Gorman v. Carpenters' & Millwrights' Health Plan,*
     410 F.3d 1194 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Grant v. Martinez,* 973 F.2d 96 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*HCA—The Healthcare Company v. Clemmons,*
     162 F. Supp. 2d 1374 (M.D. Ga. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Haggart v. Woodley,* No. 14-5106, slip op. (Fed. Cir. Jan. 8, 2016),
   *petition for certiorari filed,* No. 15-1072 (Feb. 23, 2016) . . . . . . . . . . . . . . . . . . . . . 10

*Hensley v. Eckerhart,* 461 U.S. 424 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Herman & MacLean v. Huddleston,* 459 U.S. 375 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,*
   501 U.S. 350 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6

*Lindy Bros. v. Builders, Inc. v. Am. Radiator & Standard San. Corp.,*
   487 F.2d 161 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*Merck & Co. v. Reynolds,* 130 S. Ct. 1784 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Merck & Co., Sec. Litig.,* 432 F.3d 261 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 14

*Missouri v. Jenkins,* 491 U.S. 274 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Musick, Peeler & Garrett v. Employers Ins. Of Wasau,*
   508 U.S. 286 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6

*Nemeroff v. Abelson,* 620 F.2d 339 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Newman v. Piggie Park Ent., Inc.,* 390 U.S. 400 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Overall v. Estate of Klotz,* 52 F.3d 398 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Pennsylvania v. Delaware Valley Citizens Council for Clean Air,*
   478 U.S. 546 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*Perdue v. Kenny A. ex rel. Winn,* 130 S. Ct. 1662 (2010) . . . . . . . . . . . . . . . . . . . . 1-2, 3, 15-21

*Pierce v. Visteon Corp.,* 791 F.3d 782 (7th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10

*Raff v. Belstock,* 933 F. Supp. 909 (N.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Trustees v. Greenough,* 105 U.S. 527 (1882) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

*In re U.S. Lines,* 318 F.3d 432 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Equitable Trust Co.,* 283 U.S. 738 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ursic v. Bethlehem Mines,* 719 F.2d 670 (3d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Statutes**

Securities Act of 1933
       Section 11, 15 U.S.C. §77k . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
       Section 11(a), 15 U.S.C. §77k(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       Section 11(e), 15 U.S.C. §77k(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 19
       Section 27(a)(3)(A)(i), 15 U.S.C. §77z-1(a)(3)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . 13
       Section 27(a)(6), 15 U.S.C. §77z-1(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
       Section 27(c), 15 U.S.C. §77z-1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Securities Exchange Act of 1934
       Section 9, 15 U.S.C. §78i . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       Section 9(f) [originally 9(e)], 15 U.S.C. §78i(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7
       Section 10(b), 15 U.S.C. §78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
       Section 18, 15 U.S.C. §78r . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5
       Section 21D(a)(3)(A)(i), 15 U.S.C. §78u-4(a)(3)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . 13
       Section 21D(a)(6), 15 U.S.C. §78u-4(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
       Section 21D(a)(8), 15 U.S.C. §78u-4(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6
       Section 21D(b), 15 U.S.C. §78u-4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
       Section 21D(c), 15 U.S.C. §78u-4(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Sarbanes-Oxley Act of 2002
       Section 804(b), 28 U.S.C. §1658(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Legislative History**

H.R. Conf. Rep. No. 104-369 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10-11

**Secondary Authorities**

Alexander, Janet Cooper,
       *Do the Merits Really Matter?  A Study of Settlements*
       *in Securities Class Actions,* 43 Stan. L. Rev. 497 (1991) . . . . . . . . . . . . . . . . . . . . . . 16

American Law Institute,
       Principles of the Law of Aggregate Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Coffee, John C., Jr.,
       Entrepreneurial Litigation:  Its Rise, Fall, and Future
       (Harvard University Press, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Perino, Michael A.,
    *Enron's Legislative Aftermath:  Some Reflections on the*
    *Deterrence Aspects of the Sarbanes-Oxley Act of 2002,*
    76 ST. JOHN'S L. REV. 671 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## I.  PRELIMINARY STATEMENT

The Isaacson/Weaver Family Trust is a retail investor with more than seven million dollars in liquid assets under management, most of it invested in equity securities.  The Family Trust is a member of the class in this matter because it acquired 100 shares of common stock in BioScrip Inc.'s registered public offering of April 18-19, 2013, paying $12.00 a share.  *See* Exhibit A hereto.  As of May 20, 2016, those shares, which the Isaacson-Weaver Family Trust still holds, closed at $2.48 per share.

The Family Trust respectfully objects to Lead Counsel's request for an award of attorneys' fees in the amount of 25% taken from the settlement fund, representing a 1.39 multiple of their lodestar.  For the reasons set forth below, the Family Trust submits that the award of attorneys' fees in this case should be limited to the attorneys' lodestar.

## II.  LEAD COUNSEL'S ATTORNEYS' FEES SHOULD BE LIMITED TO LODESTAR

The Family Trust respectfully submits that the appropriate fee in this case is the attorneys' lodestar, without additional enhancement.

The lodestar affords presumptively fair and adequate compensation for attorneys taking a matter, such as this one, on a contingent-fee basis.  *See Perdue v. Kenny A.,* 130 S. Ct. 1662, 1669 (2010); *City of Burlington v. Dague,* 505 U.S. 557, 562 (2006); *Grant v. Martinez,* 973 F. 2d 96, 101 (2d Cir. 1992); *In re Bolar Pharm. Co. Sec. Litig.,* 966 F.2d 731, 731 (2d Cir. 1992) ("in the context of attorneys' fee awards, we have demanded 'specific reasons' when a district court departs from the lodestar figure, which is 'strongly presumed to be reasonable'") (citations omitted).  Indeed, "there is a strong presumption that the lodestar is sufficient; factors subsumed in the lodestar calculation cannot be used as a ground for increasing an award above the lodestar; and a party seeking fees has

1

the burden of identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified." *Perdue,* 130 S. Ct. at 1669.  A lodestar fee award is  wholly appropriate in a common-fund securities class action such as this.  *See, e.g., Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43 (2d Cir. 2000).

