UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: July 26, 2017
```

*In re* BioScrip, Inc. Securities Litigation

13-cv-6922 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

On June 16, 2016, the Court issued orders approving the plan of allocation of the net settlement fund and the class action settlement.  Dkt. Nos. 123-24.  The Court now addresses Lead Counsel's application for attorney's fees.  For the reasons that follow, Counsel's application is granted in its entirety.

## I.      Background

The above case is a securities class action brought on behalf of all persons and entities who purchased or acquired the publicly traded common stock of BioScrip, Inc. ("BioScrip") between November 9, 2012 and November 6, 2013.  *See* Dkt. No. 68, at 1 (hereafter "Mar. 31, 2015 Order").  The consolidated actions stem from allegations that BioScrip violated the securities laws through two sets of allegedly misleading statements: first, statements affirming BioScrip's compliance with relevant laws notwithstanding the Government's investigation into an alleged kickback scheme between BioScrip and Novartis Pharmaceuticals Corp.; and second, statements affirming the profitability of BioScrip's pharmacy benefit management operating segment, notwithstanding the undisclosed loss of a significant segment of that business.  *See generally* Consolidated Class Action Complaint (Dkt. No. 22) (hereafter the "Complaint").  The

Court assumes familiarity with the Court's Memorandum and Order of March 31, 2015, granting in part and denying in part Defendants' motions to dismiss, which describes in detail the factual and legal contours of the case. *See* Mar. 31, 2015 Order.

On September 30, 2013, Plaintiff Timothy Faig filed the first class action complaint in this case, Dkt. No. 1, which was followed by the filing of a related complaint on November 15, 2013, by the West Palm Beach Police Pension Fund, 13-cv-8175, Dkt. No. 1. On December 2, 2013, the Fresno County Employees' Retirement Association ("Fresno" or "Lead Plaintiff") moved for appointment as lead plaintiff, as well as for approval of its selection of lead counsel, the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or "Lead Counsel"[1]). Dkt. No. 11. On December 19, 2013, the Court consolidated the two class action complaints, and appointed Fresno as Lead Plaintiff and BLB&G as Lead Counsel. Dkt. No. 17.

Lead Counsel represents that, over the next few months, it conducted an extensive factual and legal investigation, pursuant to which counsel reviewed numerous documents, conducted 72 interviews with former employees of BioScrip and other relevant individuals, researched relevant case-law, and consulted with various experts. Ross Decl. ¶ 19. On the basis of this investigation, on February 19, 2014, Lead Counsel filed Plaintiffs' Consolidated Class Action Complaint, a 110-page document asserting claims under both the Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and the Securities Act of 1933, 15 U.S.C. § 77a *et seq. See* Complaint. In

---

[1] In its December 19, 2013 Order consolidating the actions in this case and appointing Lead Plaintiff and Lead Counsel, the Court appointed Fresno Lead Plaintiff and BLB&G Lead Counsel. *See* Dkt. No. 17. In the Consolidated Class Action Complaint, however, Fresno added an additional named plaintiff, the West Palm Beach Police Pension Fund, which was represented by Saxena White P.A. *See* Complaint at 1, 110. In its request for fees, Lead Counsel includes Saxena White (and thus includes hours billed by Saxena White in the lodestar calculation). *See* Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorney's Fees and Reimbursement of Litigation Expenses, Dkt. No. 110, at 25 (hereafter "Pl. Mem."); Declaration of Hannah G. Ross, Dkt. No. 111 ¶ 90 (hereafter "Ross Decl."); Ross Decl., Ex. 5. In referring to "Lead Counsel" then, the Court refers to both BBL&G and Saxena White, and, in approving Lead Counsel's request, approves the fees requested as to both firms.

particular, Plaintiffs brought five claims against the Defendants: a claim under Section 10(b) of

the Exchange Act and Rule 10b-5 promulgated pursuant to that section, a Section 20(a) control

person claim, a claim under Section 11 of the Securities Act, a Section 12(a)(2) claim under that

act, and a Section 15 control person liability claim. *See* Mar. 31, 2015 Order at 13. Two sets of

Defendants then moved to dismiss the Complaint. *See* Dkt. Nos. 41, 45. On March 31, 2015,

the Court granted in part and denied in part both motions. Mar. 31, 2015 Order. On June 5,

2015, the Court denied the Defendants' motion for partial reconsideration. Dkt. No. 86.

Thereafter, the parties began the discovery process, which included Defendants' production of

approximately 800,000 pages of documents. Ross Decl. ¶ 41.

      In August of 2015, the parties agreed to seek a settlement via mediation, and selected

former U.S. District Judge Layn Phillips as a mediator. *Id.* ¶ 42. As part of the mediation

process, both parties submitted briefing, and appeared for a full-day mediation session on

September 25, 2015. *Id.* ¶ 46. At the session, the parties debated numerous factual and legal

areas of dispute, and ultimately failed to reach an agreement to settle the action. *Id.* After

additional negotiations, however, and after Judge Phillips provided a recommended settlement

amount, the parties ultimately reached a resolution, which they submitted to this Court for

preliminary approval on December 18, 2015. Dkt. No. 101. On February 11, 2016, the Court

issued an order preliminarily approving the settlement and providing for notice. Dkt. No. 106.

      In the settlement, BioScrip agreed to pay $10,900,000 to settle the lawsuit in its entirety

(on behalf of all defendants). Ross Decl. ¶ 3; *see also* Settlement ¶ 1(rr) (Dkt. No. 101-1); Dkt.

No. 124 (Judgment Approving Class Action Settlement). The settlement agreement also

stipulated that Lead Counsel would apply for attorney's fees, as well as costs and expenses,

directly from the fund. *See* Settlement ¶ 19. The settlement also specified that Defendants

would have no responsibility nor liability for attorney's fees beyond the settlement amount. *Id.* ¶ 23.

On May 9, 2016, Lead Plaintiff moved to approve the class action settlement and plan of allocation, Dkt. No. 107, and Lead Counsel moved for an award of attorney's fees, costs, and expenses, Dkt. No. 109. In particular, Lead Counsel requested attorney's fees in the amount of 25% of the settlement fund, i.e. $2,725,000, plus interest earned at the same rate as the Settlement Fund, reimbursement for $133,565.28 in litigation expenses incurred, and reimbursement to Lead Plaintiff for $1,378.61 in costs. *See* Pl. Mem. at 1; Ross Decl. ¶ 2. Lead Counsel argued that, relying on the percentage method to calculate a reasonable attorney's fee, the request should be approved. *See id.* at 3-4 (citing *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) (contrasting the percentage method, under which "[t]he court sets some percentage of the recovery as a fee," with the lodestar method, "under which the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate")). In this case, Lead Counsel acknowledged that 25% of the fund would amount to a 1.39 multiplier of Lead Counsel's lodestar. *See* Pl. Mem. at 9.

On May 23, 2016, the Court received an objection to the fee award, from the Isaacson/Weaver Family Trust (the "Trust" or "Objector"). *See* Dkt. No 113 (hereafter "Obj. Mem."). The Trust objected to any award above the lodestar, primarily on the basis that such an award would be inconsistent with the Supreme Court's admonition in *Perdue v. Kenny A. ex rel. Winn* that, when calculating "an attorney's fee[] under federal fee-shifting statutes . . . there is a strong presumption that the lodestar is sufficient." 559 U.S. 542, 546 (2010). No additional

4

objections to the settlement or fee application were received from any class members. *See* June 13, 2016 Tr. at 4 (Dkt. No. 125).

On June 13, 2016, the Court held a settlement fairness hearing to discuss both the proposed settlement and Lead Counsel's request for fees. *See generally* June 13, 2016 Tr. At that hearing, the Court heard argument from Lead Counsel and the Objector as to the reasonableness of the fee request. *See id.* at 12-35.

On June 16, the Court issued orders approving the plan of allocation of the net settlement fund and the class action settlement, but reserved on the question of attorney's fees. Dkt. Nos. 123, 124. The Court now addresses Lead Counsel's application for attorney's fees amounting to 25% of the common fund and the Objector's arguments that the fee award should be limited to the lodestar. For the reasons that follow, Lead Counsel's application for fees is granted in its entirety. [2]

## II.    The Objection

In opposition to Lead Counsel's requested fee, the Objector raises two principal arguments. First, and primarily, the Objector argues that Supreme Court precedent requires this Court to apply a "'strong presumption' that the lodestar figure is reasonable," a legal standard that would preclude the award of a lodestar multiplier in all but the most extraordinary of cases. *See Purdue*, 559 U.S. at 554; *City of Burlington v. Dague*, 505 U.S. 557, 562, 567 (1992) (holding that such a presumption applies when a court awards fees pursuant to a fee-shifting statute). Were the Objector correct, it would follow that the Court would lack the discretion – absent a finding that this case were "'rare'" and "'exceptional'" – to award Lead Counsel a fee

---

[2] No party has objected to the reimbursement requests for costs and Lead Plaintiff's expenses, which the Court deems reasonable and approves.

higher than its lodestar. *Purdue*, 559 U.S. at 552 (quoting *Penn. v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986)).

Second, were the Court to reject the Objector's legal argument and conclude that it has discretion to award a lodestar multiplier without such a finding, the Objector argues that the Court should, in its discretion, decline to award a fee that would result in any lodestar enhancement. Obj. Mem. at 11-21.

The Court addresses each argument in turn. In summary, the Court concludes, first, that the presumption against a lodestar enhancement articulated in *Dague* and *Purdue* when a court awards a reasonable attorney's fee from a defendant pursuant to a fee-shifting provision does not apply to the award of fees in this case from a common fund created after a settlement. Second, evaluating the fee request using the common fund principles articulated in *Goldberger*, the Court finds the request reasonable and approves it in full.

## III.    The Legal Standard Governing the Award of Fees in this Case

The Court first addresses the Objector's primary argument: that, in awarding fees in this case, the Court must apply a "'strong presumption' that the lodestar figure is reasonable," and thus has little to no discretion to award a lodestar enhancement or a percentage of the fund that would exceed the lodestar. *Purdue*, 559 U.S. at 554. The Court disagrees.

In the American system, "parties to a lawsuit usually bear their own expenses, regardless of which party prevails." *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 562 (7th Cir. 1994). At least two prominent exceptions exist to this general rule, however. First, Congress has inserted fee-shifting provisions in certain statutes – provisions that permit prevailing plaintiffs to seek compensation from defendants for "the costs they incurred to enforce [their] rights." *Id.* at 563. Second, a case may result in the creation of a "common fund" – a fund created, often after

settlement, for the benefit of the plaintiff class. "In such a case, the defendant typically pays a specific sum into the court, in exchange for a release of its liability" – often (although not always) including a release from any "potential liability for statutory attorney's fees." *Id.* at 563-64. In the context of a common fund (as is this case here), the defendant's liability is generally "fixed—it cannot exceed the amount of the common fund the defendant has agreed to pay," regardless of the award of attorney's fees. *Id.* at 564.

In the context of an award of fees from a common fund created after settlement, the Second Circuit has held that a court has a great deal of discretion in calculating a reasonable fee. *See Goldberger*, 209 F.3d at 47. A court may employ the lodestar method, "under which the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate," or the percentage method, under which "[t]he court sets some percentage of the recovery as a fee." *Id.* In either case, a district court has considerable discretion to award a fee reflecting a lodestar enhancement designed to compensate attorneys for, *inter alia*, "the risk of the litigation." *Id.*; *see also McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 425–26 (2d Cir. 2010) (affirming this framework).