A larger percent-of-fund award would, for several reasons, be inappropriate on the record in this case.

First, all the claims asserted in this case are subject to the federal securities laws' fee-shifting regime, under which reasonable attorneys' fees are properly limited to the attorneys' lodestar in all but the most exceptional circumstances.  To award Lead Counsel a larger fee than they could recover after proving defendants liable produces perverse incentives and places their interests in conflict with interests of the class that they are supposed to represent.  *See infra* at 3-11.

Second, common-fund fee awards are based on the equitable principle that the attorneys whose work contributed to recovering a common fund should be compensated for the reasonable value of their time, but in this PSLRA case substantial work was done by the Pomerantz law firm in researching, framing, and filing the initial complaint, and issuing the public notice that brought additional plaintiffs and their lawyers into the matter.  Lead Counsel asks, in sum, for compensation on the basis of work done, and risks taken, by the Pomerantz lawyers.  A percent-of-fund fee award allows a free ride on the Pomerantz lawyers' uncompensated work product, permitting Lead Counsel inequitably to claim compensation for value that Pomerantz added.  A lodestar award, on the other hand, fairly compensates Lead Counsel for the work they did.  *See infra* at 11-14.

Third the attorneys' lodestar, without enhancement, is presumptively sufficient compensation for taking a case such as this on a contingent-fee basis, and the reasons that Lead Counsel advance

for a higher fee already are for the most part fully accounted for in their lodestar, which is based on high hourly rates of contingent-fee lawyers. *See infra* at 14-21.

A. **All Claims Asserted are Subject to the Federal Securities Laws' Fee-Shifting Regime, Under which a Reasonable Fee Must be Determined on the Basis of the Attorneys' Lodestar.**

Lead Counsel's request for attorneys' fees fails to note that this case is subject to the federal securities laws' overarching fee-shifting regime. *See* 15 U.S.C. §§77k(e), 77z-1(c), 78i(f), 78r, 78u-4(a)(8), 78u-4(c). As a consequence, the attorneys' fees are subject to the rule of *Perdue v. Kenny A. ex rel. Winn,* 130 S. Ct. 1662 (U.S. 2010), and *City of Burlington v. Dague,* 505 U.S. 557 (1992), that in cases involving fee-shifting statutes reasonable attorneys' fees generally must be limited to the attorneys' lodestar – without enhancements in all but the most extraordinary of cases. Lead Counsel cannot, consistent with their ethical duties as fiduciaries of the class, demand that the class pay more than the defendants would be required to pay were the case prosecuted to judgment, and the fees assessed against the defendants as adjudicated wrongdoers.

The federal securities-law claims asserted in this action all are subject to a carefully crafted fee-shifting regime. As amended by the Securities Exchange Act of 1934, §11(e) of the Securities Act of 1933 gives the district court discretion to award fees to a prevailing litigant in any 1933 Act case if the court believes that a claim or defense lacked merit. 15 U.S.C. §77k(e). It provides: "In any suit under this or any other section of this subchapter ***the court may, in its discretion, require an undertaking for the payment of the costs of such suit, including reasonable attorney's fees, and*** if judgment shall be rendered against a party litigant, upon the motion of the other party litigant, ***such costs may be assessed*** in favor of such party litigant ***(whether or not such undertaking has been required) if the court believes the suit or the defense to have been without merit***, in an amount sufficient to reimburse him for the reasonable expenses incurred by him, in connection with such

3

suit, such costs to be taxed in the manner usually provided for taxing of costs in the court in which the suit was heard." 15 U.S.C. §77k(a) (emphasis added). All the 1933 Act claims in this case are subject to this express statutory fee-shifting provision.

The 1934 Act's leading express-liability sections similarly authorize discretionary fee-shifting with provisions that, under the logic of the Supreme Court's decisions in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 US 350 (1991), and *Musick, Peeler & Garrett v. Employers Insurance of Wasau,* 508 U.S. 286 (1993), should control actions under the implied remedy of §10(b). *Lampf* overruled decades of circuit-court precedents that had looked to external state-law limitations periods to govern the implied action under §10(b), which contains no express limitations period of its own. The Supreme Court held that federal courts cannot ignore Congress' inclusion of limitations provisions in the securities laws' express-liability sections, but rather must apply them as well to the implied remedy under §10(b). Thus, the Court concluded, the limitations period in §9 should govern §10(b) actions: "we select as the governing standard for an action under § 10(b) the language of § 9(e) [now §9(f)] of the 1934 Act, 15 U. S. C. § 78i(e) [now §78i(f)]." *Lampf,* 501 U.S. at 364 n.9; *see Merck & Co., Inc. v. Reynolds,* 130 S. Ct. 1784, 1794-95 (2010) (discussing *Lampf's* holding on this point).[1]

---

[1] "In the Sarbanes-Oxley Act of 2002, Congress extended the limitations period for § 10(b) suits from 'one year after the discovery of the facts constituting the violation,' 15 U.S.C. § 78i(e), to '2 years after the discovery of the facts constituting the violation' for actions commenced after July 30, 2002, 28 U.S.C. § 1658(b); Sarbanes-Oxley Act, § 804(b)." *Betz v. Trainer Wortham & Co.,* 519 F.3d 863, 875 (9th Cir. 2008); *see* Michael A. Perino, *Enron's Legislative Aftermath: Some Reflections on the Deterrence Aspects of the Sarbanes-Oxley Act of 2002,* 76 St. John's L. Rev. 671, 689-90 & n.89 (2002). Essentially, Congress adopted the text of §9(e) that *Lampf* held controls §10(b) and, following the wave of financial scandals that included Enron and WorldCom frauds, provided for an extended limitations period. As the Supreme Court noted in *Merck,* this was by no means a repudiation of *Lampf's* analysis and holding. *See Merck,* 130 U.S. at 1794-95.