In contrast, in the context of an award of fees directly from a defendant pursuant to a fee-shifting statute, the Supreme Court has held that a district court's discretion is far more limited. As the Objector notes, in calculating such a fee, "there is a 'strong presumption' that the lodestar figure is reasonable." *Perdue*, 559 U.S. at 554. Although that presumption may be overcome, it is only the "rare circumstance[]" that would ever justify requiring a defendant to pay an enhancement to the lodestar. *See id.*; *see also Dague*, 505 U.S. at 562.

The Objector argues that, notwithstanding the fact that courts in this Circuit routinely apply the *Goldberger* methodology to calculate a reasonable attorney's fee from a common fund created after settlement of a securities class action, the "strong presumption" against a lodestar multiplier articulated in *Purdue* and *Dague* must apply in this case. *See* Obj. Mem. at 1-2. The Objector bases this conclusion on two interlocking premises. First, although the Objector concedes that *Purdue* and *Dague* addressed how courts should calculate a *statutory* award of fees from a defendant pursuant to a fee-shifting provision, it argues that the presumption against a lodestar multiplier articulated in these cases necessarily applies where counsel seeks an award of attorney's fees from a common fund if the claims settled themselves allowed for fee-shifting. *See id.* at 2 (arguing that the alternative would create "perverse incentives and place[] the[] interests [of class counsel] in conflict with interests of the class"). Second, the Objector argues that the claims in this case are indeed governed by fee-shifting provisions, such that the *Dague* and *Purdue* presumption must apply. *See id.*

The Court addresses each of these premises (both of which must be adopted for the Objector's position to be correct), and rejects each of them. For two independent reasons, then, the Court holds that the common fund principles articulated in *Goldberger*, and not the statutory fee-shifting principles articulated in *Dague* and *Purdue*, govern the award of fees in this case, and that the Court has discretion to award a lodestar enhancement.

### A. The *Purdue* Presumption Against a Lodestar Enhancement Does Not Apply When a Court Awards Fees from a Common Fund Created after a Settlement

The first premise of the Objector's argument is that the presumption against a lodestar multiplier articulated in *Dague* and *Purdue* – two Supreme Court cases addressing the calculation of a reasonable attorney's fee pursuant to a fee-shifting statute – applies even when a

court awards fees from a settlement fund pursuant to equitable principles, provided that the claims settled were themselves subject to fee-shifting provisions. The Court disagrees.

In *Dague* and *Purdue*, the Supreme Court reviewed two awards of attorney's fees made pursuant to fee-shifting regimes. In *Dague*, the district court awarded fees to the plaintiff after finding the plaintiff a "substantially prevailing party," entitled to an award of fees under both the Solid Waste Disposal Act and the Federal Water Pollution Act. 505 U.S. at 559. In *Purdue*, children in the Georgia foster care system brought a class action asserting violations of 42 U.S.C. § 1988. 559 U.S. at 547. After the parties entered a consent decree, the plaintiffs submitted a request for fees pursuant to the fee-shifting provisions of § 1988. *Id.* In both *Dague* and *Purdue*, the respective district courts, in calculating the fee awards in question, required the defendant to pay a fee that reflected an enhancement to the lodestar. *See Dague*, 505 U.S. at 560; *Purdue*, 559 U.S. at 548. In each case, the Supreme Court reversed. Interpreting the fee-shifting provisions at issue, each of which allowed for the award of a "reasonable attorney['s] fee[]" to the prevailing or substantially prevailing party, *Dague*, 505 U.S. at 561-62; *Purdue*, 559 U.S. at 550, the Supreme Court held that, in the context of such awards, "there is a 'strong presumption' that the lodestar figure is reasonable," *id.* at 554. Although declining to hold that a district court may *never* enhance a lodestar in awarding such a fee, the Court noted that such an enhancement would only be permissible in "rare" and "exceptional" circumstances. *Id.* at 543 (internal quotation marks omitted). Such an enhancement would not be appropriate on the basis of contingency risk. *Dague*, 505 U.S. at 567.

The Objector concedes that neither *Dague* nor *Purdue* addressed the award of fees from a common fund created after a settlement. Nevertheless, the Objector argues that the limitations articulated in *Dague* and *Purdue* necessarily apply to such a scenario when the claims are

brought pursuant to a statute that would allow class counsel to move, after a finding of liability, for an award of fees from a defendant. According to the Objector, this conclusion flows both from the analysis of *Dague* and *Purdue,* and from a simple normative argument: that any alternative conclusion would mean counsel could achieve a higher award if it seeks funds from a settlement under equitable principles than if it moves for attorney's fees from the defendant directly pursuant to a statute, which would create a problematic incentive for lead counsel to settle a case through the creation of a common fund, rather than either seek a settlement that does not resolve the issue of attorney's fees or eschew settlement in favor of seeking a verdict. *See Brytus v. Spang & Co.*, 203 F.3d 238, 247 (3d Cir. 2000) ("[T]here remains the possibility that in some cases counsel for a class of plaintiffs may receive a higher fee award upon settlement than they would have received had the case proceeded to judgment.").

The Objector's argument is not without force. Nevertheless, the Court holds that the presumption articulated in *Dague* and *Purdue* does not apply in the context of an award of fees from a settlement fund, even if a statute would permit a party to otherwise seek a statutory fee award directly from a defendant. The Court reaches this conclusion for two reasons: First, although the Second Circuit has never addressed the issue the Objector raises directly, its holdings and dicta strongly disclaim the Objector's position. And second, other circuits, which have directly addressed the question, have persuasively concluded that *Dague* and *Purdue* do not, as either a statutory or policy matter, extend to the equitable award of fees from a common fund, and the Court agrees with their reasoning.

1. **Second Circuit Precedent Strongly Indicates that Common Fund Principles, not Statutory Fee-shifting Principles, Govern an Award of Attorney's Fees from a Common Fund Created After Settlement**

First, although the Second Circuit has never addressed the precise question the Objector raises – its holdings and reasoning in other cases strongly suggest an understanding that the *Dague* and *Purdue* presumption does not apply when a court awards fees from a common fund.

The most obvious place to begin is *Goldberger*. As Lead Counsel observes, the leading case in this Circuit holding that a district court may enhance a lodestar when awarding fees from a common fund itself involved claims brought under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. *See Goldberger*, 209 F.3d at 45; *id.* at 47 (affirming that a "district court may, in its discretion, increase the lodestar by applying a multiplier based on 'other less objective factors,' such as the risk of the litigation and the performance of the attorneys"). In *Goldberger*, the Second Circuit nowhere addressed the possibility that attorney's fees might be available in a 10b-5 class action – likely because, as the Court explains, *infra*, the Second Circuit has long held that such fees are *not* available to prevailing parties in such actions. *See Cotton v. Slone*, 4 F.3d 176, 181 (2d Cir. 1993). Nevertheless, the Second Circuit has since applied the *Goldberger* standard in the context of statutes that clearly contain fee-shifting provisions, suggesting that the Circuit understands equitable – and not statutory-fee-shifting – principles to apply to such an award even where a statute contains a fee-shifting provision. *See McDaniel*, 595 F.3d at 415, 417–18 (analyzing the district court's assessment of the *Goldberger* factors in the context of claims brought pursuant to 42 U.S.C. § 1983). Were the Objector correct, the legal standards articulated in *Goldberger* and *McDaniel* (not to mention in numerous district court decisions in this circuit) would be erroneous.[3]

Although much of the reasoning in *Goldberger* and *McDaniel* is inconsistent with the Objector's position, the Objector rightly observes that in neither case did the Second Circuit

---

[3] As Lead Counsel correctly observes, adoption of the Objector's position would "mark a drastic change in securities class-action jurisprudence." Pl. Reply at 1.

squarely address the scope and implications of *Dague*. Nevertheless, dicta in *Goldberger*, and a holding in an earlier Second Circuit case, further support the conclusion that *Dague* is limited to statutory fee awards. First, in *Goldberger*, in a footnote, the Second Circuit noted that counsel had argued that the district court "erroneously relied on the strictures against risk multipliers in statutory fee-shifting cases . . . in which Congress has provided by statute for the recovery of fees from losing defendants." *Id.* at 54 n.3. The Second Circuit found the district court had *not* held that it was unable to award a risk multiplier, and thus the Circuit did not need to determine whether reversal would be warranted on this ground (and in any case, as noted, the objection did not presuppose that attorney's fees are readily available in a 10b-5 action). *Id.* Nevertheless, in citing counsel's argument, the panel noted that "[c]ourts have held such strictures inapplicable to cases like this, where the lawyers seek fees from a common fund they won for plaintiffs," and favorably cited *Florin*, a case in which the Seventh Circuit rejected the precise argument the Objector makes here. *See id.* (citing 34 F.3d at 564-65).

Prior to *Goldberger*, the Second Circuit addressed a distinct but related argument in *County of Suffolk v. Long Island Lighting Co.*, and provided analysis which again cuts against the Objector's position. 907 F.2d 1295 (2d Cir. 1990). In *Suffolk*, plaintiffs brought claims against a set of defendants for, *inter alia*, violating the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* (1988) ("RICO"). *Id.* at 1300. After a trial resulting in a verdict in favor of the plaintiffs on the RICO claims, the district court granted judgment to the defendants on those claims and thereafter certified a class of plaintiffs pursuing the remaining claims. *Id.* at 1301. After the class settled with the defendants, Suffolk, a plaintiff in the action, opted out of the class and appealed the district court's dismissal of the RICO claims. *Id.* at 1302. Notwithstanding its objection to the settlement and its appeal, Suffolk moved for an equitable

12

disbursement of attorney's fees from the settlement fund, on the ground that Suffolk's counsel had provided a substantial benefit to the class. *See id.* at 1326-27. The district court denied the request on the grounds, *inter alia*, that were Suffolk to prevail in its appeal, it would have "an independent basis for recoupment of its attorney's fees" under the RICO fee-shifting provision. *Id.* at 1327.

The Second Circuit affirmed the district court's dismissal of the RICO claims, but reversed its decision as to attorney's fees, relying on analysis that undercuts the Objector's position. *See id.* at 1327-38. Assessing the interplay between a fee-shifting statute and an award of fees from a common fund, the court explained that "fee-shifting statutes are generally not intended to circumscribe the operation of the equitable fund doctrine." *Id.* at 1327. The court acknowledged that "[d]uplicative recovery is to be avoided," and that if "under a particular combination of facts, the operation of the equitable fund doctrine conflicts with an intended purpose of a relevant fee-shifting statute, the statute must control and the doctrine must be deemed abrogated to the extent necessary to give full effect to the statute." *Id.* Such was not the case, however, in *Suffolk*, where "[t]he action intended to be encouraged ha[d] already been commenced and prosecuted." *Id.*

*Suffolk* does not foreclose the possibility that a fee-shifting statute could limit a court's discretion in awarding fees from the common fund. Its analysis, however, argues against the conclusion that such a limitation would be imported in the ordinary case. Both *Dague* and *Purdue* involved, at least in part, the interpretation of the text of fee-shifting provisions. *See Purdue*, 559 U.S. at 550; *Dague*, 505 U.S. at 561-62; *see also Florin*, 34 F.3d at 564 (explaining that "*Dague*, by its terms, applies only to statutory fee-shifting cases, and its reasoning is largely based on the statutory language of fee-shifting provisions"). If fee-shifting provisions are not

generally intended to circumscribe operation of the equitable fund doctrine, it follows that there

is little basis for importing a presumption rooted in the *text* of these provisions into the award of

fees in a context not governed by that text.  Additionally, the *Suffolk* court suggested that

application of the equitable fund doctrine was consistent with the central purpose of fee-shifting

provisions, which it described as "to encourage the prosecution of certain favored actions by

private parties."  *Id.* at 1327.  The availability of the common fund doctrine provides an

additional avenue for lawyers retained on contingency to receive reasonable compensation, and

is thus not inconsistent with this stated purpose.