[2] *See also Hensley v. Eckerhart,* 461 U.S. 424, 429 & n.2 (1983); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 415 (1975); *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402-03 (1968).

In *Musick, Peeler,* moreover, the Court held that parallel provisions in sections 9 and 18, creating a right of contribution among persons jointly liable for violations, must also govern actions asserting implied liability §10(b). *See Musick, Peeler,* 508 U.S. at 294-97. The Court explained that its "task is not to assess the relative merits of the competing rules," whether favoring or disfavoring contribution, "but rather to attempt to infer how the 1934 Congress would have addressed the issue had the 10b-5 action been included as an express provision in the 1934 Act." *Id.* at 294. "Having made no attempt to define the precise contours of the private cause of action under §10(b), Congress had no occasion to address how to limit, compute, or allocate liability arising from it. *Id.* "There are, however, two sections of the 1934 Act, §§9 and 18 (15 U.S.C. §§78i and 78r), that," the Court has noted, "are close in structure, purpose, and intent to the 10b-5 action." *Musick Peeker,* 508 U.S. at 295. "Each confers an explicit right of action in favor of private parties and, in so doing, discloses a congressional intent regarding the definition and apportionment of liability among private parties." *Id.* The Court noted that "[s]ections 9 and 18 contain nearly identical express provisions for a right to contribution, each permitting a defendant to 'recover contribution as in cases of contract from any person who, if joined in the original suit, would have been liable to make the same payment.'" *Id.* (quoting 15 U.S.C. §78i(e) [now §78i(f)] and §78r(b)). Thus, the Court held: "We think that these explicit provisions for contribution are an important, not an inconsequential, feature of the federal securities laws and that consistency requires us to adopt a like contribution rule for the right of action existing under Rule 10b-5." *Id.* at 297.

These decisions' implication for fee awards should be clear. Section 11 of the 1933 Act contains a fee-shifting provision that governs all 1933 Act actions. 15 U.S.C. §77k(e). Section 10(b)'s closest siblings, sections 9 and 18 of the 1934 Act, not only include express limitations provisions and express contribution provisions that the Supreme Court held must govern the implied

remedy under §10(b).  Each also provides: "In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant."  15 U.S.C. §78i(f) [originally §78i(e)] & §78r(a).  Following the logic of *Lampf* and *Musick Peeler*, these fee-shifting provisions must govern claims arising under §10(b)'s closely related implied cause of action.

Removing any doubt for 1934 Act class actions, Congress in 1995 added a further provision to the 1934 Act with the Private Securities Litigation Reform Act of 1995, expressly authorizing district courts to require a bond and to shift fees in any 1934 Act case certified as a class action. Section 21D(a)(8) provides:  "In any private action arising under this chapter that is certified as a class action . . . the court may require an undertaking from the attorneys for the plaintiff class, the plaintiff class, or both, or from the attorneys for the defendant, the defendant, or both, in such proportions and at such times as the court determines are just and equitable, for the payment of fees and expenses that may be awarded under this subsection."  15 U.S.C. 78u-4(a)(8).  The provision's legislative history explains that "Congress long ago authorized similar undertakings in the express private right of action in Section 11 of the 1933 Act and in Sections 9 and 18 of the 1934 Act." H.R. Conf. Rep. No. 104-369, at 40 (1995).

It should be emphasized here that none of the forgoing provisions amount to the "English rule" of  "loser pays" on attorneys' fees.   Rather, each leaves fee shifting to the district court's sound discretion.  And this brings them within the Supreme Court's holdings that when statutes afford district courts discretion to shift fees, "a prevailing ***plaintiff*** ordinarily is to be awarded attorney's fees in all but special circumstances," *Christiansburg Garment Co. v. EEOC,* 434 U.S.

412, 417 (1978) (Court's emphasis),[2] since the defendant has been found to have violated a statute, *id.* at 418, while on the other hand fees may be awarded to a prevailing defendant only "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation." *Id.* at 421; *see Dean v. Riser,* 240 F.3d 505, 508 (5th Cir. 2001). Because they generally favor awards to prevailing plaintiffs but ***not*** to prevailing defendants, of course, such discretionary statutory fee-shifting provisions "bear little resemblance to either common-law attorney's fee rule: the "American Rule," under which the parties bear their own attorneys' fees no matter what the outcome of a case, or the "English Rule," under which the losing party, whether plaintiff or defendant, pays the winner's fees."[3]

That the rule favoring awards of attorneys' fees to prevailing plaintiffs applies to the federal securities laws' fee-shifting provisions should be clear. The Supreme Court's decision in *Christiansburg Garment* itself places the federal securities laws' fee-shifting provisions within the class of statutes to which its holding applies.[4] The Second Circuit naturally holds that the "standard for an award of fees under §9(e) of the Exchange Act is that set forth in *Christiansburg Garment*." *Nemeroff v. Abelson,* 620 F. 2d 339, 350 (2d Cir. 1980).

The fact that all claims in this case are subject to a fee-shifting regime should preclude Lead Counsel from seeking attorneys' fees under a percentage-of-fund methodology that produces a

---

[2]  *See also Hensley v. Eckerhart,* 461 U.S. 424, 429 & n.2 (1983); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 415 (1975); *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402-03 (1968).

[3]  *Hensley,* 461 U.S. at 443 n.2 (Brennan, J., joined by Marshall, Blackmun, and Stevens, JJ., concurring in part and dissenting in part).

[4] *Christiansburg Garment,* 434 U.S. at 415-16 &n.7 (identifying "Securities Exchange Act of 1934, 48 Stat. 889, 897, 15 U. S. C. §§ 78i (e), 78r (a)," among the "flexible" fee-shifting statutes to which its holding applies, namely those "authorizing the award of attorney's fees to either plaintiffs or defendants, and entrusting the effectuation of the statutory policy to the discretion of the district courts").