 In sum, although the Second Circuit has not directly addressed the issue before this

Court, its prior holdings and analysis suggest the conclusion that *Dague* and *Purdue* are limited

to the context they purport to address: the award of fees pursuant to a specific statute from a

defendant, rather than the award of fees pursuant to equitable principles from a common fund.

### 2. Persuasive Precedent from Other Circuits Further Disputes the Objector's Position

 Although the Second Circuit has not directly addressed the question the Objector raises,

two circuits have squarely addressed this question.  *See Staton v. Boeing Co.*, 327 F.3d 938, 967–

69 (9th Cir. 2003); *Florin*, 34 F.3d at 563-64.[4]  Each has held that common fund principles that

allow for lodestar enhancements, and not statutory fee-shifting principles that do not, govern the

---

[4] In *Staton*, the Ninth Circuit identified the Third Circuit as having also held that "there is no preclusion on recovery of common fund fees where a fee-shifting statute applies."  *Staton*, 327 F.3d at 967 & n.18 (citing *Brytus*, 203 F.3d at 246-47).  Although, as this Court explains, *infra*, language in *Brytus* indeed supports Counsel's position in this case, *see infra* pp. [], it stretches the language of that decision to read it as squarely addressing the Objector's argument in this case.  *See Brytus*, 203 F.3d at 246 ("This, of course, is not a case that was concluded by settlement. This case was tried to judgment, and a fee awarded on that basis.  We are not inclined to base our ruling on some hypothetical situation that might be presented in the future."); *id.* at 244 ("[Counsel's argument] presupposes that the *Dague* bar is inapplicable and that counsel in common fund cases are entitled to a multiplier for risk of contingency, an issue we need not decide today.").

award of funds from a settlement even where the settled claims contain fee-shifting provisions, and the Court finds the reasoning in these decisions persuasive.

In *Florin*, the Seventh Circuit held that "common fund principles properly control a case which is initiated under a statute with a fee-shifting provision, but is settled with the creation of a common fund." *Id.* at 564. Analyzing the scope of *Dague*, the panel explained that "*Dague*, by its terms, applies only to statutory fee-shifting cases," and concluded that "its reasoning is largely based on the statutory language of fee-shifting provisions." *Id.* Given that such statutes do not address the award of fees from a common fund – an award made pursuant not to statute, but to a court's inherent powers to effect equity – the Seventh Circuit held that *Dague*'s holding does not apply in such a context. *See id.*

Turning to the policy considerations animating *Dague*, the Seventh Circuit further concluded that such considerations do not support application of the *Dague* holding in the equitable fund context. As the panel explained, "[u]nlike in fee-shifting cases . . . , the fee award in a common fund case is ultimately charged against the plaintiffs' fund, rather than directly against the defendant. Thus, the defendant's liability is fixed—it cannot exceed the amount of the common fund the defendant has agreed to pay." *Id.* Accordingly, any risk of "unduly burdening the defendant with a multiplier to compensate for risk of loss" is not present. *Id.* (internal quotation marks omitted). The Seventh Circuit explained that this distinction between awarding fees directly from the defendant and awarding such fees from a fund created for the benefit of the plaintiffs was a material one, not simply a formal one: in contrast to taxing a losing defendant with a lodestar enhancement, awarding a fee from a common fund taxes plaintiffs, who, in contrast to the defendant, benefited from an attorney taking the case with no guarantee of compensation, as well as from the creation of the fund itself. *See id.* at 565 ("[T]here is no

injustice in requiring plaintiff class members to shoulder the burden of compensating counsel for prosecuting the class' case without any assurance of compensation.").

Finally, the Seventh Circuit explained that allowing an award of fees from a common fund was in no way inconsistent with the goal of the fee-shifting provisions in question. In the Seventh Circuit's estimation, such fee-shifting provisions have two purposes: to shift the burden of paying expenses to defendants and, more broadly, to "enabl[e] meritorious plaintiffs who would not otherwise be able to afford to bring a lawsuit under [the statute], to pursue their claims." *Id.* at 564; *see also id.* at 562-63 ("These fee-shifting statutes were enacted for the purpose of encouraging the private prosecution of certain favored actions, by requiring defendants who have violated plaintiffs' rights to compensate plaintiffs for the costs they incurred to enforce those rights." (citing *Suffolk*, 907 F.2d at 1327)). Under the common fund doctrine, although funds come from the settlement fund, the fund itself is paid for by defendants, and it is understood during negotiations that the settlement fund will cover attorney's fees. *See id.* at 564. More significantly, the availability of the common fund doctrine, not unlike the existence of a fee-shifting provision, serves as another way of incentivizing counsel to take a case notwithstanding plaintiffs' inability to pay. The Seventh Circuit thus held that the doctrine "comports with the" policy of fee-shifting provisions – to encourage the bringing of such suits – and there is no reason to infer that the statute should be read to abrogate the use of common fund principles.

On the basis of these distinctions – both textual and normative – as well as the court's understanding of the interaction between a fee-shifting provision's purpose and the equitable fund doctrine, the Seventh Circuit held that a risk multiplier was indeed available in the equitable context of awarding a fee from a common fund created for the benefit of plaintiffs, even if not in

16

the statutory context of awarding a fee from the defendant pursuant to a fee-shifting provision.
*See Florin*, 34 F.3d at 565.

The Ninth Circuit subsequently reached the same conclusion. In *Staton*, the court
addressed "whether the existence of potentially applicable fee-shifting statutory provisions
precludes class counsel from recovering attorneys' fees under the common fund doctrine," and
concluded that it does not. 327 F.3d at 967–69; *see also id.* at 967 (making clear that a risk
multiplier would be permitted under common fund principles, although not under statutory fee-
shifting principles). Explaining its decision, the court began by discussing the nature of the
common fund doctrine. Although the general rule that "attorney's fees . . . are not a recoverable
cost of litigation 'absent explicit congressional authorization'" would preclude a court from
awarding a fee from a defendant absent affirmative authorization in a statute, *Key Tronic Corp.
v. United States*, 511 U.S. 809, 814 (1994) (quoting *Runyon v. McCrary,* 427 U.S. 160, 185
(1976) (citing *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247 (1975))),
the Ninth Circuit explained that that background rule would "not prohibit the award of fees under
the common fund doctrine," *Staton*, 327 F.3d at 968; *see also Boeing Co. v. Van Gemert*, 444
U.S. 472, 481 (1980) (noting that, in a case where the defendant's liability was fixed by the
settlement amount, "the common-fund doctrine, . . . is entirely consistent with the American rule
against taxing the losing party with the victor's attorney's fees"). Thus, while a court would
require specific congressional authorization to shift fees from a losing party to a prevailing party,
the opposite presumption would apply to the availability of a common fund award: Congress
would have to have "*forbidden* the application of the common fund doctrine in cases in which
attorneys could potentially recover fees under the type of fee-shifting statutes at issue here" for
that doctrine – otherwise available under general equitable principles – to be abrogated. *Id.* at

17

968 (emphasis added). The Ninth Circuit went on to hold, as had the Seventh Circuit, that the intent to render unavailable a common fund award could not be inferred from the existence of such fee-shifting provisions, in part because "[t]he intent of the fee-shifting provisions . . . is not countered by the application of common fund principles." *Id.*

In addition to its core argument, the Ninth Circuit also cited two additional and persuasive considerations. First, the court observed that "contingent fee agreements between counsel and client are valid in cases where statutory fees are available," and "[c]ommon fund fees are essentially an equitable substitute for private fee agreements." *Id.* Second, the court cited to a previous Ninth Circuit case that had stated, in holding that the *Dague* presumption does not generally apply in the context of an award of fees from a common fund, that "the concerns expressed in *Dague* about unduly burdening losing parties in statutory fee cases are not present in common fund cases where fees are paid out of the settlement fund. How the fund is divided between members of the class and class counsel is of no concern whatsoever to the defendants who contributed to the fund." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1301 (9th Cir. 1994).

This Court agrees with these cases and their collective reasoning: *Dague* and *Purdue* relied on interpretations of specific statutory provisions to hold that a lodestar multiplier would rarely be available when a plaintiff moves for a reasonable attorney's fee from a defendant pursuant to a fee-shifting statute. As *Florin*, *Staton*, and *Suffolk* persuasively explain, an award of fees under equitable principles is not governed by these statutes, nor subject to their text; the normative analyses in these cases neither requires – nor suggests – that the *Dague* and *Purdue* presumption should be applied when a court awards fees from a common fund; and none of the

purposes of these fee-shifting provisions is obviously compromised by application of common fund principles.

Finally, the Court observes two additional reasons that *Dague* and *Purdue* do not apply in the common fund context. First, as noted, *Florin* and *Staton* both find it significant that a statutory fee is taxed directly to a defendant, whereas an award from a common fund – although it comes from funds provided by the defendant – is taxed to the class's recovery. This distinction is significant for an additional reason not identified in these cases: Plaintiffs, unlike defendants, are capable of avoiding the potential for any lodestar enhancement by opting to pay their counsel directly as the case progresses, rather than hire counsel on contingency. In electing to hire counsel on a contingent basis, plaintiffs trade the risk of footing the bill in the event of non-recovery for the possibility that counsel may end up being paid *more* than what plaintiff would have had to pay for a non-contingent arrangement (which presumably would approximate the lodestar). It is plainly unfair to tax the defendant for the plaintiff's choice to proceed in such a manner – i.e. to charge a defendant directly for contingency risk – as such a policy would have the effect of requiring the defendant to internalize the downside of the plaintiff's gamble, while providing plaintiff the upside of that gamble. But it is not unfair to tax such an enhancement against the plaintiff, or, here, the plaintiff class, which thus internalizes the benefits *and* detriments of the contingency agreement to which the plaintiffs explicitly or implicitly agreed. *See Goldberger*, 209 F.3d at 47 (noting that the availability of a fee from the common fund derives from equitable principles, and the "rationale for the doctrine is an equitable one: it prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost").

Second, although the Objector cites potential (and not unpersuasive) incentive problems with allowing for a lodestar enhancement in the common fund context, he fails to grapple with

the significant *benefits* to permitting a district court the discretion to award such enhancements –
benefits which may serve a class and, in turn, the purposes of fee-shifting regimes.  The Second
Circuit has held that the availability of the percentage method to calculate a fee award from a
common fund can serve as a benefit to the class in two ways: first, by aligning counsel's
incentives with the class at the time the settlement is negotiated (by tying counsel's recovery to
the size of the fee) and second, by counteracting any incentive counsel might have to eschew
early settlement so as to increase their lodestar over the course of protracted litigation.  *See Wal-*
*Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("The trend in this Circuit
is toward the percentage method, which directly aligns the interests of the class and its counsel
and provides a powerful incentive for the efficient prosecution and early resolution of litigation."