7

significantly higher fee award than they could obtain by proving the claims and seeking an award of fees from defendants found liable by a trier of fact.  Under such circumstances attorneys' fees should be calculated on the basis of the attorneys' lodestar.  *See* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION §3.13, Reporters Notes, comment b, at 254 (2010) (noting "the need for the lodestar approach when the fund is difficult to value or involves a fee shifting statute").

The Tenth Circuit held in *Eaves v. Penn,* 587 F.2d 453, 465 (10th Cir. 1978), that availability of statutory fee shifting under ERISA limits the availability of a common-fund award of attorneys' fees, since "by enacting a statutory authorization for award of attorneys' fees, we believe Congress intended that the offending party bear the costs of the award, rather than non-culpable, plan participants."[5]

The Third Circuit in *Brytus v. Spang & Co.,* 203 F.3d 238 (3d Cir. 2000), similarly rejected lawyers' contentions that they should receive a higher fee award from a common fund than the lodestar award that could be assessed against defendants actually found liable.  Observing that class counsel might seek to settle a matter in order to obtain higher fees than the lodestar award available under a fee-shifting statute, the court held that settlements and fee awards "must be carefully monitored to avoid conflicts of interest."  *Id.* at 246.  Given "the possibility that in some cases counsel for a class of plaintiffs may receive a higher fee award upon settlement than they would have

---

[5] The Tenth Circuit accordingly remanded the case for the district court to reconsider "whether or not the 'common fund' theory should apply or attorney's fees should be awarded personally against the breaching fiduciaries."  Id. at 465.  "The intent is that the offending party bear the costs of the award, rather than non-culpable, non-party plan participants." *Raff v. Belstock,* 933 F. Supp. 909, 916 (N.D. Cal. 1996) (following *Eaves*).  *Cf. Gorman v. Carpenters' & Millwrights' Health Plan,* 410 F. 3d 1194, 1202 (10th  Cir. 2005) (where fee-shifting statute applies to claims "the common fund doctrine is not dispositive"); *Gordon v. United States,* 724 F.2d 106, 109 n.5 (10th Cir. 1983) (noting that *Eaves* presented "the question whether the district court erred by awarding fees under the 'common fund' theory or whether it should have issued the award against the offending fiduciary personally"); *Ursic v. Bethlehem Mines,* 719 F. 2d 670, 673-74 (3d Cir. 1983) (limiting ERISA fee award to lodestar);   *HCA v. Clemmons,* 162 F. Supp. 2d 1374, 1380 (M.D. Ga. 2001) (following *Eaves*).

received had the case proceeded to judgment," the Third Circuit "directed the district courts to subject all fee applications in class action settlements to 'thorough judicial review,'" under which any "disparity between fees resulting from application of the different methods of calculation will be minimized if the district courts cross-check the fee from the percentage of recovery method against that from the lodestar method to assure that the percentage awarded does not create an unreasonable hourly fee." *Id*. at 247 (citations omitted).

Class counsel who enter a settlement shifting attorneys' fees from potentially culpable defendants to clearly non-culpable class members should not be permitted to charge the class they purport to represent an even higher fee than could be assessed against defendants found to have violated the law.  "For the court to award plaintiffs' counsel a percentage of the settlement when he might only have been entitled to an hourly — and therefore possibly lower — fee had he obtained a favorable judgment, would raise the spectre of a significant conflict of interest between counsel and the absent class members in the negotiation of such a settlement." *Bowen v. Southtrust Bank of Alabama,* 760 F. Supp. 889, 896 (M.D. Ala. 1991).

Recent decisions from the Seventh and Federal Circuits confirm that percent-of-fund fee awards and large multipliers should be denied when claims arise under statutes subject to fee-shifting provisions.

The Seventh Circuit in *Pierce v. Visteon Corp.,* 791 F.3d 782, 787 (7th Cir. 2015), specifically limited the common-fund doctrine's percent-of-fund fee awards and liberal lodestar multipliers to cases "outside the scope of a fee-shifting statute."  It considered and flatly rejected class counsel's contentions that it should be paid more than the lodestar amount available under the relevant fee-shifting statute: "But this case was litigated under a fee-shifting statute, and we do not

see a good reason why, in the absence of a contract, counsel should be entitled to money from the class on top of or in lieu of payment by the losing litigant." *Id.*

The Federal Circuit reached the same conclusion in *Haggart v. Woodley,* No. 14-5106, slip op. at 36-39 (Fed. Cir. Jan. 8, 2016), *petition for certiorari filed,* No. 15-1072 (Feb. 23, 2016). *Haggart* holds that counsel entitled to seek fees under a fee-shifting statute cannot seek to supplement their lodestar fee on the theory that they should receive a percentage of the common fund. The Federal Circuit explains that "we agree with the *Pierce* court's determination that permitting class counsel to recover in the presence of fee-shifting statutes . . . contravenes the Supreme Court's decision in *Dague.*" *Haggart,* slip op. at 38 (available online at http://www.cafc.uscourts.gov/sites/default/files/opinions-orders/14-5106.Opinion.1-6-2016.1.PDF )

*Haggart* does not necessarily "foreclose the application of the common fund doctrine in ***all*** instances in which a fee-shifting statute is present. Equity may sometimes deem it appropriate to give counsel a piece of either the final judgment or settlement agreement," and it may "sometimes [be] appropriate to give . . . [counsel] a slice of the class's recovery on top of a fee-shifting award." *Haggart,* slip op. at 38 (quoting *Pierce,* 791 F.3d at 787) (court's emphasis). "At its heart, equity is about fairness." *Id.* So if, for some reason, a flat lodestar fee is fundamentally unfair, equity might correct it. Yet, as the Supreme Court has repeatedly held, the attorneys' lodestar is presumptively fair compensation – and Lead Counsel here have not overcome that strong presumption.