(internal quotation marks and citation omitted)); *McDaniel*, 595 F.3d at 419 (acknowledging
problems with the percentage method, but nevertheless explaining that "the percentage method
has the advantage of aligning the interests of plaintiffs and their attorneys more fully by allowing
the latter to share in both the upside and downside risk of litigation"); *Hayes v. Harmony Gold*
*Min. Co.*, 509 F. App'x 21, 23–24 (2d Cir. 2013) (summary order) (affirming an awarded fee of
one third of a $9 million settlement, and noting that "the prospect of a percentage fee award from
a common settlement fund, as here, aligns the interests of class counsel with those of the class");
*Hayes v. Harmony Gold Min. Co.*, No. 08 CIV. 03653 (BSJ), 2011 WL 6019219, at *1
(S.D.N.Y. Dec. 2, 2011) (providing the details of the settlement and fee award).  Of course, at
the time a fee is awarded from a settlement fund, there is no question that a lower fee benefits the
class – insofar as the class receives a greater percentage of the fund.  But the incentive structure
created by the availability of a lodestar multiplier or percentage-of-the-fund recovery is, in the
aggregate, beneficial to the class.  It is these benefits that support the determination that a district

court should have discretion to rely on the percentage method when appropriate, and nothing in *Dague* or *Purdue* suggests the intention to eliminate this discretion.

In response to this precedent – from the Second Circuit and beyond – the Objector points to several circuit opinions he claims have adopted his position. Obj. Mem. at 8-10. None of these cases addresses the question before this Court or is directly contradictory to the Court's conclusion.

First, in *Pierce v. Visteon Corp.*, the Seventh Circuit addressed a scenario distinct from that at issue here: when a court awards fees (after a verdict) pursuant to a fee-shifting statute, and then lead counsel moves for additional fees from a damages award under common fund principles. 791 F.3d 782, 786 (7th Cir. 2015) ("[C]ounsel asks us to put ERISA to one side and hold that he is entitled, in addition to $303,000 from [the defendant awarded pursuant to a fee-shifting provision after a verdict], to a supplemental award from the class."). The court held that such an additional award would "undercut if not countermand *Dague* and similar decisions." *Id.* at 787. It is true that, notwithstanding the factual context of its holding, some of the language in *Pierce* appears to support the Objector's position. *See id.* ("Three principle reasons justify limiting the common-fund approach to cases outside the scope of a fee-shifting statute."). Nevertheless, the Seventh Circuit's holding was limited to the facts of the case, *see id.* ("A common-fund award . . . often builds in a multiplier in the cases where counsel prevails. Adding a common-fund award to a statutory 'reasonable' fee would undercut if not countermand *Dague* and similar decisions."), and the court at no point addressed or purported to overturn *Florin*. Although it is possible for one panel in the Seventh Circuit to overturn a prior panel, it is hard to imagine that the *Pierce* panel intended to do so *sub silentio* and without analysis. *See United States v. Reyes-Hernandez*, 624 F.3d 405, 412 (7th Cir. 2010) (citing the "long-standing principle

21

[in the Seventh Circuit] that [a panel] may not overturn circuit precedent without compelling reasons").

In *Brytus*, the Third Circuit addressed the same hybrid scenario (where a court awards a fee pursuant to a fee-shifting statute, and counsel then moves for an additional award from a common fund), and held that a district court did not abuse its discretion in declining, in such a situation, to award additional fees. *See* 203 F.3d at 247. The court explicitly distinguished the hybrid scenario from the scenario in this case. *See id.* at 246 ("This, of course, is not a case that was concluded by settlement. This case was tried to judgment, and a fee awarded on that basis."). Further, the *Brytus* court made clear that it was deciding no more than that the district court acted within its discretion in declining to provide the requested enhancement even in the hybrid scenario – not whether or not such fees could ever be available. *See id.* at 243 ("[T]he fact that a common fund has been created does not mean that the common fund doctrine *must* be applied in awarding attorney's fees, a suggestion that is implicit in counsel's argument." (emphasis added)). It did not conclude that such an enhancement was not available should a court choose to award it.

Of particular note, in *Brytus*, the Third Circuit addressed the Objector's normative argument in this case – that distinctions in how fees are awarded in the common fund and statutory contexts could create perverse incentives for counsel – and rejected it. Lead counsel argued in *Brytus* that, if the court declined to award additional common fund fees in addition to the statutory award, the fact that such fees would have been available had the case settled through creation of a common fund would create problematic incentives. *See id.* at 246 ("Of the many additional arguments counsel raise, the one that we believe requires some discussion is their contention that the District Court penalized them for proceeding to judgment, which resulted in the award of a statutory fee, whereas they would have been entitled to a fee under the

common fund doctrine had they accepted a settlement.  Counsel argue that, as a result, lawyers' self-interest might lead them to accept an otherwise inadequate settlement rather than rely on the vagaries of a court-awarded counsel fee.").  The Third Circuit acknowledged this possibility, but stressed, *inter alia*, that "the distinction between the statutory fee and the fee from a common fund is more than the amount of the fee; it is the party who pays the fee," and made clear that "by far the largest number of ERISA cases to apply the common fund analysis are those that were settled, which, as we have noted, present a different circumstance."  *Id.* at 247; *see also id.* at 248 (Stapleton, J., dissenting) (suggesting his "colleagues are content to have one set of principles apply to settlements and another to judgments").[5]  The Third Circuit thus not only did not adopt the Objector's position in, but in fact rejected it.

Finally, in *Haggart v. Woodley*, the Federal Circuit similarly held that an additional enhancement from a common fund is not generally available after a party receives funds pursuant to a fee-shifting provision.  809 F.3d 1336, 1341–42 (Fed. Cir.), *cert. denied*, 136 S. Ct. 2509 (2016) (addressing a scenario where the parties reached a settlement awarding a statutory attorney's fee, and then class counsel moved for an additional award from the settlement fund under the common-fund doctrine).  Although some of the language in *Haggart* supports the Objector's position, the Government in that case argued, and the Court held, that "[t]here is no basis in equity for awarding common-fund fees *as well as* [statutory] fees."  *Id.* at 1355 (emphasis added).

---

[5] The one judge who dissented from the majority's position did not endorse any variation of the Objector's position in this case.  Instead, he argued that courts *should* generally permit an additional award from a common fund created after judgment in addition to a statutory fee, a holding he suggested would have the effect of eliminating the incentive issues the Objector invokes.  *See id.* at 247-248.

Whether or not *Haggart*, *Pierce*, and *Brytus* were correctly decided (and the Court notes that the Second Circuit has not yet weighed in on the hybrid scenarios at issue in these cases), it is evident their holdings do not apply to the present case.

In sum, the Second Circuit has suggested – although not explicitly held – that statutory fee-shifting principles do not govern the award of a fee from a common fund created after settlement even when a statute contains a fee-shifting provision, and both circuits to address the question directly have persuasively determined that the limitations in *Dague* and *Purdue* do not apply to such a context. The Court agrees, and holds that the presumption against a lodestar enhancement in statutory fee-shifting cases does not limit a court's discretion to award such an enhancement in calculating a reasonable attorney's fee from a common fund, even where the claims settled are otherwise subject to fee-shifting provisions.

## B. In Any Event, the Claims Asserted in this Case Do Not Contain Fee-Shifting Statutes Analogous to Those in *Dague* and *Purdue*

Even were the Court to hold that the presumption against a lodestar enhancement at issue in *Dague* governs the award of attorney's fees from a common fund created after a settlement – a proposition the Court rejects – the Court would still disagree that such a presumption applies in this case. That is because no claim settled in this case contains a fee-shifting provision analogous to that at issue in *Dague* and *Purdue*.

As noted, the Objector's position relies on two premises: that *Dague* and *Purdue* apply to equitable awards, *and* that the claims in this case are subject to fee-shifting provisions that would trigger the presumption against a lodestar enhancement. As justification for the second premise, the Objector cites three fee-shifting provisions that he argues govern the claims in this case. Obj. Mem. at 3-6. First, the Objector points to provisions under the Securities Act that allow the court

24

to award attorney's fees to either party when the court "believes the suit or the defense to have been without merit." 15 U.S.C. § 77k(e). Second, the Objector points to provisions under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 109 Stat. 737, that, for purposes of the Exchange Act claims, allow the court to award attorney's fees as a sanction for violations of Federal Rule of Civil Procedure 11, 15 U.S.C. § 78u-4(c). Finally, the Objector argues that, although no additional fee-shifting provision is explicitly provided for under the judicially-implied remedy to enforce § 10(b) of the Exchange Act, Supreme Court precedent requires the conclusion that the fee-shifting provisions in Sections 9 and 18 of that Act also govern claims brought to enforce Section 10(b). *See* Obj. Mem. at 4-6 (citing *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991) and *Musick, Peeler & Garrett v. Employers Ins. of Wausau*, 508 U.S. 286 (1993)).

The Court addresses these arguments as follows: first, the Court holds that the broader fee-shifting provision governing Sections 9 and 18 of the Exchange Act is not incorporated by analogy into the implied right-of-action under Section 10(b). As to the remaining fee-shifting provisions provided for by statute, the Court finds that material distinctions between these narrower provisions and the broader fee-shifting provisions at issue in *Dague* and its progeny require the conclusion that, even if *Dague* were to operate to limit a court's discretion in awarding fees pursuant to a common fund, such limitation would not apply here.

### 1. Binding Second Circuit Authority Requires the Conclusion that the Fee-shifting Provisions in Sections 9 and 18 of the Exchange Act Are Not Incorporated by Analogy into an Action Based on Section 10(b)

First, the Court addresses the Objector's argument that Section 10(b) includes, by analogy, the fee-shifting provisions explicitly provided for under Sections 9 and 18 of the Exchange Act (such that the claims in this case *are* governed by fee-shifting provisions

analogous to those in *Dague*).  As the Objector notes, the Supreme Court has, in the past, looked

to the express causes of action under Sections 9 and 18 of the Exchange Act to define the

contours of the implied cause-of-action under § 10(b).  *See Lampf*, 501 U.S. at 360–61 (looking

to Sections 9 and 18 to determine, by analogy, the statute of limitations for the implied cause-of-

action under § 10(b)); *Musick*, 508 U.S. at 294–97 (engaging in the same inquiry to find that the

implied cause-of-action under § 10(b) includes a right of contribution).  Relying on these cases,

the Objector argues that, because Sections 9 and 18 include a broad fee-shifting provision, *see* 15

U.S.C. § 78i(f) ("In any such suit the court may, in its discretion, require an undertaking for the

payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys'

fees, against either party litigant."), it follows that Congress, had it had occasion to consider the

question, would have intended for the implied cause-of-action to enforce § 10(b) to similarly

include such a provision, *see* Obj. Mem. at 6; *see also Key Tronic Corp.*, 511 U.S. at 815 ("The

absence of specific reference to attorney's fees is not dispositive if the statute otherwise evinces

an intent to provide for such fees.").