They certainly cannot overcome it by pointing to the 1933 and 1934 Act provisions, added by the PSLRA in 1995, mandating that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. §§77z-1(a)(6), 78u-4(a)(6). The provision was added as a check on fees, in response to testimony that even under the lodestar method

"counsel in securities class actions often receive a disproportionate share of settlement awards."
H.R. Conf. Rep. No. 104-369, at 36.  Congress understood that "courts generally award attorney's
fees based on the so-called 'lodestar' approach," and the legislation's Conference Report emphasizes
that "[t]he Conference Committee does not intend to prohibit use of the lodestar approach," but only
to provide a mandatory percent-of-fund cross-check limiting those fee awards.  *Id.*  Provisions thus
designed ***to limit*** lodestar fee awards cannot be taken as license ***to increase*** them by abandoning the
lodestar methodology that properly applies common-fund cases involving claims subject to a fee-
shifting regime.


### B.    A Lodestar Award is Mandated Where, As Here, Lead Counsel Benefitted from the Uncompensated Work of Other Lawyers

The common-fund doctrine, under which Lead Counsel seeks 25% of the settlement fund, is
based on the equitable principle that the attorneys whose efforts created or preserved a fund for the
benefit of others should receive reasonable compensation for their efforts.  "Since the decisions in
*Trustees v. Greenough,* 105 U. S. 527 (1882), and *Central Railroad & Banking Co. v. Pettus,* 113
U.S. 116 (1885), this Court has recognized consistently that a litigant or a lawyer who recovers a
common fund for the benefit of persons other than himself or his client is entitled to a reasonable
attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980).
"The rationale for the doctrine is an equitable one:  it prevents unjust enrichment of those benefitting
from a lawsuit without contributing to its cost."  *Goldberger,* 209 F.3d at 47.

In *Greenough,* the Supreme Court held that a bondholder whose successful lawsuit
benefitted other similarly situated bondholders should receive an award of expenses and reasonable
attorneys' fees that it had incurred from the recovered common fund, it being inequitable to allow
the other bondholders to benefit without "contribut[ing] their due proportion of the expenses." *Id.* at

532. *Greenough* warns, of course, that "we would be very far from expressing our approval of such large allowances to trustees, receivers, and counsel as have sometimes been made, and which have justly excited severe criticism." *Greenough,* 105 U.S. at 536.   And the Supreme Court's subsequent decisions halved unreasonably generous 10% fee awards approved by lower courts. *See Pettus,* 113 U.S. at 128 (slashing fee award from 10% of fund to 5%); *United States v. Equitable Trust Co.,* 283 U.S. 738, 746-47 (1931) (same).   More recently, the Second Circuit has similarly frowned upon reflexive 25% fee awards in *Goldberger,* in which it affirmed a lodestar award amounting to just 4% of the recovered fund – a percentage in line with the Supreme Court's own common-fund precedents awarding 5%.   *See Goldberger*, 209 F.3d at 51-53.   Conceding that "that district courts across the nation have apparently eased into a practice of 'systematically' awarding fees in the 25% range," the Second Circuit rejected "[t]his routine largesse," quite frankly "disturbed by the essential notion of a benchmark." *Id.* at 51-52.   Starting with the assumption that a 25% fee award is presumptively reasonable, the Court explained, "offer[s] an all too tempting substitute for the searching assessment that should properly be performed in each case," and "could easily lead to routine windfalls where the recovered fund runs into the multi-millions." *Id.* at 52.

Significant here is the fact that the common fund from which Lead Counsel seeks compensation is not the product only of Lead Counsel's work.   To the contrary, this case was commenced by another law firm's filing of a class-action complaint:  The Pomerantz law firm on September 30, 2013, filed the initial class-action complaint with Timothy Faig the named plaintiff, asserting claims on behalf of a class of persons who acquired BioScrip common stock.  DE1.  The case being subject to the special pleading requirements of the PSLRA, *see* 15 U.S.C. §78u-4(b), the Pomerantz law firm's task in framing the initial pleading was substantial.  After doing the factual investigation necessary to plead a detailed federal securities-fraud complaint, Pomerantz was

obligated to issue the public notice required by the PSLRA, 15 U.S.C. §§77z-1(a)(3)(A)(i), 78u-4(a)(3)(A)(i).  This it did.  *See* DE7-1 (public notice).

Placed on notice of the proceeding, and with the benefit of the Pomerantz firm's work product, the Law Offices of Curtis V. Trinko, LLP and Saxena White P.A. filed a tag-along action on November 15, 2013, with the West Palm Beach Police Pension fund their named plaintiff.  *See West Palm Beach Police Pension Fund v. BioScrip, Inc.,* No. 1:13-cv-08175-AJN.  West Palm Beach then filed, and subsequently withdrew, a motion asking the Court it as Lead Plaintiff and approve its lawyers as Lead Counsel to prosecute a consolidated action.  Motion, DE9.  It subsequently withdrew that motion, to instead endorse appointment of the Fresno County Employees' Retirement Association ("Fresno") as Lead Plaintiff, and its selection of Bernstein, Litowitz as Lead Counsel.  Withdrawal of Motion, DE14.

For its own part, Bernstein Litowitz first entered the proceedings on December 2, 2013, two months Pomerantz's initial pleading – and not by filing a complaint of its own, but merely a motion asking this Court to appoint Fresno as the Lead Plaintiff, and to approve its selection of Bernstein Litowitz as Lead Counsel.  DE12.  This Court's order appointing Fresno, and approving of its choice of Bernstein Litowitz as Lead Counsel, specifically noted that West Palm Beach "filed and subsequently withdrew its own motion to be appointed as lead plaintiff," stating "that it 'supports the appointment of Fresno as lead plaintiff and its selection of lead counsel.'"  Order, DE17 at 1 n.2 (quoting West Palm Beach's Withdrawal, DE14).  But the Court did not appoint West Palm Beach, or approve its choice of counsel, to represent the class.  *See id.*  With that Order, the Pomerantz law firm, which had done the investigation necessary to commence the case, dropped out of the picture, for it had lost the competition for appointment of Lead Plaintiff and Lead Counsel – not because of any fault in its work, but merely because Bernstein Litowitz's client claimed a larger loss.