　　The Objector's argument is not without force.  Nevertheless, even were this Court inclined to

adopt the argument were it to assess it on a blank slate, binding Second Circuit authority

precludes such a holding.

　　First, in *Van Alen v. Dominick & Dominick, Inc.*, the Second Circuit rejected the precise

argument the Objector now makes – although without the benefit of *Lampf* or *Musick*.  560 F.2d

547 (2d Cir. 1977).  In *Van Alen*, the appellees also argued that, although "no statutory provision

permit[s] the award of attorneys' fees to a successful party in an action based on Section 10(b) of

the Securities Exchange Act of 1934, pursuant to which Rule 10b-5 was promulgated, . . .  such

fees should be allowed by analogy to the express allowance of attorneys' fees in connection with

the two statutorily authorized private rights of action under Sections 9(e) and 18(a) of the 1934 Act." *Id.* at 553. The Second Circuit rejected this argument. *Id.* The court noted that "the circumstances under which attorneys' fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine." *Id.* (quoting *Alyeska Pipeline Service Co.*, 421 U.S. at 262). In the panel's estimation, "Congress ha[d] been on notice that the courts would imply a private right of action under Rule 10b-5 at least since the early 1950s . . . [but] ha[d] not expressly authorized fee awards in such cases during the intervening years." *Id.* at 553-54 (internal citations omitted). Such history was "at least as consistent with the thesis that Congress did not intend to allow such awards as . . . with the thesis put forward by appellees." *Id.* at 554. The Circuit thus held that "in the absence of a clear expression of congressional intent, the district court properly denied appellees' motion for attorneys' fees." *Id.*

*Van Alen* predated *Lampf* and *Musick*. Nevertheless, in 1993, after both Supreme Court cases had been decided, the Second Circuit again affirmed that attorney's fees are not available in 10(b) actions. In *Cotton v. Slone*, the Second Circuit stated, although without analysis, that "although attorney's fees are not permitted in actions brought solely under section 10(b) of the Securities and Exchange Act, attorney's fees may be awarded on a pendent state law claim if the claim permits such an award and if the claimant has established the elements necessary for recovery on the pendent state law claim." 4 F.3d at 181; *see also Mazuma Holding Corp. v. Bethke*, 1 F. Supp. 3d 6, 19 (E.D.N.Y. 2014) (citing to *Cotton* for the same proposition). The *Cotton* panel did not cite *Van Alen*. *See Cotton*, 4 F.3d at 181. The holding in *Cotton* did reaffirm the Second Circuit's position that attorney's fees are not generally available in an action under Section 10(b).

27

The Objector does not deny this precedent. He instead argues that any decision by the Second Circuit holding that attorney's fees are not available in 10b-5 actions has been abrogated in the years since – *both* by provisions in the PSLRA, and by the holdings in both *Lampf* and *Musick*. The Court disagrees as to both counts.

### a. The PSLRA Does Not Abrogate *Van Alen* and *Cotton*

First, the Objector argues that the PSLRA contains a provision which "independently authorizes district courts to require bonds and to shift fees in any Exchange Act case that is certified as a class action," and thereby abrogates the holdings in *Van Alen* and *Cotton. See* Obj. Sur-reply at 2 (Dkt. No. 121) (citing 15 U.S.C. § 78u-4(a)(8)). Not so.

§ 78u-4(a)(8) of the PSLRA states as follows:

> **(8) Security for payment of costs in class actions**
> In any private action arising under this chapter that is certified as a class action pursuant to the Federal Rules of Civil Procedure, the court may require an undertaking from the attorneys for the plaintiff class, the plaintiff class, or both, or from the attorneys for the defendant, the defendant, or both, in such proportions and at such times as the court determines are just and equitable, for the payment of fees and expenses that *may be awarded under this subsection.*

> 15 U.S.C. § 78u-4 (emphasis added).

As Lead Counsel argued at the class action fairness hearing, the text of this provision merely authorizes securities for the payment of fees that may be awarded under the "subsection" in which it appears. *See* June 13, 2016 Tr. at 19-20. Under that subsection, the PSLRA lays out a presumption in favor of the award of attorneys' fees and costs for violation of Federal Rule of Civil Procedure 11. 15 U.S.C. § 78u-4(c)(3). Thus, the most reasonable meaning of the text is that a security may be set aside to ensure such a fee is available – so as to provide teeth to any such sanctions.

Even were the Court to ignore the limitation "under this subsection" included in the text and assume that the provision allows for a security to be set aside to pay *any* available fees, the

text would still not support the conclusion that attorney's fees are available under a 10b-5 suit. That is because, by its clear terms, the provision does not create any new substantive rights to attorney's fees; it simply provides a mechanism for a court to require a security to pay whatever attorney's fees may otherwise be available. Whether or not such fees *are* available, then, is in no way answered or addressed by the provision.

### b. *Lampf* and *Musick* Do Not Abrogate *Van Alen* and *Cotton*

Second, the Objector argues that the reasoning in *Lampf* and *Musick* implicitly abrogates the holding in *Van Alen*, such that that case's holding no longer binds this court. "[A]s a general rule," prior decisions by the Second Circuit bind subsequent panels of the circuit – as well as district courts. *Union of Needletrades, Indus. & Textile Employees, AFL-CIO, CLC v. U.S. I.N.S.*, 336 F.3d 200, 210 (2d Cir. 2003). However, there exists an exception to this rule when the prior decision's "rationale is overruled, implicitly or expressly, by the Supreme Court, or the Second Circuit court in banc." *In re S. African Apartheid Litig.,* 15 F. Supp. 3d 454, 460 (S.D.N.Y. 2014) (citing *World Wrestling Entm't Inc. v. Jakks Pac., Inc.,* 425 F. Supp. 2d 484, 499 (S.D.N.Y. 2006)) (internal quotation marks and alteration omitted). Such is not the case here.

First, although *Van Alen* was decided prior to *Lampf* and *Musick*, *Cotton* was decided after both of them. *Compare Cotton*, 4 F.3d at 176 (noting that the case was argued on June 4, 1993, and decided on September 10, 1993); *with Musick*, 508 U.S. at 286 (noting that the case was decided on June 1, 1993). *Cotton* did not address either *Lampf* or *Musick*, or revisit the analysis of *Van Alen*; nevertheless, neither of these Supreme Court cases is an intervening authority for purposes of the *Cotton* holding, an argument the Objector makes no attempt to confront. *See* Objector Sur-reply at 1.

In any event, even assuming *Lampf* and *Musick* did operate as intervening authority in this case, "it is insufficiently clear to this Court" that either case – neither of which addressed statutory fee-shifting provisions – may be read to "implicitly overrule" *Van Alen. World*

*Wrestling Entm't, Inc.*, 425 F. Supp. 2d at 500.  An analysis of the reasoning and holdings of these cases makes this conclusion evident.

In *Lampf*, the Supreme Court, faced with the question of how to determine the applicable statute of limitations for the implied cause-of-action under section 10(b), held that, "where . . . the claim asserted is one implied under a statute that also contains an express cause of action with its own time limitation, a court should look first to the statute of origin to ascertain the proper limitations period."  501 U.S. at 359.  The Court acknowledged the "state-borrowing doctrine," or the "usual rule that when Congress has failed to provide a statute of limitations for a federal cause of action," a court should look to the "local time limitation most analogous to the case at hand."  *Id.* at 355-56.  Nevertheless, faced with "the awkward task of discerning the limitations period that Congress intended courts to apply to a cause of action it really never knew existed," the Court determined that analogous provisions in the Exchange Act, namely Sections 9 and 18, provided a better source.  *Id.* at 359-60.  Significantly, the Supreme Court recognized that, notwithstanding ambiguity as to Congressional intent, "a [statute of limitations] period [had to be] selected," and noted that, although "[o]n rare occasions, th[e] Court ha[d] found it to be Congress' intent that no time limitation be imposed upon a federal cause of action," neither party took that position before the Court.  *Id.* at 356 & n.3.  Additionally, in holding that the statutes of limitation in Sections 9 and 18 should be incorporated into Section 10(b), the Court joined "every Court of Appeals" that had yet assessed the question.  *Id.* at 362.

In *Musick*, the Court faced the question of "whether a right to contribution is within the contours of the 10b-5 action."  508 U.S. at 294.  In engaging with the question, the Court acknowledged that, in the past, it had inquired whether particular statutes "expressly or by clear implication envisioned a contribution right to accompany the substantive damages right created, or, failing that, whether Congress intended courts to have the power to alter or supplement the remedies enacted."  *Id.* at 291 (internal quotation marks and citation omitted).  The Court noted that such investigation of Congressional intent, however, was of limited use in explicating a judicially-created right of action.  *See id.*  Thus, the Court turned to analogous provisions in the

Exchange Act – Sections 9 and 18 – and again determined that, because a right of contribution was included in both express causes of action, Congress would have intended such a right to exist in the context of 10(b). *See id.* at 295-96. Finally, the Court noted, as it had in *Lampf*, that its conclusion was "consistent with the rule adopted by the vast majority of Courts of Appeals and District Courts that have considered the question," a point "of particular importance because in the more than 20 years since a right to contribution was first recognized for 10b–5 defendants, neither the Securities and Exchange Commission nor the federal courts [had] suggested that the contribution right detracts from the effectiveness of the 10b–5 implied action or interferes with the effective operation of the securities laws." *Id.* at 297-98 (internal citations omitted).

There is no question that *Musick*, and to some extent *Lampf*, lend support to the Objector's position: that the analogy rejected in *Van Alen* has been rehabilitated by the Supreme Court. Nevertheless, and putting aside that *Cotton* post-dates these decisions – the cases do not clearly overturn binding Second Circuit precedent for several reasons. First, neither decision addressed the availability of attorney's fees, and thus neither had occasion to confront case-law suggesting, in the fee-shifting context, that Courts presume no such fees to be available absent clear Congressional intent. *See Key Tronic Corp.*, 511 U.S. at 814-15; *see also Van Alen*, 560 F.2d at 553 (relying on such case-law). In *Musick*, the Court did note that a search for clear intent by Congress to create a right of contribution would be futile in the context of a judicially created cause of action. 508 U.S. at 291; *see also id.* at 291-92 ("Having implied the underlying liability in the first place, to now disavow any authority to allocate it on the theory that Congress has not addressed the issue would be most unfair to those against whom damages are assessed."). Nevertheless, the presumption in favor of the American Rule is a significant one on which *Van Alen* relied, and nothing in *Musick* or *Lampf* directly confronts it.

Second, in both cases the Supreme Court pointed out that numerous courts had already interpreted the private right of action under § 10(b) to borrow its statute of limitations and right of contribution from Sections 9 and 18. *See Lampf*, 501 U.S. at 362; *Musick*, 508 U.S. at 297-98. In contrast, the Objector has pointed to no case that has held attorney's fees to be routinely

31

available under the 10b-5 private right of action.  The distinction is relevant under the reasoning in *Musick*: in that case, the Court, as noted, found the existence of extensive supporting precedent relevant because "in the more than 20 years since a right to contribution was first recognized for 10b–5 defendants, neither the Securities and Exchange Commission nor the federal courts [had] suggested that the contribution right detracts from the effectiveness of the 10b–5 implied action or interferes with the effective operation of the securities laws." *Id.* at 298 (internal citation omitted).  The *inverse* argument would apply here: despite courts not generally reading a fee-shifting provision into such actions, there is no indication that that absence has affected the viability or effectiveness of such suits.