One might have expected West Palm Beach's lawyers to drop out of the picture as well.   But when Bernstein Litowitz filed Fresno's Consolidated Amended Complaint, it included West Palm Beach as an "Additional Named Plaintiff," adding Saxena White P.A. as "Counsel for Additional Named Plaintiff the West Palm Beach Police Pension Fund." *see* CCAC, DE22 at 110.   It appears that Bernstein Litowitz did so without authorization of this Court and in violation of the PSLRA's lead-plaintiff and lead-counsel provisions, under which "lead plaintiffs must obtain court approval for any new counsel."   *In re Merck & Co. Inc. Sec. Litig.,* 432 F.3d 261, 266 (3d Cir. 2005).   But the fundamental point here is that Lead Counsel Bernstein Litowitz and "Additional Counsel" Saxena White P.A. both benefitted from the case-starting efforts and work product of the Pomerantz law firm, renowned for its meticulous care in pleading securities-fraud claims.

It is, of course, well established that one "who seeks equity must do equity." *In re U.S.Lines,* 318 F.3d 432, 437 (2d Cir. 2003); *see, e.g., Overall v. Estate of Klotz*, 52 F.3d 398, 404 (2d Cir. 1995).   Yet Lead Counsel seeks no award of fees to the Pomerantz firm, asking this Court instead to credit it with the work others have done to commence this case.

A lodestar award would properly credit Lead Counsel with the work that they themselves did to advance this case.   A percent-of-fund award, on the other hand, would on the record in this case pay them for the uncompensated work of others.   The attorneys' fee award should accordingly be limited to a lodestar recovery.

### C.   Lead Counsel's Lodestar Already Fully Incorporates and Rewards them for Factors that they Contend Warrant an Enhanced Award

Lead Counsel insist a 1.39 multiplier enhancement is warranted, explaining:   "The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors."   Fee Brief, DE110 at 8 (quoting *In re Global Crossing Sec. & ERISA Litig.*, 225 FRD 436, 468 (S.D.N.Y 2004).   Yet the Supreme Court

14

holds that courts cannot enhance a lodestar award on account of considerations already adequately incorporated in, and thus compensated by, the lodestar itself.  It has repeatedly "held that an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation." *Perdue,* 130 S. Ct. at 1673; *see Dague,* 505 U.S. at 562-63.

Consistent with the Supreme Court's holdings, a lodestar enhancement cannot be based on factors such as the "complexity of the issues," or "the skill of the attorneys."   In *Perdue,* for example, the Supreme Court explained:

> We have thus held that the novelty and complexity of a case generally may not be used as a ground for an enhancement because these factors "presumably [are] fully reflected in the number of billable hours recorded by counsel." . . .  We have also held that the quality of an attorney's performance generally should not be used to adjust the lodestar "[b]ecause considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate."

*Perdue,* 130 S. Ct. at 1673 (quoting *Blum v. Stenson,* 465 U.S. 886, 898 (1984), and *Pennsyvalnia v. Delaware Valley Citizens Council for Clean Air,* 478 U.S. 546, 566 (1986)).  Indeed, the Supreme Court holds that "the overall quality of performance ordinarily should not be used to adjust the lodestar, thus removing any danger of 'double counting.'"  *Delaware Valley I,* 478 U.S. at 566. Lead Counsel's extensive argument that this case presented complex issues, Fee Brief, DE110 at 17-18, and their assertions that the quality of their performance should be rewarded with an enhanced fee, thus are flatly contrary to Supreme Court precedents.

Their assertion that the $10.9 million settlement is "a very favorable result" because it "represents approximately 17%-28% of the Settlement Class's estimated maximum recoverable damages," Fee Brief, DE110 at 18, ignores the fact that similar cases typically settle for around 20% of losses.  *See* Janet Cooper Alexander, *Do the Merits Really Matter?  A Study of Settlements in Securities Class Actions,* 43 Stan. L. Rev. 497 (1991).

15

Under the heading "Time and Labor Expended," Lead Counsel demonstrate that they put some hours in on the case.  Fee Mem., DE110 at 11-12.  But the hours worked are already fully accounted for in their lodestar.  *See Perdue,* 130 S. Ct. at 672-73.

Lead Counsel quote *Goldberger's* statement that "the risk of success [is] 'perhaps the foremost' factor to be considered" in determining a reasonable award of attorneys' fees, *Goldberger,* 209 F.3d at 54, and then assert that "'litigation risk must be measured as of when the case is filed,' rather than with the hindsight benefit of subsequent events." Fee Brief, DE110 at 13 (quoting *Global Crossing,*, 225 F.R.D. at 467).  Thus, Bernstein Litowitz insists, it should be compensated for the risk that the Pomerantz law firm took by commencing an action that Bernstein Litowitz entered more than two months later, and with the full advantage of Pomerantz's work product reflected in the original complaint.  *See supra* at 13-14.

 Lead Counsel ignore the fact that *Goldberger* expresses profound skepticism concerning the risk of non-recovery in securities class actions.  *Goldberger,* 209 F.3d at 52.  They also ignore the fact that *Goldberger* affirmed an unenhanced lodestar fee award based on findings that "(4) use of current hourly billing rates compensated counsel for delay in payment; and (5) use of high hourly billing rates compensated counsel for the quality of their efforts, and what risk there was in the case."  *Goldberger,* 209 F.3d at 54.  The case was one in which a special master reviewed "the hourly rates sought by counsel, ranging as high as the $550 per hour charged by Melvyn I. Weiss of the Milberg firm," but concluded "that allowing these high hourly rates was justified to compensate for the risks undertaken by counsel in prosecuting the case, as well as to recognize the quality of the representation rendered."  *Goldberger,* 209 F.3d at 46.