In short, neither *Lampf* nor *Musick* directly addressed the issue here, and their reasoning is – if plainly not irrelevant – at least distinguishable.  In such a circumstance, the Court cannot ignore binding Second Circuit authority, some of which *post-dates* these decisions.  The Court thus concludes that the only fee-shifting provisions available in this case are the ones expressly provided for by statute, allowing for fees only when a court "believes the suit or the defense to have been without merit," 15 U.S.C. § 77k(e), or when the Court sanctions a party under Federal Rule of Civil Procedure 11, 15 U.S.C. § 78u-4(c).

## 2.  The Express Fee-Shifting Provisions Available in this Case Are Materially Distinct from those in *Dague* and its Progeny

As to those express fee-shifting provisions, the Court finds that material distinctions between such narrow provisions and the broad fee-shifting provisions in *Dague* and its progeny require the conclusion that, even if *Dague* could be read to apply in the common fund context, its presumption would not apply here.

In *Dague* and *Purdue*, as in *Pierce*, *Brytus*, and *Haggart*, courts assessed the award of fees pursuant to traditional fee-shifting statutes under which a prevailing plaintiff is generally entitled to a reasonable fee.  *See, e.g.*, *Dague*, 505 U.S. at 561-62 (noting that the statute at issue

32

provided for a fee to a "prevailing or substantially prevailing party" and was thus "similar to . . . many other federal fee-shifting statutes").

In contrast to these statutory fee-shifting provisions, the express fee-shifting provisions in this case are much narrower, allowing for fees only when a court "believes the suit or the defense to have been without merit," 15 U.S.C. § 77k(e), or when the Court sanctions a party under Federal Rule of Civil Procedure 11, 15 U.S.C. § 78u-4(c). Such provisions are materially distinct from those in *Dague* in two ways fatal to the Objector's argument. First, the fee provisions in the statutes in this case have distinct purposes from those in traditional fee-shifting statutes. *Cf. Suffolk*, 907 F.2d at 1327 (acknowledging that if "the operation of the equitable fund doctrine conflicts with an *intended purpose* of a relevant fee-shifting statute, the statute must control" (emphasis added)). Whereas the fee provisions at issue in *Dague* and its progeny arguably evince a Congressional intent to have defendants pay plaintiffs' counsel's fees,[6] the narrower provisions at issue here are designed to deter both parties from abusing the judicial process. *See, e.g.*, *W. Fed. Corp. v. Erickson*, 739 F.2d 1439, 1444 (9th Cir. 1984) (noting that fees under § 77k(e) are available only when a defense "borders on the frivolous or is brought in bad faith"). Such a distinction is significant, given that courts that have extended the *Dague* presumption to the hybrid fee context (where a reasonable fee has already been paid pursuant to statute) have cited the Congressional purpose in having defendants pay counsel's fee as one argument in favor of expanding the scope of the *Dague* holding. *See Haggart*, 809 F.3d at 1357

---

[6] The Court notes that, as *Florin* and *Staton* explained, application of the common fund doctrine is not plainly inconsistent with this purpose, and further, as the *Suffolk* court itself observed, application of that doctrine is consistent with the core purpose of fee-shifting statutes – to encourage the prosecution of certain classes of cases notwithstanding the plaintiff's inability to pay. *See Suffolk*, 907 F.2d at 1327; *Staton*, 327 F.3d at 968; *Florin*, 34 F.3d at 564. Nevertheless, the point the Court makes here is: even assuming, *arguendo*, that application of the common fund doctrine could conflict with the purpose of some fee-shifting statutes to have defendants bear the costs of litigation (a point that is more persuasive, in any case, when defendants have *already* paid a fee pursuant to a fee-shifting statute as in hybrid cases such as *Pierce*), such argument would be inapplicable in the present case.

("Under the URA, it is the Government, as opposed to class counsel or another member of the plaintiff class, who bears the reasonable cost of the action.").

Second, and relatedly, the Objector's normative arguments, although not without force in the context of the fee-shifting statute at issue in *Dague*, have no purchase in the context of the limited fee provisions at issue here. The Objector's primary argument in this case is that "[t]o award Lead Counsel a larger fee than they could recover after proving defendants liable produces perverse incentives and places their interests in conflict with interests of the class they are supposed to represent." Obj. Mem. at 2; *see also id.* at 7-8 ("The fact that all claims in this case are subject to a fee-shifting regime should preclude Lead Counsel from seeking attorneys' fees under a percentage of fund methodology that produces a significantly higher fee award than they could obtain by proving the claims and seeking an award of fees from defendants found liable by a trier of fact."). Such an argument makes little sense when applied to fee-shifting provisions that allow for fees from either party to be paid only in the rarest of circumstances. In such a case, the availability of such fees is unlikely to affect counsel's incentives. Indeed, the Objector makes no attempt to argue that, *in this case*, counsel would have been reasonable in assuming there was *any* possibility that fees could be recovered under any of these provisions, and the Court sees no basis to make such a conclusion.[7]

---

[7] Lead Counsel represents, in a declaration in support of approval of the settlement, that the Defendants "raised numerous compelling arguments in their motions to dismiss and would have repeated these arguments at summary judgment and trial," Ross Decl. ¶ 51, and indeed the Court acknowledged that some of these arguments might present impediments to a Plaintiffs' judgment in resolving the Defendants' motion to dismiss, *see* Mar. 31, 2015 Order at 24 (noting, *inter alia*, that the timing of the Government's communication with BioScrip "may cast doubt on whether the statements or omissions [addressing BioScrip's legal compliance] were truly misleading"). The Court agrees with Lead Counsel's representation, and sees no basis to assume that in this case Lead Counsel could reasonably have anticipated recovering attorney's fees under the narrow provisions available in the Securities and Exchange Acts claims.

In sum, there is simply no statutory *or* equitable argument why the existence of the fee-shifting provisions at issue in this case could or should in any way affect the award of fees from the common fund.[8] Even if the fee-shifting statutes in *Dague* and its progeny could be read to implicitly impose such a restriction, that restriction would not extend beyond the fee-shifting provisions at issue in those cases. *Cf. Staton*, 327 F.3d at 968 ("[U]nless Congress has forbidden the application of the common fund doctrine in cases in which attorneys could potentially recover fees *under the type of fee-shifting statutes at issue here*, the courts retain their equitable power to award common fund attorneys' fees." (emphasis added)).

## IV. The Fee Request

Having found that the Court has the discretion to approve the requested fee award, the Court must now determine whether or not, in its discretion, the award is reasonable. For the following reasons, the Court concludes that the request is reasonable, and approves it in full.

In awarding fees from a common fund created after a settlement, "both the lodestar and the percentage of the fund methods are available to district judges in calculating attorneys' fees" *Goldberger,* 209 F.3d at 50; *see also McDaniel,* 595 F.3d at 417. Although both methods are available, however, "'the trend in this Circuit has been toward the use of a percentage of recovery as the preferred method of calculating the award for class counsel in common fund cases,' particularly in complex securities class actions." *Athale v. Sinotech Energy Ltd.*, 11 Civ. 05831 (AJN), 2013 WL 11310686, at *7 (S.D.N.Y. Sept. 4, 2013) (quoting *In re Beacon Assocs. Litig.,* No. 09 Civ. 777(CM), 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013)); *see also Wal-Mart Stores, Inc.,* 396 F.3d at 121 ("The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." (internal quotation marks and

---

[8] The Court observes that the Objector did not argue, more generally, that the *Dague* and *Perdue* presumptions govern any award of fees from a common fund, regardless of whether a fee-shifting provision otherwise exists.

citation omitted)).  Regardless of which method the court selects, a district court has considerable discretion to award a fee reflecting a lodestar enhancement designed to compensate attorneys for, *inter alia*, "the risk of the litigation and the performance of the attorneys." *Goldberger*, 209 F.3d at 47.

Even when applying the percentage method to calculate a reasonable attorney's fee, the lodestar is not "irrelevant." *In re Citigroup Inc.*, 965 F. Supp. 2d 369, 388 (S.D.N.Y. 2013).  The Second Circuit has endorsed the use of the lodestar as a "'cross-check' on the reasonableness of the requested percentage." *Goldberger*, 209 F.3d at 50 (quoting *In re General Motors Corp. Pick-up Truck Fuel Tank Prod. Liability Litig.*, 55 F.3d 768, 820 (3d Cir. 1995)).  A district court relying on the cross-check approach need not "exhaustively scrutinize[]" "the hours documented by counsel." *Id.*  Nonetheless, the approach can help affirm that the requested percentage is not, given the circumstances, excessive.

Finally, "[n]o matter which method is chosen, district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: '(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.' " *Wells Fargo Bank, N.A. v. ESM Fund I, LP*, No. 10 Civ. 7332 (AJN), 2013 WL 2395615, at *1 (May 31, 2013) (citing *Goldberger*, 209 F.3d at 50).  Ultimately, the "[d]etermination of 'reasonableness' is within the discretion of the district court." *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527(DLC), 2004 WL 2397190, at * 10 (S.D.N.Y. Oct. 26, 2004) (quoting *Goldberger*, 209 F.3d at 47).

The Court agrees that the percentage-of-the-fund method is appropriate in this case as a starting point to calculate a reasonable attorney's fee.  *See Sinotech Energy Ltd.*, 2013 WL 11310686, at *7–8.  Applying that methodology, and for the following reasons, the Court approves the award.

### a. 25% Is a Reasonable Percentage of the Common Fund in Light of Comparable Awards

First, Lead Counsel's request in this case, 25 percent of a $10,900,000 common fund, "falls within the range of percentages regularly awarded in" analogous common fund cases. *See Sinotech Energy Ltd.*, 2013 WL 11310686, at *8 (noting that 25% of the common fund is reasonable in a securities class action, but reducing this percentage on the basis that, applying the lodestar cross-check, the award would amount to a lodestar multiplier of 7.04); *see also, e.g.*, *Hayes*, 2011 WL 6019219, at *1 (approving a fee in the amount of one third of a $9 settlement fund); *Hicks v. Stanley*, No. 01 CIV. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) (holding that 30% of a $10,000,000 fund was reasonable, on the basis that a "30% fee is consistent with fees awarded in comparable class action settlements in the Second Circuit"); *see also id.* ("As the size of the settlement fund increases, the percentage of the fund awarded as fees often decreases so as to prevent a windfall to plaintiffs' attorneys. A settlement amount of $10 million does not raise the windfall issue in the same way as would a $100 million settlement, and a 30% fee does not produce such a windfall." (internal citation omitted)); *id.* (collecting cases for the proposition that courts routinely award a percentage amounting to approximately 1/3 of a 10 million dollar settlement); Pl. Mem. at 6-7 (collecting numerous additional examples). Indeed, the Second Circuit regularly affirms similarly sized awards. *See, e.g.*, *Hayes*, 509 F. App'x at 23–24; *see also id.* (noting that "*Goldberger* [recognizes] that '[w]hat constitutes a reasonable fee is properly committed to the sound discretion of the district court,'" and further noting that "the prospect of a percentage fee award from a common settlement fund, as here, aligns the interests of class counsel with those of the class" (quoting *Goldberger*, 209 F.3d at 47)).