Here, Bernstein Litowitz partner Max Berger's billing rate is $975 an hour.  DE111-6, at ECF5.  Blair Nicholas, a 1995 graduate of the University of San Diego School of Law, bills $875 an

hour.  *Id.*  So does Gerald Silk, a 1995 graduate of the Brooklyn Law School.  *Id.*  Hannah Ross, a

1998 graduate of the Penn State Dickinson School of Law, bills $775 an hour.  *Id.*  Maya Saxena and

Joseph E. White, both of Saxena White P.A., whose retention was not approved by the Court, each

bill $750 an hour.  DE111-7, at ECF5.  These all are high rates.  And they are reasonable rates ***for***

***contingency-fee lawyers***.  Just as in *Goldberger,* they already reflect the risk that in some fraction of

cases the lawyers will not get paid – and whatever risk this case presented they have avoided by

settling.  With a 1.39 multiplier, Max Berger's effective hourly rate jumps from $975 to $1355 an

hour, while in *Perdue* the Supreme Court objected that the effect of a lodestar "enhancement was to

increase the top rate for the attorneys to more than $866 per hour, and the District Court did not

point to anything in the record that shows that this is an appropriate figure for the relevant market."

*See Perdue,* 130 S. Ct. at 1675-76 (footnote omitted).

The Supreme Court also has observed that contingency risk already is largely covered by the

lodestar, and that double-counting that risk to enhance the lodestar is impermissible.  In *Dague,* the

Supreme Court wrote:

> We note at the outset that an enhancement for contingency would likely duplicate in
> substantial part factors already subsumed in the lodestar. The risk of loss in a particular case
> (and, therefore, the attorney's contingent risk) is the product of two factors: (1) the legal and
> factual merits of the claim, and (2) the difficulty of establishing those merits. The second
> factor, however, is ordinarily reflected in the lodestar—either in the higher number of hours
> expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and
> experienced enough to do so. *Blum*, *supra*, at 898-899. Taking account of it again through
> lodestar enhancement amounts to double counting. *Delaware Valley II*, 483 U. S., at 726-727
> (plurality opinion).

*Dague,* 505 U.S. at 562-63.

Lead Counsel complain that they have "received no compensation during more than two

years of litigation," Fee Brief, DE110 at 13, ignoring the fact that pursuant to *Missouri v. Jenkins,*

491 U.S. 274, 283-84 (1989), they already have employed their "current rates in the lodestar

17

calculation to 'compensate for the delay in receiving compensation, inflationary losses, and the loss of interest.'" Fee Brief, DE110 at 8 n.6 (citation omitted). To award a further enhancement on this ground would amount to very sort of the double-counting that *Perdue* proscribes.

Finally, Lead Counsel insist that public policy warrants a particularly generous fee award in a securities class action like this one. They point out that the Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission." Fee Brief, DE110 at 20 (quoting *Tellabs, Icc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)). Yet on what basis do they assert that this case is a particularly meritorious private action? The settlement itself obviates – indeed, it forecloses – any finding that this is a meritorious case.

Lead Counsel's fee brief goes on at length about the risks presented by the litigation because a trier of fact might conclude that the case lacks merit. Lead Counsel note that "[e]ven though the Court partly sustained the Complaint, it found that several of the alleged misstatements were not actionable and that Lead Plaintiff had failed to adequately allege scienter with respect to some statements – indeed, the Court dismissed most of Lead Plaintiff's claims concerning the PBM Scheme." Fee Brief at 14. "Had the litigation continued," Lead Counsel add, "there is simply no guarantee that Lead Plaintiff would have been able to establish falsity and scienter with respect to the remaining statements." Fee Brief at 14. This appears to be an argument that Lead Counsel should be specially rewarded for pleading claims that may not be meritorious. The securities laws permit shifting fees to one who advances a meritless claim. *See, e.g.,* 15 U.S.C. 77k(e). But they surely do not authorize or permit the Court to reward counsel for advancing meritless claims.

18

Lead Counsel extend their argument that advancing meritless claims deserves extra compensation, asserting that under *Dura Pharms. Inc. v. Broudo,* 544 U.S. 336, 345-46 (2005), the "plaintiffs bear the burden of proving 'that the defendants' misrepresentations 'caused the loss for which plaintiff seeks to recover." "Thus," Lead Counsel urges, "even if Lead Plaintiff prevailed in establishing liability, there existed significant additional risks to establishing damages." Fee Brief at 15.

These arguments, that Lead Counsel should be rewarded for advancing potentially meritless claims, are objectionable for a further reason. The risks they raise – inability to show any defendants' scienter or to demonstrate *Dura* loss causation – ignore a fundamental characteristic of this case. Neither scienter nor loss causation is an element of the 1933 Act claims of class members such as the Family Trust. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 381-82 (1983); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 208-09 (1976). It is grossly unfair to tax 1933 Act claimants such as the Family Trust, whose claims do not require proof of scienter or loss causation, with extra attorneys' fees because Lead Counsel would have difficulty proving what need not be proved in the first place.

Lead counsel's contention that public policy favors generous fee awards in securities class actions, unconstrained by limitations affecting fees in civil-rights cases and similar litigation, also ignores the public-policy consequences of high fees in securities cases for those fields. If you pay lawyers more to do securities cases than to do civil-rights cases, many will choose to forego civil-rights litigation in favor of the more lucrative field of securities class actions. Columbia University's Professor John Coffee, Jr. recently observed that

> the extraordinary concentration of plaintiff's law firms focused on litigating "stock drop" securities cases, while ignoring other financial frauds (such as "pump and dump" schemes, seemingly represents a serious misallocation of resources. . . . [A]n estimated $17 billion in plaintiff's attorney's fees were paid in connection with securities class actions between 1997

and 2007. Had that money (or just a portion of it) instead been allocated in a more politically accountable way, it is likely that other areas of misconduct might have been pursued and litigated (e.g., employment discrimination, environmental issues, health care, etc.).