### b. The Lodestar Cross-Check Supports the Requested Award

Applying the lodestar cross-check underscores and affirms the reasonableness of the requested percentage. There is no question that Lead Counsel's lodestar multiplier of 1.39 is at the lower range of comparable awards in common fund cases. *See Sinotech Energy Ltd.*, 2013

WL 11310686, at *8 (collecting examples of courts awarding lodestar multipliers of "between four and five"); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 590 (S.D.N.Y. 2008) ("[L]odestar multiples of over 4 are routinely awarded."); *Maley v. Del Global Techs. Corp.* 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (noting that multiplier of 4.65 was "well within the range awarded by courts in this Circuit and courts throughout the country"); *see also Wal-Mart Stores, Inc.*, 396 F.3d at 123 (noting that, although in a megafund case, the lodestar multiplier of 3.5 "ha[d] been deemed reasonable under analogous circumstances"); Pl. Mem. at 9-10 & n.8 (collecting numerous cases). This multiplier is especially reasonable given the fact that the lodestar does not reflect any work Lead Counsel has done since December 18, 2015 or will do subsequent to the date of the publication of this order. Ross Decl. ¶ 90; *cf. In re Facebook, Inc. IPO Sec. & Derivative Litig.*, MDL No. 12-2389, 2015 WL 6971424, at *10 (S.D.N.Y. Nov. 9, 2015), *aff'd sub nom. In re Facebook, Inc.*, 674 F. App'x 37 (2d Cir. 2016) (summary order) (finding, in awarding a fee of 33% of a $26.5 million settlement fund, amounting to a lodestar multiplier of 1.02, that the fact that "the work in [the] matter [was] not yet concluded for [p]laintiffs' counsel who will necessarily need to oversee the claims process, respond to inquiries, and assist Class Members in submitting their Proof of Claims" supported the reasonableness of the award). Indeed, although the Objector argues that a presumption against any multiplier applies in this case, counsel for the Objector acknowledged at the Fairness Hearing that, in the context of a common fund award, a multiplier of 1.39 or 1.4 is "not a huge multiplier as multipliers go." June 13, 2016 Tr. at 31.

### c. The *Goldberger* Factors Further Support the Requested Award

Applying the *Goldberger* factors further affirms the reasonableness of counsel's requested fee award. *See* 209 F.3d at 50 (listing the factors as "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations" (internal quotation marks and alteration omitted)). The Court observes, as

an initial matter, that the facts cited as follows are merely examples to support the Court's ultimate factual conclusions as to these factors: the Court relies on the record as a whole to support its findings, and has not cited every relevant fact here.

### 1. The Time and Labor Expended by Counsel

First, there is no question that Lead Counsel expended significant time and labor in this case. As Lead Counsel points out, the relatively low lodestar multiplier underscores the fact that counsel expended almost 4,000 hours of time over a course of two years without receiving any compensation or guarantee of compensation. *See* Pl. Mem. at 2. That work included conducting an extensive investigation of the allegedly fraudulent misrepresentations and omissions in order to draft the consolidated class action complaint (an investigation that included reviewing numerous documents, conducting 72 interviews, and consulting with experts); drafting numerous legal memoranda, including responses to two motions to dismiss by two sets of Defendants and a motion for reconsideration; engaging in extensive discovery after the Court denied in part those motions – including the review of approximately 800,000 pages of documents; and negotiating a settlement over several months with Defendants. *See generally* Ross Decl. This was not a case where, after the filing of the Consolidated Class Action complaint, the parties immediately turned to settlement discussions. *See Cassese v. Williams*, 503 F. App'x 55, 59 (2d Cir. 2012) (summary order) (quoting the district court as noting that the case before it was not "the average class action where there is a complaint served, a few things occur, and then there is a settlement"). It was a hard-fought, complicated case, requiring extensive work on the part of Lead Counsel.

### 2. The Magnitude and Complexities of the Litigation

Second, and for similar reasons, the Court finds that this case was an unusually complex securities class action. Courts in this circuit have noted, in the past, that "[s]ecurities class actions are generally complex and expensive to prosecute." *In re Flag Telecom Holdings, Ltd.*

*Sec. Litig.*, No. 02-CV-3400 (CM), 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010) (internal quotation marks omitted).   That is so, but in this case several complex legal and factual questions, many of which came to the forefront in Defendants' motions to dismiss, *see generally* Mar. 31, 2015 Order, rendered the litigation particularly complicated, and those issues continued to divide the parties throughout the settlement discussions, *see* Ross Decl. ¶ 46.   Further, the case required briefing a shifting legal landscape: the Supreme Court issued its decision in *Omnicare Inc. v. Laborers Dist. Counc. Constr. Ind. Pension Fund*, 135 S. Ct. 1318 (2015), on March 24, 2015, altering the standard governing when an opinion statement may be found misleading in certain Securities actions and requiring supplemental briefing by the parties.  *See* Dkt. Nos. 63-66.

### 3.  The Risk of the Litigation

Third, the risk of the litigation undoubtedly supports Lead Counsel's requested fee. Courts consistently assess the risk involved in litigation when assessing the reasonableness of an award.  *See, e.g.*, *Sinotech Energy Ltd.*, 2013 WL 11310686, at *5-6.  In particular, they address three categories of risk: (1) risks inherent in the litigation itself (i.e. hurdles to successfully establishing liability); (2) risks that the defendant may be unable to pay any ultimate award (i.e. risks of recovery); and (3) contingency fee risks (i.e. the specific risk that Lead Counsel will not be compensated at all for its work).  *See In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004) (Lynch, J.) ("From the outset . . . , this case presented significant litigation, collectability, and contingency risks."); *see also McDaniel*, 595 F.3d at 424–25 (noting that a district court's determination that a case was "an ordinary civil rights case in which liability appear[ed] reasonably certain" was not clearly erroneous); *Sinotech Energy Ltd.*, 2013 WL 11310686, at *9 (noting that the facts that the case presented "a number of risks of litigation and recovery . . . and counsel was working on a contingent fee basis" weighed in favor "of a substantial award").  "It is well-established that litigation risk must be measured as of when the case is filed." *Goldberger*, 209 F.3d at 55.

The Court concludes that this case presented significant risks across all three categories:
litigation, recovery, and contingency. First, in an attached declaration, Lead Counsel
persuasively describes numerous factual and legal issues that presented challenges to any
ultimate finding of liability. *See* Ross Decl. ¶¶ 49-60; *see also* June 13, 2016 Tr. at 6-8; Mar. 31,
2015 Order (granting in part and denying in part the Defendants' motions to dismiss). Without
exhaustively detailing these factual and legal challenges, the Court cites, by way of example, the
parties' disagreement as to the significance of the Government's civil investigative demand
("CID"), served on BioScrip in October 2012. *See* Mar. 31, 2015 Order at 6. As noted,
Plaintiffs asserted in the Complaint that a series of statements made by the Defendants misled the
public as to whether BioScrip was under investigation for participating in an alleged kickback
scheme with Novartis, and as to BioScrip's internal beliefs as to its own legal compliance. Much
of Plaintiffs' theory of the case turned on the allegation that a CID the Government served on
BioScrip in October 2012 put BioScrip on notice that it was or might become the target of a
Government investigation into the alleged kickback scheme, and that its own conduct had not
been in compliance with relevant laws. *See* Mar. 31, 2015 Order at 14-29 (discussing this
theory). As Lead Counsel noted at the Fairness Hearing, BioScrip, in turn, consistently
maintained that the CID "was a standard subpoena and that that investigative demand did not in
any way inform defendants that they were themselves being investigated for any type of
kickback scheme." June 13, 2016 Tr. at 6. Instead, Defendants maintained that BioScrip did not
believe itself to be a target until it received that information explicitly – only days before
BioScrip alerted the public of the existence of the investigation. *See* Memorandum of Law in
Support [of] The Bioscrip Defendants' Motion to Dismiss the Consolidated Amended Complaint
at 3 (Dkt. No. 42) ("In October 2012, BioScrip received a [CID] – the equivalent of a third-party
subpoena . . . . [and] fully cooperated with the government by producing documents and
testimony for nearly a year. It was only in September 2013 that the Department of Justice . . .
first notified BioScrip that it was contemplating bringing anti-kickback claims against BioScrip
itself, in addition to Novartis."). As the Court explained in denying BioScrip's motion to dismiss

claims brought under this factual theory, the Stipulation of Settlement signed by BioScrip and

the Government on January 8, 2014 stated that it was only on "September 11, 2013 [that] the

United states (sic) first notified BioScrip that the United States was contemplating civil claims

against BioScrip . . . ." Mar. 31, 2015 Order at 24 (internal quotation marks omitted).  Because

the date of this notification was "after the last of BioScrip's statements identified by Plaintiffs as

being misleading," the Court, although citing its obligation to take as true all facts asserted in the

Complaint on a motion to dismiss, observed that the statement "may cast doubt on whether the

statements or omissions were truly misleading in light of the fact that BioScrip had not yet been

told that the United States was contemplating civil changes." *Id.* (emphasis omitted).  Going

further, the Court noted that "[t]he meaning and import of this statement may very well seriously

undermine Plaintiffs' plausible allegations about the information conveyed by the CID." *Id.*

Additionally, to persist with the same example, BioScrip's statements as to its own

beliefs about its legal compliance, as opinion statements, were initially governed by the standard

articulated by the Second Circuit in *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011)

(holding that an opinion statement is actionable as securities fraud "to the extent that the

statement was both objectively false and disbelieved by the defendant at the time it was

expressed"); *see also* Mar. 31, 2015 Order at 18-19.  During the pendency of this litigation, the

Supreme Court arguably altered the standard for liability on such statements in a way that made

it somewhat easier for Plaintiffs to establish liability.  *See* Mar. 31, 2015 Order at 20 ('To the

extent *Fait* has been construed to mean that there is liability for legal compliance opinions only

in the context of statements subjectively disbelieved when made, but not in instances where a

speaker's statement, although sincerely believed, failed to make clear the factual basis for that

statement, *Omnicare* may call that interpretation into question.").  Yet, at the time the first

complaint in this case was filed (as well as at the time the Consolidated Class Action Complaint

was filed by Lead Counsel), *Omnicare* was not yet the law – and the risks associated with the

*Fait* standard instead governed.  *See Goldberger*, 209 F.3d at 55 ("It is well-established that

litigation risk must be measured as of when the case is filed.").  In sum, then, as to the claims

arising out of BioScrip's statements concerning its legal compliance, Lead Counsel faced a key factual hurdle – the challenge of building a case on the CID – as well as a significant (if inter-related) legal one.