*     *     *

Within the plaintiff's bar, if we today identified all the plaintiff's attorneys experienced in complex federal civil litigation, it seems likely that a majority of them are today litigating corporate and securities class actions. From a social welfare perspective, this may represent an excessive investment. That brings us to the heart of the matter. . . . [T]he private attorney general responds to market forces, and these forces appear to make securities class litigation more profitable and less risky than, say, employment discrimination litigation (particularly after the *Wal-Mart* decision), even if the latter may produce more socially desirable results.

JOHN C. COFFEE, JR., ENTREPRENEURIAL LITIGATION: ITS RISE, FALL, AND FUTURE 225-26, 229 (Harvard University Press, 2015). High fees in securities cases come at the expense of effective enforcement of civil-rights and employment-discrimination laws.

In the end, however, all Lead Counsel offer are subjective considerations that they contend warrant a generous attorneys' fee award. Yet the Supreme Court's more recent decisions on attorneys' fees have repudiated resort to subjective considerations. *See Perdue v. Kenny A.,* 130 S. Ct. 1662 , 1672 & n.4 (2010). The Court observed in *Perdue* that "[s]etting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results." *Perdue,* 130 S. Ct. at 1672 (quoting *Delaware Valley I,* 478 U.S. at 563). "An alternative, the lodestar approach, was pioneered by the Third Circuit in *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (1973)," a common-fund case whose methodology the Supreme Court has extended to fee-shifting statutes.

> Although the lodestar method is not perfect, it has several important virtues. First, in accordance with our understanding of the aim of fee-shifting statutes, the lodestar looks to "the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895

20

(1984). Developed after the practice of hourly billing had become widespread, see G*isbrecht, supra,* at 801, 122 S.Ct. 1817, the lodestar method produces an award that ***roughly*** approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case. Second, the lodestar method is readily administrable, *see Dague,* 505 U.S., at 566, 112 S.Ct. 2638; *see also Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 609 (2001); and unlike the *Johnson* approach, the lodestar calculation is "objective," *Hensley, supra,* at 433, and thus cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results.

*Perdue,* 130 S.Ct. at 130 (Court's emphasis).

Lodestar awards remain appropriate, and in a case such as this – involving claims subject to fee shifting statutes, and commenced by the uncompensated work of other lawyers – a lodestar award is the only appropriate award.

## III.   CONCLUSION

For the foregoing reasons, the Isaacson-Weaver Family Trust objects to an award of attorneys' fees that exceeds Lead Counsel's lodestar.

DATED:  May 23, 2016                      Respectfully submitted,

LAW OFFICE OF ERIC ALAN ISAACSON

Eric Alan Isaacson

(Pro Hac Vice Motion Pending)

6580 Avenida Mirola
La Jolla, CA  92037-6231
Email: ericalanisaacson@icloud.com
Telephone:  858-263-9581

Attorney for Objector Isaacson/Weaver Family Trust

21

# EXHIBIT A



**Transaction Confirmation**
**Confirm Date: April 19, 2013**                               Page 1 of 2

Brokerage Account Number
████1588 TRUST - UNDER AGREEMENT

**SUSAN K WEAVER**

SUSAN K WEAVER
ERIC A ISAACSON TTEE
ISAACSON/WEAVER FAMILY TRUST
U/A 1/21/99
6580 AVENIDA MIROLA
LA JOLLA CA 92037-6231

0100023498

| | |
|---|---|
| Online | Fidelity.com |
| FAST(sm)-Automated Telephone | 800-544-5555 |
| Customer Service | 800-544-6666 |

| REFERENCE NO. | TYPE | REG.REP. | TRADE DATE | SETTLEMENT DATE | CUSIP NO. | ORDER NO. | ORIG. | |
|---|---|---|---|---|---|---|---|---|
| 13109-0BZVRX | 1* | W## | 04-19-13 | 04-24-13 | 09069N108 | 00000- | | |

| | | SECURITY DESCRIPTION and DISCLOSURES | | |
|---|---|---|---|---|
| You Bought | 100 | BIOSCRIP INC | Principal Amount | 1,200.00 |
| at | 12 | WE HAVE ACTED AS PRINCIPAL. | Settlement Amount | 1,200.00 |
| Symbol: BIOS | | THIS NOTICE IS PROVIDED TO YOU, IN LIEU | | |

THIS NOTICE IS PROVIDED TO YOU, IN LIEU
OF THE FINAL PROSPECTUS, PURSUANT TO
SECURITIES ACT RULE 173 TO THE EXTENT
THAT THE SALE WAS MADE PURSUANT TO A
REGISTRATION STATEMENT OR IN A
TRANSACTION IN WHICH A FINAL PROSPECTUS
WOULD HAVE BEEN REQUIRED  TO HAVE BEEN
DELIVERED IN THE ABSENCE OF SECURITIES
ACT RULE 172. YOU CAN REQUEST A COPY OF
THE FINAL PROSPECTUS (WHICH NEED NOT BE
PROVIDED BEFORE SETTLEMENT) FROM US BY
CALLING 866-602-4402. SOLICITED ORDER

0100023498                  ALL ORDERS ARE UNSOLICITED UNLESS SPECIFIED ABOVE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SUSAN K WEAVER
ERIC A ISAACSON TTEE
ISAACSON/WEAVER FAMILY TRUST
U/A 1/21/99
6580 AVENIDA MIROLA
LA JOLLA CA 92037-6231


FIDELITY INVESTMENTS
PO BOX 770001
CINCINNATI OH  45277-0003

Please use this form to make additional investments in your
brokerage account ████1588 only.

| AMOUNT OF INVESTMENT | $ |
|---|---|

If there are sufficient funds in your brokerage core account
(or margin account), Fidelity will use those funds to cover
the trade(s) on this confirm.  If you wish to deposit
additional money, use this deposit slip and make checks
payable to: NATIONAL FINANCIAL SERVICES LLC.
Deposits will be made to the account listed above.  Please
mail checks to the Fidelity address on this form. Refer to the
last page for instructions on depositing certificates.

099 0X66421588  00  000