The Objector argues that Lead Counsel's arguments as to the factual and legal risks in the case (including, but not limited to, the examples cited above), amount to the argument that "Lead Counsel should be specially rewarded for pleading claims that may not be meritorious." Obj. Mem. at 18. Such a statement misconstrues the nature of the Court's inquiry. It is true that, in measuring the risks associated with litigation, the Court would not enhance a lodestar on the basis that Lead Counsel pursued frivolous claims. But the risk analysis asks something else: whether certain claims and cases, although potentially meritorious, might face factual and legal hurdles that create a material risk that the case may fail. It is surely in the interest of public policy that such claims – which indeed *may* be meritorious, measured at the outset, even if they are not ultimately successful – are brought – and the risk analysis is designed to compensate Lead Counsel for accepting such representation. Indeed, case-law clearly establishes that such risk is a relevant factor in the Court's analysis. *See, e.g.*, *McDaniel*, 595 F.3d at 424 (2d Cir. 2010) (noting that a district court's determination that a case was "an ordinary civil rights case in which liability appear[ed] reasonably certain" was not clearly erroneous); *Goldberger*, 209 F.3d at 53 (finding that a district court did not abuse its discretion in concluding that "from counsel's perspective, this was a 'promising' case, with almost certain prospects of a large recovery from solvent defendants").

The Objector also argues that certain risks in the case pertaining to challenges proving scienter and loss causation should not be factored into the Court's analysis, as neither scienter nor loss causation are elements of the Securities Act claims brought by claimants such as the Trust. Obj. Mem. at 19. The Objector cites no case-law suggesting that the Court should, or *must*, assess risk on a claim by claim basis in the context of awarding a fee from a fund created after collective settlement of a number of securities claims. In any case, however, many of the material risks in this case, including those associated with the CID, extended to all of the claims:

43

The Court noted in its March 31, 2015 order, in addressing the element of scienter under the Exchange Act claims relating to BioScrip's statements of legal compliance, that the "question of scienter largely turn[ed]" on the same issues relevant to whether the opinion statements were misleading. Mar. 31, 2015 Order at 26. The Court further noted, in analyzing the Securities Act claims, that "[t]he test for whether a statement is materially misleading under § 12(a)(2) is identical to that under § 10(b) and § 11: whether representations, viewed as a whole, would have misled a reasonable investor. " *Id.* at 44 (quoting *Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004)). In other words, the challenges associated with proving the legal compliance statements were misleading apply to both Securities Act and Exchange Act claims – and the Court sees no reason to hold that the former claims were subject to a materially lesser degree of risk.

In addition to litigation risk, this case also presented recovery risk and contingency risk. As to recovery risk, evidence in the case – including from the January 2014 settlement agreement between BioScrip and the Government – raised doubts as to whether BioScrip would be able to withstand a large financial judgment. *See* Ross Decl., Ex. 2, at 2 (noting that, "in connection with its discussions with the United States, BioScrip has submitted records and information regarding its financial circumstances, and has demonstrated to the United States that BioScrip lacks the financial wherewithal to pay certain damages and penalties sought by the United States in connection with its claims against BioScrip"); *see also* Ross Decl. ¶¶ 61-65 (describing in detail shortcomings in the Defendants' ability to pay the full value of a judgment against them). As to contingency risk, Lead Counsel in this case worked for two years without compensation on a contingency fee basis, and in that time billed almost 4,000 hours without a guarantee of recovery. *See* June 13, 2016 Tr. at 14. As courts have noted, this arrangement weighs in favor of a large award here. *In re Glob. Crossing Sec.,* 225 F.R.D. at 467 ("Securities Lead Counsel pursued this case intensely for over two years on an entirely contingent basis. The contingent nature of Securities Lead Counsel's representation is a key factor in determining a reasonable award of attorneys' fees.").

Finally, the Court makes two additional points about the risk in this case. First, the Court concludes that the risks associated with this litigation did not simply emerge when the Defendants filed their motions to dismiss: they were predictable from the outset. Thus, Lead Counsel would reasonably have been aware, in accepting this representation, that it could be involved in protracted motion practice for years prior to receiving any fee. Second, the Court notes that it is aware that the Second Circuit has, in the past, expressed some doubt that securities class actions are, on the whole, risky. *See Goldberger*, 209 F.3d at 52 (relying on a pre-PSLRA article for the proposition that such risk rarely exists (citing Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions*, 43 Stan. L. Rev. 497, 578 (1991)). Regardless of whether or not such litigation is, as a *general* matter, risky, the Court concludes that the risks in *this case* weigh in favor of approving the award.

### 4. The Quality of the Representation, The Requested Fee in Relation to the Settlement, and Public Policy Considerations

The remaining *Goldberger* factors similarly weigh in favor of approving the award. As to quality of representation, the Court finds that Lead Counsel's work was consistently of a high quality – in its motion practice, in its appearances before the Court, and in attaining a fair and reasonable settlement. This finding is further buttressed by two relevant factors. First, opposing counsel in this case was itself highly skilled, a factor courts have considered in approving fees. *See In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695(CM), 2007 WL 4115808, at *7 (S.D.N.Y. Nov. 7, 2007) ("Defendants were represented by a well-staffed team of lawyers from the New York office of Gibson, Dunn & Crutcher, LLP, one of the country's largest law firms, who tenaciously challenged Plaintiffs at every stage of the litigation up until the eve of trial. That Plaintiffs' Counsel was able to obtain a substantial settlement from these Defendants confirms the quality of Plaintiffs' Counsel's representation in this matter, and is a factor in determining the reasonableness of the fee request."); *accord In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 (LMM), 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16,

2006), *aff'd*, 272 F. App'x 9 (2d Cir. 2008) (summary order); *In re Glob. Crossing Sec.*, 225

F.R.D. at 467. Second, Lead Plaintiff, a governmental defined-benefit pension plan that

"manages billions of dollars of assets on behalf of its members," Kendig Decl. ¶ 3 (Ross Decl.,

Ex. 4), approved the fee request, and Donald Kendig, the Retirement Administrator for Lead

Plaintiff, represents that he reviewed "the work performed [by Lead Counsel], the recovery

obtained for the Settlement Class, and the risks of the Action" in reaching that determination, *id.*

¶ 7. The Second Circuit has indicated that this factor may be weighed by a court in determining

the reasonableness of the requested fee. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d

129, 133 (2d Cir. 2008) ("We expect . . . that district courts will give serious consideration to

negotiated fees because PSLRA lead plaintiffs often have a significant financial stake in the

settlement").

   As to the size of the requested fee in relation to the settlement, the Court finds that, in

relation to the settlement, 25% is a reasonable fee. As already noted, 25% – although perhaps on

the higher end of percentages awarded in all common fund cases – is reasonable in a case with

around a $10,000,000 settlement. *See Hicks*, 2005 WL 2757792, at *9. The Court is of course

aware that the Second Circuit has rejected any contention that 25% of a fund serve as a

"benchmark" for a common fund award. *Goldberger*, 209 F.3d at 51. The Court finds, on the

facts of *this* case, 25% to be reasonable.

   Finally, the Court finds that public policy favors the award. Courts have, as a generic

matter, frequently observed that "the public policy of vigorously enforcing the federal securities

laws must be considered" in calculating an award. *Maley*, 186 F. Supp. 2d at 373. Specifically

in this case, however, the Court finds that it is important to incentivize counsel to accept

representations that, as a result of complex factual and legal issues, are less likely to settle

immediately – and may instead present complex challenges and extensive motion practice.

Further, the Court observes that there are substantial public policy reasons to endorse the

percentage-of-the-fund method in this case – reasons that contradict the Objector's suggestion

that an award above the lodestar need create problematic incentives. *See supra* [pp numbers].

In short, comparing the requested fee to comparable awards in other cases, comparing the lodestar multiplier to comparable multipliers in such cases, and evaluating the *Goldberger* factors, the Court concludes that the request is reasonable.

### d. The Objector's Remaining Contentions

In addition to those arguments addressed above, the Objector makes two primary contentions as to why the Court, even applying common fund principles, should limit Lead Counsel's fee to the lodestar. Neither argument alters the Court's conclusion.

First, the Objector argues that Lead Counsel should receive only the lodestar because Lead Counsel benefitted from the work of the law firm that filed the first complaint in this case, Pomerantz Grossman Hufford Dahlstrom & Gross LLP. *See* Dkt. No. 1. While the Second Circuit has held, in the past, that a district court did not abuse its discretion in reducing a fee on the basis of "advance spadework that assisted counsel in their suit," no such reduction is warranted here for several reasons. *McDaniel*, 595 F.3d at 423. First, the complaint in question was filed on September 30, 2013 – seven days after the purported truthful disclosure of the Government's investigation of the kickback scheme – and is a mere 18 pages long. *See* Dkt. No. 1. The complaint leaves out numerous facts later uncovered by Lead Counsel. *See* Pl. Reply at 11 (listing numerous facts and claims left out of the complaint that later appeared in the complaint filed by Saxena White, and in the Consolidated Class Action Complaint). Although it is arguable that the complaint assisted both Saxena White, and Lead Counsel in their later efforts, there is simply no argument that this assistance was sufficiently material to affect this Court's evaluation of the reasonableness of the fee award. Additionally, even were the Court to conclude that this initial complaint were materially useful to Lead Counsel, the Court would still award the requested fee: the existence of the complaint in no way alters the fact that Lead Counsel conducted an extensive investigation, crafted the Consolidated Class Action Complaint, engaged in extensive briefing, and negotiated the settlement.

The Objector also argues that the Court should limit the award to the lodestar as Lead Counsel's high hourly rates already incorporate contingency risk. *See* Obj. Mem. at 14-21. The Court finds this argument unpersuasive for three reasons. First, the Objector largely (although not entirely) cites to rules articulated in the fee-shifting context for the proposition that "an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation." Obj. Mem. at 15 (citing *Purdue*, 559 U.S. at 553; *Dague*, 505 U.S. at 562-63). As noted, *Purdue* and *Dague* apply in the fee-shifting context and hold that factors like the complexity of a case and the quality of a counsel's performance may not be used to an enhance a lodestar. *See Purdue*, 559 U.S. at 553; *Dague*, 505 U.S. at 562-63. In the common fund context, such factors may result in an enhancement.

Second, Lead Counsel's rates do not appear to clearly reflect contingency risk. BLB&G charges a partner rate of between $700 and $975 and an associate rate of between $450 and $550, and Saxena White charges a partner rate of $750 and associate rate of between $345 and $385 dollars. *See* Ross Decl., Ex. 5. Lead Counsel points out that other firms charge rates for contingent and non-contingent matters that equal or exceed these numbers. *See, e.g.*, *In re Credit Default Swaps Antitrust Litig.*, No. 13MD2476 (DLC), 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (granting a fee award amounting to a lodestar multiplier of six, in a case where a successful, international law firm cited partner rates of $834 to $1,125 and associate rates of $411 to $714, *see* Dkt. No. 120, Ex. 2); *see also* Pl. Reply at 13-14 (collecting cases and examples). In any case, even were the Court to conclude that the rates reflected contingency risk – or that the rates were, for other reasons, higher than reasonable – the effect would simply be to render the lodestar multiplier of 1.39 artificially low. Even were the true multiplier higher (say, 2.5), it would still be well within the reasonable range of similar awards, and the Court would still approve the fee request.

In short, the Court finds that the requested attorney's fee award is reasonable, and that the Objector's counter-arguments to that determination are unconvincing.

## IV.    Conclusion

In conclusion, the Court grants Lead Counsel's requested attorney's fee.  The Court also grants Lead Counsel's request for litigation expenses and costs and expenses incurred by the Court-appointed Plaintiff.


SO ORDERED.


Dated: July _____ 2017
       New York, New York

_____
ALISON J. NATHAN
United States District Judge

49